

# DECLARATION

## Case No. : 20-08049 (AST)

Desiree Kelley, certifies and declares as follows:

1. I am over the age of 18 years and not a party to this action.

2. My business address is 14800 Frye Road, Fort Worth, Texas 76155.

3. I am a  Transactions Specialist III  and Custodian of Records for JPMorgan Chase Bank, N.A. (hereinafter referred to as the "Bank") in the National Subpoena Processing Department located in Fort Worth, Texas.

4. Based on my knowledge of the Bank's business records practices and procedures, the enclosed records are a true and correct copy of the original documents kept by the Bank in the ordinary course of business.

5. Based on my knowledge of the Bank's business records practices and procedures, the records were made at or near the time of the occurrence of the matters set forth in the records by, or from information transmitted by a person with knowledge of those matters.

6. It is the regular practice of the Bank to make such a record of transactions in the ordinary course of business.

I declare under penalty of perjury, under the laws of the State of Texas, that the foregoing is true and correct.

Dated: 9/14/2021

By: _Desiree Kelley_
Desiree Kelley
Transactions Specialist III
JPMORGAN CHASE BANK, N.A.

SB1259488-F1

SUBP52a



EHREN-NIKNIM CHASE 000002



EHREN-NIKNIM CHASE 000171

EHREN-NIKNIM CHASE 000172



NIKNIM MANAGEMENT INC.
27 KETTLEPOND RD
JERICHO, NY 11753-1157

9783

1-2/210

DATE July 6/17

PAY TO THE
ORDER OF    Cash —    $ 750/—

Seven hundred and fifty Dollars    DOLLARS

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO  Elizabeth. For 2 months

⑈⑈02100021⑈  76035  ⑈9783

ENDORSE HERE

DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTION USE

*FEDERAL RESERVE BOARD OF GOVERNORS REG. CC

EHREN-NIKNIM CHASE 000173

**NIKNIM MANAGEMENT INC.**
27 KETTLEPOND RD
JERICHO, NY 11753-1157

4691

1-2/210

DATE 6 / 19 / 17

PAY TO THE
ORDER OF   Catherine Brickell Music                    $ 390/—

three hundred and ninety dollars    DOLLARS

**CHASE ○**
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO Vocal lesson

⑈:0 2 10000 2 1⑈    76035    ⑈⑈4691

For Deposit Only - JPMC

EHREN-NIKNIM CHASE 000174





EHREN-NIKNIM CHASE 000176



EHREN-NIKNIN CHASE 000179



248

DEPOSIT TICKET

**NIKNIM MANAGEMENT INC.**
27 KETTLEPOND RD
JERICHO, NY 11753-1157

DATE ___02/3/12___
DEPOSITS MAY NOT BE AVAILABLE FOR IMMEDIATE WITHDRAWAL

SIGN HERE FOR CASH RECEIVED (IF REQUIRED) ✱

**CHASE** ⬤
JPMorgan Chase Bank, N.A.
www.Chase.com

☑ ☐ CASH ►

1-2/210

_____ ►      2465.04
_____ ►      368.81

TOTAL FROM
OTHER SIDE ►

SUB TOTAL ►

✱ LESS CASH
RECEIVED ►

$      2833.85

⑆580 20 10 28⑆      76035

EHREN-NIKNIM CHASE 000180



NIKNIM MANAGEMENT INC.
27 KETTLEPOND RD
JERICHO, NY 11753-1157

4688

3-2/210

DATE June 19 17

PAY TO THE
ORDER OF        Cash                        $ 1000 |—

One thousand    Dollars —        DOLLARS

CHASE ⬡
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO Kelly 600 (Ranju)

⑈021000021⑈    76035    ⑈4688

EHREN-NIKNIM CHASE 000183

**NIKNIM MANAGEMENT INC.**
27 KETTLEPOND RD
JERICHO, NY 11753-1157

5088

DATE _July / 18 / 17_

PAY TO THE
ORDER OF _Cash_ — $ 1160

_One Thousand one hundred and sixty_ DOLLARS

**CHASE**
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO _____    NP

⑆0210000210⑆    76035    ⑈5089

549447310336 152052    20170717 00000000076035
TRN_DEBIT    NREYESL    1160
Jackson Heights 0494    94004 5494 12 0195

EHREN-NIKNIM CHASE 000184



NIKNIM MANAGEMENT INC.
27 KETTLEPOND RD
JERICHO, NY 11753-1157

5090

2/210

DATE July /12/17

PAY TO THE ORDER OF   Dr Parisi                    $ 151.50

One hundred one Dollars one dollar and 50 cents  DOLLARS

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO  Doctor

⑆021000021⑆      76035      5090

582228554160 172529    20170717 00000000076035
TRN_DEBIT      IRESTRE        15150
Old Brookville 0822      94004 5822 4  0118

Mary S. Parisi, MD

**NIKNIM MANAGEMENT INC.**
27 KETTLEPOND RD
JERICHO, NY 11753-1157

5086

DATE July/12/17

PAY TO THE ORDER OF _Cash—_   $ 235/—

_Two hundred and thirty fee_   DOLLARS

**CHASE** ⬡
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO _Sabn_

⑆0210000210⑆   76035   ⑈5086⑈

TD Mobile Deposit
7/18/2017 7:24:03 AM

EHREN-NIKNIM CHASE 000186



253

NIKNIM MANAGEMENT INC.
27 KETTLEPOND RD
JERICHO, NY 11753-1157

5087

1-7/210

DATE July 17 17

PAY TO THE
ORDER OF    TemPco    $ 1466/44

One thousand and Four Hundred Sixty-six 44/cents DOLLARS

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO  Air conditioner

⑆021000021⑆    76035    ⑆5087

FOR DEPOSIT ONLY
TEMPCO, INC.
89482277

EHREN-NIKNIM CHASE 000187

254



NIKNIM MANAGEMENT INC.
27 KETTLEPOND RD
JERICHO, NY 11753-1157

5088
1-2/210

DATE 07/21/17

PAY TO THE
ORDER OF        Cash                        $ 300/-

Three Thousand                    00/100        DOLLARS

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO

⑆0210000211⑆        76035        ⑈5088

EHREN-NIKNIM CHASE 000188





For Deposit Only - JPMC

EHREN-NIKNIM CHASE 000189



**NIKIM MANAGEMENT INC.**
27 KETTLEPOND RD.
CHO, NY 11753-1157

⑆580 20 10 28⑆     7603⑆



*charles* SCHWAB

211 Main Street, San Francisco, CA 94105

Bank of America
Commercial Disbursement Account
Northbrook, IL

No 6916671

70-2328
0719

Date: 07/19/2017

Pay:
***THREE DOLLARS THIRTY CENTS***

To The Order Of:
A WALIA & Y VIRK TTEE
JANAMINDER VIRK IRREVOCABLE TR

PAY          $3.30

Present For Payment Within 180 Days

⑈6916671⑈ ⑆071923⑆ 87651⑈01104⑈

04234412

JPMorganChase Bank 072603 003845 931656

DST 00000275  CHK89774-00

EHREN-NIKNIM CHASE 000195

1002

**NIKNIM MANAGEMENT INC.**
27 KETTLEPOND RD.
JERICHO, NY 11753-1157

1-2/210

DATE 07/30/12

PAY TO THE ORDER OF __Cash._____ | $ 1360

One Thousand Three Hundred Sixty —— 00/100 DOLLARS

**CHASE**
JPMorgan Chase Bank, N.A.
www.Chase.com

FOR _____

⑈00100 2⑈ ⑇02 10000 2 1⑈    760 35

EHREN-NIKNIM CHASE 000196





# EXHIBIT 7

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------

|  |  |
|---|---|
| In re: | :   Chapter 11 |
| | : |
| ORION HEALTHCORP, INC[1]. | :   Case No. 18-71748 (AST) |
| | : |
| Debtors. | :   (Jointly Administered) |
| | : |
| HOWARD M. EHRENBERG IN HIS | : |
| CAPACITY AS LIQUIDATING TRUSTEE OF | :   Adv. Pro. No. 20-08049 (AST) |
| ORION HEALTHCORP, INC., ET AL., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| ARVIND WALIA; NIKNIM MANAGEMENT | : |
| INC., | : |
| | : |
| | : |
| Defendant. | : |

---------------------------------------

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS ARVIND WALIA AND NIKNIM MANAGEMENT INC.

The Court, having considered the *Motion for Summary Judgment, or in the Alternative*

*Summary Adjudication as Against Defendants Arvind Walia and Niknim Management Inc.*, ("the

---

1 The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Orion Healthcorp, Inc. (7246); Constellation Healthcare Technologies, Inc. (0135); NEMS Acquisition, LLC (7378); Northeast Medical Solutions, LLC (2703); NEMS West Virginia, LLC (unknown); Physicians Practice Plus Holdings, LLC (6100); Physicians Practice Plus, LLC (4122); Medical Billing Services, Inc. (2971); Rand Medical Billing, Inc. (7887); RMI Physician Services Corporation (7239); Western Skies Practice Management, Inc. (1904); Integrated Physician Solutions, Inc. (0543); NYNM Acquisition, LLC (unknown) Northstar FHA, LLC (unknown); Northstar First Health, LLC (unknown); Vachette Business Services, Ltd. (4672); Phoenix Health, LLC (0856); MDRX Medical Billing, LLC (5410); VEGA Medical Professionals, LLC (1055); Allegiance Consulting Associates, LLC (7291); Allegiance Billing & Consulting, LLC (7141); New York Network Management, LLC (7168). The corporate headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 203, Middletown, NJ 07748.

DOCS_LA:346907.1 65004/003

262

**Motion**") [Docket No. __] dated January __, 2023 of Plaintiff, Howard M. Ehrenberg in his capacity as Liquidating Trustee of Orion Healthcorp, Inc., *et al.*, (the "**Plaintiff**" or the "**Liquidating Trustee**") seeking entry of judgment against Defendants Arvind Walia and Niknim Management Inc. (the "**Defendant**"); the accompanying *Joint Statement Of Uncontroverted Facts; Plaintiff's Statement Of Additional Uncontroverted Facts In Support Of Motion For Summary Judgment* [Docket No. __]; *Affidavit Of Jeff Nolan In Support Of Plaintiff's Motion For Summary Judgment* [Docket No. __]; *Affidavit Of Edith Wong In Support Of Plaintiff's Motion For Summary Judgment* [Docket No. __]; *Request For Judicial Notice In Support Of Plaintiff's Motion For Summary* [Docket No. __]; and the Court having duly considered the argument of counsel at the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion and all pleadings filed by the Trustee in support of the Motion establish sufficient cause for the relief requested in the Motion; and after due deliberation thereon; and good and sufficient cause appearing therefor as stated on the record at the Hearing to Issue Ruling on Plaintiff's Motion [Docket No. __] (the "**Ruling Hearing**"); and upon sufficient cause appearing therefore;

      IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

      1.    The Motion is granted with respect to the Plaintiff's First Cause of Action to Avoid an Intentionally Fraudulent Transfer under 11 U.S.C. §§544 and 548(a)(1)(A) and N.Y. Debtor and Creditor Law §276 as stated in particular on the record at the Ruling Hearing.  The evidence indicates the $4,020,000.00 Transfer ("Transfer") was an interest of the Debtors in property made by the Debtors to Defendants with actual fraudulent intent to misstate the transactions and thereby place those funds beyond the reach of legitimate creditors of the Debtors.

2.    The Motion is granted with respect to the Plaintiff's Second Cause of Action to Avoid a Constructively Fraudulent Transfer under 11 U.S.C. §544 and N.Y. Debtor and Creditor Law §§272-275, and §273-a, as against Defendants, as the Transfers of $4,020,000.00 to Defendants was not made in good faith or for fair consideration to the Debtors as stated in particular on the record of the Ruling Hearing.

3.    Judgment is issued in favor of Plaintiff against Defendants *Arvind Walia and Niknim Management Inc*. jointly and individually, in the total amount of $4,020,000.00, plus post judgment interest in accordance with the federal rate.

4.    The Bankruptcy Court retains jurisdiction to enforce and implement the respective terms and provisions of this judgment and any request for fees or costs.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------

In re:                                          :    Chapter 11

ORION HEALTHCORP, INC.[1]                        :    Case No. 18-71748 (AST)

                              Debtors.           :    (Jointly Administered)

------------------------------------------------

HOWARD M. EHRENBERG IN HIS CAPACITY              :
AS LIQUIDATING TRUSTEE OF ORION                  :    Adv. Pro. No. 20-08049 (AST)
HEALTHCORP, INC., ET AL.,                        :
                                                 :    [Joint Statement of Uncontroverted
                              Plaintiff,          :    Facts and Additional Separate
                                                 :    Statement of Facts, Affidavits Jeffrey
v.                                               :    P. Nolan, Frank Lazzara and Request
                                                 :    For Judicial Notice Filed
ARVIND WALIA AND NIKNIM MANAGEMENT,              :    Concurrently Herewith]
INC.                                             :
                                                 :
                              Defendants.         :
                                                 :
                                                 :

------------------------------------------------

**AFFIDAVIT OF EDITH WONG IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT, OR IN THE
ALTERNATIVE, SUMMARY ADJUDICATION AS AGAINST
DEFENDANTS ARVIND WALIA AND NIKNIM MANAGEMENT, INC.**

STATE OF NEW JERSEY          )
                             )
COUNTY OF BERGEN             )

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Orion Healthcorp, Inc. (7246); Constellation Healthcare Technologies, Inc. (0135); NEMS Acquisition, LLC (7378); Northeast Medical Solutions, LLC (2703); NEMS West Virginia, LLC (unknown); Physicians Practice Plus Holdings, LLC (6100); Physicians Practice Plus, LLC (4122); Medical Billing Services, Inc. (2971); Rand Medical Billing, Inc. (7887); RMI Physician Services Corporation (7239); Western Skies Practice Management, Inc. (1904); Integrated Physician Solutions, Inc. (0543); NYNM Acquisition, LLC (unknown) Northstar FHA, LLC (unknown); Northstar First Health, LLC (unknown); Vachette Business Services, Ltd. (4672); Phoenix Health, LLC (0856); MDRX Medical Billing, LLC (5410); VEGA Medical Professionals, LLC (1055); Allegiance Consulting Associates, LLC (7291); Allegiance Billing & Consulting, LLC (7141); New York Network Management, LLC (7168). The corporate headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 303, Middletown, NJ 07748.

Edith Wong, being duly sworn, deposes and says:

1.      I am a Managing Director within the Forensic and Litigation Consulting group at FTI Consulting ("FTI") and a Certified Public Accountant ("CPA") in the state of New York.  I have more than 16 years of experience in forensic accounting investigations.  The facts stated herein are of my own personal knowledge.  If called upon as a witness to any facts set forth herein, I could and would competently testify thereto.

2.      I make this Affidavit in support of the accompanying *Motion For Summary Judgment, or in the Alternative Summary Adjudication, Against Defendants Arvind Walia and Niknim Management, Inc.* (the "Motion").[2]

3.      In September 2017, FTI was retained in connection with investigative and advisory services regarding Constellation Healthcare Technologies, Inc. ("CHT").  I was part of a team of FTI professionals (the "FTI Investigative Team") who, in conjunction with Debtors' counsel, conducted an investigation of the financial condition and business operations of CHT.  In connection with the investigation, the FTI Investigative team was granted access to the records of the Debtors including, bank statements, accounts payable, accounts receivables, vendor files, customer files, financial systems and email communications of the Debtors' employees.  I am familiar with the server which houses or maintains records within the Debtor's files in an electronic format having utilized it as part of my duties.  As such, I am personally familiar with the Debtors' book and records.

4.      Paul Parmjit Parmar, aka Paul Parmar, was the Chief Executive Officer of the Debtor, Constellation Healthcare Technologies, Inc., a consolidated enterprise which

---

[2] Capitalized terms not otherwise defined herein have the same meaning ascribed to them in the Motion.

operated in the healthcare sector primarily in revenue and practice management for physician practices.

5. The Debtor CHT maintained corporate bank accounts at M&T Bank. Attached to this Affidavit as **Exhibits A and B,** are true and correct copies of M&T Bank Statements for February 2016 and August 2016, respectively, of the Debtor CHT (Ex. A, Ehren-Walia 00138-140; 00147-148) as maintained and located within the business records of the Debtors. On February 19, 2016, $5,058,408.81, was transferred out of the Debtor CHT bank account (Ex. A, Ehren-Walia 00138) Again, On August 10, 2016, $12,740,000 was transferred out of the Debtor CHT bank account to the IOLA account. (Ex. B, Ehren-Walia 00147)

6. The Debtor Orion Healthcorp Inc. maintained corporate bank accounts one of which was at JP Morgan Chase Bank, N.A. Attached to this Affidavit as **Exhibit C,** is a true and correct copy of the March 2017, JP Morgan Chase Bank, N.A. bank statement of the Debtor Orion Healthcorp, Inc. with JP Morgan Chase Bank, N.A. as maintained and located within the business records of the Debtors. (Ex. C, Ehren-Walia 00149-154) On March 10, 2017, $5,590,000 was transferred out of the Debtor Orion bank account to the IOLA Account. (Ex. C, Ehren-Walia 00152)

7. Attached to this Affidavit as **Exhibit D** is a true and correct copy of an email chain from Paul Parmar dated December 1, 2014 (Ex. D, Ehren-Walia 005138-5140) as maintained and located within the business records of the Debtors.

8. Attached to this Affidavit as **Exhibit E** are true and correct copies of correspondence dated February 20, 2015 (Ehren-Walia 005141) as maintained and located within the business records of the Debtors.

9.    Attached to this Affidavit as **Exhibit F** is are true and correct copy of the Asset Purchase Agreement made and entered as of March [ ], 2015 (Ehren-Abruzzi 000002-000076, as maintained and located within the business records of the Debtors and marked at the deposition of Walia as Ex. 1.

10.    Attached to this Affidavit as **Exhibit G** is a true and correct copy of Disbursement Authorization and Itemization Form Re: Sale Of Porteck Corporation (Ehren-Walia 000084-85 as maintained and located within the business records of the Debtors.

11.    Attached to this Affidavit as **Exhibit H,** is a true and correct copy of an email dated May 17, 2017 from Ted Brindamour to Arvind Walia and Paul Parmar with AllRad Direct Due Diligence Findings [Draft Report] dated May 18, 2017 (Ehren-Walia 003966-00402) as maintained and located within the business records of the Debtors.

12.    Attached to this Affidavit as **Exhibit I** is a true and correct copy of the multiple email exchange dated May 18, 2017 from Arvind Walia to Parmar and Zaharis (Ehren-Walia 003977-3988) as maintained and located within the business records of the Debtors.

13.    Attached to this Affidavit as **Exhibit J** is an email exchange between Parmar, Walia and Zaharis dated May 31, 2017, (Ehren-Walia 004003-4006) as maintained and located within the business records of the Debtors.

14.    Attached to this Affidavit as **Exhibit K** is a true and correct copy of email from Arvind Walia dated May 31, 2017, to Paul Parmar attaching the AllRad Direct Due Diligence Findings [Draft Report] dated May 18, 2017 (Ehren-Walia 004019-4032) as maintained and located within the business records of the Debtors.

15.    Attached to this Affidavit as **Exhibit L** is a true and correct copy of email from Parmar to Robinson Brog dated May 31, 2017 (Ehren-Walia 004032) as maintained and located within the business records of the Debtors.

16.    Attached to this Affidavit as **Exhibit M** is a true and correct copy of email from Walia to Parmar dated June 15, 2017, (Ehren-Walia 004413) as maintained and located within the business records of the Debtors.

17.    Attached to this Affidavit as **Exhibit N** is a true and correct copy of email from Walia to Parmar dated June 19, 2017, (Ehren-Walia 004519) as maintained and located within the business records of the Debtors

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18 day of January, 2023, at Tenafly, NJ

JOEL GIL
Notary Public, State of New Jersey
My Commission Expires Feb 14, 2027

EDITH WONG

# EXHIBIT A

 **M&T Bank**

| FOR INQUIRIES CALL: | NEW YORK CITY PRIVATE BANKING<br>(212) 350-2535 |
| --- | --- |

00   0 07668M M2  077

000000                                          P

**CONSTELLATION HEALTHCARE TECHNOLOGIES IN**
**3200 WILCREST DR SUITE 600**
**HOUSTON TX 77042**

| ACCOUNT TYPE | |
| --- | --- |
| COMMERCIAL MONEY MARKET SAVINGS | |

| ACCOUNT NUMBER | STATEMENT PERIOD |
| --- | --- |
| 15004231868132 | FEB.01-FEB.29,2016 |

| BEGINNING BALANCE | $21,075,669.55 |
| --- | --- |
| DEPOSITS & CREDITS | 0.00 |
| LESS CHECKS & DEBITS | 6,359,681.01 |
| INTEREST | 1,455.66 |
| LESS SERVICE CHARGES | 450.00 |
| ENDING BALANCE | $14,716,994.20 |

INTEREST PAID YEAR TO DATE            $3,414.51

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
| --- | --- | --- | --- | --- |
| 02/01/2016 | BEGINNING BALANCE | | | $21,075,669.55 |
| 02/01/2016 | TELLER MISCELLANEOUS DEBIT | | $100,000.00 | 20,975,669.55 |
| 02/05/2016 | In Branch Transfer/Withdrawal | | 300,000.00 | 20,675,669.55 |
| 02/08/2016 | BOOK TRANSFER DEBIT | | 138,394.41 | |
| 02/08/2016 | SERVICE CHARGE FOR ACCOUNT 015004231868132 | | 450.00 | 20,536,825.14 |
| 02/09/2016 | BOOK TRANSFER DEBIT | | 440,512.54 | 20,096,312.60 |
| 02/19/2016 | OUTGOING FEDWIRE FUNDS TRANSFER ROBINSON BROG LEINWAND GREENE | | 5,058,408.81 | 15,037,903.79 |
| 02/25/2016 | BOOK TRANSFER DEBIT | | 307,365.25 | 14,730,538.54 |
| 02/29/2016 | INTEREST PAYMENT | $1,455.66 | | |
| 02/29/2016 | BOOK TRANSFER DEBIT | | 10,000.00 | |
| 02/29/2016 | BOOK TRANSFER DEBIT | | 5,000.00 | 14,716,994.20 |
| | ENDING BALANCE | | | $14,716,994.20 |

## INTEREST RATE HISTORY

| INTEREST RATE | BEGINNING DATE | ENDING DATE |
| --- | --- | --- |
| 0.10% | 01/31/2016 | 02/29/2016 |

TENTH AND MARKET STREET
1007 NORTH MARKET STREET SUITE 12 WILMINGTON, DE 19801

EHREN-WALIA 00138

271

# HOW TO BALANCE YOUR M&T BANK ACCOUNT

## TO BALANCE YOUR CHECKBOOK WITH YOUR ACCOUNT STATEMENT COMPLETE STEPS 1, 2, & 3.

**STEP 1** **Place a checkmark ( ✔ )** beside each item listed on this statement which has a corresponding entry in your check register.
Also place a checkmark next to the item in your check register.

**STEP 2** **ADD** to your check register:
(a) Any deposits and other credits shown on this statement which you have not already entered.
(b) Any interest this statement shows credited to your account.

**STEP 3** **SUBTRACT** from your check register:
(a) Any checks or other withdrawals shown on this statement which you did not enter into your register.
(b) Any automatic loan payments or ATM or other electronic debits shown on this statement which you have not already subtracted.
(c) Any service charges shown on this statement which you have not already subtracted.

### TO DETERMINE THE CURRENT BALANCE IN YOUR ACCOUNT:

**STEP 4** **List** any outstanding checks or debits written in your register, but not yet appearing on your statement.

| OUTSTANDING CHECKS AND OTHER DEBITS | |
|---|---|
| NUMBER | AMOUNT |
| 1 | $ |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| SUBTOTAL OF COLUMN 1 | $ |

| OUTSTANDING CHECKS AND OTHER DEBITS | |
|---|---|
| NUMBER | AMOUNT |
| 13 | $ |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| SUBTOTAL OF COLUMN 2 | |
| SUBTOTAL OF COLUMN 1 + | |
| TOTAL OUTSTANDING CHECKS AND DEBITS | $ |

**STEP 5** **Enter** on this line **the Ending Balance** shown in the summary on the front of this statement.

$ 

**STEP 6** **Enter the total of any deposits or other credits** shown on your check register which are not shown on this statement.

$ 

**STEP 7** **Enter the total of STEPS 5 & 6.**

$ 

**STEP 8** **Enter TOTAL OUTSTANDING CHECKS & DEBITS** (from **STEP 4**).

$ 

**STEP 9** **Subtract STEP 8 from STEP 7** and enter the difference here.

$ 

This amount should be your current account balance.

---

Is your business growing too big or is it taking too much time for your deposit accounts to be balanced on the back of the statement like this?
M&T Bank offers an account reconciliation service as one of its many cash management products.
For more information, contact your branch manager or relationship manager
or call M&T Bank Cash Management Services at 1-800-724-2240.


**M&T Bank**

EHREN-WALIA 00139

# EXHIBIT B

 **M&T Bank**

FOR INQUIRIES CALL:  **NEW YORK CITY PRIVATE BANKING**
(212) 350-2535

00    0 07668M NM  017

000000                          P

**CONSTELLATION HEALTHCARE TECHNOLOGIES IN**
**3400 RT 35 SOUTH**
**SUITE 9**
**HAZLET NJ 07730**

| ACCOUNT TYPE | |
|---|---|
| M&T ADVANCED BUSINESS CHECKING | |

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| 9862225647 | 08/01/16 - 08/31/16 |

| | |
|---|---|
| BEGINNING BALANCE | $29,047.16 |
| DEPOSITS & CREDITS | 12,790,719.89 |
| LESS CHECKS & DEBITS | 12,740,000.00 |
| LESS SERVICE CHARGES | 0.00 |
| ENDING BALANCE | $79,767.05 |

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
|---|---|---|---|---|
| 08/01/2016 | BEGINNING BALANCE | | | $29,047.16 |
| 08/09/2016 | In Branch Transfer/Deposit | $12,220,000.00 | | |
| 08/09/2016 | In Branch Transfer/Deposit | 500,000.00 | | 12,749,047.16 |
| 08/10/2016 | OUTGOING FEDWIRE TRANSFER AUTO NON REP Robinson Brog | | $12,740,000.00 | 9,047.16 |
| 08/12/2016 | DEPOSIT | 20,719.89 | | 29,767.05 |
| 08/17/2016 | INCOMING FEDWIRE FUNDS TRANSFER AMERICAN EXPRESS TRAVEL RELATED | 50,000.00 | | 79,767.05 |
| | NUMBER OF DEPOSITS/CHECKS PAID | 4 | 0 | |

EHREN-WALIA 00147

**TENTH AND MARKET STREET**
**1007 NORTH MARKET STREET SUITE 12 WILMINGTON, DE 19801**

# HOW TO BALANCE YOUR M&T BANK ACCOUNT

**TO BALANCE YOUR CHECKBOOK WITH YOUR ACCOUNT STATEMENT COMPLETE STEPS 1, 2, & 3.**

**STEP 1** **Place a checkmark ( ✔ )** beside each item listed on this statement which has a corresponding entry in your check register.
Also place a checkmark next to the item in your check register.

**STEP 2** **ADD** to your check register:
(a) Any deposits and other credits shown on this statement which you have not already entered.
(b) Any interest this statement shows credited to your account.

**STEP 3** **SUBTRACT** from your check register:
(a) Any checks or other withdrawals shown on this statement which you did not enter into your register.
(b) Any automatic loan payments or ATM or other electronic debits shown on this statement which you have not already subtracted.
(c) Any service charges shown on this statement which you have not already subtracted.

### TO DETERMINE THE CURRENT BALANCE IN YOUR ACCOUNT:

**STEP 4** **List** any outstanding checks or debits written in your register, but not yet appearing on your statement.

| OUTSTANDING CHECKS AND OTHER DEBITS | |
|---|---|
| NUMBER | AMOUNT |
| 1 | $ |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| SUBTOTAL OF COLUMN 1 | $ |

| OUTSTANDING CHECKS AND OTHER DEBITS | |
|---|---|
| NUMBER | AMOUNT |
| 13 | $ |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| SUBTOTAL OF COLUMN 2 | |
| SUBTOTAL OF COLUMN 1 + | |
| TOTAL OUTSTANDING CHECKS AND DEBITS | $ |

**STEP 5** **Enter** on this line **the Ending Balance** shown in the summary on the front of this statement.
$

**STEP 6** **Enter the total of any deposits or other credits** shown on your check register which are not shown on this statement.
$

**STEP 7** **Enter the total of STEPS 5 & 6.**
$

**STEP 8** Enter TOTAL OUTSTANDING CHECKS & DEBITS (from **STEP 4**).
$

**STEP 9** **Subtract STEP 8 from STEP 7** and enter the difference here.
$
This amount should be your current account balance.

---

Is your business growing too big or is it taking too much time for your deposit accounts to be balanced on the back of the statement like this?
M&T Bank offers an account reconciliation service as one of its many cash management products.
For more information, contact your branch manager or relationship manager or call M&T Bank Cash Management Services at 1-800-724-2240.


**M&T Bank**

EHREN-WALIA 00148

# EXHIBIT C



**CHASE** ⬡

JPMorgan Chase Bank, N.A.
Texas Market
P O Box 659754
San Antonio, TX 78265 - 9754

March 01, 2017 through March 31, 2017
Account Number: **000000684966450**

## CUSTOMER SERVICE INFORMATION

**If you have any questions about your statement, please contact your Customer Service Professional.**



00003210 DDA 201 211 09117 NNNNNNNNNNN 1 000000000 63 0000

ORION HEALTHCORP INC
OPERATING ACCT
ATTN FINANCE
368 W PIKE ST STE 102
LAWRENCEVILLE GA 30046-3240

## CHECKING SUMMARY    Commercial Checking

|  | INSTANCES | AMOUNT |
|---|---|---|
| **Beginning Balance** |  | **$343,294.90** |
| Deposits and Additions | 49 | 33,078,889.99 |
| Electronic Withdrawals | 48 | - 27,522,676.12 |
| Other Withdrawals, Fees & Charges | 5 | - 23,710.04 |
| **Ending Balance** | **102** | **$5,875,798.73** |

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 03/01 | Remote Online Deposit        1001 | $245,212.06 |
| 03/02 | Fedwire Credit Via: Grandpoint Bank/122244566 B/O: Rand Medical Billing Inc Simi Valley CA 93065-0000 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Grandpoint B O Bi=Transfer To Orion Bbi=/Time/16:3 5 Imad: 0302Mmqfmp9E000159 Tm: 5879509061Ff | 80,000.00 |
| 03/02 | Fedwire Credit Via: Silicon Valley Bank/121140399 B/O: Collabnet Inc South San Francisco, CA 94080 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Sil Vly Bk S O Bi=Invoice No.Inv-07312 Bbi=/Time/0 5:00 Imad: 0302L1B77D1C000080 Tm: 0316909061Ff | 6,254.00 |
| 03/02 | JPMorgan Access Transfer From Account000000004063105 | 195,000.00 |
| 03/02 | JPMorgan Access Transfer From Account000000004064343 | 119,000.00 |
| 03/02 | JPMorgan Access Transfer From Account000000004063682 | 78,000.00 |
| 03/03 | Fedwire Credit Via: Cobiz Bank NA/102003206 B/O: Western Skies Practice Managem Littleton, CO 80128-0000 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Cobiz Bank Bbi =/Time/16:04 Imad: 0303J2B74W1C000187 Tm: 5437009062Ff | 75,000.00 |
| 03/03 | Deposit | 5,640.76 |

EHREN-WALIA 00149
Page 1 of 6

# CHASE ⬡

March 01, 2017 through March 31, 2017
Account Number: 000000684966450

## DEPOSITS AND ADDITIONS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 03/06 | Book Transfer Credit B/O: Vachette Business Services, Ltd. Blissfield MI 49228-1266 Trn: 4791100065Jo | 85,000.00 |
| 03/06 | Book Transfer Credit B/O: Northeast Medical Solutions, LLC Monroeville PA 15146-2156 Trn: 4805100065Jo | 65,000.00 |
| 03/06 | Fedwire Credit Via: Grandpoint Bank/122244566 B/O: Rand Medical Billing Inc Simi Valley CA 93065-0000 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Grandpoint B O Bi=Transfer To Orion Bbi=/Time/15:4 9 Imad: 0306Mmqfmp9E000108 Trn: 4852409065Ff | 62,000.00 |
| 03/06 | Fedwire Credit Via: Zb, NA, (Formerly Amegy Bank N.A.)/113011258 B/O: Rmi Physician Services Corp Houston TX 77042-6000 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=21982281 Bbi=/Bnf/Dallas TX/Time/12:53 Imad: 0306L4B74B3C000856 Trn: 3150309065Ff | 31,000.00 |
| 03/06 | Remote Online Deposit        1001 | 1,249.00 |
| 03/06 | JPMorgan Access Transfer From Account000000004063105 | 97,000.00 |
| 03/06 | JPMorgan Access Transfer From Account000000004064343 | 65,000.00 |
| 03/06 | JPMorgan Access Transfer From Account000000004063682 | 33,000.00 |
| 03/07 | Remote Online Deposit        1001 | 250.00 |
| 03/08 | Fedwire Credit Via: Grandpoint Bank/122244566 B/O: Rand Medical Billing Inc Simi Valley CA 93065-0000 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Grandpoint B O Bi=Transfer To Orion Bbi=/Time/16:3 3 Imad: 0308Mmqfmp9E000141 Trn: 5012809067Ff | 26,000.00 |
| 03/08 | Fedwire Credit Via: Cobiz Bank NA/102003206 B/O: Western Skies Practice Managem Littleton, CO 80128-0000 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Cobiz Bank Bbi =/Time/16:41 Imad: 0308J2B74W1C000237 Trn: 5078509067Ff | 20,000.00 |
| 03/08 | Fedwire Credit Via: Zb, NA, (Formerly Amegy Bank N.A.)/113011258 B/O: Rmi Physician Services Corp Houston TX 77042-6000 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=22002378 Bbi=/Bnf/Dallas TX/Time/15:12 Imad: 0308L4B74B3C001899 Trn: 4242709067Ff | 8,000.00 |
| 03/08 | JPMorgan Access Transfer From Account000000004063105 | 119,000.00 |
| 03/08 | JPMorgan Access Transfer From Account000000004064343 | 51,000.00 |
| 03/08 | JPMorgan Access Transfer From Account000000004063682 | 38,000.00 |
| 03/09 | Book Transfer Credit B/O: Physicians Practice Plus LLC Jericho NY 11753- Trn: 3634700068Jo | 117,000.00 |
| 03/09 | Book Transfer Credit B/O: Vachette Business Services, Ltd. Blissfield MI 49228-1266 Trn: 3644700068Jo | 44,000.00 |
| 03/09 | Remote Online Deposit        1001 | 2,589.85 |
| 03/10 | Fedwire Credit Via: Bank of America N A/026009593 B/O: Orion Healthcorp Inc Roswell Gaus Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=01170310001627Nn O Bi=Ref Nynm,Ref Orion Healthcorp IN C Bbi=/Time/15:12 Imad: 0310B6B7Hu3R011563 Trn: 4714209069Ff | 29,562,500.00 |
| 03/10 | Fedwire Credit Via: Grandpoint Bank/122244566 B/O: Rand Medical Billing Inc Simi Valley CA 93065-0000 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Grandpoint B O Bi=Transfer To Orion Bbi=/Time/15:1 0 Imad: 0310Mmqfmp9E000188 Trn: 4693809069Ff | 52,000.00 |
| 03/10 | Book Transfer Credit B/O: Northeast Medical Solutions, LLC Monroeville PA 15146-2156 Trn: 5271600069Jo | 47,000.00 |

EHREN-WALIA 00150


**CHASE**

March 01, 2017 through March 31, 2017
Account Number: **000000684966450**

## DEPOSITS AND ADDITIONS | *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 03/10 | Orig CO Name:Paypal        Orig ID:Paypalsd11 Desc Date:170309 CO Entry Descr:Transfer Sec:PPD    Trace#:091000017451864 Eed:170310   Ind ID:53622A38Sp5We        Ind Name:Porteck Corporation Transfer Tm: 0687451864Tc | 9,000.00 |
| 03/16 | Remote Online Deposit        1001 | 599.95 |
| 03/16 | JPMorgan Access Transfer From Account000000004063105 | 219,000.00 |
| 03/16 | JPMorgan Access Transfer From Account000000004064343 | 84,000.00 |
| 03/16 | JPMorgan Access Transfer From Account000000004063682 | 42,000.00 |
| 03/17 | Remote Online Deposit        1001 | 125,555.41 |
| 03/17 | Deposit | 13,279.52 |
| 03/20 | Fedwire Credit Via: Grandpoint Bank/122244566 B/O: Rand Medical Billing Inc Simi Valley CA 93065-0000 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Grandpoint B O BI=Transfer To Orion Bbi=/Time/13:4 1 Imad: 0320Mmqfmp9E000063 Tm: 3594009079Ff | 92,000.00 |
| 03/20 | Fedwire Credit Via: Cobiz Bank NA/102003206 B/O: Western Skies Practice Managem Littleton, CO 80128-0000 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Cobiz Bank Bbi =/Time/13:37 Imad: 0320J2B74W1C000073 Tm: 3549909079Ff | 72,000.00 |
| 03/22 | Remote Online Deposit        1001 | 4,776.53 |
| 03/28 | Remote Online Deposit        1001 | 10,822.59 |
| 03/29 | Remote Online Deposit        1001 | 67,285.87 |
| 03/29 | Deposit | 447.21 |
| 03/30 | Deposit      877321217 | 25.00 |
| 03/31 | Fedwire Credit Via: Grandpoint Bank/122244566 B/O: Rand Medical Billing Inc Simi Valley CA 93065-0000 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Grandpoint B O BI=Transfer To Orion Bbi=/Time/15:1 9 Imad: 0331Mmqfmp9E000214 Tm: 7410109090Ff | 60,000.00 |
| 03/31 | Fedwire Credit Via: Silicon Valley Bank/121140399 B/O: Collabnet Inc South San Francisco, CA 94080 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Sil Vly Bk S O BI=Invoice No.Inv-08731 Bbi=/Time/0 5:01 Imad: 0331L1B77D1C000245 Tm: 0458809090Ff | 6,254.00 |
| 03/31 | JPMorgan Access Transfer From Account000000004063105 | 475,000.00 |
| 03/31 | JPMorgan Access Transfer From Account000000004063682 | 176,000.00 |
| 03/31 | JPMorgan Access Transfer From Account000000004064343 | 174,000.00 |
| 03/31 | Orig CO Name:Merck 2187        Orig ID:1221109110 Desc Date:Mar 31 CO Entry Descr:EDI Paymntsec:CCD    Trace#:028000088438435 Eed:170331   Ind ID:160390617        Ind Name:Integrated Physician S Ref*TN*0160390617*Merck Sharp And D Ohme Corp.2100643530 00074265000000 02 116,14\ Tm: 0898438435Tc | 116,148.24 |

**Total Deposits and Additions**                                              **$33,078,889.99**



EHREN-WALIA 00151
Page 3 of 6

Case 8:20-cv-00449-bast   Doc 155-32   Filed 06/03/24   Entered 06/03/24 20:02:24
Case 2:24-cv-03330-GRB   Document 4-2   Filed 06/03/24   Page 40 of 122 PageID #:
486



**CHASE ◯**

March 01, 2017 through March 31, 2017
Account Number: **000000684966450**

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 03/01 | Fedwire Debit Via: Mfrs Buf/022000046 A/C: Msmd LLC US Ref:/Time/13:57 Imad: 0301B1Qgc07C010235 Trn: 3997700060Jo | $20,000.00 |
| 03/01 | JPMorgan Access Transfer To Account000000699642872 | 11,051.22 |
| 03/01 | Orig CO Name:Orion Healthcorp     Orig ID:9966450001 Desc Date:Prfund CO Entry Descr:Cash Disb Sec:CCD   Trace#:021000023722829 Eed:170301  Ind ID:9966450001        Ind Name:EFT File Name: Rp06010     EFT/ACH Created Offset For Origin#: 9090209001  CO Eff Date: 17/03/ | 37,517.37 |
| 03/02 | JPMorgan Access Transfer To Account000000699642864 | 380,540.40 |
| 03/02 | Fedwire Debit Via: Cb&T Dv of Synovus/061100606 A/C: Data Media US Imad: 0302B1Qgc04C004841 Trn: 5686600061Jo | 38,688.00 |
| 03/02 | JPMorgan Access Transfer To Account000000699642864 | 37,969.18 |
| 03/02 | JPMorgan Access Transfer To Account000000699642864 | 19,328.47 |
| 03/02 | Orig CO Name:Orion Healthcorp     Orig ID:9966450001 Desc Date:Prfund CO Entry Descr:Cash Disb Sec:CCD   Trace#:021000022908220 Eed:170302  Ind ID:9966450001        Ind Name:EFT File Name: Rp06111     EFT/ACH Created Offset For Origin#: 9090209001  CO Eff Date: 17/03/ | 2,530.10 |
| 03/03 | Book Transfer Debit A/C: Physicians Practice Plus LLC Jericho NY 11753- Trn: 4622700062Jo | 110,000.00 |
| 03/03 | JPMorgan Access Transfer To Account000000699642872 | 300,000.00 |
| 03/03 | Book Transfer Debit A/C: Orion Healthcorp Inc Lawrenceville GA 30046-3240 Trn: 4862700062Jo | 76,742.86 |
| 03/06 | JPMorgan Access Transfer To Account000000699642872 | 219,021.39 |
| 03/06 | JPMorgan Access Transfer To Account000000699642872 | 315,000.00 |
| 03/08 | Fedwire Debit Via: Wells Fargo NA/121000248 A/C: Chlic US Ref:/Time/13:25 Imad: 0308B1Qgc03C010155 Trn: 3301200067Jo | 976.31 |
| 03/08 | JPMorgan Access Transfer To Account000000699642872 | 69,154.82 |
| 03/09 | JPMorgan Access Transfer To Account000000699642864 | 8,857.17 |
| 03/09 | JPMorgan Access Transfer To Account000000699642864 | 286,477.32 |
| 03/09 | Orig CO Name:Orion Healthcorp     Orig ID:9966450001 Desc Date:Prfund CO Entry Descr:Cash Disb Sec:CCD   Trace#:021000029939280 Eed:170309  Ind ID:9966450001        Ind Name:EFT File Name: Rp06800     EFT/ACH Created Offset For Origin#: 9090209001  CO Eff Date: 17/03/ | 3,500.00 |
| 03/10 | Fedwire Debit Via: Citicorp FL/266086554 A/C: Holland & Knight Llp Trust Account US Ref: Kelly Litigation Escrow Imad: 0310B1Qgc01C004736 Trn: 5262200069Jo | 820,500.00 |
| 03/10 | Fedwire Debit Via: Wells Fargo NA/121000248 A/C: Robinson Brog Leinwand Greene Genovus Ref: Nynm Acqsn Reps & Warranties Escrow/Time/16:35 Imad: 0310B1Qgc07C023085 Trn: 5328500069Jo | 3,590,000.00 |
| 03/10 | Fedwire Debit Via: Wells Fargo NA/121000248 A/C: Robinson Brog Leinwand Greene Genovus Ref: Nynm Acqsn Share Escrow/Time/16:37 Imad: 0310B1Qgc03C005940 Trn: 5334300069Jo | 2,000,000.00 |
| 03/10 | JPMorgan Access Transfer To Account000000699642864 | 155,040.58 |
| 03/10 | Book Transfer Debit A/C: Elizabeth Kelly Staten Island NY 10304-1355 Ref: Nynm Acqsn Orion Healthcorp Trn: 5469400069Jo | 15,589,500.00 |
| 03/14 | JPMorgan Access Transfer To Account000000699642872 | 136,425.57 |
| 03/14 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Mcguire Woods Operating Account US Ref: Orion Healthcorp Inc Imad: 0314B1Qgc05C009052 Trn: 4158000073Jo | 42,850.00 |
| 03/14 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Moore And VAN Allen US Ref: 327000.027492, 758171 Imad: 0314B1Qgc05C009882 Trn: 4550800073Jo | 28,500.00 |
| 03/14 | Orig CO Name:Orion Healthcorp     Orig ID:9966450001 Desc Date:Prfund CO Entry Descr:Cash Disb Sec:CCD   Trace#:021000023320959 Eed:170314  Ind ID:9966450001        Ind Name:EFT File Name: Rp0730S     EFT/ACH Created Offset For Origin#: 9090209001  CO Eff Date: 17/03/ | 2,968.01 |



**CHASE** ⬡

March 01, 2017 through March 31, 2017
Account Number: **000000684966450**

## ELECTRONIC WITHDRAWALS *(continued)*



| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 03/14 | Orig CO Name:Bmwfinancial Svs      Orig ID:1222568977 Desc Date:170312 CO Entry Descr:Bmwfs Pymtsec:PPD    Trace#:021000029641895 Eed:170314  Ind ID:210311393      Ind Name:Harmohan Par4002267244 Trn: 0729641895Tc | 1,714.24 |
| 03/15 | Fedwire Debit Via: Qd Cty B&T Bttndrf/073902232 A/C: Pediatric Group Associates SC US Imad: 0315B1Qgc03C006974 Trn: 4125400074Jo | 191,739.16 |
| 03/15 | Fedwire Debit Via: First Financial Bk/042200910 A/C: Children's Medical Center Payroll US Imad: 0315B1Qgc04C004420 Trn: 4129800074Jo | 119,579.98 |
| 03/15 | Fedwire Debit Via: Fifth Third Cinci/042000314 A/C: Pediatric Associates of Dayton US Ref:/Time/17:15 Imad: 0315B1Qgc08C008789 Trn: 5765100074Jo | 359,488.31 |
| 03/15 | Orig CO Name:Bankdirect Capit      Orig ID:9000022256 Desc Date:031517 CO Entry Descr:Web Pmts Sec:Web    Trace#:111924687880371 Eed:170315  Ind ID:Wrh7H6      Ind Name:Orion Healthcorp, Inc 877-226-5456 Trn: 0747880371Tc | 8,714.42 |
| 03/16 | JPMorgan Access Transfer To Account000000699642864 | 19,455.10 |
| 03/16 | JPMorgan Access Transfer To Account000000699642864 | 375,410.68 |
| 03/16 | Orig CO Name:Orion Healthcorp      Orig ID:9966450001 Desc Date:Prfund CO Entry Descr:Cash Disb Sec:CCD    Trace#:021000026145699 Eed:170316  Ind ID:9966450001      Ind Name:EFT File Name: Rp07519    EFT/ACH Created Offset For Origin#: 9090209001  CO Eff  Date: 17/03/ | 44,586.55 |
| 03/16 | Orig CO Name:Orion Healthcorp      Orig ID:9966450001 Desc Date:Prfund CO Entry Descr:Cash Disb Sec:CCD    Trace#:021000026145681 Eed:170316  Ind ID:9966450001      Ind Name:EFT File Name: Rp0751J    EFT/ACH Created Offset For Origin#: 9090209001  CO Eff  Date: 17/03/ | 1,200.00 |
| 03/20 | Fedwire Debit Via: Cb&T Dv of Synovus/061100606 A/C: Data Media US Imad: 0320B1Qgc01C005540 Trn: 4933700079Jo | 94,712.65 |
| 03/20 | Book Transfer Debit A/C: Sher Tremonte Llp Attorney Trust New York, NY 100042209 Trn: 4933600079Jo | 9,444.44 |
| 03/20 | Book Transfer Debit A/C: Physicians Practice Plus LLC Jericho NY 11753- Trn: 4951800079Jo | 110,956.46 |
| 03/21 | Orig CO Name:Orion Healthcorp      Orig ID:9966450001 Desc Date:Prfund CO Entry Descr:Cash Disb Sec:CCD    Trace#:021000026514537 Eed:170321  Ind ID:9966450001      Ind Name:EFT File Name: Rp0800T    EFT/ACH Created Offset For Origin#: 9090209001  CO Eff  Date: 17/03/ | 7,289.00 |
| 03/21 | Orig CO Name:NJ Naturalgas      Orig ID:4210621680 Desc Date:Mar 17 CO Entry Descr:Ebill    Sec:Web    Trace#:031000056092910 Eed:170321  Ind ID:10399608032017      Ind Name:Payer Name Trn: 0796092910Tc | 2,162.35 |
| 03/21 | Orig CO Name:NJ Naturalgas      Orig ID:4210621680 Desc Date:Mar 17 CO Entry Descr:Ebill    Sec:Web    Trace#:031000056092911 Eed:170321  Ind ID:10399619032017      Ind Name:Payer Name Trn: 0796092911Tc | 1,554.43 |
| 03/23 | JPMorgan Access Transfer To Account000000699642864 | 8,727.66 |
| 03/23 | JPMorgan Access Transfer To Account000000699642864 | 278,747.87 |
| 03/28 | JPMorgan Access Transfer To Account000000699642872 | 943,806.98 |
| 03/30 | JPMorgan Access Transfer To Account000000699642864 | 375,630.50 |
| 03/30 | JPMorgan Access Transfer To Account000000699642864 | 19,777.94 |
| 03/30 | JPMorgan Access Transfer To Account000000699642872 | 244,838.63 |
| **Total Electronic Withdrawals** | | **$27,522,676.12** |



|  | March 01, 2017 through March 31, 2017 |
|---|---|
|  | Account Number: 000000684966450 |

## OTHER WITHDRAWALS, FEES & CHARGES

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 03/03 | Withdrawal | $5,000.00 |
| 03/15 | Account Analysis Settlement Charge | 6,210.04 |
| 03/16 | Withdrawal | 5,500.00 |
| 03/16 | Withdrawal | 500.00 |
| 03/27 | Withdrawal | 6,500.00 |
| **Total Other Withdrawals, Fees & Charges** | | **$23,710.04** |

Your service charges, fees and earnings credit have been calculated through account analysis.

## DAILY ENDING BALANCE

| DATE | AMOUNT | DATE | AMOUNT |
|---|---|---|---|
| 03/01 | $519,938.37 | 03/17 | 6,725,188.20 |
| 03/02 | 519,136.22 | 03/20 | 6,674,074.65 |
| 03/03 | 108,034.12 | 03/21 | 6,663,068.87 |
| 03/06 | 13,261.73 | 03/22 | 6,667,845.40 |
| 03/07 | 13,511.73 | 03/23 | 6,380,369.87 |
| 03/08 | 205,380.60 | 03/27 | 6,373,869.87 |
| 03/09 | 70,135.96 | 03/28 | 5,440,885.48 |
| 03/10 | 7,585,595.38 | 03/29 | 5,508,618.56 |
| 03/14 | 7,373,137.56 | 03/30 | 4,868,396.49 |
| 03/15 | 6,687,405.65 | 03/31 | 5,875,798.73 |
| 03/16 | 6,586,353.27 | | |

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call or write us at the phone number or address on the front of this statement (non-personal accounts contact Customer Service) if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.    We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.  Be prepared to give us the following information:

• Your name and account number
• The dollar amount of the suspected error
• A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.

We will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation .

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement.  If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you.  For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account.

 JPMorgan Chase Bank, N.A. Member FDIC



EHREN-WALIA 00154
Page 6 of 6

# EXHIBIT D

## RE: Combined Porteck and PCA by Client

**From:**
Paul Parmar <"/o=exchangelabs/ou=exchange administrative group
(fydibohf23spdlt)/cn=recipients/cn=807e953e3e604cdeb1e5c6668cf3199e-paul">
**To:**
Glenn Cunningham <glenc@g-r-consulting.com>
**Date:**
Mon, 01 Dec 2014 11:40:22 -0500

Hahahahaha this is a joke, please please find me a real billing company

**From:** Glenn Cunningham [mailto:glenc@g-r-consulting.com]
**Sent:** Monday, December 1, 2014 11:38 AM
**To:** Paul Parmar
**Subject:** RE: Combined Porteck and PCA by Client

Last month.

Glenn R. Cunningham,
President, G R Capital Management Inc.
451 Hungerford Dr., Suite 119 - 227
Rockville, MD 20850
Off: (240) 477-7320
Fax:(240) 454-8182
Cell:(240) 994-8876
E-Mail: glenc@g-r-consulting.com

This electronic mail may contain information that is privileged, proprietary and confidential and/or exempt from disclosure under applicable law.  This transmission is intended solely for the individual or entity designated above.  If you are not the intended recipient, you should understand that any distribution, copying, or use of the information contained in this transmission by anyone other than the intended recipient is unauthorized and strictly prohibited.  If you have received this electronic mail in error, please immediately notify the sender and destroy all copies which you may have of this communication.

**From:** Paul Parmar [mailto:paul@pegasusbluestarfund.com]
**Sent:** Monday, December 01, 2014 11:24 AM
**To:** Glenn Cunningham
**Subject:** RE: Combined Porteck and PCA by Client

When was it acquired ?

**From:** Glenn Cunningham [mailto:glenc@g-r-consulting.com]
**Sent:** Monday, December 1, 2014 11:23 AM
**To:** Paul Parmar
**Subject:** RE: Combined Porteck and PCA by Client

PCA is a recent medical billing acquisition.

Glenn R. Cunningham,
President, G R Capital Management Inc.
451 Hungerford Dr., Suite 119 - 227
Rockville, MD 20850
Off: (240) 477-7320
Fax:(240) 454-8182
Cell:(240) 994-8876
E-Mail: glenc@g-r-consulting.com

EHREN-WALIA 005138

This electronic mail may contain information that is privileged, proprietary and confidential and/or exempt from disclosure under applicable law.  This transmission is intended solely for the individual or entity designated above.  If you are not the intended recipient, you should understand that any distribution, copying, or use of the information contained in this transmission by anyone other than the intended recipient is unauthorized and strictly prohibited.  If you have received this electronic mail in error, please immediately notify the sender and destroy all copies which you may have of this communication.

**From:** Paul Parmar [mailto:paul@pegasusbluestarfund.com]
**Sent:** Monday, December 01, 2014 11:18 AM
**To:** Glenn Cunningham
**Subject:** RE: Combined Porteck and PCA by Client

So PCA data set is prospective clients ?

**From:** Glenn Cunningham [mailto:glenc@g-r-consulting.com]
**Sent:** Monday, December 1, 2014 11:07 AM
**To:** Paul Parmar
**Subject:** RE: Combined Porteck and PCA by Client

Change the call to noon. Done

Also they have like I mentioned to you on the phone as I knew this from before, 17% of the revenue is Telecom and not medical billing ? correct, 16.2 % of the gross revenue is from the India call center, perhaps we use a different multiple for the valuation?

What is PCA Data Set ? with no names of clients under this category, PCA is a client list of a recent acquisition. I requested the client list be sorted by revenue. We should have the TTM list later today.

What are the two subtotals ? why are certain clients bucketed together in the two subtotals? Not sure of either, I have requested an answer from the broker, he is working on it. I will ask during the call.

First set of clients in the subtotal is 11.1% and second set of clients in subtotal is 52.4%, telecom is 17% and Authorizations is 2.28%, PCA Data Set is 18% = 100% ?

What is the set of clients in first subtotal that is 11.1% I'm not sure why they broke out the client list this way. Have asked, will mention during the call at 12:00.
What are the set of clients in second subtotal that is 52.4%, Above.
What is PCA Data Set that is 18%, Acquisition client list.


Glenn R. Cunningham,
President, G R Capital Management Inc.
451 Hungerford Dr., Suite 119 - 227
Rockville, MD 20850
Off: (240) 477-7320
Fax:(240) 454-8182
Cell:(240) 994-8876
E-Mail: glenc@g-r-consulting.com


This electronic mail may contain information that is privileged, proprietary and confidential and/or exempt from disclosure under applicable law.  This transmission is intended solely for the individual or entity designated above.  If you are not the intended recipient, you should understand that any distribution, copying, or use of the information contained in this transmission by anyone other than the intended recipient is unauthorized and strictly prohibited.  If you have received this electronic mail in error, please immediately notify the sender and destroy all copies which you may have of this communication.

**From:** Paul Parmar [mailto:paul@pegasusbluestarfund.com]

EHREN-WALIA 005139

**Sent:** Monday, December 01, 2014 6:38 AM
**To:** Glenn Cunningham
**Subject:** RE: Combined Porteck and PCA by Client

Change the call to noon.

Also they have like I mentioned to you on the phone as I knew this from before, 17% of the revenue is Telecom and not medical billing ?

What is PCA Data Set ? with no names of clients under this category

What are the two subtotals ? why are certain clients bucketed together in the two subtotals ?

First set of clients in the subtotal is 11.1% and second set of clients in subtotal is 52.4%, telecom is 17% and Authorizations is 2.28%, PCA Data Set is 18% = 100% ?

What is the set of clients in first subtotal that is 11.1%
What are the set of clients in second subtotal that is 52.4%
What is PCA Data Set that is 18%

**From:** Glenn Cunningham [mailto:glenc@g-r-consulting.com]
**Sent:** Monday, December 1, 2014 6:24 AM
**To:** Paul Parmar
**Subject:** FW: Combined Porteck and PCA by Client

Paul,

In preparation for today's call at 10 with the Porteck group, I have attached 2015 projected revenue by client. They are working on the TTM revenue by client which we hope to have shortly.

Let me know if you have questions.

Glenn R. Cunningham,
President, G R Capital Management Inc.
451 Hungerford Dr., Suite 119 - 227
Rockville, MD 20850
Off: (240) 477-7320
Fax:(240) 454-8182
Cell:(240).994-8876
E-Mail: glenc@g-r-consulting.com

This electronic mail may contain information that is privileged, proprietary and confidential and/or exempt from disclosure under applicable law. This transmission is intended solely for the individual or entity designated above. If you are not the intended recipient, you should understand that any distribution, copying, or use of the information contained in this transmission by anyone other than the intended recipient is unauthorized and strictly prohibited. If you have received this electronic mail in error, please immediately notify the sender and destroy all copies which you may have of this communication.

EHREN-WALIA 005140

# EXHIBIT E



**Date:** 2/20/2015

**To:** Arvind Walia
CEO, Porteck Corporation
300 Jericho Quadrangle West Suite 320
Jericho, NY 11753

http://www.porteck.com/
516-874-8101 (phone)
646-536-2515 (fax)
516-770-6222 (Mobile)

**Re:** For the Sale of Porteck Corporation to:

Constellation Health Technologies, Inc.
875 3rd Avenue
9th Floor
New York, NY 10022
Paul Parmar, CEO

Purchase price:                  $7,800,000
Paid at Closing:                  $5,500,000
Earn-out paid in 12 months: $2,300,000

**Due Now: $5,500,000 x 3.5%  = $192,500**

Earn out paid in 12 months subject to a success fee of 3.5x the amount paid.

**Wire:**   Abstract Business Advisors, LLC
Wells Fargo, Anthem Village branch. Henderson, NV
RT# 121000248  /

For any additional questions, please call Dana Ferguson 504-220-4660

Exhibit
Wal 0009

*2712 Botticelli Drive*            *Henderson, NV 89052*            *Phone: 702-896-9286*

EHREN-WALIA 005141

# EXHIBIT F

ASSET PURCHASE AGREEMENT

made and entered into as of

March [  ], 2015

by and among

PHYSICANS PRACTICE PLUS LLC,

PORTECK CORPORATION

AND

THE SHAREHOLDERS OF

PORTECK CORPORATION

EHREN-WALIA 000002

ARTICLE 1 SALE AND PURCHASE OF SHARES ......................................................................... 1
Section 1.1        Purchase of Assets. ................................................................................. 1
Section 1.2        Excluded Assets. ..................................................................................... 3
Notwithstanding anything to the contrary herein, Seller will retain and not transfer, and Buyer
will not purchase or acquire, the following assets (collectively, the "**Excluded Assets**"): ....... 3
Section 1.3        Assumption of Liabilities. ...................................................................... 4
Section 1.4        Excluded Liabilities. ............................................................................... 4
Section 1.5        Consent of Third Parties. ........................................................................ 4
Section 1.6        Purchase Price and Payment for Assets .................................................. 5
Section 1.7        Post-Closing Payment. ........................................................................... 7
Section 1.8        Allocation. ............................................................................................. 13
Section 1.9        Passage of Title and Risk of Loss. ......................................................... 13

ARTICLE 2 CLOSING ......................................................................................................... 13
Section 2.1        Closing. .................................................................................................. 13
Section 2.2        Closing Deliverables. ............................................................................ 13

ARTICLE 3 REPRESENTATIONS AND WARRANTIES REGARDING THE SELLER ....... 16
Section 3.1        Organization; Authority; Due Execution. ............................................. 16
Section 3.2        Subsidiaries and Equity Investments. .................................................... 17
Section 3.3        Consents; No Violation. ......................................................................... 17
Section 3.4        Indebtedness. ......................................................................................... 18
Section 3.5        Capitalization. ........................................................................................ 18
Section 3.6        Litigation. .............................................................................................. 19
Section 3.7        Assets; Personal Property. ..................................................................... 19
Section 3.8        Real Property. ........................................................................................ 20
Section 3.9        List, etc. ................................................................................................. 20
Section 3.10       Tax Matters. ........................................................................................... 20
Section 3.11       Employees. ............................................................................................ 23
Section 3.12       Employee Benefits. ................................................................................ 23
Section 3.13       Intellectual Property. ............................................................................. 25
Section 3.14       Financial Statements; Accounts Receivable. ......................................... 27
Section 3.15       Absence of Certain Changes. ................................................................. 28
Section 3.16       Bank Accounts. ...................................................................................... 30
Section 3.17       Compliance With Law. .......................................................................... 30
Section 3.18       Environmental Matters. ......................................................................... 31
Section 3.19       Contracts and Commitments. ................................................................. 31
Section 3.20       Insurance. ............................................................................................... 34
Section 3.21       Affiliate Transactions. ........................................................................... 35
Section 3.22       Distributors, Suppliers and Customers. .................................................. 35
Section 3.23       Products Liability and Warranty Liability. ............................................. 36
Section 3.24       Absence of Certain Business Practices. .................................................. 36
Section 3.25       Records. .................................................................................................. 36
Section 3.26       Disclosure. ............................................................................................. 36
Section 3.27       Brokers and Finders. .............................................................................. 37

{00718038.DOCX;1 }

i

EHREN-WALIA 000003

Section 3.28    Inventory.............................................................................................. 37
Section 3.29    Privacy................................................................................................. 37
Section 3.30    HIPAA Compliance............................................................................. 37
Section 3.31    False Claims Act Compliance. ........................................................... 37

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF THE SELLING
SHAREHOLDERS ................................................................................................. 38
Section 4.1    Ownership of Shares............................................................................ 38
Section 4.2    Authority.............................................................................................. 38
Section 4.3    Litigation. ............................................................................................ 38
Section 4.4    Brokers and Finders............................................................................ 38
Section 4.5    Equity Investments. ............................................................................ 39

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER .................... 39
Section 5.1    Organization; Authority; Due Execution............................................. 39
Section 5.2    Consents; No Violation. ...................................................................... 39
Section 5.3    Litigation. ............................................................................................ 40
Section 5.4    Compliance with Law.......................................................................... 40
Section 5.5    Brokers and Finders............................................................................ 40
Section 5.6    Funds. ................................................................................................. 40
Section 5.7    Ownership............................................................................................ 40

ARTICLE 6 CERTAIN COVENANTS AND AGREEMENTS OF THE SELLING PARTIES
AND BUYER ......................................................................................................... 40
Section 6.1    Expenses and Finder's Fees............................................................... 40
Section 6.2    Public Announcements........................................................................ 41
Section 6.3    Management Incentives....................................................................... 41
Section 6.4    PARCS Software. ............................................................................... 41
Section 6.5    Non-Competition, Non-Solicitation and Non-Disclosure. ................... 42
Section 6.6    INTENTIONALLY DELETED. ............................................................. 44
Section 6.7    Porteck India....................................................................................... 44
Section 6.8    Further Assurances. ........................................................................... 44
Section 6.9    Proceedings......................................................................................... 45
Section 6.10    Use of Business Name....................................................................... 45
Section 6.11    Tax Returns; Liability for Transfer Taxes and Fees........................... 45
Section 6.12    Insurance............................................................................................ 45
Section 6.13    Transition............................................................................................ 46
Section 6.14    Assignment of Cash............................................................................ 46
Section 6.15    Seller's Existence. .............................................................................. 46
Section 6.16    Mail..................................................................................................... 46
Section 6.17    Access to Information.......................................................................... 46
Section 6.18    Certain Employees.............................................................................. 46
Section 6.19    Employee Payments............................................................................ 47
Section 6.20    Conduct of the Buyer Post-Closing..................................................... 47
Section 6.21    AHMS.................................................................................................. 47

ARTICLE 7 INDEMNIFICATION............................................................................. 48

EHREN-WALIA 000004

Section 7.1    Indemnification.................................................................................................... 48

ARTICLE 8 DEFINITIONS.............................................................................................................. 52
Section 8.1    Definitions. ......................................................................................................... 52

ARTICLE 9 MISCELLANEOUS ..................................................................................................... 65
Section 9.1    Waiver. ................................................................................................................ 65
Section 9.2    Notices................................................................................................................. 66
Section 9.3    Governing Law; Consent to Jurisdiction and Waiver of Jury Trial. ............... 66
Section 9.4    Counterparts........................................................................................................ 67
Section 9.5    Headings. ............................................................................................................ 67
Section 9.6    Entire Agreement................................................................................................ 67
Section 9.7    Amendment and Modification............................................................................ 67
Section 9.8    Binding Effect; Benefits. ................................................................................... 68
Section 9.9    Joint Drafting...................................................................................................... 68
Section 9.10   Severability......................................................................................................... 68
Section 9.11   Interpretation. ..................................................................................................... 68
Section 9.12   Assignability....................................................................................................... 69
Section 9.13   Specific Performance.......................................................................................... 69
Section 9.14   Selling Shareholder Representative.................................................................... 69

{00718038.DOCX;1 }

EHREN-WALIA 000005

293

ASSET PURCHASE AGREEMENT (herein, together with the Schedules and Exhibits attached hereto, referred to as this "**Agreement**"), dated as of March [ ], 2015 (the "**Closing Date**"), by and among Arvind Walia ("**Walia**"), an individual residing at 3 Farmwood Lane, Upper Brookville, New York 11545 The JANAMINDER VIRK IRREVOCABLE TRUST, THE ARVIND WALIA IRREVOCABLE TRUST  (each of the foregoing, including Walia, a "**Selling Shareholder**", and collectively the "**Selling Shareholders;**"), Porteck Corporation, a New York corporation (the "**Seller;**"  each of the Selling Shareholders and the Seller are individually a "**Selling Party**", and collectively, the "**Selling Parties**"), Walia as the representative for the Selling Shareholders (the "**Selling Shareholder Representative**") and Physicans Practice Plus LLC, a Delaware limited liability company ("**Buyer**"). Capitalized terms used in this Agreement without definition shall have the meanings ascribed to such terms in **Article 8**.

WITNESSETH:

WHEREAS, the Selling Shareholders own all of the issued and outstanding shares of capital stock of the Seller (the "**Shares**"); and

WHEREAS, Buyer wishes to purchase from Seller, and Seller wishes to sell, assign and transfer to Buyer, substantially all of Seller's assets and properties held in connection with, necessary for, or material to the Business, and Buyer has agreed to assume and discharge the Assumed Liabilities (as defined below) in full as and when they become due,

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties herein contained, and upon the terms and subject to the conditions hereinafter set forth, the Parties hereto hereby agree as follows:

ARTICLE 1

SALE AND PURCHASE OF SHARES

Section 1.1     Purchase of Assets.  Subject to the terms and conditions hereof, at Closing Seller will sell, transfer, assign and deliver to Buyer, and Buyer will purchase from Seller, all right, title and interest of Seller in and to the properties, assets and rights of every nature as the same may exist on the Closing Date, whether real, personal, tangible, intangible or otherwise and whether now existing or acquired prior to the Closing (other than the Excluded Assets), wherever located (collectively, the "**Assets**") other than the Excluded Assets, including the following:

(a)     all of Seller's rights relating to prepaid expenses, prepayments, security deposits and similar items made by or on behalf of Seller ("**Prepayments**");

(b)     the property and equipment listed in **Schedule 1.1(b)**, and all other machinery, equipment, furnishings, inventory, supplies, vehicles, tools, dies, molds and parts and similar property including, without limitation, computers, telephone equipment, cell phones, furniture, office supplies and other items, devices and supplies used by any Employee in connection with the performance of services on behalf of the Business;

(c)      all rights of Seller to the PARCS Software, the Source Code and the other Intellectual Property, tangible embodiments thereof and rights thereunder or in respect thereof relating to or used or held for use in connection with the Business (including rights and remedies in respect of infringements) (together with all Intellectual Property rights included in the other clauses of this **Section 1.1**, the "**Intellectual Property Assets**");

(d)      all rights of Seller under the Contracts listed on **Schedule 1.1(d)** (collectively, the "**Assigned Contracts**"), including rights to receive payment, goods or services and to assert claims, including indemnification claims (if any), and take other actions;

(e)      copies or the original forms of all records, files and lists relating to customers, suppliers and Assigned Contracts, all data and information regarding customers of the Business within the possession or control of the Seller, including without limitation all customer purchase orders and the Seller's invoices related thereto and all of the Seller's purchase orders and the suppliers' invoices related thereto, and all other Books and Records (whether copies or originals are provided shall be in the sole discretion of Seller), provided that if the Books and Records are not in original form, Seller shall make available to Buyer the original form of the Books and Records, as reasonably required by Buyer;

(f)      all rights of Seller under Governmental Approvals and Permits (including Environmental Permits) including pending applications therefor or renewals thereof, to the extent their transfer is permitted by law;

(g)      all right, title and interest of Seller in and to the telephone and fax numbers set forth on **Schedule 1.1(g)**, to the extent such numbers are assignable by the Seller;

(h)      all right, title and interest of Seller in and to the domain names and websites set forth on **Schedule 1.1(h)**, including the right to use email addresses at such domain names or otherwise using Porteck.com.

(i)      all rights of Seller under or pursuant to all warranties, representations and guarantees (i) made by suppliers in connection with products or services furnished to the Business or (ii) otherwise pertaining to the Business or affecting the Assets;

(j)      Seller's right and interest to the name "Porteck Corporation" and any derivation thereof;

(k)      All business relationships and goodwill in connection with the Business as a going concern, including all goodwill associated with the Intellectual Property Assets;

(l)      insurance benefits, including rights and proceeds, arising from or relating to the Assets or Assumed Liabilities prior to Closing; and

(m)      the Deposits

Subject to the terms and conditions hereof, at the Closing, the Assets shall be transferred to Buyer free and clear of all liabilities, obligations and Liens excepting only

Assumed Liabilities and Permitted Liens, by Seller executing and delivering to Buyer the Bill of Sale.

Section 1.2    Excluded Assets.

Notwithstanding anything to the contrary herein, Seller will retain and not transfer, and Buyer will not purchase or acquire, the following assets (collectively, the "**Excluded Assets**"):

(a)    accounts receivable, notes receivable and other receivables, including those listed in **Schedule 1.2(a),** notes, bonds and other evidences of indebtedness of, and rights to receive payments from, any Person (the "**Accounts Receivable**"), together with any rights and interests in checks and wire transfers which are in transit as of or following the Closing or any amounts credited to any bank accounts on or after the Closing on account of an Accounts Receivable, together with any unbilled accrued revenue;

(b)    the assets listed on **Schedule 1.2;**

(c)    (i) Seller's Certificate of incorporation, Seller's by-laws, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, and other documents relating to the organization, maintenance, and existence of Seller as a corporation, and (ii) the rights of Selling Parties under this Agreement or any Seller Document;

(d)    any and all rebates with respect to workmen's compensation insurance;

(e)    refunds of Taxes attributable to Seller with respect to all periods prior to Closing, excluding with respect to Transfer Taxes arising out of the transfer of Assets to Buyer;

(f)    all rights of Seller to claims, demands, lawsuits and judgments with respect to the Business or the ownership, use or value of any Asset;

(g)    the Financial Records; and

(h)    all Contracts and instruments relating to Seller's Indebtedness other than the Permitted Indebtedness.

(i)    all brokerage accounts and securities accounts and securities entitlements, together with any rights and interests in checks and wire transfers which are in transit as of or following the Closing or any amounts credited to any bank accounts on or after the Closing which are not on account of Accounts Receivable, and all public or marketable securities, all rights and interests in and to any bank accounts of Seller; provided, however that with respect to any accounts that the Seller has with JP Morgan Chase, the Seller shall cause such accounts to be assigned and transferred to the Buyer and assist the Buyer in having such persons as Buyer selects be named authorized signatories on such accounts, and following the transfer of such accounts, Buyer shall transfer to the Seller any monies rightfully belonging to

EHREN-WALIA 000008

Seller that were in such accounts for the period ending February 28, 2015 (Accounts Receivable less Accounts Payable) and in connection therewith the Buyer and Seller shall cause reconciliations of such accounts at 90, 180 and 270 days following the Closing Date.

Section 1.3    Assumption of Liabilities.

(a)    Subject to the terms and conditions hereof, at Closing Buyer shall assume and agree to pay and discharge when due the following liabilities relating to the Assets and existing at or arising on or after the Closing Date (collectively, the "**Assumed Liabilities**"):

(i)    liabilities, obligations and commitments relating exclusively to the Permitted Indebtedness (defined in Section 8.1);

(ii)    liabilities, obligations and commitments arising out of the Assigned Contracts following the Closing Date; and

(iii)    liabilities, obligations and commitments relating to any rent or other amount payable, together with other liabilities, obligations and commitments under the Seller Leases arising after the Closing Date as well as any liabilities, obligations and commitments under the Seller Leases whether arising before or after the Closing Lease with respect to the condition of the Seller Leased Property.

(b)    At Closing, Buyer shall assume the Assumed Liabilities (other than the Assigned Contracts and Seller Leases which will be assumed in accordance with **Section 2.2(b)** by executing and delivering to Seller the Assumption Agreement substantially in the form annexed hereto as **Exhibit 1.3(b)** (the "**Assumption Agreement**").

Section 1.4    Excluded Liabilities.  Notwithstanding anything to the contrary herein, Buyer shall not assume any liabilities, obligations or commitments of Seller (including any liabilities, obligations or commitments of Seller relating to or arising out of the operation of the Business, the employment of the Employees or the ownership (or leasing of), operation or use of the Assets prior to the Closing), including any Proceeding with respect to the operation of the Business, the employment of the Employees or the ownership (or leasing of), operation or use of the Assets prior to the Closing, other than the Assumed Liabilities (the "**Excluded Liabilities**").  The Excluded Liabilities include, but are not limited to, the Specific Excluded Liabilities and the items set forth on **Schedule 1.4**.

Section 1.5    Consent of Third Parties.  Notwithstanding anything to the contrary herein, this Agreement shall not constitute an agreement to assign or transfer any interest in any Governmental Approval, Permit or Assigned Contract or any claim or right arising thereunder if such assignment or transfer without the consent or approval of a third party would constitute a breach thereof or affect adversely the rights of Buyer thereunder, and any such transfer or assignment shall be made subject to such consent or approval being obtained.  In the event any such consent or approval is not obtained prior to the Closing, Buyer and Seller shall continue to use commercially reasonable efforts to obtain any such consent or approval after the Closing, and Seller will cooperate with Buyer in lawful and commercially reasonable

EHREN-WALIA 000009

arrangements to provide that Buyer shall receive the interest of Seller in the benefits under any such Governmental Approval, Permit or Assigned Contract, including to the extent commercially reasonable, performance by Seller, as agent, provided that Buyer shall undertake to pay or satisfy the corresponding liabilities for the enjoyment of such benefit to the extent Buyer would have been responsible therefor if such consent or approval had been obtained.  Seller shall pay and discharge, and shall indemnify and hold Buyer harmless from and against, before and after the Closing (a) any and all out-of-pocket costs of seeking any such Governmental Approval and Permit and (b) any fees charged by any third party with respect to seeking any such Assigned Contract consent. Nothing in this **Section 1.5** shall be deemed a waiver by Buyer of its right to receive prior to the Closing an effective assignment of all of the Assets nor shall this **Section 1.5** be deemed to constitute an agreement to exclude from the Assets any assets described under **Section 1.1**.  The parties hereby agree that the Seller shall have 60 days from the date hereof to obtain the consent of the landlord with respect to the Seller Leased Property.

Section 1.6    Purchase Price and Payment for Assets.

(a)    The purchase price for the Assets consists of the following (i) $12,800,000 (the "**Closing Consideration**"), of which sum (1) $12,300,000 will be paid by Buyer to Seller (the "**Closing Payment**"), (2) $500,000 will be deemed paid by Buyer's causing the cancellation of the Seller's obligation to Constellation Health Technology Inc. pursuant to that certain Promissory Note (the "**Bridge Note**") dated February 9, 2015, and (ii) the Post-Closing Payment payable pursuant to **Section 1.7** (collectively, the "**Purchase Price**").

(b)    Payment of Purchase Price.  At the Closing, Buyer shall deliver to Seller the Closing Payment in immediately available funds by wire transfer to an account or accounts designated by Seller to Buyer in writing no later than three Business Days prior to the Closing.

(c)    Discharge of Debt and Liabilities.

(i)    At or before the Closing, the Selling Parties shall pay and discharge all debts, liabilities and obligations of the Seller (including, without limitation, any liabilities in respect of any Indebtedness, Payables and Transaction Expenses as well as any accounts payable and accrued expenses that have been incurred in the Ordinary Course of Business consistent with past practices); provided, however the Seller shall not be required to discharge and pay Permitted Indebtedness and the Bridge Note and Assumed Liabilities.  The Parties agree that if there is a dispute after the Closing and prior to March 31, 2016 as to whether a particular debt, liability or obligation is, on the one hand an Excluded Liability or another debt, liability or obligation of the Seller or on the other hand is an Assumed Liability or another debt, liability or obligation of the Buyer, the Buyer's accountants shall determine to what extent each Party is responsible for such debt, liability or obligation, and such accountants' determination shall be final and binding on the Parties; provided however if a disputed debt, liability or obligation is for an amount in excess of $50,000, then the dispute may be referred thereafter for decision to a Neutral Firm that will agree to act as Arbiter. If: (i) Buyer and the Seller are unable to agree on the selection of an Arbiter within fifteen (15) days, then each of Buyer, on the one hand, and the Seller, on the other hand, shall select one Neutral Firm and those two Neutral Firms together shall appoint a Neutral Firm as Arbiter hereunder, and such appointment shall be

EHREN-WALIA 000010

conclusive and binding on all of the Parties; or (ii) if any Party does not select a Neutral Firm within ten (10) days of written demand therefor by the other Party, then the Neutral Firm selected by the other Party shall act as the Arbiter. The Seller and Buyer shall each be entitled to present one written statement of position with respect to the matters in dispute within twenty (20) days of the engagement of the Arbiter (with copies to be provided concurrently to the other Party) and, no later than the tenth (10th) day following receipt thereof, one rebuttal statement with respect to the statement of position delivered by the other Party (which shall be provided concurrently to the other Party). As soon as practicable, but no later than forty-five (45) days after its acceptance of its appointment as Arbiter, the Arbiter shall determine, based solely on the written statements by Buyer and the Seller, and not by independent review, the relative responsibility of the Parties for such particular debt, liability or obligation and shall render a written report as to the determination. The Arbiter shall have exclusive jurisdiction over, and resort to the Arbiter as provided in this **Section 1.7(k)** shall be the sole recourse and remedy of the Parties against one another with respect to, any such disputes; and the Arbiter's determination shall (absent mathematical error) be conclusive and binding on all of the Parties and shall be enforceable in a court of law. The fees of the Arbiter shall be borne equally by the Parties.

(ii)     Except as provided below, at or before the Closing, the Seller shall cause all security interests, encumbrances and other Liens (other than Permitted Liens) on or relating to any of the properties, assets and rights of the Seller, at the Selling Parties' sole cost and expense, to be released, extinguished and discharged in full, and shall deliver to Buyer instruments and Uniform Commercial Code ("**UCC**") termination statements, releasing, extinguishing and discharging all such security interests, encumbrances, mortgages and other Liens (other than Permitted Liens), all in form and substance satisfactory to Buyer. In the event Buyer elects to proceed with the Closing prior to its receipt of all such documentation, instruments and UCC termination statements, the Selling Parties shall nevertheless obtain and deliver to Buyer all instruments and UCC termination statements, and obtain the release, extinguishment and discharge of all Liens contemplated to be released by this **Section 1.6(c)(ii)**. The Parties agree that if the Liens held by Wachovia (the "**Wachovia Liens**") have not been extinguished prior to the Closing, they shall proceed with the Closing and Seller shall obtain and deliver subsequent to the Closing documentation, instruments and UCC termination statements with respect to the Wachovia Liens.

(d)     The Business.  The business activities, operations and affairs of the Seller as currently being conducted, including without limitation, the provision of medical billing and collection services, business process outsourcing, and the creation and management of software related to medical billing and collection services, is herein called the "**Business**".

(e)     For the purpose of partially securing Seller's obligations pursuant, and without limiting Seller's obligations thereunder, the amount of two million five hundred thousand Dollars ($2,500,000) in cash (the "Escrow Amount") shall be delivered by Buyers at the Closing to the Escrow Agent by wire transfer of immediately available funds to an account (the "Escrow Account") to be designated and administered by the Escrow Agent pursuant to an escrow agreement substantially in the form of Exhibit A (the "Escrow Agreement"), which Escrow Agreement shall provide, among other things, that any amounts remaining in the Escrow Account shall be released to Seller twelve (12) months after the Closing, to the extent not subject

EHREN-WALIA 000011

to any claims made prior to that time. Seller and Buyer agree that for all Tax purposes, any amounts in the Escrow Account released to the Seller pursuant to this Section 2.7 shall be treated as additional purchase price, unless otherwise required by applicable Law. The Escrow Payment Working Capital Deficiency

Section 1.7    Post-Closing Payment.

(a)    General. Buyer shall pay the Seller following the Closing in accordance with this Section certain additional sums (the "**Post-Closing Payment**") an amount (the "**Earn-Out Payment**") based upon the Earn-Out Factor (as defined below) and Buyer's revenue and EBITDA during the Designated Period or Second Designated Period as applicable (provided, however the Earn-Out Payment shall be reduced, if necessary, so that aggregate amount of the Closing Consideration, the Post-Closing Payment and the amount payable pursuant to **Section 6.3** shall not exceed $25,000,000 (and if at the time the Earn-Out Payment would ordinarily be paidThe Escrow, together with the Earn-Out Payment, the "**Post-Closing Conditional Payment**"), which are subject to reduction pursuant to **Section 1.7(d)** provided, however that the Post Closing Conditional Payment shall, if Buyer's EBITDA for the Designated Period is less than $2,000,000, be reduced by (I) 5.4 multiplied by (II) an amount equal to $2,000,000 minus Buyer's EBITDA for the Designated Period; provided, further, however the Post-Closing Payment is not payable if Porteck India or the Selling Parties are in material breach of their obligations under the Option Agreement (as determined by arbitration in accordance with **Section 9.3(c))** on the first anniversary of the Closing Date and, if Buyer's EBITDA for the Designated Period is $2,000,000 or less, on the second anniversary of the Closing Date, and any Post-Closing Payment will be deferred until such determination if a notice seeking arbitration is commenced within 13 months following the Closing Date; and provided further, however Buyer may set off against the Post-Closing Payment any amounts owing to Buyer pursuant to **Section 7.1(a)** if a claim therefor is brought by a Buyer Indemnified Person in accordance with **Section 7.1(e)**. The "**Earn-Out Factor**" equals, if Buyer's EBITDA for the Designated Period is more than $2,000,000, (i) (A) Buyer's EBITDA for the Designated Period less (B) $2,000,000 multiplied by (ii) 2.7, and if Buyer's EBITDA for the Designated Period is $2,000,000 or less, (i) (A) Buyer's EBITDA for the Second Designated Period less (B) $2,300,000 multiplied by (ii) 2.7 . The "**Designated Period**" means the twelve consecutive calendar months commencing with the first calendar month beginning after the Closing Date. The "**Second Designated Period**" means the twelve consecutive calendar months commencing with the thirteenth calendar month beginning after the Closing Date. "**EBITDA**" means net income before deduction of interest, taxes, depreciation and amortization and with such adjustments, if any, to which the Buyer and Seller may agree in writing.

(b)    Earn-Out based on Revenue. Buyer shall pay the Seller, subject to reduction pursuant to **Section 1.7(d),** an amount equal to the Earn-Out Factor if the Buyer's revenue for the Designated Period (if the Earn-Out Factor is based on the Designated Period) or the Second Designated Period (if the Earn-Out Factor is based on the Second Designated Period) is at least $13,000,000; provided, however if the Buyer's revenue for the Designated Period or Second Designated Period, as applicable, is at least $11,000,000 but less than $13,000,000, then Buyer shall pay the Seller an amount equal to the Earn-Out Factor multiplied by a fraction, the

EHREN-WALIA 000012

numerator of which is the Buyer's revenue for the Designated Period or Second Designated Period, as applicable, and the denominator of which is $13,000,000. No amount shall be payable pursuant to this **Section 1.7(b)** if the Buyer's revenue for the Designated Period or Second Designated Period, as applicable, is less than $11,000,000. Revenue shall be calculated on an accrual basis in accordance with GAAP, with a deduction for a reasonable estimate of bad debt.

By way of an example if the Buyer's EBITDA for the Designated Period is $3,000,000, then the Earn-Out Factor would be $2,700,000 (i.e. ($3,000,000 - $2,000,000) x 2.7), and then if the revenues were $13,500,000 for the Designated Period, the Seller would be entitled to $2,700,000 under **Section 1.7(b)**, but if the revenues were $12,000,000 the Seller would be entitled to $2,492,307.69 ( *i.e.* $2,700,000 x ($12,000,000 ÷ $13,000,000) under **Section 1.7(b)**. If the revenues were only $10,000,000, the Seller would receive nothing under **Section 1.7(b)**.

If instead of EBITDA for the Designated Period of $3,000,000 the Buyer's EBITDA is only $2,200,000, then the Earn-Out Factor would be $540,000 (i.e. ($2,200,000 - $2,000,000) x 2.7), and then if the revenues were $13,500,000 for the Designated Period, the Seller would be entitled to $540,000 under **Section 1.7(b)**, but if the revenues were $12,000,000 the Seller would be entitled to $498,461.54 ( *i.e.* $540,000 x ($12,000,000 ÷ $13,000,000) under **Section 1.7(b)**. If the revenues were only $10,000,000, the Seller would receive nothing under **Section 1.7(b)**.

(c)  Earn-Out based on EBITDA. Buyer shall pay the Seller, subject to reduction pursuant to **Section 1.7(d),** an amount equal to the Earn-Out Factor if the Buyer's EBITDA for the Designated Period (if the Earn-Out Factor is based on the Designated Period) or the Second Designated Period (if the Earn-Out Factor is based on the Second Designated Period) is at least $2,750,000; provided, however if the Buyer's EBITDA for the Designated Period or Second Designated Period, as applicable, is at least $2,400,000 but less than $2,750,000, then Buyer shall pay the Seller an amount equal to the Earn-Out Factor multiplied by a fraction, the numerator of which is the Buyer's EBITDA for the Designated Period or Second Designated Period, as applicable, and the denominator of which is $2,750,000. No amount shall be payable pursuant to this **Section 1.7(c)** if the Buyer's EBITDA for the Designated Period or Second Designated Period, as applicable, is less than $2,400,000.

By way of an example if the Buyer's EBITDA for the Designated Period is $3,000,000, then the Earn-Out Factor would be $2,700,000 (i.e. ($3,000,000 - $2,000,000) x 2.7), and as a result since the EBITDA was at least $2,750,00, the Seller would be entitled to $2,700,000 under **Section 1.7(c)**.

However if the Buyer's EBITDA for the Designated Period is $2,500,000, then the Earn-out Factor would be $1,350,000 (i.e. ($2,500,000 - $2,000,000) x 2.7), and as a result since the EBITDA was at least $2,400,000, the Seller would be entitled to $1,178,181.82 ( *i.e.* $1,350,000 x ($2,4000,000 ÷ $2,750,000) under **Section 1.7(c)**.

EHREN-WALIA 000013

If the EBITDA for the Designated Period were only $2,200,000, the Seller would receive nothing under **Section 1.7(c)** because there is no payout under this provision if EBITDA is less than $2,400,000.

(d)    Reductions to Post-Closing Payments. Any Post-Closing Conditional Payment shall be reduced by an amount equal to the Top Client Loss and any Post-Closing Payment shall be reduced by an amount equal to (i) the Bad A/R Amount plus (ii) the Expected Working Capital Deficiency. The "**Bad A/R Amount**" means (i) $0.00 if the Closing Accounts Receivable Collections is at least 80% of the Closing Accounts Receivables and (ii) if the Closing Accounts Receivable Collections is less than 80% of the Closing Accounts Receivables, then the amount of the Closing Accounts Receivables less the Closing Accounts Receivable Collections. "**Top Client Loss**" means $ 0.00 unless before the end of the Designated Period one or more of the Top Clients ceases to be a Current Customer, in which case Top Client Loss means the amount by which $11,000,000 exceeded the average annual revenue during the Adjusted Designated Period. The "**Adjusted Designated Period**" means (i) if the Section 1.7 Notice is not delivered, the Designated Period and (ii) if the Section 1.7 Notice is delivered, the Designated Period and the Second Designated Period. The "**Expected Working Capital Deficiency**" is the amount, if any, by which the Expected Working Capital exceeds $_____. The "**Expected Working Capital**" is the amount of working capital the Buyer needed to have on hand as of the Closing Date in order to operate the Business as in effect at such date in the Ordinary Course of Business, which amount shall be reasonably determined by the Buyer following the Closing. Once the Buyer determines the Expected Working Capital, the Buyer shall deliver to the Seller a notice setting forth the amount of the Expected Working Capital and the amount of the Expected Working Capital Deficiency, if any. The Selling Parties shall have seven days from its receipt of such notice to pay Buyer the amount of the Expected Working Capital Deficiency (the "**Deficiency Amount**") and if it is not received by Buyer, interest will accrue on the Expected Working Capital Deficiency at the rate of ten percent (10%) per annum from the date of the notice until the date of the payment of the Post-Closing Payment at which time the accrued interest will be deducted from the Post-Closing Payment; if Buyer receives from Seller the Deficiency Amount, Buyer will repay Seller the Deficiency Amount at the same time it pays the Post-Closing Payment.

(e)    Preparation of Preliminary Statement. Within 60 days following the end of the Designated Period, Buyer will prepare, or cause to be prepared, and deliver to the Seller a Preliminary Statement (the "**Preliminary Statement**") setting forth the revenues and EBITDA of the Buyer for the Designated Period, prepared in accordance with GAAP; provided, however that the Seller has the option exercisable by delivering written notice (the "**Section 1.7 Notice**") to Buyer at least 60 days prior to the end of the Designated Period to require Buyer also to calculate revenues for the Second Designated Period, in which case Buyer will not prepare, or cause to be prepared, a Preliminary Statement within 60 days following the end of the Designated Period, but instead Buyer will prepare, or cause to be prepared, within 60 days following the end of the Second Designated Period a Preliminary Statement setting forth (i) the revenues for the Designated Period and the Second Designated Period, prepared in accordance with GAAP and (ii) EBITDA of the Buyer for the Designated Period, prepared in accordance with GAAP. The Preliminary Statement shall be accompanied by a letter from the Buyer's accountants which states that the Preliminary Statement was prepared in accordance with this Agreement.

(f)    Review of Preliminary Statement.  Promptly after the preparation of the Preliminary Statement, Buyer shall deliver it to the Seller. The Seller and any independent accountant selected by the Seller may review the Preliminary Statement and may make inquiry of Buyer and its representatives. Buyer will make available to the Seller and such independent accountant, as reasonably requested by the Seller, all books and records of the Buyer required to assess the Preliminary Statement. The Preliminary Statement shall be binding and conclusive upon, and deemed accepted by, the Seller, unless the Seller shall have notified Buyer in writing of any objections thereto, consistent with the provisions of this **Section 1.7**, within forty five (45) days after the delivery thereof. The written notice delivered by the Seller to Buyer under this **Section 1.7(f)** shall specify in reasonable detail each specific item on the Preliminary Statement that the Seller disputes and a summary of the reasons for such dispute.  Any portion of the Preliminary Statement not so disputed by the Seller shall be deemed final and conclusive.

(g)    Disputes.  If a dispute between Buyer and the Seller relating to the Preliminary Statement that cannot be resolved by Buyer and the Seller within thirty (30) days after receipt by Buyer of the notice referred to in **Section 1.7(f)**, the Seller may engage an nationally recognized accounting firm to prepare if a dispute relates to the statement the revenues and EBITDA of the Buyer for the Designated Period, an audited statement of the revenues and EBITDA of the Buyer for the Designated Period, prepared in accordance with GAAP (any such statement, a "**Reply Statement**").  The Preliminary Statement shall be binding except to the extent there is a Material Difference between the Preliminary Statement and the Reply Statement, in which case Buyer and the Seller shall try to resolve the dispute with respect to the portion where a Material Difference exists.   "**Material Difference**" means a difference between the Preliminary Statement and the Reply Statement of at least 5% with respect to revenues for the Designated Period or either 5% or $150,000 with respect to EBITDA of the Buyer for the Designated Period.  If a dispute with respect to the portion where a Material Difference exists cannot be resolved by Buyer and the Seller within thirty (30) days after receipt by Buyer of the Reply Statement, the dispute with respect to such portion shall be referred thereafter for decision to a mutually agreeable independent nationally recognized accounting firm who has not then provided services to any Party in the past two (2) years (a "**Neutral Firm**") that will agree to act as Arbiter (the "**Arbiter**"). If: (i) Buyer and the Seller are unable to agree on the selection of an Arbiter within fifteen (15) days of the conclusion of the period described above, then each of Buyer, on the one hand, and the Seller, on the other hand, shall select one Neutral Firm and those two Neutral Firms together shall appoint a Neutral Firm as Arbiter hereunder, and such appointment shall be conclusive and binding on all of the Parties; or (ii) if any Party does not select a Neutral Firm within ten (10) days of written demand therefor by the other Party, then the Neutral Firm selected by the other Party shall act as the Arbiter. The Seller and Buyer shall each be entitled to present one written statement of position with respect to the matters in dispute (which shall not include factual or expert affidavits, reports or submissions) within twenty (20) days of the engagement of the Arbiter (with copies to be provided concurrently to the other Party) and, no later than the tenth (10th) day following receipt thereof, one rebuttal statement (which shall not include factual or expert affidavits, reports or submissions) with respect to the statement of position delivered by the other Party (which shall be provided concurrently to the other Party). As soon as practicable, but no later than forty-five (45) days after its acceptance of its appointment as Arbiter, the Arbiter shall determine, based solely on the written statements by Buyer and the Seller, and not by independent review, only those items in dispute on the Preliminary Statement and shall render a written report as to the resolution of each dispute and

EHREN-WALIA 000015

the resulting calculation of the Final Statement. In making its determination, the Arbiter shall elect the position of either Buyer, on the one hand, or the Seller, on the other hand, with respect to the calculation of each item of disagreement and may not impose an alternative resolution with respect thereto. The Arbiter shall have exclusive jurisdiction over, and resort to the Arbiter as provided in this **Section 1.7(g)** shall be the sole recourse and remedy of the Parties against one another with respect to, any disputes arising out of or relating to the Preliminary Statement and the Final Statement; and the Arbiter's determination shall (absent mathematical error) be conclusive and binding on all of the Parties and shall be enforceable in a court of law. The fees of the Arbiter shall be borne equally by the Parties.

(h)     Final Statement.  The Preliminary Statement shall become final and binding upon the Parties upon the earliest of: (i) the failure by the Seller to object thereto within the period permitted under, and otherwise in material accordance with the requirements of, **Section 1.7(f)**; (ii) the written agreement between Buyer and the Seller with respect thereto; and (iii) the decision by the Arbiter with respect to disputes under **Section 1.7(g)**. The Preliminary Statement, as deemed to be agreed pursuant to clause (i) above, or as adjusted pursuant to the written agreement of Buyer and the Seller hereto or as determined by the Arbiter, when final and binding, is referred to herein as the "**Final Statement.**"

(i)     Post-Closing Adjustment to the Purchase Price.  As soon as practicable (but not more than five (5) Business Days) after the determination of the Final Statement, Buyer shall pay to Seller the Post-Closing Payment.  Such amount shall be paid to the Selling Shareholders in immediately available funds.

(j)     Preparation of Accounts Receivable Statement.  Within 330 days following the Closing, Seller will prepare, or cause to be prepared, and deliver to the Buyer a Preliminary Accounts Receivable Statement (the "**Preliminary A/R Statement**") setting forth the amount the Seller collected during the 270 day period commencing on the first day after the Closing Date with respect to the Closing Accounts Receivables (the "**Closing Accounts Receivable Collections**").  The Preliminary A/R Statement shall be accompanied by a letter from the Seller's accountants which states that the Preliminary A/R Statement was prepared in accordance with this Agreement.  The Buyer and any accountant selected by the Buyer may review the Preliminary A/R Statement and may make inquiry of Seller and its representatives. Seller will make available to the Buyer and such accountant, as reasonably requested by the Buyer, all books and records of the Seller required to assess the Preliminary A/R Statement. The Preliminary A/R Statement shall be binding and conclusive upon, and deemed accepted by, the Buyer, unless the Buyer shall have notified Seller in writing of any objections thereto, consistent with the provisions of this **Section 1.7**, within thirty (30) days after the delivery thereof. The written notice delivered by the Buyer to Seller under this **Section 1.7(j)** shall specify in reasonable detail each specific item on the Preliminary A/R Statement that the Buyer disputes and a summary of the reasons for such dispute.  Any portion of the Preliminary A/R Statement not so disputed by the Buyer shall be deemed final and conclusive.

(k)     Disputes.  If a dispute between Buyer and the Seller relating to the Preliminary A/R Statement that cannot be resolved by Buyer and the Seller within thirty (30) days after receipt by Seller of the notice referred to in **Section 1.7(j)**, the Buyer may engage a nationally recognized accounting firm to prepare a statement of the amount the Seller collected

during the 270 day period commencing on the first day after the Closing Date with respect to the Closing Accounts Receivables (any such statement, a "**Reply A/R Statement**").  The Preliminary A/R Statement shall be binding except to the extent there is a Material A/R Difference between the Preliminary A/R Statement and the Reply A/R Statement, in which case Buyer and the Seller shall try to resolve the dispute with respect to the portion where a Material A/R Difference exists.   "**Material A/R Difference**" means a difference between the Preliminary A/R Statement and the Reply A/R Statement of at least 5%.  If a dispute with respect to the portion where a Material A/R Difference exists cannot be resolved by Buyer and the Seller within thirty (30) days after receipt by Seller of the Reply A/R Statement, the dispute with respect to such portion shall be referred thereafter for decision to a Neutral Firm that will agree to act as Arbiter. If: (i) Buyer and the Seller are unable to agree on the selection of an Arbiter within fifteen (15) days of the conclusion of the period described above, then each of Buyer, on the one hand, and the Seller, on the other hand, shall select one Neutral Firm and those two Neutral Firms together shall appoint a Neutral Firm as Arbiter hereunder, and such appointment shall be conclusive and binding on all of the Parties; or (ii) if any Party does not select a Neutral Firm within ten (10) days of written demand therefor by the other Party, then the Neutral Firm selected by the other Party shall act as the Arbiter. The Seller and Buyer shall each be entitled to present one written statement of position with respect to the matters in dispute (which shall not include factual or expert affidavits, reports or submissions) within twenty (20) days of the engagement of the Arbiter (with copies to be provided concurrently to the other Party) and, no later than the tenth (10th) day following receipt thereof, one rebuttal statement (which shall not include factual or expert affidavits, reports or submissions) with respect to the statement of position delivered by the other Party (which shall be provided concurrently to the other Party). As soon as practicable, but no later than forty-five (45) days after its acceptance of its appointment as Arbiter, the Arbiter shall determine, based solely on the written statements by Buyer and the Seller, and not by independent review, only those items in dispute on the Preliminary A/R Statement and shall render a written report as to the resolution of each dispute and the resulting calculation of the Final A/R Statement. In making its determination, the Arbiter shall elect the position of either Buyer, on the one hand, or the Seller, on the other hand, with respect to the calculation of each item of disagreement and may not impose an alternative resolution with respect thereto. The Arbiter shall have exclusive jurisdiction over, and resort to the Arbiter as provided in this **Section 1.7(k)** shall be the sole recourse and remedy of the Parties against one another with respect to, any disputes arising out of or relating to the Preliminary A/R Statement and the Final A/R Statement; and the Arbiter's determination shall (absent mathematical error) be conclusive and binding on all of the Parties and shall be enforceable in a court of law. The fees of the Arbiter shall be borne equally by the Parties.

(l)     Final A/R Statement.  The Preliminary A/R Statement shall become final and binding upon the Parties upon the earliest of: (i) the failure by the Buyer to object thereto within the period permitted under, and otherwise in material accordance with the requirements of, **Section 1.7(j)**; (ii) the written agreement between Buyer and the Seller with respect thereto; and (iii) the decision by the Arbiter with respect to disputes under **Section 1.7(k)**. The Preliminary A/R Statement, as deemed to be agreed pursuant to clause (i) above, or as adjusted pursuant to the written agreement of Buyer and the Seller hereto or as determined by the Arbiter, when final and binding, is referred to herein as the "**Final A/R Statement.**"

EHREN-WALIA 000017

Section 1.8 <u>Allocation.</u> The Parties agree to allocate the Purchase Price, the Assumed Liabilities and other relevant items among the Assets in accordance with the allocation schedule annexed hereto as **Schedule 1.8**. In connection with the foregoing, the Parties shall cooperate with each other and provide such information as any of them shall reasonably request. The Parties will each report the federal, state and local and other Tax consequences of the purchase and sale contemplated hereby (including the filing of Internal Revenue Service Form 8594) in a manner consistent with such allocation schedules.

Section 1.9 <u>Passage of Title and Risk of Loss.</u> Legal title, equitable title and risk of loss with respect to the property and rights to be transferred hereunder shall not pass to Buyer until the property or right is transferred at the Closing hereunder; provided, however, that if any loss of any of the Assets occurs prior to the transfer of the property or right, Buyer shall be entitled to the proceeds of any insurance payable with respect to the loss of such Assets.

ARTICLE 2

CLOSING

Section 2.1 <u>Closing.</u> The closing of the transactions provided for herein (the "**Closing**") will take place at the offices of Robinson Brog Leinwand Greene Genovese & Gluck P.C. at the address set forth in **Section 9.2(b)** hereof on the Closing Date. All proceedings to be taken and all documents to be executed and delivered by the Parties at the Closing shall be deemed to have been taken, executed and delivered simultaneously and no proceedings shall be deemed taken nor any documents executed or delivered until all have been taken, executed and delivered.  Closing shall be deemed effective as of 11:59 pm on the Closing Date. Notwithstanding the foregoing (i) the Selling Parties may deliver all of the Seller Documents required hereunder to Buyer's counsel on or before the Closing Date (to hold and deliver in escrow according to the Selling Parties' instructions), and (ii) Buyer may deliver all of the Buyer Documents required hereunder to the Seller's counsel on or before the Closing Date (to hold and deliver in escrow according to the Buyer's instructions).

Section 2.2 <u>Closing Deliverables.</u>

(a) At the Closing, the Selling Parties will deliver to Buyer:

(i) the Bill of Sale substantially in the form attached hereto as **Exhibit 2.2(a)(i)** (the "**Bill of Sale**"), executed and dated the Closing Date, with respect to the Assets, in each case dated as of the date that is one day prior to the Closing Date;

(ii) Employment Agreements, duly executed by the Key Employees, in the forms attached hereto as **Exhibit 2.2(a)(ii)** (the "**Employment Agreements**");

(iii) a guarantee from each of the Selling Shareholders and Arvind's wife, in the form attached hereto as **Exhibit 2.2(a)(iii)**, and dated as of the Closing Date;

EHREN-WALIA 000018

(iv)     an assignment and assumption of all Assigned Contracts (other than the Seller Leases) substantially in the form attached hereto as **Exhibit 2.2(a)(iv)** (the "**Assignment of Contracts**") executed by the Seller and dated the Closing Date;

(v)     an assignment and assumption of all copyrights substantially in the form attached hereto as **Exhibit 2.2(a)(v)** (the "**Assignment of Copyrights**") executed by the Seller and dated the Closing Date;

(vi)     an assignment of all domain names substantially in the form attached hereto as **Exhibit 2.2(a)(vi)** (the "**Assignment of Domain Names**") executed by the Seller and dated the Closing Date;

(vii)     a trademark assignment substantially in the form attached hereto as **Exhibit 2.2(a)(vii)** (the "**Trademark Assignment**") executed by the Seller and dated the Closing Date;

(viii)     an assignment and assumption of Intellectual Property substantially in the form attached hereto as **Exhibit 2.2(a)(viii)** (the "**Assignment of Intellectual Property**") executed by the Seller and dated the Closing Date;

(ix)     an assignment of any other agreements and instruments constituting Assets substantially in the form attached hereto as **Exhibit 2.2(a)(ix)** (the "**General Assignment**") executed by the Seller and dated the Closing Date;

(x)     the Assumption Agreement executed by the Seller and dated the Closing Date;

(xi)     with respect to the Seller Leases, an assignment of such Seller Leases executed by Seller and dated the Closing Date (the "**Lease Assignment**"), accompanied by the landlord's consent and estoppel executed by the landlord for the Seller Leased Property (the "**Landlord**") and dated the Closing Date (the "**Landlord Estoppel**"), in the form and substance acceptable to Landlord, if any, as **Exhibit 2.2(a)(xi)**

(xii)     a certificate of good standing of the Seller certified as of a then recent date by the Secretary of State of the jurisdiction of such entity's incorporation;

(xiii)     certified copies of the resolutions duly adopted by the board of directors of the Seller and the shareholders of the Seller authorizing the execution, delivery and performance of this Agreement and each of the other Seller Documents executed by the Seller and the consummation of all transactions contemplated hereby and thereby;

(xiv)     a certificate of the secretary or other appropriate officer of the Seller certifying as to the incumbency of the officer(s) of the Seller executing this Agreement and the other Seller Documents, including specimen signatures;

(xv)     pay-off letter(s) in form and substance reasonably satisfactory to Buyer evidencing the amount required to discharge at Closing all Indebtedness

EHREN-WALIA 000019

(other than Permitted Indebtedness and the Bridge Note) and accomplish the release of all Liens related thereto;

(xvi)   general releases releasing the Seller executed by each of the Selling Shareholders in form and substance as **Exhibit 2.2.(a)(xvii)**, provided, however that such release shall not release any claim, loss or obligation of the Selling Shareholders arising under (i) this Agreement or any agreement delivered pursuant to this Agreement, or (ii) any obligations provided by law or under the Seller's governance documents with respect to the indemnification of such Selling Shareholders

(xvii)   consent from Arvind's wife in which she consents to the transactions, represents that she has no equity or right to acquire equity issued or issuable by the Seller and releases the Seller;

(xviii)   Option Agreement providing Buyer or its designee with the right to acquire all of the stock or substantially all of the assets of Porteck India (the "**Option Agreement**") executed by Porteck India and  each of the Selling Shareholders in form and substance as **Exhibit 2.2.(a)(xviii)**;

(xix)   certificates of insurance for the Buyer Insurance Policies required under **Section 6.11(c)**, certifying that such Buyer Insurance Policies are in full force and effect as of the date specified on the certificates;

(xx)   copies of UCC-3 termination statements extinguishing all Liens, other than Permitted Liens, on the Assets;

(xxi)   evidence of the termination of all Specified Employees;

(xxii)   copies or originals of all Books and Records;evidence of payment of the Buyer Transaction Expenses in accordance with the instructions provided by Buyer to Seller;

(xxiii)  a list of all checks issued by the Seller that have not been debited from the Seller's bank account prior to the Closing; andsuch other instruments and documents of any Selling Party, in form and substance reasonably acceptable to Buyer, as may be reasonably necessary to effect the Closing.

(b)      At the Closing, Buyer will:

(i)      deliver to Seller in accordance with **Section 1.6** the Closing Payment;

(ii)     deliver to each Key Employee duly executed counterpart of the Employment Agreement for such Key Employee;

EHREN-WALIA 000020

(iii)    deliver to the Seller a guarantee from Orion Healthcorp Inc., which indirectly owns all of the equity of Buyer, in the form attached hereto as **Exhibit 2.2(b)(iii)**, and dated as of the Closing Date;

(iv)    the Assignments of Contracts executed by the Buyer and dated the Closing Date;

(v)    the Assignments of Copyright executed by the Buyer and dated the Closing Date;

(vi)    the Assignments of Intellectual Property executed by the Buyer and dated the Closing Date;

(vii)    the Assumption Agreement executed by the Buyer and dated the Closing Date;

(viii)    the Lease Assignment and Landlord Estoppal executed by Buyer;

(ix)    deliver to the Seller such other instruments and documents, in form and substance reasonably acceptable to the Seller, as may be reasonably necessary to effect the Closing;

(x)    certified copies of the resolutions duly adopted by the Manager of the Buyer authorizing the execution, delivery and performance of this Agreement and each of the other Buyer Documents executed by the Buyer and the consummation of all transactions contemplated hereby and thereby.

ARTICLE 3

REPRESENTATIONS AND WARRANTIES REGARDING THE SELLER

The Seller hereby represents and warrants to Buyer that:

Section 3.1    Organization; Authority; Due Execution.

(a)    The Seller is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has all requisite corporate power and authority to own, lease and operate its properties and assets, and to carry on its business as presently conducted and in the places such properties are now owned, leased or operated and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of its properties or conduct of its business requires such qualification except where the failure to be so qualified or in good standing would not have a Material Adverse Effect. The Seller has provided to Buyer a complete and correct copy of its certificate of incorporation and bylaws as amended to date. Such certificate of incorporation and bylaws so delivered are in full force and effect. **Schedule 3.1(a)** hereto contains a correct and complete list of each jurisdiction where the Seller is qualified or licensed to do business. The Seller does not do any business under any name other than the name set forth in the certificate of

incorporation. The Seller has provided to Buyer complete and accurate copies of the minutes of all meetings of the shareholders of the Seller, the board of directors of the Seller and the committees thereof. The minute books and other similar records of the Seller contain accurate summaries of all actions taken at any meetings of the shareholders of the Seller, the board of directors of the Seller and the committees thereof, and include all written consents executed in lieu of the holding of any such meeting. **Schedule 3.1(a)** hereto lists all directors and executive officers of the Seller.

(b)      The Seller has all requisite corporate power and authority to enter into this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by the Seller of this Agreement and the other Seller Documents executed and delivered by the Seller and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly and validly adopted and approved by the board of directors of the Seller and no other corporate proceedings on the part of the Seller or its shareholders are necessary with respect to any such matter. This Agreement and the other Seller Documents to which the Seller is a party have been duly executed and delivered by the Seller and constitute the valid, binding and enforceable obligation of the Seller, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and rules of law governing specific performance, injunctive relief and other equitable remedies.

Section 3.2      <u>Subsidiaries and Equity Investments.</u>  Other than Porteck India the Seller does not have and has never had a Subsidiary.  Other than Porteck India the Seller does not have any interest, direct or indirect, or any commitment to purchase any interest, direct or indirect, in, or the power to vote the equity interest of, any other corporation, limited liability company, partnership, joint venture or other business enterprise or entity (other than with respect to any marketable securities included in current assets).  None of the Business has been conducted through any direct or indirect Subsidiary or any direct or indirect Affiliate of the Seller or any Selling Shareholder other than Porteck India pursuant to the agreement dated as of December 29, 2004 as extended by an undated agreement by and between Porteck India and the Seller; the Selling Parties do not engage in any business with Porteck India other than pursuant to such agreement.

Section 3.3      <u>Consents; No Violation.</u>

(a)      Except as set forth on **Schedule 3.3(a)** hereto, no notices, reports or other filings are required to be made with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by, the Seller from any Governmental Entity or Person (i) in connection with the execution and delivery of this Agreement or any of the other Seller Documents by the Seller and the consummation by the Seller of the transactions contemplated hereby and thereby, or (ii) the absence of which could (A) prevent, delay or impair the Seller's ability to consummate the transactions contemplated by this Agreement or any other Seller Document, or (B) impair the ability of Buyer following consummation of the transactions contemplated hereby to conduct the Business.

EHREN-WALIA 000022

(b)    Assuming all required Consents as listed on **Schedule 3.3(a)** are obtained, except as set forth on **Schedule 3.3(b)** hereto, the execution, delivery and performance of this Agreement and the other Seller Documents do not, and the consummation of the transactions contemplated hereby and thereby will not, constitute or result in (i) with or without notice or the passage of time, or both, a breach or violation of, or a default under, the Seller's certificate of incorporation or bylaws or other governing documents, (ii) with or without notice or the passage of time, or both, a breach of, or violation of or a conflict with, or a default under, or the termination of, or the acceleration under, any Contract, debt, obligation, governmental or non-governmental permit or license to which the Seller is a party or to or by which it or any of the Business is subject or bound, (iii) the creation or imposition of any Lien upon the Business, the Seller or any of the Assets, or (iv) the violation of any Law, order, judgment, decree or award of any court, Governmental Entity or arbitrator to or by which any Selling Shareholder, the Seller, or the Business is subject or bound.

Section 3.4    Indebtedness.  Except as set forth on **Schedule 3.4**, (i) the Seller does not have any outstanding Indebtedness and is not a party to any Contract providing for the creation, incurrence or assumption thereof and (ii) no Liens exist upon the Business, the Seller or any of its assets.  On the date hereof the amount outstanding on the Permitted Indebtedness is $600,000.00.  As of the time of the Closing, the Selling Parties have paid and discharged all debts, liabilities and obligations of the Seller (including, without limitation, any liabilities in respect of any Indebtedness, Payables and Transaction Expenses as well as any accounts payable and accrued expenses that have been incurred in the Ordinary Course of Business consistent with past practices) other than the Permitted Indebtedness and the Bridge Note and the Assumed Liabilities.

Section 3.5    Capitalization.

(a)    As of the Closing Date, the authorized capital stock of the Seller consists of 200 shares of common stock of which each Selling Shareholder holds the issued and outstanding Shares set forth by such Selling Shareholder's name on **Schedule 3.5(a)**, all of which Shares are validly issued, fully paid and non-assessable. No shares of capital stock of the Seller have been issued other than the Shares and the Selling Shareholders are the sole record and beneficial owners of all of the issued and outstanding shares of capital stock of the Seller. Except as set forth in **Schedule 3.5(a)** hereto, the Seller does not have outstanding any bonds, debentures, notes or other obligations which provide the holders of which with the right to vote (or which are convertible into or exercisable for securities having the right to vote) with the shareholders or equity holders of the Seller.

(b)    Except as set forth in **Schedule 3.5(b)** hereto, the Seller does not have any (i) issued or outstanding subscription, warrant, option, convertible security or other right (contingent or otherwise) to purchase or acquire any shares of its capital stock or other equity interest, (ii) obligation (contingent or otherwise) to issue any subscription, warrant, option, convertible security or other such right, or to issue or distribute to holders of any shares of capital stock or other equity interest of the Seller any evidences of indebtedness or assets of the Seller, (iii) obligation (contingent or otherwise) to purchase, redeem or otherwise acquire any shares of its capital stock or other equity interest or to pay any dividend or to make any other

EHREN-WALIA 000023

distribution in respect thereof, or (iv) outstanding or authorized stock or equity appreciation rights, phantom stock, phantom equity or similar rights or obligations.

(c)    Except as set forth in **Schedule 3.5(c)** hereto, there is no agreement, written or oral, between or among the Seller and any holder(s) of securities of the Seller, relating to the sale or transfer (including agreements relating to rights of first refusal, co-sale rights or "drag along" rights), registration under the Securities Act of 1933, as amended, or voting of the capital stock or equity interests of the Seller.

Section 3.6    Litigation.  Except as set forth in **Schedule 3.6** hereto, to the best of Seller's knowledge, there is no civil, criminal or administrative suit, action, proceeding, investigation, review or inquiry pending or, to the Selling Parties' Knowledge, threatened against or affecting the Seller or any of its properties or rights, nor is there any judgment, decree, injunction, rule or order of any Governmental Entity or arbitrator outstanding, against or affecting the Seller or any of its properties or rights (the foregoing collectively referred to as "**Proceedings**"). None of the Proceedings is reasonably likely, either individually or in the aggregate, to have a Material Adverse Effect or to prevent, impair or materially delay the ability of the Seller to consummate the transactions contemplated by this Agreement and the other Seller Documents.  To the Selling Parties' Knowledge, there is no meritorious basis for any such civil, criminal or administrative suit, action or other Proceeding against Seller.

Section 3.7    Assets; Personal Property.

(a)    (i) On the date hereof, except as set forth on **Schedule 3.7(a)** Seller has good and valid title to and otherwise has the right to use pursuant to a valid and enforceable lease, license or similar contractual arrangement, all of the Assets free and clear of any Liens other than Permitted Liens.

(b)    Except as set forth on **Schedule 3.7(b)**, the Assets, together with the assets available to Buyer pursuant to the other Seller Documents and the Specific Employees, constitute all the assets, tangible and intangible, and all the employees used for the Business as currently conducted. To the Selling Parties' Knowledge, there are no facts or conditions affecting any material Assets which would reasonably be expected, individually or in the aggregate, to interfere with the current use, occupancy or operation of such Assets.  (i) Seller has conducted the Business only through Seller and not through any other divisions or any direct or indirect subsidiary or any Affiliate and (ii) no part of the Business is operated by Seller through any entity other than Seller.

(c)    Set forth on **Schedule 3.7(c)** hereto is a true and complete list of all tangible personal property owned or leased or licensed by the Seller (the "**Personal Property**"), except for items having a value of less than $10,000, which do not, in the aggregate, have a total market value of more than $50,000, and sets forth with respect to all such listed items, all leases and licenses related thereto. The Seller has good and marketable title to, or holds by valid and existing lease or license, all of the Personal Property, except with respect to assets disposed of in the Ordinary Course of Business, free and clear of all Liens, except for Permitted Liens and except for Liens securing the Seller's Indebtedness to People's United Bank, Atlantic Health, LLC, Itria Ventures LLC and Swift Financial Corporation, that will be released at the Closing.

EHREN-WALIA 000024

(d)    The Personal Property together with any Seller Leased Property is adequate and sufficient for the conduct of the Business as conducted before and at the Closing. Except as set forth on **Schedule 3.7(c)** hereto, to the Selling Parties' Knowledge, each item of Personal Property is free from material defects and is in safe and good operating condition and repair (subject to normal wear and tear). To the Selling Parties' Knowledge, the Personal Property has been maintained by the Seller in all material respects in accordance with normal industry practice and is suitable for the purposes for which it presently is used.

Section 3.8    <u>Real Property.</u>  The Seller does not own, and has not at any time owned, any real property. **Schedule 3.8** hereto sets forth a complete and correct list of all real property leased, subleased, licensed, operated or occupied by the Seller (collectively the "**Seller Leased Property**"), the location thereof, and the leases, licenses or other agreements pursuant to which the Seller leases, subleases, licenses, operates or occupies the Seller Leased Property (collectively, the "**Seller Leases**"). Except as set forth in **Schedule 3.8** hereto, neither the Seller, nor, to the Selling Parties' Knowledge, any other party is in default under any of the Seller Leases (nor, to the Selling Parties' Knowledge, does there exist any condition which, upon the passage of time or the giving of notice or both, would cause a default thereunder during the term of such Seller Lease). Except as set forth in **Schedule 3.8** hereto, no Seller Leased Property is occupied by a party other than the Seller, and, to the Selling Parties' Knowledge, no party has not granted any party other than the Seller a right to occupy such property during the term of such Seller Lease. The Seller has not assigned, leased, subleased or granted to any Person any rights in any Seller Lease. Other than the Seller Leases, there are no other agreements or arrangements whatsoever relating to the Seller's use or occupancy of any of the Seller Leased Property. The Seller has not transferred, mortgaged or assigned any interest in any of the Seller Leases. To the Selling Parties' Knowledge, (i) there is no pending or threatened condemnation or similar Proceeding affecting any Seller Leased Property or any portion thereof, (ii) each Seller Leased Property is supplied with utilities and other services sufficient to operate the Business conducted at such Seller Leased Property, and (iii) neither the operations of the Seller or the Business on the Seller Leased Property, or the Seller Leased Property, violate in any material manner any applicable building code, zoning requirement, or classification or statute relating to the particular property or such operations. The Seller Leased Property is, to the Selling Parties' Knowledge, in good operating condition and repair and is adequate and sufficient for the conduct of the Business conducted as it is presently conducted at such Seller Leased Property.

Section 3.9    <u>List, etc.</u>  The Seller has not sold, assigned, leased or licensed or transferred to any Person any list of past, present or prospective customers, suppliers or licensees of the Business. No Person (other than the Seller) is entitled to use any such list.

Section 3.10    <u>Tax Matters.</u>

(a)    The Seller has timely filed all Tax Returns required to be filed by the Seller in the manner provided by Law. All such Tax Returns are true, correct and complete in all material respects. The Seller has timely paid all Taxes due, whether or not shown as being due on any Tax Returns. All Taxes that the Seller is or was required by Law to collect or withhold have been duly withheld or collected, and paid to the proper Tax authority. Except as has been disclosed on **Schedule 3.10(a)** hereto:

EHREN-WALIA 000025

(i)     No claim for unpaid Taxes has become a Lien of any kind against the property of the Seller or is being asserted against the Seller, except for Liens for Taxes not yet due and payable.

(ii)     No audit, examination, investigation, deficiency or refund litigation or other Proceeding in respect of Taxes of the Seller is pending (or to the Selling Parties' Knowledge, threatened or being conducted by a Tax authority), and neither the Seller nor any Selling Shareholder has received notice of the commencement of any audit that is ongoing, examination, deficiency litigation or other Proceeding with respect to any such Taxes.

(iii)     No material issues have been raised in any notice received by the Seller or any Selling Shareholder from any Tax authority in connection with the examination of any of the Tax Returns filed by the Seller.

(iv)     No extension or waiver of the statute of limitations on the assessment of any Taxes has been granted to the Seller and is currently in effect.

(v)     The Seller is not a party to or bound by any Tax allocation or sharing agreement. The Seller (A) has not been a member of an affiliated group within the meaning of Code Section 1504(a) or any similar group under state, local or foreign law filing a consolidated federal income Tax Return; (B) does not have any liability for the Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise; and (C) is not a party to, bound by, nor has any obligation under, or potential liability with regards to, any Tax sharing arrangement, Tax indemnification agreement or similar contract or arrangement.

(vi)     The Seller has never entered into or been a party to (A) a transaction subject to registration pursuant to Code Section 6111 as a "reportable transaction" within the meaning of Code Section 6111(b)(2) or as a "tax shelter" as defined in former Code Sections 6111(c) or (d), (B) a transaction subject to the list requirements of Code Section 6112, (C) a tax shelter within the meaning of Code Section 6662(d), or (D) a "listed transaction" as set forth in written guidance or a notice issued by the Internal Revenue Service (the "**IRS**"). None of the Seller's Tax Returns contained or were required to contain a disclosure statement under Sections 6011 or 6662 of the Code (or any predecessor statute) or any similar provision of state, local or foreign Law.

(vii)     No power of attorney has been granted by or with respect to the Seller which remains in effect with respect to any matter relating to Taxes.

(viii)     The Seller is not a party to any agreement, plan, contract or arrangement that would result, separately or in the aggregate, in the payment of any "excess parachute payments" within the meaning of Section 280G of the Code.

(ix)     The Seller does not have any deferred intercompany gain or loss arising as a result of a deferred intercompany transaction within the meaning of Treasury Regulation Section 1.1502-13 (or similar provision under state, local or foreign law) or any excess loss accounts within the meaning of Treasury Regulation Section 1.1502-19.

{00718038.DOCX;1 }{00718038.DOCX;1 }{00718038.DOCX;1 }     21

EHREN-WALIA 000026

(x)    The Seller is not and has never been a United States real property holding corporation (as that term is defined in Section 897(c)(2) of the Code) during the applicable period specified in Section 897(c)(1)(ii) of the Code.

(xi)    The Seller is not and has never been subject to a Tax ruling that has continuing effect.

(xii)    The Seller will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending on or after the Closing Date as a result of any: (A) adjustment under either Section 481(a) or 482 of the Code (or an analogous provision of state, local or foreign law) by reason of a change in accounting method or otherwise; (B) "closing agreement" as described in Code section 7121 (or any corresponding or similar provision of state, local or foreign income Tax law) executed on or prior to the Closing Date; (C) intercompany transaction or excess loss account described in Treasury Regulations under Code Section 1502 (or any corresponding or similar provision of state, local or foreign income Tax law); (D) installment sale or open transaction disposition made on or prior to the Closing Date; or (E) prepaid amount received on or prior to the Closing Date.

(xiii)    The net operating losses, if any, of the Seller are not limited under Section 382 of the Code and any excess credits, net capital losses, and foreign tax credits of the Seller are not limited under Section 383 of the Code.

(xiv)    No claim has ever been made by an authority in a jurisdiction where the Seller does not file Tax Returns that the Seller is or may be subject to taxation by that jurisdiction.

(xv)    All "non-qualified deferred compensation plans" (as such term is defined under section 409A(d)(1) of the Code and the guidance issued thereunder) of the Seller under which the Seller makes, is obligated to make or promises to make any payments or other awards (each, a "**409A Plan**") (A) meet and have met the requirements of Code Sections 409A(a)(2), (3), and (4) of the Code, and (B) are, and at all times were, operated in accordance with such requirements, are operated in good faith compliance with the transitional relief and all guidance and regulations provided by the Internal Revenue Service under section 409A of the Code, and (C) no 409A Plan has been funded by an off-shore arrangement described in Section 409A(b)(1) of the Code.

(xvi)    The Seller does not own any interest in any entity that is treated as a "disregarded entity" for federal tax purposes.

(b)    The Seller has not distributed stock of another entity, or had its stock distributed by another entity, in a transaction that was purported or intended to be governed, in whole or in part, by Section 355 or 361 of the Code.

(c)    The Seller has been a validly electing S corporation within the meaning of Code Sections 1361 and 1362, and any corresponding provision(s) of state or local law for each jurisdiction in which it is required to file Tax Returns since its incorporation. There are no facts that would permit the Internal Revenue Service to revoke such election. The Seller

{00718038.DOCX;1 }{00718038.DOCX;1 }{00718038.DOCX;1 }    22

EHREN-WALIA 000027

has not, since the date of its incorporation, acquired assets from another corporation in a transaction in which the Seller's tax basis in such acquired assets was determined, in whole or in part, by reference to the Tax basis of such assets in the hands of the transferor.

(d)    The Seller has delivered to Buyer correct and complete copies of all Tax Returns, examination reports, and statements of deficiencies filed by, assessed against, or agreed to by the Seller.

Section 3.11    **Employees.** **Schedule 3.11** hereto sets forth the name, current annual compensation rate (including bonus and commissions), title, current base salary rate, accrued bonus, accrued sick leave, accrued vacation benefits and accrued severance pay of each Employee of the Seller other than those who ceased to be employees or consultants prior to January 1, 2015. **Schedule 3.11** hereto further lists all such Employees, as well as agents and independent contractors, covered by an employment non-competition, non-solicitation, consulting or severance agreement with the Seller, and the Seller has provided to Buyer current and complete copies of each such agreement, as well as copies of any confidentiality or other agreement covering any proprietary Intellectual Property applicable to any such Person. **Schedule 3.11** hereto further lists the Seller's policies and practices concerning Reimbursable Expenses, and the amounts of Reimbursable Expenses that have been submitted to the Seller but have not been reimbursed as of the Closing Date.  The Seller is not a party to nor otherwise bound by any collective bargaining agreement, contract or other agreement or understanding with a labor union or labor organization, nor is the Seller the subject of any Proceeding asserting that it has committed an unfair labor practice or seeking to compel the Seller to bargain with any labor union or labor organization, nor is there pending or, to the Selling Parties' Knowledge, threatened, any labor strike, dispute, walkout, work stoppage, slowdown or lockout involving the Seller. To the best of its knowledge, the Seller is in compliance in all material respects with all applicable Laws respecting employment and employment practices, independent contractor arrangements, terms and conditions of employment and wages and hours and occupational safety and health. Except as disclosed in **Schedule 3.11** hereto, there is no action, suit or legal, administrative, arbitration, grievance or other Proceeding pending or, to the Selling Parties' Knowledge, threatened and, to Selling Parties' Knowledge, there is no investigation pending or threatened against the Seller relating to the Seller's employment practices or any of the applicable Laws described in this **Section 3.11**.  Except as set forth on **Schedule 3.11,** the Selling Parties have not received any notice, and, to the Selling Parties' Knowledge, have no reason to believe, that any Employee of the Seller (other than those who ceased to be employees or consultants prior to January 1, 2015) intends or is considering terminating his employment with the Seller before the Closing or does not intend to accept employment with Buyer on the Closing Date or if he intends to accept employment with Buyer is considering terminating his employment with Buyer thereafter.

Section 3.12    Employee Benefits.

(a)    A copy of each bonus, deferred compensation, pension, retirement, profit-sharing, thrift, savings, employee stock ownership, stock bonus, stock purchase, restricted stock, stock option, employment, retention, deal-sharing, termination, severance, exit, change of control, compensation, medical, health or other welfare plan, agreement, policy or arrangement that covers Employees, directors or former directors of the Seller (the "**Compensation and**

EHREN-WALIA 000028

**Benefit Plans**") has been provided to Buyer prior to the Closing Date. For each Compensation and Benefit Plan, copies of the following documents (to the extent applicable) have also been provided to Buyer prior to the Closing Date: (i) any amendments since the last restatement of such plan; (ii) any trust agreement or other funding agreement; (iii) the most recent Form 5500 annual report, including all attachments; (iv) the most recent annual actuarial valuation report; and (v) the most recent IRS determination letter, and any outstanding request for such a letter. The Compensation and Benefit Plans existing as of the Closing Date are listed on **Schedule 3.12(a)** hereto, and any "change of control" or similar provisions therein which will be affected by the transactions contemplated hereby are specifically identified in such Schedule.

(b)     To the best of Seller's knowledge, all of the Compensation and Benefit Plans are in compliance in all material respects with all applicable Laws including but not limited to the Code, the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**") and the Family and Medical Leave Act. Each Compensation and Benefit Plan that is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA (a "**Pension Plan**"), that is intended to be qualified under Section 401(a) of the Code and is not a standardized prototype plan has received a favorable determination letter from the IRS, has applied for such letter in a timely fashion, or has a remaining period of time within which to apply for such a letter, and it is not aware of any circumstances likely to result in revocation of any such favorable determination letter, the refusal to issue such a favorable determination letter or any material costs under the IRS's Employee Plans Compliance Resolution System. There are no pending or, to the Selling Parties' Knowledge, threatened claims or litigation relating to any of the Compensation and Benefit Plans. The Seller has not engaged in a transaction with respect to any Compensation and Benefit Plan that, assuming the taxable period of such transaction expired as of the Closing Date, would subject it to fiduciary liability payment of additional benefits or a material tax or penalty imposed pursuant to either Section 4975 of the Code or Section 502 of ERISA.

(c)     As of the Closing Date, except as set forth on **Schedule 3.12(c)** hereto, the Seller does not maintain or contribute to an employee pension benefit plan subject to Title IV of ERISA or Section 412 of the Code.

(d)     Except as set forth on **Schedule 3.12(d)** hereto, the Seller does not have any obligations for retiree health and life benefits under any Compensation and Benefit Plan. The Seller may amend or terminate any such plan under the terms of such plan at any time without incurring any material liability thereunder. Except as set forth on **Schedule 3.12(d)** hereto, the Seller does not have any obligation to provide group continuation coverage to former employees or their dependents as required by Section 600 et seq. of ERISA and Section 4980B of the Code.

(e)     Except as set forth on **Schedule 3.12(e)** hereto, neither the execution of this Agreement by the Seller or the Selling Shareholders nor the consummation of the transactions contemplated by this Agreement will (i) entitle any Employees of the Seller to severance pay, (ii) accelerate the time of payment or vesting or trigger any payment of compensation or benefits or forgiveness of indebtedness under, increase the amount payable or trigger any other material obligation pursuant to, any of the Compensation and Benefit Plans, (iii) obligate Buyer to assume any of the Compensation and Benefit Plans or to extend an offer of

employment to any current employees, or (iv) result in any breach or violation of, or a default under, any of the Compensation and Benefit Plans.

(f)     Except as set forth on **Schedule 3.12(f)** hereto, all annual reports required to be filed under any Laws applicable to the Compensation and Benefits Plans have been timely filed with the respective Governmental Entity with which such reports are required to be filed, including, without limitation Form 5500 and Form 11-K.

(g)     To the Selling Parties' Knowledge, all Compensation and Benefit Plans covering current or former non-U.S. employees or consultants or former employees or consultants of the Seller comply in all material respects with applicable Laws. The Seller does not have any material unfunded liabilities with respect to any Compensation and Benefit Plan that covers such employees or consultants.

(h)     The Seller (x) does not participate, maintain or contribute to, or have any liability or obligation under or with respect to, any single or multi-employer Compensation and Benefit Plan governed by or subject to Title IV of ERISA (whether by reason of being a member of an affiliated group of companies, one of which maintains such a plan, or otherwise), and (y) has not participated, maintained, contributed or incurred any liability or obligation with respect to any such plan.

Section 3.13    Intellectual Property.

(a)     **Schedule 3.13(a)** hereto sets forth all of the Intellectual Property owned, in whole or in part, including jointly with others, by the Seller (collectively, the "**Owned Intellectual Property**") including, without limitation a complete and accurate list of all United States and foreign (i) patents and patent applications; (ii) Trademark registrations and applications and material unregistered Trademarks; and (iii) copyright registrations and applications, indicating for each, the applicable jurisdiction, registration number (or application number) and date issued (or date filed). **Schedule 3.13(a)** hereto lists all actions that must be taken by Buyer within one hundred eighty (180) days from the Closing Date, including the payment of any registration, maintenance, renewal fees, annuity fees and taxes or the filing of any documents, applications or certificates for the purposes of maintaining, perfecting or preserving or renewing any Intellectual Property of the Seller. **Schedule 3.13(a)** separately lists all Owned Intellectual Property that is owned in part or jointly owned with any other Person.

(b)     License Agreements.

(i)     **Schedule 3.13(b)(i)** hereto sets forth a complete and accurate list of all license, service or similar agreements (written or oral) granting to the Seller any material right to use or practice any rights under any Intellectual Property (other than off-the-shelf software that is subject to "shrink-wrap" or similar license and is commercially available and is not a material component of any product or service marketed, distributed or commercially exploited by the Seller) (collectively, the "**License Agreements**").

(ii)     The Seller has not licensed Software or granted other rights in to use or practice any rights under any Owned Intellectual Property.

EHREN-WALIA 000030

(iii)    No Person has received from the Seller, or has the right to use, any Owned Intellectual Property.

(iv)    Except as set forth on **Schedule 3.13(b)(iv)** hereto, there is no outstanding or, to the Selling Parties' Knowledge, threatened dispute or disagreement with respect to any License Agreement. Except as set forth in **Schedule 3.13(b)(iv)** hereto, the Seller is not in breach of, nor has failed to perform under, any of the License Agreements.

(c)    Ownership; Sufficiency of Intellectual Property Assets.  The Seller owns or possesses adequate licenses or other rights to use and practice, free and clear of all Liens (other than Permitted Liens), rights, claims and interests of any Governmental Entity, orders and arbitration awards, and without payment of any kind to any Person, all of the Owned Intellectual Property. Except as set forth in **Schedule 3.13(c)(i)** hereto, each current and former officer, employee, agent, developer, consultant and contractor who (a) has had or has access to any Owned Intellectual Property has executed a confidentiality and nondisclosure agreement that protects the confidentiality of the trade secrets of the Owned Intellectual Property; and (b) contributed to or participated in the creation and/or development of the Owned Intellectual Property either: (i) is a party to a "work made for hire" agreement under which the Seller is deemed to be the original owner/author of all right, title and interest in the Intellectual Property created or developed by such Person; or (ii) has executed an assignment or an agreement to assign in favor of the Seller of all such Person's right, title and interest in the Intellectual Property, and any such agreement is suitable to vest sole and exclusive right, title and interest in and to all inventions, creations, developments, and works (including, without limitation, intellectual property rights contained therein) in the Seller. The Seller is not engaged in the wrongful use of any confidential information or trade secrets or patentable inventions of any Employee of the Seller or any other person, firm or entity and to Seller's Knowledge no such Employee, person, firm or entity, has alleged that the Seller is engaged in such wrongful use or that the Seller does not own the Owned Intellectual Property.  Except as set forth in **Schedule 3.13(c)(ii)** hereto, the Owned Intellectual Property identified in **Schedule 3.13(a)** hereto, together with the Seller's unregistered copyrights, if any, and rights under the licenses granted to the Seller under the License Agreements, if any, constitute all the material Intellectual Property rights used in the operation of the Business, other than "shrink wrap" software licenses, and, to the Selling Parties' Knowledge, are all the Intellectual Property rights necessary to operate the Business after the Closing Date in substantially the same manner as the Business has been operated by the Seller.

(d)    No Infringement. To Selling Parties' Knowledge, none of the products or services manufactured, distributed, marketed, sold, licensed or performed by the Seller, nor any of the Owned Intellectual Property used in the conduct of the Business, infringe upon, violate or constitute the unauthorized use of any rights owned or controlled by any Person, including any Intellectual Property or proprietary rights (including, without limitation, patents, design patents, Trademarks, common law marks, domain names, trade dress, industrial property and copyrights) of any Person.

(e)    No Pending or Threatened Infringement Claims. Except as set forth on **Schedule 3.13(e)** hereto, there has been pending no litigation and no notice or other claim has been received by the Seller (i) alleging that the Seller has engaged in any activity or

EHREN-WALIA 000031

conduct that infringes upon, violates or constitutes the unauthorized use of any of the Intellectual Property or proprietary rights of any Person, or (ii) challenging the ownership, use, validity or enforceability of any Owned Intellectual Property, or the Intellectual Property exclusively licensed by or to the Seller. The Seller has not received any writing requesting, inquiring or demanding the licensing of any other Person's Intellectual Property or proprietary rights.

(f)  No Infringement by Third Parties. To Selling Parties' Knowledge, no third party is misappropriating, infringing, diluting or violating any Owned Intellectual Property or Intellectual Property exclusively licensed to the Seller, and no such claims have been brought against any Person by the Seller.

(g)  **Schedule 3.13(g)** hereto sets forth a list of all websites of the Business or of or maintained by the Seller (the "**Websites**"). With respect to such Websites, except as set forth on **Schedule 3.13(g)** hereto, the Seller (i) itself or through contractors, operates and manages each Website, (ii) has the right to modify each Website, and to make links and hyperlinks therefrom to other internet sites, and (iii) owns or possesses the perpetual, world-wide, royalty-free, fully assignable right to operate each Website as presently conducted or contemplated to be conducted, including, without limitation, the fully assignable right to operate such Website with its current host on its current server as presently operated or contemplated to be operated and to use, enhance, and create derivative works of or from and maintain all source code and other Intellectual Property and proprietary rights necessary to operate, develop, modify, make derivative works of or from, support and maintain each website. Without limiting the foregoing, except as set forth on **Schedule 3.13(g)** hereto, the Seller owns or possesses the perpetual, world-wide royalty free, fully assignable right to use, display, perform, publish, disseminate, transmit and distribute the content and other information displayed, published, performed, disseminated, transmitted or distributed on or through each Website, and to disseminate, transmit, distribute, market, sell or license the information, products, and services disseminated, transmitted, marketed, sold or licensed on or through each Website.

Section 3.14   Financial Statements; Accounts Receivable.

(a)  Annexed hereto as **Schedule 3.14(a)** are the (i)  unaudited financial statements of the Seller as at and for the twelve month periods ended December 31, 2014, 2013 and 2012, together with a report thereon by Sellers' accountants (collectively, the "**Annual Financial Statements**"), and (ii) unaudited internal interim financial statements of the Seller as at and for the one-month periods ended January 31, 2015, December 31, 2014, November 31, 2014 and October 31, 2014 (the "**Interim Financial Statements**"), including in each of clauses (i), and (ii), balance sheets and a statement of income and retained earnings and a statement of cash flows (the Annual Financial Statements and the Interim  Financial Statements, collectively the "**Financial Statements**"). Except as set forth therein or in **Schedule 3.14(a)** hereto, the Annual Financial Statements have been prepared in all material respects in accordance with the Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants throughout the periods indicated and present fairly, in all material respects, the financial condition of the Business as at the twelve month period ended December 31, 2014, 2013 and 2012, as the case may be.  The Interim Financial Statements have been prepared in all material respects on a basis consistent with the Annual Financial Statements, <u>except that</u> the Interim Financial Statements do not contain notes and other

EHREN-WALIA 000032

presentation items required by GAAP, may be subject to normal audit or year-end adjustments and have not been audited, reviewed, compiled, or otherwise tested by the Company's independent auditor.  The balance sheets included in the Interim Financial Statements present fairly, in all material respects, the financial condition of the Business as at the end of the one-month periods ended January 31, 2015, December 31, 2014, November 31, 2014 and October 31, 2014.  The statement of income and retained earnings and the statement of cash flows included in the Interim Financial Statements present fairly in all material respects the results of operations and cash flows of the Business for the one-month periods ended January 31, 2015, December 31, 2014, November 31, 2014 and October 31, 2014.

(b)    Accounts Receivable.  **Schedule 3.14(b)** sets forth the accounts receivables listings of the Seller as of 11:59 PM on the date immediately prior to the Closing Date (the "**Closing Accounts Receivable**").  Except as set forth therein or in **Schedule 3.14(b)**, all of the Closing Accounts Receivable were the result of bona fide transactions in the ordinary course of business.  Except as set forth therein or in **Schedule 3.14(b)** hereto, the Company has not received written notice from any obligor of any material accounts receivable that such obligor is refusing to pay or contesting payment of which has not been resolved prior to the Closing Date, other than in the Ordinary Course of Business under any Contract with any obligor of any accounts receivable.

Section 3.15    Absence of Certain Changes.

(a)    Except as expressly contemplated by this Agreement or set forth on **Schedule 3.15(a)** hereto, since December 31, 2014, (x) the Seller has conducted the Business only in, and has not engaged in any transaction other than according to, the Ordinary Course of Business, (y) the Seller has not entered into any Contracts that are materially less favorable to the Seller than Contracts entered into, consistent with past custom and practice, and (z) there has not occurred:

(i)    any Material Adverse Effect;

(ii)    any damage, destruction or other casualty loss with respect to any material asset or property owned, leased or otherwise used by the Seller, whether or not covered by insurance;

(iii)    any declaration, setting aside or payment of any dividend or other distribution (whether in cash, stock or property) in respect of the Seller's capital stock, or any repurchase, redemption or other reacquisition of any shares of capital stock or other securities of the Seller;

(iv)    any change in the Seller's accounting principles, practices or methods;

(v)    any change in any Tax election or any settlement or compromise of any Tax claim or liability; or

(vi)    any agreement or commitment to take any of the actions referred to in clauses (iii) through (v) above.

EHREN-WALIA 000033

        (b)    Without limiting the foregoing provisions of **Section 3.15(a)**, since December 31, 2014, except the Bridge Note and as set forth in **Schedule 3.15(b)** hereto, the Seller has not:

        (i)    incurred any obligation or liability, absolute, accrued, contingent or otherwise, whether due or to become due, except current liabilities for trade or business obligations incurred in the Ordinary Course of Business, none of which are, individually or in the aggregate, material;

        (ii)    mortgaged, pledged or subjected to any Lien (other than Permitted Liens), any of the rights, assets or property, tangible or intangible of the Seller;

        (iii)    sold, transferred, leased to others or otherwise disposed of any assets, properties or rights of the Seller, except for inventory sold, supplies consumed, and minor amounts of obsolete equipment replaced, in each case in the Ordinary Course of Business;

        (iv)    encountered any labor union organizing activity, had any actual or, to Selling Parties' Knowledge, threatened employee strike, work stoppage, slow down or lockout, or, to Selling Parties' Knowledge, had any adverse change in its relations with its Employees, customers, distributors or suppliers or any governmental regulatory authority or self regulatory authority;

        (v)    transferred or granted any rights under, or entered into any settlement regarding the breach or infringement of, any license, copyright, Trademark, patent, or other Intellectual Property of the Seller, or modified any existing rights with respect thereto;

        (vi)    made any change in excess of 5% in the rate of compensation, commission, bonus or other direct or indirect remuneration payable, or has paid or agreed or orally promised to pay, conditionally or otherwise, any bonus, extra compensation, pension or severance or vacation pay, to any Employee, salesman, representative or agent of the Seller;

        (vii)    instituted, settled or agreed to settle any litigation, action or Proceeding before any court or governmental body;

        (viii)    received any notice or information from any distributor, salesman, representative, vendor, supplier, customer or group of customers, that it (they) intend(s) to cease doing business with the Seller, including, without limitation, any notices of material change in revenues, costs or method of distribution;

        (ix)    made any purchase commitments in excess of the normal, ordinary and usual requirements of the Business or at any price materially in excess of the current market price or upon terms and conditions more onerous than those that are usual and customary in the trade or made any change in its selling, pricing, advertising or personnel practices inconsistent with its prior or prudent business practices;

EHREN-WALIA 000034

(x)     taken any action to accelerate any payment of or taken any action to adversely change the terms of, any accounts receivable of the Seller nor delay the payment of, or taken any action to adversely change the terms of, the accounts payable of the Seller;

(xi)     entered into any transaction, contract or commitment other than in the Ordinary Course of Business, or paid or agreed to pay any brokerage, finder's fee, or other compensation in connection with, or incurred any severance pay obligation by reason of, this Agreement or the transactions contemplated hereby;

(xii)     amended any Compensation and Benefit Plans; or

(xiii)     entered into any agreement or made any commitment to take any of the types of actions described in any of clauses (i) through (xii) of this **Section 3.15(b)**.

Section 3.16    Bank Accounts.    **Schedule 3.16** hereto sets forth a list of all bank and savings accounts, securities accounts, certificates of deposit and safe deposit boxes of the Seller and those persons authorized to sign thereon as of the date of this Agreement.

Section 3.17    Compliance With Law.

(a)     To the best of Seller's Knowledge, except as set forth in **Schedule 3.17(a)** hereto, the Business has not been, and is not being, conducted in violation of any law, ordinance, regulation, treaty, judgment, order (whether temporary, preliminary or permanent), decree, arbitration award, license or permit of any Governmental Entity (each a "**Law**" and collectively, "**Laws**"), except for violations or possible violations that, individually or in the aggregate, are not material or are not reasonably likely to prevent, materially delay, materially burden or materially impair the Seller's ability to consummate the transactions contemplated by this Agreement or materially impair the ability of Buyer, following the Closing, to conduct the Business in any jurisdiction in which it is now being conducted in the manner in which it is now being conducted. No action, demand, requirement, or review by any Governmental Entity with respect to the Seller or affecting any of its properties or assets is pending or, to the Selling Parties' Knowledge, threatened, nor has any Governmental Entity indicated to the Seller an intention to conduct the same or that an investigation of the Seller is being conducted. To the Selling Parties' Knowledge, no material change is required in its processes, properties or procedures in connection with any such Laws, and it has not received any notice or communication of any material noncompliance with any such Laws that has not been cured as of the Closing Date.

(b)     Except as set forth on **Schedule 3.17(b)** hereto, the Seller has in effect all material approvals, authorizations, certificates, filings, franchises, licenses, notices and permits of or with all Governmental Entities (collectively, "**Permits**") necessary to own, lease or operate the properties and other assets of the Seller or to carry on, the Business. All such Permits are set forth on **Schedule 3.17(b)** hereto. There has occurred no default under, or violation of, any such Permit, and each such Permit is in full force and effect. The execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated by this

EHREN-WALIA 000035

Agreement will not result in a violation of or default under and will not cause the revocation or cancellation of any such Permit. The Seller has not received any communication that, and to the Selling Parties' Knowledge there are no facts which have, or reasonably should have, led it or them to believe that, any of the Permits are not currently in good standing.

(c)     To the best of the Seller's knowledge, the Seller has kept all required records and has filed with Governmental Entities all required notices, supplemental applications and annual or other reports required for the operation of the Business. To the Selling Parties' Knowledge, neither the ownership nor use of the assets or properties of the Seller, nor the conduct, production or operations of the Business, conflicts with the rights of any Person. Neither the ownership nor use of the assets or properties of the Seller, nor the conduct, production or operations of the Business violates, or, with or without notice or the passage of time, or both, will violate, conflict with or result in a default, right to accelerate or loss of rights under, any terms or provisions of the certificate of incorporation or by-laws or other governing documents of the Seller, or any Permit, Contract, or commitment to which the Seller is a party.

Section 3.18    Environmental Matters.  Except as disclosed in **Schedule 3.18** hereto, to the best of Seller's knowledge: (i) the Seller has complied in all material respects with all applicable Environmental Laws; (ii) the Seller has no material liability under any Environmental Law for any Hazardous Substance disposal or contamination on the properties currently leased or operated by the Seller; (iii) the Seller has no material liability under any Environmental Law for any Hazardous Substance disposal or contamination on the properties formerly owned or operated by the Seller; (iv) the Seller has no liability under any Environmental Law for any Hazardous Substance disposal or contamination on any property owned or operated by any other Person; (v) the Seller is not in violation of and has no liability under any Environmental Law for any release or threat of release of any Hazardous Substance; (vi) the Seller to its knowledge has not received any written notice, demand, letter, claim or request for information alleging that it may be in violation of or liable under any Environmental Law; (vii) the Seller to its knowledge is not subject to any orders, decrees, injunctions or other arrangements with any Governmental Entity or an indemnitor of any third party indemnitee for any liability under any Environmental Law or relating to Hazardous Substances; (viii) to the Selling Parties' Knowledge, there are no circumstances or conditions involving the Seller that could reasonably be expected to result in any material claims, liability, investigations, costs or restrictions on the use, or transfer of any of the Seller Leased Properties pursuant to any Environmental Law; (ix) to the Selling Parties' Knowledge, none of the Seller Leased Properties contains any underground storage tanks, asbestos-containing material, lead-based paint, or polychlorinated biphenyls in violation of any Environmental Law or that would reasonably be expected to result in liability to the Seller under any Environmental Law; and (x) the Seller has not engaged in any activities involving the generation, use, handling or disposal of any Hazardous Substances in violation of any Environmental Law or that would reasonably be expected to result in any material liability under any Environmental Law. Except as disclosed in **Schedule 3.18** hereto, there have been no environmental investigations, studies, audits, tests, reviews or other analyses conducted by or for the Seller, or of which the Seller has knowledge, relating to any Seller Leased Properties or facility now or previously owned or leased by the Seller that have not been delivered to Buyer.

Section 3.19    Contracts and Commitments.

EHREN-WALIA 000036

(a)    **Schedule 3.19(a)** hereto contains a true and complete list of all of the following Contracts and documents to which the Seller is bound or which pertain to any of the Business (together with all other Contracts required to be listed on a Schedule to this Agreement and/or delivered to Buyer, collectively, the "**Material Contracts**"):

(i)    service, management, consulting or similar types of Contracts involving receipts in excess of $25,000 over the term of any such Contract;

(ii)    sales, maintenance, supply, purchase, distribution, dealer, and distributor Contracts involving receipts in excess of $25,000 over the term of any such Contract;

(iii)    sale, maintenance, supply, purchase, distribution, dealer, and distributor Contracts involving payments in excess of $25,000 over the term of any such Contract;

(iv)    Government Contracts and Government Bids (as used herein, "**Government Contract**" means any Contract that (x) is between the Seller and a U.S. or other Governmental Entity or (y) is entered into by the Seller as a subcontractor (at any tier) in connection with a Contract between another Person and a U.S. or other Governmental Entity. As used herein, "**Government Bid**" means any offer by the Seller to sell goods or to provide services prior to the Closing Date which, if accepted, would result in a Government Contract);

(v)    covenants not to compete or other covenants (x) limiting or restricting the development, manufacture, marketing, distribution or sale of any of the products or services of the Seller or any future line extension of such products or services into other forms, or (y) limiting or restricting the ability of the Seller to enter into any market or line of business or to compete with any other Person, or any other covenant restricting or prohibiting the Seller from transacting business or dealing in any manner with any other Person;

(vi)    Contracts with any Affiliate of the Seller or with any director, officer, shareholder or Employee of the Seller;

(vii)    advertising Contracts requiring expenditures or fees in excess of $25,000 in any twelve-month period after the Closing Date;

(viii)    management, employment, service, consulting, retention, severance or other similar type of Contract whereby the Seller is provided with services;

(ix)    License Agreements and other Contracts relating in whole or in part to the Intellectual Property of the Seller (including any License Agreement or other Contract under which the Seller is the licensee or licensor of any such Intellectual Property, but excluding any License Agreement or other Contracts related to "shrink wrapped" Software);

(x)    internet or website related agreements relating to the Business (including, without limitation, all interactive service, portal, web site management,

EHREN-WALIA 000037

hosting, server, content licensing, advertising, branding, and link or hyperlink agreements) and development agreements;

(xi)     Seller Leases and other leases, subleases or licenses under which the Seller holds any leasehold or other interest or right to the use of any real property, or pursuant to which the Seller has assigned, leased, subleased or granted to any Person any rights therein;

(xii)    mortgage, pledge, security agreement, deed of trust, loan agreement, credit agreement, indenture, conditional sale or title retention agreement, equipment financing obligation or other instrument or agreement granting a Lien (other than a Permitted Lien) upon any of the properties or assets of the Seller;

(xiii)   Contracts regarding the release, transportation or disposal of Hazardous Substances, or the clean-up, abatement or other action relating to Hazardous Substances or Environmental Laws;

(xiv)    Contracts establishing or creating any partnership, joint venture, limited liability company, limited liability partnership or similar entity;

(xv)     Contracts to make any capital expenditures or capital additions or improvements with commitments in excess of $10,000 in any twelve-month period after the Closing Date or in excess of $50,000 in the aggregate over the term of any such Contract;

(xvi)    Contracts relating to the storage or warehousing of any inventory or products of the Seller, or relating to the charter or purchase of transportation or shipping services;

(xvii)   guarantees or other Contracts in respect of any Indebtedness of any Person other than with respect to the deposit of third party checks;

(xviii)  Contracts providing for the indemnification of any current or former director, officer or Employee of the Seller (other than such provisions as are set forth in the certificate of incorporation, by-laws or similar charter documents of the Seller);

(xix)    any agreements, arrangements or commitments by or relating to the Seller under which the Seller indemnifies any other Person or is required to carry insurance for the benefit of any other Person (other than credit agreements, leases, supply agreements and other Contracts otherwise scheduled as Material Contracts);

(xx)     all other Contracts, commitments and purchase orders (other than short-term purchase orders for supplies and services and sales orders of inventory, for cash), in each case: other than those (A) made in the Ordinary Course of Business on customary terms and conditions and consistent with past practices, and (B) involving payments or receipts by the Seller of less than $25,000 in any single case or series of related orders; and

(xxi)   any other Contracts to which the Seller is a party or by which any of them or any of the Business is bound that is material to the Business or the Seller.

(b)   Each Material Contract that requires or may require the consent or waiver of a third party prior to consummation of the transactions contemplated by this Agreement in order to avoid a material breach or violation of, or default under, such Material Contract is identified and marked by an asterisk on **Schedule 3.19(a)** hereto. Each Material Contract is a valid and binding obligation of the Seller, in full force and effect and enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general principles of equity.

(c)   Except as set forth on **Schedule 3.19(c),** the Seller is not and to the Selling Parties' Knowledge, no other party to any Material Contract, is in violation of or in default under any Material Contract, nor, to the Selling Parties' Knowledge, has any event occurred or circumstance or condition exist, that (with or without notice or lapse of time or both) would reasonably be expected to (i) result in a violation of or default under any Material Contract, (ii) give any party the right to cancel or terminate or modify any Material Contract, or (iii) give any party to any Material Contract the right to seek material damages or other remedies. Except as set forth in **Schedule 3.19(c)** hereto, there have been no oral or written modifications of, or amendments or waivers with respect to, any of the terms of any of the Material Contracts. Except for any consents required thereunder which are properly so indicated on **Schedule 3.19(a)** hereto, each Material Contract will be unaffected by the sale of or other transfer of the Assets and the transactions contemplated by this Agreement and the other Seller Documents, and following the Closing, Seller will be entitled to the full benefits thereof.

Section 3.20   Insurance.**Schedule 3.20(a)** hereto sets forth: (i) the policies of insurance presently in force covering the Seller including, without limitation, those covering public and product liability, personnel, properties, buildings, machinery, equipment, furniture, fixtures and operations, specifying with respect to each such policy, the name of the insurer, type of coverage, term of policy, limits of liability and annual premium; (ii) the Seller's premiums and losses by year, by type of coverage, since January 1, 2010 based on information received from the Seller's insurance carrier(s); (iii) all outstanding insurance claims by the Seller for damage to or loss of property or income which have been referred to insurers or which the Seller believes to be covered by commercial insurance and (iv) general comprehensive liability policies carried by the Seller since January 1, 2010, including excess liability policies. The Seller has heretofore delivered to Buyer complete and correct copies of the policies and agreements set forth on **Schedule 3.20(a)** hereto.The insurance policies set forth on **Schedule 3.20(a)** hereto are in full force and effect, all premiums with respect thereto covering all periods up to and including the date of the Closing have been or will be paid prior to Closing, and no notice of cancellation or termination has been received with respect to any such policy. Such policies are sufficient for compliance with all requirements of applicable Law and all Contracts relating to the Seller, are, to Selling Parties' Knowledge, valid, outstanding and enforceable policies, provide (in the Selling Parties' opinion) adequate insurance coverage for the assets and operations of the Business, will remain in full force and effect through the respective dates set forth on **Schedule 3.20(a)** hereto without the payment of additional premiums, and will not in

any way be affected by, or terminate or lapse by reason of, the transactions contemplated by this Agreement. **Schedule 3.20(b)** hereto identifies all risks which have been designated as being self-insured.

Section 3.21    Affiliate Transactions.

(a)    Except as set forth in **Schedule 3.21(a)** hereto, the Seller has not purchased goods or services from, or sold goods or services to, or otherwise engaged in any transaction with, any Person (i) that is a Shareholder or Affiliate of the Seller, or (ii) of which more than 10% of its voting equity is owned directly or indirectly by one or more Shareholders or members of their immediate families (or trusts established by or for the benefit of any Shareholder or family member) or Affiliates of the Seller. All such transactions were entered into in the Ordinary Course of Business and on terms and conditions that are no less favorable to the Seller than would be obtained in a comparable arm's length transaction with a Person that is not an Affiliate of the Seller.

(b)    Except as set forth in **Schedule 3.21(b)** hereto, no shareholder, Employee, officer, director or agent of the Seller has any interest in any property, real or personal, tangible or intangible, used in or pertaining to the Business.

Section 3.22    Distributors, Suppliers and Customers.

(a)    Set forth in **Schedule 3.22(a)** hereto is a list of names and addresses of the ten (10) largest suppliers (measured by dollar volume of purchases) of the Seller and the percentage of the business which each such supplier represented during the twelve (12) month period ended December 31, 2014.  Set forth in **Schedule 3.22(a)** hereto is a list of names and addresses of the ten (10) largest customers (measured by dollar volume of purchases) and all other customers that accounted for more than $100,000 in revenue of the Seller and the percentage of the business which each such customer represented during the twelve (12) month period ended December 31, 2014.  Except as set forth on **Schedule 3.22 (a),** the Selling Parties have not received any notice, and, to the Selling Parties' Knowledge, there is no reason to believe, that (u) any customer has expressed any concern about the Seller's performance of its services or the cost of such services, (v) any customer has ceased, or will cease (either before or after the Closing), to use the products or services of the Seller, (w) any customer has materially reduced or will materially reduce (either before or after the Closing), the use of products or services of the Seller, (x) any customer intends or is considering reevaluating the use of the Seller's products or services, either before or after the Closing, (y) the Seller is at risk of any of its customers not renewing its agreement or arrangement with the Seller, or reducing the services or products it obtains from the Seller, on account of performance, prices or otherwise or (z) the Seller is performing all of its contractual obligations to each of its customers as required and in accordance with such customer's expectations and in no case is the Seller more than 10% below the expected performance standards.  To the Selling Parties' Knowledge, no unfilled customer order or commitment obligating the Seller to perform services will result in a loss to the Seller upon completion of performance.

EHREN-WALIA 000040

(b)     To the best of Selling Parties' Knowledge, the relationships of the Seller with its distributors, suppliers, customers, and licensors or sublicensors of rights with respect to Intellectual Property are reasonably good commercial working relationships.

Section 3.23   Products Liability and Warranty Liability.  Except as set forth in **Schedule 3.23** hereto, the Seller does not provide any product warranties with respect to the products or services sold by the Seller, other than with respect to title thereto. Except as set forth in **Schedule 3.23** hereto, the Seller has not received any written complaints of any damages to any Person relating to the products or services of the Seller with respect to which the Seller has any liability. The Selling Parties do not know of any facts that indicate the Seller has any material liability for warranty claims or returns with respect to any of its products or services. **Schedule 3.23** hereto sets forth a description of all product or service warranty claims in excess of $10,000 per such warranty claim, with respect to products and services of the Seller since January 1, 2012.

Section 3.24   Absence of Certain Business Practices.   Neither the Seller nor any officer, Employee or agent of the Seller, nor any other person or entity acting on its behalf, has, directly or indirectly, given or agreed to give any gift or similar benefit to any client, customer, governmental employee or other person or entity who is or may be in a position to help or hinder the business of the Seller (or assist the Seller in connection with any actual or proposed transaction) which (a) might subject the Seller to any damage or penalty in any civil, criminal or governmental litigation or Proceeding, (b) if not given in the past, might have had an adverse effect on the assets, properties, business or operations of the Seller, or (c) if not continued in the future, might adversely affect the Seller's assets, operations or prospects or which might subject the Seller to suit or penalty in any private or governmental litigation or Proceeding. There are no situations with respect to the Seller which involved or involves (i) the use of any corporate funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to political activity, (ii) the making of any direct or indirect unlawful payments to government officials or others from corporate funds or the establishment or maintenance of any unlawful or unrecorded funds, (iii) the receipt of any illegal discounts or rebates or any other violation of antitrust laws or (iv) any investigation by any Government Entity.

Section 3.25   Records.   The Books and Records are, and at all times were, prepared in the Ordinary Course of Business and appropriately reflect the operations and transactions of the Seller in all material respects, and there has been no transaction involving the Seller which properly should have been set forth therein and which has not been accurately so set forth.

Section 3.26   Disclosure.  No representations or warranties by the Selling Parties in this Agreement, including the Schedules and Exhibits hereto, and no statement contained in any document, certificates, or other writing furnished or to be furnished by the Seller or the Selling Parties to Buyer pursuant to the provisions hereof, contains or will contain any untrue statement of material fact or omits or intentionally will omit to state any material fact necessary, in order to make the statements herein or therein in light of the circumstances under which they are made, not misleading.

EHREN-WALIA 000041

Section 3.27    Brokers and Finders.  Except for the fees set forth on **Schedule 4.4**, which are the sole responsibility of the Selling Shareholders, none of the Selling Parties nor any of their respective officers, directors, trustees or employees has employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with the transactions contemplated by this Agreement.

Section 3.28    Inventory.  The Seller does not maintain any inventory.

Section 3.29    Privacy.  The Seller, to the best of its knowledge, is not in breach of any contractual or regulatory obligation to secure or otherwise safeguard Personal Data it receives in connection with the operation of the business of the Seller and the Websites.  The Seller has at all times taken commercially reasonable measures to ensure that all Personal Data is protected against loss and unauthorized access, use, modification, disclosure or other misuse, and, except as set forth in **Schedule 3.29**, there has been no unauthorized access to or other misuse of such data.  The Seller has made all notifications to customers or individuals required to be made by the Seller by any Privacy and Security Laws arising out of or relating to any event of access to or acquisition of any Personal Data by an unauthorized Person, including third parties and Employees of the Seller acting outside of the scope of their authority or authorization in a manner which is otherwise unlawful.  True and correct copies of all applicable current internal and customer or user-facing privacy policies of the Seller ("**Seller Privacy Policies** ") have been provided to Buyer.  To the best of Seller's knowledge, the  Seller has complied with all Privacy and Security Laws in connection with the operation of the business of the Seller and the Websites.  To the best of Seller's knowledge, no Personal Data disclosures, representations or covenants made or contained in any Seller Privacy Policy to any customer have been inaccurate or in violation of any Privacy and Security Laws.  There is no complaint to or audit, Proceeding, investigation (formal or informal) or claim currently pending against, the Seller by (i) any Person, or (ii) any Governmental Entity, with respect to the collection, use or disclosure of Personal Data.  The negotiation, execution and consummation of the transactions contemplated by this Agreement, and any disclosure and/or transfer of information in connection therewith, will not breach or otherwise cause any violation of any Privacy Policy or Privacy and Security Laws.

Section 3.30    HIPAA Compliance.  The Seller is in compliance in all material respects with the Health Insurance Portability and Accountability Act of 1996, P.L. 104-191, as amended by P.L. 111-5 Division A, Title XIII HITECH, and the related regulations contained in 45 C.F.R. Parts 160 and 164, (collectively, the "**Privacy and Security Regulations**") and 45 C.F.R. Parts 160 and 162 (collectively, the "**Transaction Regulations**") with regard to its business operations. To the Selling Parties' Knowledge of the Seller, the Seller has not received any complaints or other notices from any source of any failures to meet the requirements of the Privacy and Security Regulations or Transaction Regulations.

Section 3.31    False Claims Act Compliance.  To the Selling Parties' Knowledge, the Seller has not presented, or caused to be presented, a false or fraudulent claim for payment to any governmental health insurance program or other third party payer. To the Selling Parties' Knowledge, the Seller has not violated any federal or state laws governing the submission of claims for payment to governmental and/or non-governmental payers, including, without limitation, the statutes codified at 18 U.S.C. § 1347 and 31 U.S.C. § 3729.

EHREN-WALIA 000042

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF THE SELLING SHAREHOLDERS

Each Selling Shareholder hereby severally represents and warrants to Buyer:

Section 4.1    Ownership of Shares.  Such Selling Shareholder is the legal and beneficial owner of the Shares set forth by such Selling Shareholder's name on **Schedule 3.5(a)**.

Section 4.2    Authority.  Such Selling Shareholder has the legal power, right and authority to enter into and perform this Agreement and each other Seller Document to which it is a party, and to perform each of its obligations hereunder and thereunder. The execution, delivery and performance of this Agreement and the other Seller Documents to be executed by the Seller and the consummation by the Seller of the transactions contemplated hereby and thereby have been duly and validly authorized and no other corporate proceedings on the part of the Seller or its shareholders are necessary with respect to any such matter. This Agreement and the other Seller Documents to which such Selling Shareholder is a party have been duly executed and delivered by such Selling Shareholder, and such Agreement and such Seller Documents constitute a valid and binding obligation of such Selling Shareholder, enforceable in accordance with their terms subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general principles of equity. The execution, delivery and performance of this Agreement and such Seller Documents by such Selling Shareholder (a) except as set forth on **Schedule 3.3(b)** hereof, require no action by or in respect of, or filing with, or consent of, any Governmental Entity or any other Person and (b) do not contravene, or constitute a default under, any provision of applicable Law or of any Material Contract, judgment, injunction, order, decree or any other instrument binding upon such Selling Shareholder.

Section 4.3    Litigation.  Except as set forth on **Schedule 4.3**, to the best of Seller's knowledge, there is no civil, criminal or administrative suit, action, proceeding, investigation, review or inquiry pending against such Selling Shareholder, or, to such Selling Shareholder's Knowledge, threatened against or affecting such Selling Shareholder or any of his properties or rights, nor is there any judgment, decree, injunction, rule or order of any Governmental Entity or arbitrator outstanding against or affecting such Selling Shareholder or any of such Selling Shareholder's properties or rights, except such that are not, individually or in the aggregate, reasonably likely to prevent, materially delay or materially impair (a) such Selling Shareholder's ability to consummate the transactions contemplated by this Agreement, (b) Buyer's ability to acquire ownership of the Assets, free and clear of all Liens, or (c) the ability of Buyer, following the Closing, to conduct the Business.

Section 4.4    Brokers and Finders.  Except for the fees set forth on **Schedule 4.4**, which are the sole responsibility of the Selling Shareholders, none of the Selling Parties nor any of their respective officers, directors, trustees or employees has employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with the transactions contemplated by this Agreement.

EHREN-WALIA 000043

331

Section 4.5    Equity Investments.  Except as set forth on **Schedule 4.5**, such Selling Shareholder does not have any interest, direct or indirect, or any commitment to purchase any interest, direct or indirect, in, or the power to vote the equity interest of, any corporation, limited liability company, partnership, joint venture or other business enterprise or entity (other than with respect to any marketable securities and the Shares).

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Selling Shareholders that:

Section 5.1    Organization; Authority; Due Execution.

(a)    Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has all requisite limited liability company power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted and in the places such properties are now owned, leased or operated and is qualified to do business and is in good standing as a foreign limited liability company in each jurisdiction where the ownership or operation of its properties or conduct of its business requires such qualification, except where the failure to be so qualified or in good standing, when taken together with all other such failures, will not prevent, materially delay or materially impair Buyer's ability to consummate the transactions contemplated by this Agreement.

(b)    Buyer has all requisite limited liability company power and authority to enter into this Agreement and each agreement, document and instrument to be executed or delivered by it in connection with this Agreement (collectively, the "**Buyer Documents**"), to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and the other Buyer Documents to be executed by Buyer and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly and validly authorized and no other limited liability company proceedings on the part of Buyer or its members are necessary with respect to any such matter. This Agreement and the other Buyer Documents to be executed by Buyer have been duly executed and delivered by Buyer and constitute the valid, binding and enforceable obligations of to be executed by Buyer, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general principles of equity.

Section 5.2    Consents; No Violation.

(a)    No notices, reports or other filings are required to be made with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by Buyer from any Governmental Entity or any other Person in connection with the execution and delivery of this Agreement or the other Buyer Documents to be executed by Buyer and the consummation by Buyer of the transactions contemplated hereby and thereby except those that

EHREN-WALIA 000044

the failure to make or obtain will not, individually or in the aggregate, prevent, materially delay or materially impair Buyer's ability to consummate the transactions contemplated by this Agreement.

(b)    The execution, delivery and performance of this Agreement and the other Buyer Documents do not, and the consummation of the transactions contemplated hereby and thereby will not, constitute or result in: (i) (with or without notice, lapse of time or both) a breach or violation of, or a default under, Buyer's certificate of formation or operating agreement or other governing documents, or (ii) (with or without notice, lapse of time or both) a breach or violation or a conflict with, or a default under, or the termination of, or the acceleration under, any Contract, debt, obligation, governmental or non-governmental permit or license to which Buyer is a party or to or by which it is subject or bound; except, in the case of clause (ii) of this **Section 5.2(b)**, for any violation, default or acceleration, that, individually or in the aggregate, will not prevent, materially delay or materially impair Buyer's ability to consummate the transactions contemplated by this Agreement.

Section 5.3    <u>Litigation.</u>  There is no civil, criminal or administrative suit, action, proceeding, investigation, review or inquiry pending or, to Buyer's knowledge, threatened against or affecting Buyer or any of its properties or rights, nor is there any judgment, decree, injunction, rule or order of any Governmental Entity or arbitrator outstanding against or affecting Buyer or any of its properties or rights such that will not, individually or in the aggregate, prevent, materially delay or materially impair Buyer's ability to consummate the transactions contemplated by this Agreement.

Section 5.4    <u>Compliance with Law.</u>  Buyer is not in violation of any Law, except for violations or possible violations that, individually or in the aggregate, will not prevent, materially delay or materially impair Buyer's ability to consummate the transactions contemplated by this Agreement.

Section 5.5    <u>Brokers and Finders.</u>  Except for the fees set forth on **Schedule 5.5**, which are the sole responsibility of Buyer, Buyer has not employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with the transactions contemplated by this Agreement.

Section 5.6    <u>Funds.</u>  The Buyer has access to, and will have available on the Closing Date, funds sufficient to pay the Closing Consideration.

Section 5.7    <u>Ownership.</u>  All of Buyer's equity is owned by Physicans Practice Plus Holdings LLC, and all of the equity of Physicans Practice Plus Holdings LLC is owned by Orion Healthcorp Inc.

ARTICLE 6

CERTAIN COVENANTS AND AGREEMENTS OF THE
SELLING PARTIES AND BUYER

Section 6.1    <u>Expenses and Finder's Fees.</u>  Except as provided in **Sections 3.27, 4.4 and 5.5** concerning brokers and finders' fees and in **Article 7** and except for the Transaction

EHREN-WALIA 000045

333

Expenses, whether or not the Closing is consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be paid by the Party incurring such expense; provided, however that in the event this Agreement is consummated the Selling Parties shall pay all of the costs incurred by the Seller (other than the Buyer Transaction Expenses); and provided, further, however that Seller shall pay the Buyer Transaction Expenses, which Buyer Transaction Expenses shall be paid by Seller at the Closing and evidence delivered to Buyer in accordance with **Section 2.2(a)(xxiv)**; and provided, further, that in the event this Agreement is not consummated solely due to the material breach of the Selling Parties herein, then the Seller shall pay all of the Buyer Transaction Expenses, not to exceed one hundred thousand ($100,000) dollars.

Section 6.2    Public Announcements.    The Parties agree that no public release, announcement or any other disclosure to the public concerning any of the transactions contemplated hereby shall be made or issued by any Party without the prior written consent of Buyer and the Seller (which consent shall not be unreasonably withheld or delayed), except to the extent such release, announcement or disclosure may be required by applicable law, in which case the Party required to make the release, announcement or disclosure shall allow Buyer or the Seller, as the case may be, reasonable time to comment on such release, announcement or disclosure in advance of such issuance or disclosure. Notwithstanding the foregoing, subsequent to the Closing, Buyer may independently disclose the consummation of the transactions provided for herein without obtaining the prior consent of the Seller, provided that such disclosure shall not include the price paid by Buyer in connection therewith.

Section 6.3    Management Incentives.    Following the Closing, Buyer shall implement a $1,000,000 bonus pool for Melodie Kraljev with the bonus to be due and payable if the following conditions have been met: (i) Walai is still employed by Buyer on the day immediately prior to the second anniversary of the Closing Date and (ii) the achievement within two years of the Closing Date of certain objectives: (A) the substantial completion of the implementation of PARCS Software for all clients of Constellation Health Technologies Inc. and its subsidiaries (the "**Constellation Group**") and (B) the substantial completion of the transition to Porteck India of the offshore services currently provided to the Constellation Group by GeBBS Healthcare Solutions.

Section 6.4    PARCS Software.    Within 60 days from the Closing Date, the Selling Parties shall deliver to the Buyer, on a computer supplied by the Buyer, to be held at a location determined by the Buyer in its sole and absolute discretion, a copy of the Source Code for the PARCS Software together with the files, programs, notes and other materials that the Selling Parties used to generate such Source Code. The Selling Parties shall delete all such files, programs, notes and other materials from any computers in the control of the Selling Parties Such Source Code shall be true and complete and without defect of any kind. Such Source Code shall be deemed to be Intellectual Property Assets and shall be Owned Intellectual Property. The Selling Parties shall sign an acknowledgement that they have assigned the Source Code pursuant to this Agreement, they have no right title or interest in any of the Source Code and that, following the delivery of the computer, neither they nor, to the Seller's Knowledge, any other person has a copy of the Source Code or the means to create a copy of the Source Code, which acknowledgement shall reaffirm the representations and warranties contained in **Section 3.13** with respect to the Source Code).

EHREN-WALIA 000046

Section 6.5     <u>Non-Competition, Non-Solicitation and Non-Disclosure.</u>

   (a)    <u>Non-Competition</u>. Each Selling Party agrees that it shall not, and it shall take all commercially reasonable efforts to cause its Affiliates to not, whether or not for compensation, directly or indirectly, individually or as an officer, director, shareholder, trustee, employee, consultant, advisor, partner, proprietor or otherwise, for a period commencing on the Closing Date and ending 24 months after the Closing Date (the "**Restricted Period**"), participate or engage in or provide any services to, or have any direct or indirect interest in, any business which is engaged in whole or in part in (i) the provision of medical billing and collection services in the Maryland, District of Columbia, Delaware, Pennsylvania, Ohio, New Jersey, New York, Connecticut, Massachusetts, Rhode Island, Vermont, New Hampshire or Maine (collectively, the "**Territory**") and/or (ii) business process outsourcing anywhere in the world; provided, however, that nothing in this Agreement shall preclude a Selling Party from purchasing or owning up to five percent (5%) of the outstanding capital stock of a company which has a class of securities registered under Section 12 of the Securities Act of 1934, as amended, or trading on a national securities exchange or quoted in an over-the-counter market.

   (b)    <u>Non-Solicitation</u>. Each Selling Party agrees that during the Restricted Period it shall not, and it shall cause its Affiliates to not, either directly or indirectly, for itself or any third party, (1) solicit or induce or cause the soliciting or inducement of any sales or services in the Business to, and shall not make any sales to or provide any services in the Business to, any Person that was a customer or client of the Seller during the 12 month period ending on the Closing Date, (2) employ or otherwise engage, or offer to employ or otherwise engage, any Specified Employee or any person who is then an employee, consultant or agent of the Buyer or (3) interfere with or harm the contractual or business relationships with any vendor, supplier, customer, client, licensor, licensee or independent contractor of the Buyer. In addition, each Selling Party agrees that it shall not, and, for a period of five (5) years following the Closing Date, it shall cause its directors, officers and shareholders and their Affiliates to not, defame the Buyer, its services, or its members, managers, subsidiaries, employees, officers or agents.

   (c)    <u>Non-Disclosure</u>. Each Selling Party agrees that it shall not, and it shall take all efforts to cause its Affiliates to not, use for itself or others, or publish, disclose or otherwise reveal or divulge, any Confidential Information (as such term is defined below); provided, that subsequent to the fifth anniversary of the Closing Date, such restriction shall apply only if such use or disclosure is materially adverse to the Buyer. Each Selling Party shall, and shall take all commercially reasonable efforts to cause its Affiliates to, (1) maintain all Confidential Information in the strictest confidence and keep the same secret using at least the same degree of care as it uses for its personal confidential information, (2) retain all Confidential Information in trust in a fiduciary capacity for the sole and absolute benefit of the Buyer, and (3) refrain from using or allowing to be used any Confidential Information for its own benefit or for the benefit of any third party, provided, however, that in the event disclosure of Confidential Information is requested (i) by a Governmental Authority under color of law or applicable regulation, (ii) pursuant to subpoena or other compulsory process, or (iii) otherwise as may be required by law, each such Selling Party to the extent lawfully possible will give the Buyer at least five (5) days prior written notice before its disclosure and will provide the Buyer with copies of any responsive materials. For purposes of this Agreement, "**Confidential**

EHREN-WALIA 000047

**Information**" shall mean non-public information concerning the financial data, strategic business plans, product development (or other proprietary product data), customer lists, customer information, costs, pricing, materials, supplies, venders, products, services, information relating to governmental relations, discoveries, practices, processes, methods, marketing plans, Intellectual Property and other material non-public, proprietary and confidential information of the Buyer or relating to the Business, that, in any case, is not otherwise generally available to the public and has not been disclosed by the Buyer to others not subject to confidentiality agreements.  Confidential Information does not include information (other than information assigned to Buyer pursuant to this Agreement) that (i) is already known to a Selling Party on a non-confidential basis at the time of disclosure to such Selling Party, (ii) becomes known to a Selling Party from a source other than the Buyer; provided, that, such source has not entered into a confidentiality agreement with the Seller or the Buyer with respect to such information or obtained the information from an entity or person who is a party to a confidentiality agreement with the Seller or the Buyer, and without a breach of this Agreement or without a breach of duty owed by any other person or entity to the Seller or Buyer, (iii) is proven by competent evidence by a Selling Party that it was independently conceived or discovered by such Selling Party without reference to or use of the Confidential Information, or (iv) has become publicly known and made generally available through no wrongful act of a Selling Party.

(d)     Enforcement. If any Selling Party commits a breach, or threatens to commit a breach, of any of the provisions of **Section 6.5(a)-(c)**, (such person committing or threatening to commit a breach, the **"Breaching Party"**), then the Buyer shall have the following rights and remedies, each of which shall be independent of the others and shall be severally enforceable, and all of such rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available to the Buyer under law or in equity:

(i)     The right and remedy to have such provisions of this Section specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to the Buyer and that money damages will not provide an adequate remedy at law; and in connection therewith the right to obtain, without notice to such Breaching Party  and without the need to post any bond, a temporary restraining order, an injunction and any other equitable relief.  Such right of injunctive relief shall be cumulative and in addition to whatever other remedies the Buyer may have at law or in equity, including the right of the Buyer to recover from such Breaching Party as set forth in **Section 6.5(d)(ii)** below; and.

(ii)     The right and remedy to require such Breaching Party to account for and pay over to the Buyer all compensation, profits, monies, accruals, increments or other benefits (collectively "**Benefits**") derived or received by it as the result of any transactions constituting a breach of any of the provisions of **Section 6.5(a)-(c)**, and each Breaching Party hereby agrees to account for and pay over such Benefits to the Buyer.

(e)     Severability. The provisions of this **Article** are severable, and if any provision or any part of any provision of this **Article** is found to be invalid or unenforceable, the balance of that provision and the other provisions hereof shall be given full force and effect and remain fully valid and enforceable.

EHREN-WALIA 000048

(f)     Blue-Penciling. If any one, or any part, of the covenants contained in this **Section** is held to be unenforceable because of the duration of such provision or the area covered thereby, the Parties agree that the court making such determination shall have the power to reduce the duration and/or area of such provision and, in its reduced form, said provision shall then be enforceable.

(g)     Venue.  The Parties hereto intend to and hereby confer jurisdiction to enforce the covenants contained in this **Article** upon the courts of any state or other jurisdiction within the geographical scope of such covenants in which such breach has occurred. In the event that the courts of any one or more of such states or other jurisdictions shall hold such covenants wholly unenforceable by reason of the breadth of such scope or otherwise, it is the intention of the Parties hereto that such determination not bar or in any way affect in the courts of any other states or other jurisdictions within the geographical scope of such covenants the Buyer's right or the Selling Parties' right, as applicable, to the relief for breaches of such covenants in such other states, the above covenants as they relate.

(h)     Exclusivity.  The Parties hereby acknowledge and agree that the restrictions contained in **Sections 6.9 (a)-(c)** and, in the case of Walia, in his Employment Agreement, are intended to be the exclusive restrictions on the Selling Parties with respect to the subject matters contained therein and are in lieu of any other restrictions imposed by law or in equity.

(i)     Termination.  Notwithstanding the foregoing, in the event it is determined by arbitration in accordance with Section 9.3(c) that the Buyer defaulted under its obligations under this Agreement, and failed to cure such default in the applicable cure period, if any, then the restrictive covenants given herein by Selling Parties under this **Section 6.5** shall be null and *void ab initio*.

Section 6.6     INTENTIONALLY DELETED.

Section 6.7     Porteck India.  The Selling Parties shall use their best efforts to cause Porteck India to comply with its obligations under the Option Agreement and shall keep Buyer informed of Porteck India's operations and business and shall promptly notify Buyer of any developments or changes with respect to Porteck India, its assets and/or its business.

Section 6.8     Further Assurances.  Following the Closing Date, (i) each Selling Party, shall, from time to time, execute and deliver such additional instruments, documents, conveyances or assurances and take such other actions as shall be necessary, or otherwise reasonably requested by Buyer, to confirm and assure the rights and obligations provided for in this Agreement and in the Seller Documents and render effective the consummation of the transactions contemplated hereby and thereby and (ii) the Buyer shall, from time to time, execute and deliver such additional instruments, documents, conveyances or assurances and take such other actions as shall be necessary, or otherwise reasonably requested by Seller, to confirm and assure the rights and obligations provided for in this Agreement and in the Seller Documents and render effective the consummation of the transactions contemplated hereby and thereby.

EHREN-WALIA 000049

Section 6.9    <u>Proceedings.</u>  The Selling Parties shall be responsible for the fees and expenses of all Proceedings set forth on **Schedule 3.6** and all additional Proceedings whether or not commenced after the date hereof which are based upon or arise from any act, transaction, circumstance, sale or providing of works, material, product or services, state of facts or other condition which occurred or existed before the Closing Date.

Section 6.10    <u>Use of Business Name.</u>  Seller shall no later than the Closing Date change its name to a name approved by Buyer (which approval shall not be unreasonably withheld or delayed) and thereafter, the Seller Parties will not, and will not permit any Affiliate to directly or indirectly, use or do business, or assist any third party in using or doing business, under the names and marks "Porteck" (or any other name confusingly similar to such name and mark) and will not use any e-mail address containing such name; provided, however that Porteck India may continue to use its name so long as no party to the Option Agreement (excluding the Buyer) is in breach thereof.

Section 6.11    <u>Tax Returns; Liability for Transfer Taxes and Fees.</u>

(a)    All sales (including, without limitation, bulk sales), use, value added, documentary, stamp, gross receipts, registration, transfer, conveyance, excise, recording, license and other similar Taxes and fees ("**Transfer Taxes**") arising out the transfer of the Assets to Buyer shall be borne by Buyer.  Subject to **Section 7.2(i),** Buyer shall prepare and timely file all Tax Returns required to be filed in respect of such Transfer Taxes, provided that Seller shall be permitted to prepare, on a timely basis, any such Tax Returns that are the primary responsibility of Seller under applicable Law.  Each party's preparation of any such Tax Returns shall be subject to the other party's approval, which approval shall not be unreasonably withheld or delayed.  All Tax Returns in respect of such Transfer Taxes shall be prepared in a manner not inconsistent with **Schedule 1.8**.

(b)    Each party (the "**Providing Party**") will provide the other party promptly upon request with certificates of exemption or other similar documents pertaining to the exemption or potential exemption from Transfer Taxes arising from of the sale of all or a portion of the Assets pursuant to the transactions contemplated hereby, to the extent the Providing Party is entitled to, pursuant to applicable law, issue such certificates and similar documents.

(c)    The Selling Parties will prepare and timely file all Tax Returns to be filed with respect to the Seller for 2014 and 2015 and will provide the Buyer copies of all such Tax Returns promptly after such Tax Returns are filled.

Section 6.12    <u>Insurance.</u>

(a)    **Schedule 6.12** sets forth certificates for all insurance policies (including fidelity bonds and other similar instruments) currently in effect, relating to the Assets or the Business (the "**Insurance Policies**").

(b)    Seller has delivered to Buyer (i) copies of all of the Insurance Policies (as amended) in effect at the time of the Closing and (ii) a certificate of insurance for the Insurance Policies, certifying that such Insurance Policies are in full force and effect as of the

EHREN-WALIA 000050

date specified on the certificate (such date to be prior to the Closing Date, but no more than 10 days prior to the Closing Date).  Seller shall maintain the Insurance Policies in full force and effect through December 31, 2015

       Section 6.13   <u>Transition.</u>

       (a)   For a reasonable period following the Closing, the Selling Parties shall use their best efforts, at no cost to the Selling Parties, to encourage Seller's customers, clients, suppliers, and other business associates to maintain the same business relationships with Buyer after the Closing as they maintained with Seller prior to the Closing.  The Selling Parties will refer to Buyer all customer inquiries relating to the businesses of Seller.  The Selling Parties agree to use their best efforts to take such actions as may be necessary to entitle Buyer to use Seller's telephone numbers identified on **Schedule 1.1(g)**.

       (b)   Seller shall not commence any Proceeding against any Person (other than the Buyer); provided, however that Seller may maintain Proceedings set forth on **Schedule 3.6** and may bring counterclaims in connection with Proceedings in which Seller is a defendant; provided, further however that Seller may commence Proceedings to collect Closing Accounts Receivable with the prior written consent of Buyer, which consent will not be unreasonably denied, delayed or conditioned.

       Section 6.14   <u>Assignment of Cash.</u>  Buyer agrees to promptly turn over to Seller any funds it receives after the Closing in connection with the operation of the Business before the Closing.  Seller agrees to promptly turn over to Buyer any funds it receives after the Closing in connection with the operation of the Business following the Closing.

       Section 6.15   <u>Seller's Existence.</u>  Until the Seller has satisfied its obligations pursuant to this Agreement, Seller shall continue to validly exist as a corporation, in good standing under the laws of the State of New York, and Seller shall take all necessary action, including the payment of any filing and other fees to maintain such existence.

       Section 6.16   <u>Mail.</u>  The Selling Parties agree to forward to Buyer any mail or e-mails received by them after the Closing that relate to the Assets, the Assumed Liabilities or the operation of the Business after the Closing or otherwise properly relates to the Buyer and not the Selling Parties.  Buyer agrees to forward to Seller any mail or e-mails received by the Buyer after the Closing that relate to the Excluded Assets or the Excluded Liabilities or otherwise properly relates to the Seller and not the Buyer.

       Section 6.17   <u>Access to Information.</u>  To the extent that Seller provides Buyer with the original form of the Books and Records under **Section 1.1(e)** of this Agreement, for a period of seven years, commencing on the Closing Date, Seller shall, upon written notice to Buyer setting forth a commercially reasonable purpose, be entitled to inspect and make copies of, at Seller's expense, such original Books and Records.

       Section 6.18   <u>Certain Employees.</u>  As of the Closing, the Seller will assign to Buyer the contract for employment of the employees or consultants of the Seller set forth on **Schedule 6.18** (the "**Specified Employees**").  The Seller will use all reasonable efforts to facilitate the transfer of the Specified Employees to Buyer, and will waive, or cause to be

EHREN-WALIA 000051

waived, any non-competition, non-solicitation or non-disclosure or similar obligations any such Specified Employee granted to or for the benefit of the Seller or any Seller Affiliate or any other agreement, arrangement or provision that would restrict the activities in which such Specified Employees could engage in connection with their employment by the Buyer.

Section 6.19    Employee Payments.  Seller will retain all obligations and liabilities (other than the vacation pay obligations and liabilities which are covered by the next sentence) arising prior to the Closing Date that it may have with respect to any employee employed in the conduct of the Business including any obligation to provide severance pay or other termination benefits, if any, arising from Seller's termination of their employment and to the extent that any Specified Employee received deferred compensation, including bonuses, in 2014 or has been told that such Employee will receive deferred compensation, including bonuses, in 2015, the amount of such deferred compensation, including bonuses, multiplied by a fraction, the numerator of which is the number of calendar days in 2015 before the Closing Date and the denominator of which is 365.  Seller will deliver to the Buyer on or before Closing a schedule (the "**Vacation Pay Schedule**") setting forth the vacation pay payable to each of the Specified Employees and Buyer will be responsible for and will discharge all obligations to make the vacation pay payments to the Specified Employees in accordance with the Vacation Pay Schedule (the "**Buyer's Vacation Pay Obligations**") and in exchange the Buyer will reduce the Post-Closing Payment by the amount of all payments made by the Buyer pursuant to this sentence; the Seller will retain all other obligations and liabilities arising prior to the Closing Date that it may have to provide vacation pay with respect to any employee employed in the conduct of the Business.  Seller will be responsible for and discharge any and all obligations, to its employees under the Worker Adjustment and Retraining Notification Act ("**WARN**"), if any.

Section 6.20    Conduct of the Buyer Post-Closing.  Until the Buyer has satisfied its obligations pursuant to **Section 1.7** in full, Buyer will not (i) be sold to an unaffiliated third party (whether by means of an asset sale, the sale of a majority of its equity in one or a series of related transactions) other than to an Affiliate of Buyer or (ii) merge the Company into or with any other entity other than to an Affiliate of Buyer, each, a "**Material Event**".  If a Material Event occurs, then any and all Post-Closing Payments shall then be payable, when due, pursuant to Section 1.3, as if the EBITDA and Revenues, for any relevant Designated Period, were annualized for the period commencing on the first day following the Closing Date and ending on the date of the Material Event; provided, however, that a restructuring, reorganization, sale of assets, or other similar transaction that does not materially impact the operations of the Business or the Buyer, or an initial public offering of any parent of the Buyer, shall not be deemed a Material Event for purposes of this Section 6.20.

Section 6.21    AHMS.  The Parties agree that if any of the AHMS Contracts is terminated by AHMS because the assignment of such AHMS Contract by Seller to Buyer breached such AHMS Contract, then the Seller Parties shall pay the Buyer an amount equal to 20% of the Seller's revenue in 2014 attributable to such AHMS Contract multiplied by 5.4.

EHREN-WALIA 000052

ARTICLE 7

INDEMNIFICATION

Section 7.1    <u>Indemnification.</u>

(a)    <u>Indemnification by the Selling Parties</u>. Subject to the limits set forth in this **Article 7**, from and after the Closing, (1) the Selling Parties jointly and severally agree to indemnify, defend and hold Buyer and its Affiliates and their respective officers, directors, managers, members, shareholders, employees, agents and representatives (the "**Buyer Indemnified Persons**") harmless from and in respect of Losses that they may incur or suffer arising out or by reason of, in connection with or due to (i) any breach of any representation or warranty of the Seller contained in this Agreement or any other Seller Document, (ii) any breach of any covenant or agreement of the Seller contained in this Agreement or any other Seller Document, (iii) any of the Excluded Assets or Excluded Liabilities, (iv) any and all claims of third parties with whom the Seller or its agents have had discussions with respect to the disposition of the Seller or its Business in connection with or arising out of such discussions, (v) the operation of the Business prior to the Closing Date or the ownership, operation or use of the Assets prior to the Closing Date and any and all debts, liabilities and obligations of, and any and all violation of laws, rules, regulations, codes or orders by the Seller, direct or indirect, fixed, contingent, legal, statutory, contractual or otherwise, which exist at or as of the Closing Date or which arise after the Closing Date to the extent based upon or arising from any act, transaction, circumstance, sale or providing of works, material, product or services, state of facts or other condition which occurred or existed, before the Closing Date, whether or not then known, due or payable, (vi) any and all claims relating to the matters set forth on **Schedule 3.6** or any other civil, criminal or administrative suit, action, proceeding, investigation or other Proceeding to the extent based upon or arising from any act, transaction, circumstance, sale or providing of works, material, product or services, state of facts or other condition which occurred or existed, before the Closing Date, whether or not then known, due or payable,  or with respect to the operation of the Business prior to Closing, the employment of the Employees prior to Closing or the ownership (or leasing of), operation or use of the Assets prior to the Closing, (vii) any and all claims relating to the ownership of the PARCS Software, the Source Code and the other Owned Intellectual Property, including, without limitation, that such Owned Intellectual Property does infringe upon, violate or constitute the unauthorized use of any of the Intellectual Property or proprietary rights of any Person or that any Person is entitled to use the PARCS Software, the Source Code and the other Owned Intellectual Property, (<u>viii</u>)  any and all Taxes of any Seller Party whether or not relating to or arising out of the Business; (<u>ix</u>) any and all Pre-Closing Taxes of Seller; (<u>x</u>) any and all Benefit Liabilities of Seller (except to the extent of Buyer's Vacation Pay Obligations); (<u>xi</u>) environmental matters (including Losses relating to any remediation for environmental matters disclosed in **Schedule 3.18**), (xii) with respect to services provided by Seller before the Closing (<u>A</u>) any claim based on a warranty with respect to services rendered before the Closing and (<u>B</u>) any warranties issued before Closing relating to such services (whether expressed or implied by operation of Law);  (xiii) [intentionally omitted]; (xiv) the Seller having failed to duly qualify or obtain a license to do business in all of the jurisdictions in which the nature of the Seller's activities required such qualification or licensing; (xv) any Losses or other amounts (including with respect to disability and unemployment) with respect to Employees of Seller (other than to the extent arising out of their employment by Buyer) and/or

EHREN-WALIA 000053

any or all claims relating the Wachovia Lien and the failure to have it extinguished prior to the Closing (the "**Joint Indemnification**") and (2) each Selling Shareholder severally and not jointly agrees to indemnify, defend and hold the Buyer Indemnified Persons harmless from and in respect of Losses that they may incur or suffer arising out or by reason of, in connection with or due to (i) any breach of any representation or warranty of such Selling Shareholder contained in this Agreement or any other Seller Document, (ii) any breach of any covenant or agreement of such Selling Shareholder contained in this Agreement or any other Seller Document (the "**Several Indemnification**").

(b)     Indemnification by Buyer. Subject to the limits set forth in this **Article 7**, from and after the Closing, Buyer agrees to indemnify, defend and hold the Selling Parties, and their respective agents and representatives (the "**Seller Indemnified Persons**") harmless from and in respect of any and all Losses that they may incur or suffer arising out of or by reason of or in connection with or due to (i) any breach of any representation or warranty of Buyer set forth in this Agreement or any other Buyer Document, or (ii) the failure to perform any of the covenants or agreements of Buyer set forth in this Agreement, including, without limitation, payment of the Post-Closing Payment and the Buyer's Vacation Pay Obligations, or any other Buyer Document, including the Employment Agreements; (iii) the Assumed Liabilities; (iv) any failure of Buyer to comply with applicable bulk sales laws (in consideration of which indemnification obligation Seller hereby waives compliance by Buyer with any applicable bulk sales laws);  or (v) the operation of the Business following the Closing Date or the ownership, operation or use of the Assets following the Closing Date, except, in the case of clause (v), to the extent such Losses result from or arise out of the Excluded Liabilities or constitute Losses for which any Seller Party is required to indemnify Buyer Indemnitees under **Section 7.1(a)**.

(c)     Certain Limitations. Anything in this **Article 7** to the contrary notwithstanding:

(i)     neither the Buyer Indemnified Persons, on the one hand, nor Seller Indemnified Persons, on the other hand, shall be entitled to recover pursuant to **Section 7.1(a) or 7.1(b)**, as the case may be, in respect of breaches of representations and warranties (other than the representations and warranties set forth in **Sections 3.1 [Organization; Authority; Due Execution], 3.5 [Capitalization], 3.7 [Assets; Personal Property], 3.10 [Tax Matters], 4.1 [Ownership of Shares] and 4.2 [Authority]**, and Buyer's representations and warranties set forth in **Section 5.1(b) [Organization; Authority; Due Execution]** (all such representations and warranties being herein called "**Specified Representations**") from the respective other Party hereunder for any Losses) except to the extent that the aggregate amount of any such Losses indemnifiable hereunder exceeds $100,000 (the "**Basket**"), at which point, either the Buyer Indemnified Persons or the Seller Indemnified Persons, as the case may be, will be obligated to indemnify the Party seeking indemnification for all such Losses in excess of the Basket, subject to the other clauses of this **Section 7.1(c)**;

(ii)     the Buyer Indemnified Persons shall not be entitled to recover from any Selling Party for breaches of representations and warranties of the Seller or such Selling Party (other than with respect to the representations in **Section 3.13** with respect to

EHREN-WALIA 000054

the PARCS Software) in an aggregate amount in excess of Four Million Dollars ($4,000,000) (the "**Cap**");

(iii)    the Seller Indemnified Persons shall not be entitled to recover for breaches of representations and warranties of Buyer in an aggregate amount in excess of the Cap;

(iv)    none of the foregoing limitations on indemnification in clauses (i), (ii) and (iii) of this **Section 7.1(c)** shall apply to a breach of any Specified Representation or to any claim based on fraud or intentional misrepresentation;

(v)    solely for purposes of calculating the amount of Losses incurred arising out of or relating to any breach of a representation, warranty, covenant or agreement (and not for purposes of determining whether or not such a breach has occurred) any reference to "Material Adverse Effect" or any other materiality qualifications in such representation, warranty, covenant or agreement shall be disregarded; and

(vi)    the amount which an Indemnifying Party is required to pay to, for or on behalf of any Indemnified Party pursuant to this **Article 7** shall be adjusted (including, retroactively) by any insurance proceeds and any indemnity, contribution, or other similar payment actually recovered by or on behalf of such Indemnified Party in reduction of the related indemnifiable loss (the "**Indemnifiable Loss**"). Amounts required to be paid, as so reduced, are hereinafter sometimes called an "**Indemnity Payment**." If an Indemnified Party shall have received or shall have had paid on its behalf an Indemnity Payment in respect of an Indemnifiable Loss and shall subsequently receive insurance proceeds or other payment in respect of such Indemnifiable Loss, then the Indemnified Party shall pay to the Indemnifying Party the amount of such insurance proceeds or other payment or, if lesser, the amount of the Indemnity Payment. To the extent that any Indemnified Party is entitled to indemnification pursuant to this **Article 7**, the Indemnifying Party shall be entitled to exercise, and shall be subrogated to, any rights and remedies (including rights of indemnity, rights of contribution and other rights of recovery) that any Indemnified Party may have to insurance policies or similar contracts with respect to which such Indemnified Party is a beneficiary. The Indemnified Party shall take such actions as the Indemnifying Party may reasonably request for the purpose of enabling the Indemnifying Party to perfect or exercise the right of subrogation of the Indemnifying Party under this **Section 7.1(c)(vii)**.

(d)    Survival. The representations, warranties and covenants of the Parties contained in this Agreement, any other Seller Document or Buyer Document, as the case may be, or in any instrument delivered pursuant hereto or thereto will survive the Closing and will remain in full force and effect thereafter, except that the representations and warranties of the Parties shall expire eighteen (18) months following the Closing; provided, that: (i) such representations and warranties shall survive beyond such period with respect to any breach thereof if written notice thereof shall have been duly given within such period and (ii) the representations and warranties set forth in **Sections 3.10 [Tax Matters], 3.12 [Employee Benefits] and 3.18 [Environmental Matters]** shall survive the Closing until one (1) month following the lapse of the applicable statute of limitations. None of foregoing limitations on survival shall apply in the case of fraud, intentional misconduct or intentional misrepresentation.

EHREN-WALIA 000055

(e)    <u>Notice and Opportunity to Defend</u>. The following shall apply:

(i)    If there occurs an event (a "**Covered Proceeding**")
which a Party asserts is an indemnifiable event pursuant to **Section 7.1(a) or 7.1(b)**, the Party or
Parties seeking indemnification (the "**Indemnified Party**") shall notify the other Party or Parties
obligated to provide indemnification (the "**Indemnifying Party**") promptly. If such event
involves any claim or the commencement of any action or proceeding by a third person, the
Indemnified Party shall give such Indemnifying Party prompt written notice of such claim or the
commencement of such action or proceeding; provided, however, that the failure to provide
prompt notice as provided herein will relieve the Indemnifying Party of its obligations hereunder
only to the extent that such failure prejudices the Indemnifying Party hereunder. In case any such
action shall be brought against any Indemnified Party and after such Indemnified Party has
notified the Indemnifying Party of the commencement thereof, the Indemnifying Party shall be
entitled to assume the defense thereof, with counsel reasonably selected by the Indemnifying
Party and reasonably approved by the Indemnified Party after notice from the Indemnifying
Party to the Indemnified Party. The Indemnifying Party and the Indemnified Party agree to
cooperate fully with each other and their respective counsel in connection with the defense,
negotiation or settlement of any such action or asserted liability.

(ii)    If the Indemnifying Party agrees to assume the
defense of a Covered Proceeding, the Indemnified Party shall have the right to participate at its
own expense in the defense of such action or asserted liability. If the Indemnifying Party is
otherwise entitled to control the settlement of a Covered Proceeding (subject to the requirements
and limitations of this **Section 7.1**), the Indemnifying Party will be entitled to control such
settlement only if (A) the terms of such settlement require no more than the payment of money
(for example, such settlement does not require the Indemnified Party to admit any wrongdoing or
take or refrain from taking any action), (B) the full amount of such monetary settlement is fully
paid by the Indemnifying Party, and (C) the Indemnified Party receives as part of such settlement
a legally binding and enforceable unconditional satisfaction and release of all claimed liabilities
or obligations in form and substance reasonably satisfactory to the Indemnified Party.

(iii)    Notwithstanding any provision of this Agreement to
the contrary, the Party or Parties who would otherwise be the Indemnifying Party (in this
subsection the **"First Party"**) shall not be entitled to assume or direct the defense or settlement
of any Covered Proceeding with respect to the Party or Parties who would otherwise be the
Indemnified Party (in this subsection the "**Other Party**") if the aggregate amount of Losses
which will or could reasonably result from such Covered Proceedings to the Other Party,
together with the maximum aggregate amount which could reasonably result from all other
unresolved Covered Proceedings for which the First Party is liable hereunder, exceeds an amount
equal to the Cap, after deducting all Losses for which the Party has, has had or could reasonably
be anticipated to indemnify the Other Party by reason of this **Article 7**, whether in respect of
such Covered Proceeding and/or the events or circumstances giving rise thereto and/or in respect
of all other claims and/or indemnification obligations. In such event, the Other Party shall be
entitled to control the defense and settlement of any such Covered Proceeding, and, without
limiting the provisions of **Section 7.1** hereof, the First Party shall be liable for all Losses in
connection thereunder.

EHREN-WALIA 000056

(f)    _Purchase Price Adjustment_. The Parties hereby agree that any payment made pursuant to this **Article 7** shall result in a corresponding adjustment to the Purchase Price.

ARTICLE 8

DEFINITIONS

Section 8.1    _Definitions._  For purposes of this Agreement, the following terms used in this Agreement shall have the meanings ascribed to them below:

"**409A Plan**" has the meaning ascribed to such term in **Section 3.10(a)(xv)**.

"**Accounts Receivable**" has the meaning ascribed to such term in **Section 1.2(a)**.

"**Adjusted Designated Period**" has the meaning ascribed to such term in **Section 1.7(d)**.

"**Affiliate**" of any Person means another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person.

"**Agreement**" has the meaning ascribed to such term in the Preamble.

"**AHMS**" means Atlantic Health Management Solutions, LLC.

"**AHMS Contract**" means any contract assigned by AHMS to the Seller in December 2013.

"**Annual Financial Statements**" has the meaning ascribed to such term in **Section 3.14(a)**.

"**Arbiter**" has the meaning ascribed to such term in **Section 1.1**.

"**Assets**" has the meaning ascribed to such term in **Section 1.7(g)**.

"**Assigned Contracts**" has the meaning ascribed to such term in **Section 1.1(d)**.

"**Assignment of Contracts**" has the meaning ascribed to such term in **Section 2.2(a)(iv)**.

"**Assignment of Copyrights**" has the meaning ascribed to such term in **Section 2.2(a)(v)**.

"**Assignment of Domain Names**" has the meaning ascribed to such term in **Section 2.2(a)(vi)**.

"**Assignment of Intellectual Property**" has the meaning ascribed to such term in **Section 2.2(a)(viii)**.

EHREN-WALIA 000057

"**Assumed Liabilities**" has the meaning ascribed to such term in **Section 1.3(a)**.

"**Assumption Agreement**" has the meaning ascribed to such term in **Section 1.3(b)**.

"**Bad A/R Amount**" has the meaning ascribed to such term in **Section 1.7(d)**.

"**Basket**" has the meaning ascribed to such term in **Section 7.1(c)(i)**.

"**Benefit Liabilities**" means liabilities, obligations, commitments, costs and expenses, including reasonable fees and disbursements of attorneys and other advisors, including any such expenses incurred in connection with the enforcement of any applicable provision of this Agreement relating to the Employees other than liabilities arising out of such Employees' employment with Buyer from and after the Closing, former employees or consultants of Seller or Seller Benefit Plans, including as to the payment of wages and the provision of employment benefits to any Employee.

"**Benefits**" has the meaning ascribed to such term in **Section 6.5(d)(ii)**.

"**Bill of Sale**" has the meaning ascribed to such term in **Section 2.2(a)(i)**.

"**Books and Records**" means all operating data and records of the Seller which are necessary to or used or useful in the operation of the Business, wherever located, including all books of account, ledgers, general, financial, accounting, tax, warranty, shipping records, invoices, management letters from accountants, purchase and sales records and information, customers' records, records pertaining to customer requirements, equipment maintenance and warranty information, customer and prospect lists, correspondence, catalogues, promotion materials, customer contacts, customer invoices, customer returns and vendor product information, credit and collection records, and all other files, records, literature and other documents of the Seller, whether in written, electronic or other form.

"**Breaching Party**" has the meaning ascribed to such term in **Section 6.5(d)**.

"**Bridge Note**" has the meaning ascribed to such term in **Section 1.6(a)**.

"**Business**" has the meaning ascribed to such term in **Section 1.6(d)**.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which commercial banking institutions in New York, New York are authorized or obligated by law or executive order to be closed.

"**Buyer**" has the meaning ascribed to such term in the Preamble.

"**Buyer Documents**" has the meaning ascribed to such term in **Section 5.1(b)**.

"**Buyer Indemnified Persons**" has the meaning ascribed to such term in **Section 7.1(a)**.

EHREN-WALIA 000058

"**Buyer Transaction Expenses**" means the sum of the fees and expenses of third parties (such as accountants, lawyers, consultants or other outside advisors) incurred by Buyer arising or resulting from the transactions contemplated by this Agreement, which remain outstanding immediately prior to the Closing, which fees and expenses amount to $2,800,000.

"**Buyer's Vacation Pay Obligations**" has the meaning ascribed to such term in **Section 6.19**.

"**Cap**" has the meaning ascribed to such term in **Section 7.1(c)(ii)**.

"**Closing**" has the meaning ascribed to such term in **Section 2.1**.

"**Closing Accounts Receivable**" has the meaning given to such term in **Section 3.14(b).**

"**Closing Accounts Receivable Collections**" has the meaning ascribed to such term in **Section 1.7(j)**.

"**Closing Consideration**" has the meaning ascribed to such term in **Section 1.6(a).**

"**Closing Date**" has the meaning ascribed to such term in the Preamble.

"**Closing Payment**" has the meaning ascribed to such term in **Section 1.6(a).**

"**Code**" means the Internal Revenue Code of 1986, as amended. All citations to the Code or to the regulations promulgated thereunder shall include any amendments or any substitute or successor provisions thereto.

"**Compensation and Benefits Plans**" has the meaning ascribed to such term in **Section 3.12(a)**.

"**Confidential Information**" has the meaning ascribed to such term in **Section 6.5(c).**

"**Consent**" means any consent, approval, authorization, waiver, permit, grant, franchise, concession, agreement, license, exemption or order of, registration, certificate, declaration or filing with, or report or notice to, any Person, including but not limited to any Governmental Entity.

"**Constellation Group**" has the meaning ascribed to such term in **Section 6.3.**

"**Contracts**" or "**Contract**" means all contracts, agreements, leases, licenses, franchises, purchase orders, sale, license or service orders, instruments, commitments, arrangements and understandings (in each case, whether written or oral and including all amendments thereto) to which the Seller is a party or by which the Seller is bound or under which the Seller or the Business has any rights or is entitled to any benefits but excluding therefrom any licenses for "shrink-wrapped-off-the-shelf software".

EHREN-WALIA 000059

"**Covered Proceeding**" has the meaning ascribed to such term in **Section 7.1(e)(i)**.

"**Current Customer**" means a Top Client unless such Top Client (x) has ceased, or indicated that it intends to cease, to use the products or services of the Seller before the Closing or Buyer on or after the Closing, (y)  has reduced by at least 50% on an annual basis or indicated it will reduce by at least 50% on an annual basis the collective use of products or services of the Seller before the Closing and Buyer after the Closing or (z) has indicated that it will not pay for a majority (measured by dollar amount) of the products or services that the Seller or Buyer has provided (other than products and services for which it has already paid).

"**Deficiency Amount**" has the meaning ascribed to such term in **Section 1.7(d).**

"**Deposits**" means prepayments, advances, security deposits and similar items made to or for the benefit of Seller.

"**Designated Period**" has the meaning ascribed to such term in **Section 1.7(a)**.

"**Earn-Out Factor**" has the meaning ascribed to such term in **Section 1.7(a)**.

"**Earn-Out Payment**" has the meaning ascribed to such term in **Section 1.7(a)**.

"**EBITDA**" has the meaning ascribed to such term in **Section 1.7(a)**.

"**Employees**" mean current and former employees and consultants of the Seller, including leased and temporary employees, involved in whole or in part in the Business.

"**Employment Agreements**" has the meaning ascribed to such term in **Section 2.2(a)(iii).**

"**Environmental Law**" means any Law, permit, authorization, policy, opinion, common law or agency requirement applicable to the Seller relating to: (i) the protection, investigation or restoration of the environment, health and safety, or natural resources or exposure to any harmful or hazardous material, (ii) the handling, use, presence, disposal, release or threatened release of any chemical substance or waste water, or (iii) noise, odor, wetlands, pollution, contamination or any injury or threat of injury to persons or property, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Resource Conservation and Recovery Act, the Occupational and Safety and Health Act (solely to the extent related to Hazardous Substances), Clean Water Act and the Oil Pollution Act.

"**Environmental Permit**" means any permit, license, authorization or consent required pursuant to applicable Environmental Laws.

"**ERISA**" has the meaning ascribed to such term in **Section 3.12(b)**.

"**Escrow Account**" has the meaning set forth in **Section 1.6**.

EHREN-WALIA 000060

"**Escrow Agreement**" has the meaning set forth in **Section 1.6**.

"**Escrow Amount**" has the meaning set forth in **Section 1.6**.

"**Excluded Assets**" has the meaning ascribed to such term in **Section 1.2**.

"**Excluded Liabilities**" has the meaning ascribed to such term in **Section 1.4**.

"**Expected Working Capital**" has the meaning ascribed to such term in **Section 1.7(d).**

"**Expected Working Capital Deficiency**" has the meaning ascribed to such term in **Section 1.7(d).**

"**Final A/R Statement**" has the meaning ascribed to such term in **Section 1.7(l)**.

"**Final Statement**" has the meaning ascribed to such term in **Section 1.7(h)**.

"**Financial Records**" means the financial, Tax and accounting records (in any form), including books of original entry, such as general ledgers and trial balances covering any accounting period ending through the Closing Date relating directly or indirectly to the Business, the Assets or the Employees

"**Financial Statements**" has the meaning ascribed to such term in **Section 3.14(a).**

"**First Party**" has the meaning ascribed to such term in **Section 7.1(e)(iii)**.

"**GAAP**" means U.S. generally accepted accounting principles as in effect from time to time.

"**General Assignment**" has the meaning ascribed to such term in **Section 2.2(a)(ix)**.

"**Governmental Approval**" means any Consent of, with or to any Governmental Entity.

"**Government Bid**" has the meaning ascribed to such term in **Section 3.19(a)(iv).**

"**Government Contract**" has the meaning ascribed to such term in **Section 3.19(a)(iv).**

"**Governmental Entity**" means (i) any supranational, federal, state, local, municipal, foreign or other government; (ii) any governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal); or (iii) any body, authority or agency exercising or entitled to exercise

EHREN-WALIA 000061

any administrative, executive, judicial, legislative, police, regulatory or taxing authority, including any arbitral tribunal.

"**Hazardous Discharge**" means the use, management, handling, transport, treatment, generation, storage, spill, escape, seepage, leakage, spillage, emission, release, discharge, remediation or clean-up of any Hazardous Substance on or about any of the Seller Leased Property or caused by the Seller.

"**Hazardous Substance**" means any substance that is: (i) listed, classified or regulated in any concentration pursuant to any Environmental Law, (ii) any petroleum product or by-product, asbestos-containing material, lead-containing paint or plumbing, polychlorinated biphenyls, radioactive materials or radon, or (iii) any other substance which may be the subject of regulatory action by any Governmental Entity pursuant to any Environmental Law.

"**HIPAA**" has the meaning ascribed to such term in **Section 3.12(b)**.

"**Indebtedness**" means, without duplication, and in each case whether fixed, contingent or otherwise, and to the extent existing or accrued or required to be accrued at or as of the Closing, (i) any indebtedness for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (ii) any indebtedness evidenced by any note, bond, debenture or other debt security, including "overdraft", (iii) all indebtedness for the deferred purchase price of property or a business represented by a note, or earnout or contingent purchase payment obligation, (iv) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (v) all indebtedness secured by a purchase money mortgage or other Lien to secure all or part of the purchase price of the property subject to such mortgage or Lien, (vi) all obligations under leases which shall have been or must be, in accordance with GAAP, recorded as capital leases, (vii) any credit extended in the nature of banker's acceptances or letters of credit, (viii) any obligations (including, but not limited to, interest, fees, penalties and other expenses) under any interest rate swap agreements or instruments, (ix) all interest, fees and other expenses owed with respect to the indebtedness referred to above, and (x) all indebtedness and liabilities referred to above which is directly or indirectly guaranteed, and, with respect to (i) to (x) above, all premiums, penalties, charges, fees, expenses and other amounts that are or would be due (including with respect to early termination) in connection with the payment and satisfaction in full of such obligations.

"**Indemnifiable Loss**" has the meaning ascribed to such term in **Section 7.1(c)(vi)**.

"**Indemnified Party**" has the meaning ascribed to such term in **Section 7.1(e)(i)**.

"**Indemnifying Party**" has the meaning ascribed to such term in **Section 7.1(e)(i)**.

"**Indemnity Payment**" has the meaning ascribed to such term in **Section 7.1(c)(vi)**.

EHREN-WALIA 000062

"**Insurance Policies**" has the meaning ascribed to such term in **Section 6.12**.

"**Intellectual Property**" means any know-how, proprietary rights or other intellectual property, including without limitation, trade secrets, inventions, formulae, processes, patents (including all reissues, divisions, continuations and extensions thereof), patent applications, Trademarks, Trademark registrations, Trademark applications, service marks, service mark registrations, service mark applications, copyrights, copyright registrations, copyright applications, web sites and home pages, uniform resource locators, domain names all rights to, and all intellectual property used or necessary to, create, publish, modify or maintain, any website or home page, customer and vendor information, lists and data bases, customer files, customer lists, mailing and subscription lists, supplier lists, information not known to the general public, literary works, whether or not copyrightable, ideas, concepts, designs, drawings, discoveries, product and service developments, inventions, improvements, processes, logos, software, source codes and materials, object codes and materials, algorithms, techniques, technology, technical information, research material, prototypes and models.

"**Intellectual Property Assets**" has the meaning ascribed to such term in **Section 1.1(c)**.

"**Interim Financial Statements**" has the meaning ascribed to such term in **Section 3.14(a).**

"**IRS**" has the meaning ascribed to such term in **Section 3.10(a)(vi).**

"**Joint Indemnification**" has the meaning ascribed to such term in **Section 7.1(a).**

"**Key Employees**" mean ARVIND WALIA, MELODIE KRALJEV, ALON BARAM and Matt Malone.

"**Landlord**" has the meaning ascribed to such term in **Section 2.2(a)(xi)**.

"**Landlord Estoppel**" has the meaning ascribed to such term in **Section 2.2(a)(xi)**.

"**Law**" or "**Laws**" has the meaning ascribed to such term in **Section 3.17(a)**.

"**Lease Assignment**" has the meaning ascribed to such term in **Section 2.2(a)(xi))**.

"**License Agreements**" has the meaning ascribed to such term in **Section 3.13(b)(i)**.

"**Liens**" means with respect to any property or asset, all liens, mortgages, pledges, security interests, conditional sales agreements, purchase options, rights of first refusal or other encumbrance of like nature in respect of such property or asset.

"**Losses**" means any and all losses, damages, costs, deficiency and reasonable expenses (including reasonable fees and expenses of counsel incident to any of the foregoing, or

EHREN-WALIA 000063

incurred in investigating or attempting to avoid the same or to oppose the imposition thereof, or in enforcing any of the obligations of any Indemnifying Party).

"**Material Adverse Effect**" means any change or effect (or any development that is reasonably likely to result in any change or effect) that (i) is materially adverse to the assets, business, financial condition, or results of operations of the Seller, or (ii) would materially and adversely impair the ability of the Seller to consummate the transactions contemplated by this Agreement; provided however, that "Material Adverse Effect" does not include material adverse changes or effects on the assets, business, financial condition or results of operations of the Seller resulting from: (i) changes in general economic or political conditions but which do not affect the Seller disproportionately, (ii) changes generally affecting the industries in which the Seller operates or (iii) changes in applicable law, rules, regulations.

"**Material A/R Difference**" has the meaning ascribed to such term in **Section 1.7(k)**.

"**Material Contracts**" has the meaning ascribed to such term in **Section 3.19(a).**

"**Material Difference**" has the meaning ascribed to such term in **Section 1.7(g).**

"**Material Event**" has the meaning ascribed to such term in **Section 6.20.**

"**Neutral Firm**" has the meaning ascribed to such term in **Section 1.7(g).**

"**Option Agreement**" has the meaning ascribed to such term in **Section 2.2(a)(xi)**.

"**Ordinary Course of Business**" means the ordinary course of business of the Seller consistent with past custom and practice (including with respect to frequency and amount).

"**Other Party**" has the meaning ascribed to such term in **Section 7.1(e)(iii)**.

"**Owned Intellectual Property**" has the meaning ascribed to such term in **Section 3.13(a)**.

"**PARCS Software**" means the Seller's proprietary software commonly referred to as Porteck Accounts Receivable & Billing Collections System (PARCS SOFTWARE).

"**Parties**" means the parties to this Agreement and "**Party**" means any one of them.

"**Payables**" means all accounts payable, accrued expenses and other amounts payable of the Seller, in each case whether fixed, contingent or otherwise, and to the extent existing or accrued or required to be accrued at or as of the Closing Date, determined in accordance with GAAP; provided, however that the Seller shall obtain bills from each of its accountants and attorneys as of the business day immediately prior to the Closing Date each of which shall be paid prior to or at the Closing.

EHREN-WALIA 000064

"**Pension Plan**" has the meaning ascribed to such term in **Section 3.12(b).**

"**Permits**" has the meaning ascribed to such term in **Section 3.17(b)**.

"**Permitted Indebtedness**" means the Seller's obligations pursuant to the Promissory Note in the original principal amount of $600,000 issued by the Seller to P.C. Advantage, Inc.

"**Permitted Liens**" means: (i) inchoate Liens for current taxes not yet due and payable, (ii) minor Liens that have arisen in the Ordinary Course of Business (including mechanics', workmen's', landlords', warehousemen's, bailees', licensor's and other statutory liens (or other liens arising by operation of law) incurred in the Ordinary Course of Business for amounts not in default or being contested in good faith, and deposits or pledges to secure obligations under workmen's compensation or similar laws), which in each case or in the aggregate, are not substantial in amount, do not materially detract from the value of the assets subject thereto or materially impair the operations of the Seller and (iii) liens granted in connection with Permitted Indebtedness.

"**Person**" means an individual, corporation, partnership, limited liability company, trust or unincorporated organization or a Governmental Entity, or any other entity.

"**Personal Data**" shall mean any and all information (including without limitation (a) first and last name; (b) home address; (c) internet protocol address; (d) email address; (e) geographic location; (f) health or diet information; (g) information about family members; (h) political beliefs; (i) group memberships; (j) social security number or other personal identification number; (k) account numbers; and (l) salary or other employment information) to the extent any such information, alone or in combination with other information processed by the Seller or its Subsidiaries, identifies or is associated with an identified natural person.

"**Personal Property**" has the meaning ascribed to such term in **Section 3.7(c)**.

"**Porteck India**" means Porteck India Infoservices Private Limited, a company incorporated under the Companies Act, 1956 (India)

"**Post-Closing Payment**" has the meaning ascribed to such term in **Section 1.7(a)**.

"**Post-Closing Conditional Payment**" has the meaning ascribed to such term in **Section 1.7(a)**.

"**Pre-Closing Tax Period**" means the taxable period (including all prior taxable years or periods) ending on the day before the Closing Date.

"**Pre-Closing Taxes**" means any Taxes relating to or arising out of the Business, or any of the Assets (i) for any taxable period ending on or before the Closing Date or (ii) that (in the case of any taxable period that begins on or before the Closing Date and ends after the Closing Date) are apportioned to the period of such taxable period that ends on the Closing Date

EHREN-WALIA 000065

(such apportionment being computed on a per diem basis in the case of any property (or similar taxes) and computed based on the closing of the books method in any other case).

"**Preliminary A/R Statement**" has the meaning ascribed to such term in **Section 1.7(j)**.

"**Preliminary Statements**" has the meaning ascribed to such term in **Section 1.7(e)**.

"**Prepayments**" has the meaning ascribed to such term in **Section 1.1(a)**.

"**Privacy and Security Laws**" shall mean Laws regarding collecting, accessing, using, disclosing, electronically transmitting, securing, sharing, transferring and storing Personal Data including federal, state or foreign laws or regulations regarding (i) data privacy and information security, (ii) data breach notification (as applicable), (iii) unfair or deceptive practices and (iv) trespass, computer crime and other Laws governing unauthorized access to or use of electronic data

"**Privacy and Security Regulations**" has the meaning ascribed to such term in **Section 3.30**.

"**Proceedings**" has the meaning ascribed to such term in **Section 3.6**.

"**Providing Party**" has the meaning ascribed to such term in **Section 6.11**.

"**Purchase Price**" has the meaning ascribed to such term in **Section 1.6(a)**.

"**Reimbursable Expenses**" mean any and all expenses, including those related to automobiles, telephones, memberships, travel and entertainment, of the Seller's directors, officers, employees and consultants, that the Seller is obligated to reimburse or are of the type that the Seller has generally reimbursed.

"**Reply A/R Statement**" has the meaning ascribed to such term in **Section 1.7(k)**.

"**Reply Statement**" has the meaning ascribed to such term in **Section 1.7(g).**

"**Restricted Period**" has the meaning ascribed to such term in **Section 6.5(a).**

"**Second Designated Period**" has the meaning ascribed to such term in **Section 1.7(a)**.

"**Section 1.7 Notice**" has the meaning ascribed to such term in **Section 1.7(e)**.

"**Seller**" has the meaning ascribed to such term in the Preamble.

"**Seller Benefit Plans**" means each written or oral employee benefit plan, scheme, program, policy, arrangement and contract (including, but not limited to, any "employee benefit plan," as defined in Section 3(3) of ERISA, whether or not subject to ERISA, and any bonus,

EHREN-WALIA 000066

deferred compensation, stock bonus, stock purchase, restricted stock, stock option or other equity-based arrangement, and any employment, termination, retention, bonus, change in control or severance plan, program, policy, arrangement or contract) for the benefit of any current or former officer, employee or director of the Seller.

"**Seller Documents**" means this Agreement and each other agreement, document or instrument to be executed or delivered by the Seller, the Selling Shareholder Representative or any Selling Shareholder pursuant to this Agreement.

"**Seller Indemnified Persons**" has the meaning ascribed to such term in **Section 7.1(b)**.

"**Seller Leased Property**" has the meaning ascribed to such term in **Section 3.8**.

"**Seller Leases**" has the meaning ascribed to such term in **Section 3.8**.

"**Seller Privacy Policies**" has the meaning ascribed to such term in **Section 3.29**

"**Selling Party**" or "**Selling Parties**" has the meaning ascribed to such term in the Preamble.

"**Selling Parties' Knowledge**" means Walai has no actual knowledge, after reasonable inquiry and investigation, of any fact or matter that leads him, or reasonably should have led him, to believe the applicable representation and warranty is or was not true.

"**Selling Shareholder**" or "**Selling Shareholders**" has the meaning ascribed to such term in the Preamble.

"**Selling Shareholder Representative**" has the meaning ascribed to such term in the Preamble.

"**Selling Shareholder Representative Expenses**" has the meaning ascribed to such term in **Section 9.14(f).**

"**Several Indemnification**" has the meaning ascribed to such term in **Section 7.1(a).**

"**Shares**" has the meaning ascribed to such term in the Preamble.

"**Software**" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, testing scripts, schematics, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, and (iv) all documentation, including user manuals, training materials and functional specifications or similar documentation, relating to any of the foregoing.

EHREN-WALIA 000067

"**Source Code**" means the complete human-readable source code corresponding to the most current version of the PARCS Software that Seller is selling to Buyer pursuant to this Agreement, together with all documentation, comments, keys and passwords necessary for the Buyer to compile, install and run the PARCS Software.

"**Specific Excluded Liabilities**" means any and all of the following debts, liabilities, claims and obligations, whether fixed, contingent or otherwise, in each case to the extent existing or accrued or required to be accrued at or as of the Closing, or made, asserted or arising after the Closing but based upon or arising from any act, transaction, circumstance, sale or providing of goods or services, state of facts or other condition which occurred or existed on or prior to the Closing, whether or not then known, due or payable:

(i)    any claims, liabilities or obligations against or of the Seller under or arising out of any actual or claimed stock option, stock purchase, equity-based incentive, profit-sharing or similar plan(s), program(s), agreement(s) or arrangement(s) and/or under any and all qualified or non-qualified stock options, grants or awards and/or any other agreement, arrangement or understanding to make a payment to any director, officer or employee in connection with the sale of the Assets or any transaction contemplated by this Agreement;

(ii)    any and all claims, liabilities and obligations against or of the Seller by, of or to any of its present or former direct or indirect shareholders, including any arising out of any action by the Seller in connection with any of the transactions contemplated by this Agreement;

(iii)    any and all claims, liabilities and obligations in respect of brokerage or finder's fees payable by the Seller and all investment banking, legal, accounting and other consulting or similar costs and expenses incurred by the Seller in connection with the negotiation, execution and/or consummation of this Agreement and/or any of the transactions contemplated hereby;

(iv)    any and all Transaction Expenses, Indebtedness of the Seller and Payables and any and all other liabilities and obligations of the Seller to the Selling Shareholders or any Affiliate(s) of any Selling Shareholder (whether current or long-term);

(v)    any and all claims, liabilities and obligations against or of the Seller as a guarantor, co-obligor or surety of or with any other Person, (other than the Seller), or arising by reason of the Seller being an Affiliate of any Selling Shareholder or against or of any Affiliate of any Selling Shareholder;

(vi)    any and all claims, liabilities and obligations for or in respect of any and all foreign, federal, state and local Taxes of or imposed on the Seller or with respect to any of the income or activities thereof allocable to any Pre-Closing Tax Period;

EHREN-WALIA 000068

(vii)    any and all claims, liabilities and obligations against or of the Seller with respect to any Compensation and Benefits Plans arising out of any events occurring, or circumstances or state of facts existing, on or prior to the Closing Date; or

(viii)    any and all claims, liabilities and obligations against or of the Seller based on or arising from the presence of any Hazardous Substance on any of the Seller Leased Property, or any Hazardous Discharge on or prior to the Closing Date, and/or the failure to obtain any license or permit required in connection with any Hazardous Substance or Hazardous Discharge or the retention, disposal, treatment or use thereof, and/or arising out of any, in each case, based on or arising from any act, transaction, state of facts or other condition which occurred or existed on or before the Closing Date, on, from, involving or by any of the Seller Leased Property, or the Seller, or any of its Affiliates, and/or any demand of any government agency or authority or other person or entity prior to, on or after the Closing Date which is based upon or in any way related to any discharge of any Hazardous Substance, the presence, use, disposal or treatment of a Hazardous Substance, and/or noncompliance with any Environmental Law on or prior to the Closing Date, on, from, involving or by any of the Seller Leased Property, the Seller or any of its Affiliates.

"**Specified Employees**" has the meaning ascribed to such term in **Section 6.18**.

"**Specified Representations**" has the meaning ascribed to such term in **Section 7.1(c)(i)**.

"**Subsidiary**" or "**Subsidiaries**" of any Person means another Person, an amount of the voting securities, other voting rights or voting partnership interests of which is sufficient to elect at least a majority of its board of directors or other governing body (or, if there are no such voting interests, fifty percent (50%) or more of any class or series of capital stock or other partnership, joint venture, membership or other equity interest of which) is owned directly or indirectly by such first Person.

"**Tax**" or "**Taxes**" means all taxes, including (i) all federal, state, local, provincial or foreign income or franchise taxes; (ii) all gross receipts, ad valorem, value-added, goods and services, excise, real property, personal property, sales, use, transfer, withholding, employment, unemployment, insurance, social security, business license, business organization, environmental (including Taxes under Code section 59A), workers compensation, profits, license, lease, service, service use, severance, stamp, occupation, windfall profits, customs, duties, franchise, net worth, commercial profits and other taxes imposed by any Governmental Entity; (iii) any interest, penalties, assessments or additions to tax resulting from, attributable to or incurred in connection with any items listed in clauses (i) or (ii) of this paragraph; and (iv) any liability in respect of any items described in clauses (i), (ii) and/or (iii) payable by reason of contract, assumption, transferee liability, operation of law or Treasury Regulations section 1.1502-6(a) (or any predecessor or successor thereof or any similar provision under law or otherwise).

"**Tax Contest**" means an audit, claim, dispute or controversy relating to Taxes.

EHREN-WALIA 000069

"**Tax Return**" means any return, declaration, report, statement or information return required to be filed with any Governmental Entity with respect to Taxes, including all required Schedules and other attachments thereto, and any amendments thereof.

"**Territory**" has the meaning ascribed to such term in **Section 6.5(a).**

"**Top Client Loss**" has the meaning ascribed to such term in **Section 1.7(d)**.

"**Top Clients**" mean DIG(Doshi), SMS/800, Doctor United, Atlantic Imaging and Precision Imaging of New York.

"**Trademark Assignment**" has the meaning ascribed to such term in **Section 2.2(a)(vii)**.

"**Trademarks**" means all trademarks and service marks (whether registered or unregistered), trade names and designs, together with all goodwill related to the foregoing owned by or licensed to the Seller.

"**Transaction Expenses**" means the sum of the fees and expenses of third parties (such as accountants, lawyers, consultants or other outside advisors) incurred by the Seller arising or resulting from the transactions contemplated by this Agreement, which remain outstanding as of the Closing Date.

"**Transaction Regulations**" has the meaning ascribed to such term in **Section 3.30**.

"**Transfer Taxes**" has the meaning ascribed to such term in **Section 6.11**.

"**UCC**" has the meaning ascribed to such term in **Section 1.6(c)(ii)**.

"**Vacation Pay Schedule**" has the meaning ascribed to such term in **Section 6.19**.

"**Wachovia Liens**" has the meaning ascribed to such term in **Section 1.6(c)**.

"**Walai**" has the meaning ascribed to such term in the Preamble.

"**WARN**" has the meaning ascribed to such term in **Section 6.19**.

"**Websites**" has the meaning ascribed to such term in **Section 3.13(g).**

ARTICLE 9

MISCELLANEOUS

Section 9.1     Waiver.  Any failure of any of the Selling Parties to comply with any of their obligations or agreements herein contained may be waived only in writing by Buyer. Any failure of Buyer to comply with any of its obligations or agreements herein contained may

EHREN-WALIA 000070

358

be waived only in writing by the Seller. No waiver granted hereunder shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

          Section 9.2    <u>Notices.</u>  All notices and other communications hereunder shall be in writing and shall be deemed to have been given if delivered personally or by overnight courier, or certified, registered or express mail, postage prepaid. Any such notice shall be deemed given when so delivered personally or two business day after deposit with an overnight courier, or if mailed, five business days after the date of deposit in the United States mails, as follows:

If to Selling Parties, then to:   Arvind Walai
                               27 Kettlepond Rd
                               Jericho, New York 11753

          with a copy (which shall not constitute notice) to:

                               Steven Landy & Associates, PLLC
                               270 Madison Avenue, Suite 1400
                               New York, New York 10016
                               Attn: Steven Landy, Esq.

If to Buyer, then to:               Physicans Practice Plus LLC
                               c/o Robinson Brog Leinwand
                               Greene Genovese & Gluck P.C.
                                875 Third Avenue
                               New York, NY 10022

with a copy (which shall not constitute notice) to:   Robinson Brog Leinwand
                               Greene Genovese & Gluck P.C.
                               875 Third Avenue New York NY, 10022
                               Attention: A. Mitchell Greene, Esq.

or to such other address as any such Party may designate in writing in accordance with this **Section 9.2**. In this Section, "notice" includes any demand or request permitted or required under this Agreement. Any notice given hereunder may be given on behalf of any Party by its counsel or other authorized representatives.

          Section 9.3    <u>Governing Law; Consent to Jurisdiction and Waiver of Jury Trial.</u>

          (a)    This Agreement shall be governed by and construed in accordance with the internal substantive laws, and not the choice of law rules, of the State of New York.

          (b)    Subject to **Section 1.7(g)** and except for matters for which the Parties have agreed pursuant to this Agreement to submit to arbitration in accordance with **Section 9.3(c)**, each of the Parties irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York located in New York County, State of New York, or if such court does not have jurisdiction, the state courts of the State of New

EHREN-WALIA 000071

York located in New York County for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each of the Parties hereto irrevocably and fully waives the defense of an inconvenient forum to the maintenance of such suit, action or proceeding. Each of the Parties further agrees that service of any process, summons, notice or document to such Party's respective address listed above in one of the manners set forth in **Section 9.2** hereof shall be deemed in every respect effective service of process in any such suit, action or proceeding; provided that with respect to this **Section 9.3(b)** only, any such notice solely sent in accordance with **Section 9.2** shall be deemed given only if and when actually received by the other Party. Nothing herein shall affect the right of any Person to serve process in any other manner permitted by Law. Each of the Parties hereto irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in either of the courts named in this subsection and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. The Parties hereto hereby irrevocably and unconditionally waive trial by jury in any legal action or proceeding relating to this Agreement or any other agreement entered into in connection therewith and for any counterclaim with respect thereto. Notwithstanding the preceding, the Parties may subsequently agree in writing that any such proceeding may be brought and maintained in any other court sitting in the United States that has jurisdiction.

(c)     The Parties hereby agree that to the extent that any provision hereto provides for arbitration that they shall to submit such matter to binding arbitration in accordance with the rules of the American Arbitration Association.  Such arbitration shall be held in New York City.  Buyer and Seller shall each select one arbitrator and the two such selected arbitrators shall select a third arbitrator.

Section 9.4     Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Execution and delivery of this Agreement by delivery of a facsimile or electronically recorded copy in .pdf file format bearing a copy of the signature of a Party shall constitute a valid and binding execution and delivery of this Agreement by such Party. Such copies shall constitute enforceable original documents.

Section 9.5     Headings.  The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.6     Entire Agreement.  This Agreement, including the Exhibits and Schedules hereto and the documents referred to herein, embodies the entire agreement and understanding of the Parties hereto in respect of the subject matter contained herein. This Agreement supersedes all prior agreements and understandings between the Parties with respect to the subject matter hereof other than the Confidentiality Agreement.

Section 9.7     Amendment and Modification.  This Agreement may be amended or modified only by written agreement of the Seller and Buyer.

EHREN-WALIA 000072

Section 9.8    Binding Effect; Benefits.    This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective successors and permitted assigns; nothing in this Agreement, express or implied, is intended to confer on any Person other than the Parties and their respective successors and permitted assigns (and, to the extent provided in **Section 7.1**, the other Buyer Indemnified Parties and Seller Indemnified Parties) any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 9.9    Joint Drafting.    The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.10    Severability.    Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible to the fullest extent permitted by applicable Law in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

Section 9.11    Interpretation.    When a reference is made in this Agreement to an Article, Section, Schedule or Exhibit, such reference will be to an Article or Section of, or a Schedule or Exhibit to, this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement. All terms used herein with initial capital letters have the meanings ascribed to them herein and all terms defined in this Agreement will have such defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Unless otherwise indicated, any agreement, instrument or statute defined or referred to herein, or in any agreement or instrument that is referred to herein, means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. References to a Person are also to its permitted successors and assigns.  When a reference is made in this Agreement to any of the Selling Parties providing, disclosing or making available any document, writing or other material to Buyer, such document, writing or other material has been placed in and remains in the data room labeled Porteck hosted Dropbox and such document, writing or other material shall not be removed from without Buyer's and Seller's consent.

EHREN-WALIA 000073

Section 9.12    <u>Assignability.</u> This Agreement shall not be assignable by any Party hereto without the prior written consent of the other Parties, provided that Buyer (i) may grant a security interest in its rights under this Agreement to its lenders as security for Buyer's obligations to such lenders (and such lenders may exercise their rights and remedies with respect to such security interest), (ii) may assign its rights under the Agreement to any Affiliate of Buyer (provided that in the reasonable assessment of Buyer, such assignee has the financial capacity to perform all of the Buyer's obligations under this Agreement) and (iii) may assign its rights to indemnity, in whole or in part, to any Person that acquires an interest in Buyer or a material portion of its assets or the Business. Notwithstanding any assignment by Buyer described in clause (ii) of the proviso in the previous sentence of this Section, Buyer shall remain liable under this Agreement jointly and severally with the assignee.

Section 9.13    <u>Specific Performance.</u> The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that each Party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement (without any obligation of such Party to post any bond or other surety in connection therewith) and to enforce specifically the terms and provisions of this Agreement in addition to any other remedy to which such Party may be entitled at law or in equity.

Section 9.14    <u>Selling Shareholder Representative.</u>

(a)    In order to administer the transactions contemplated by this Agreement, including the calculations set forth in **Article I** hereof, and the Exhibits and schedules hereto, the Selling Shareholders hereby designate and appoint Walai as their representative for purposes of this Agreement and the Exhibits and as attorney-in-fact and agent for and on behalf of each Selling Shareholder (in such capacity, the "**Selling Shareholder Representative**") in connection with and to facilitate the consummation of the transactions contemplated hereby, which shall include the power and authority.

(b)    The Selling Shareholders hereby authorize the Selling Shareholder Representative to represent them, and their successors, with respect to the following matters: (i) to enforce and protect the rights and interests of the Selling Shareholders arising out of or under or in any manner relating to this Agreement and each other agreement, document, instrument or certificate referred to herein or therein or the transactions provided for herein or therein (including in connection with any and all claims for indemnification brought under **Section 7.1(b)** hereof, including the defense or settlement of any claims) and to take any and all actions which the Selling Shareholder Representative believes are necessary or appropriate under this Agreement for and on behalf of the Selling Shareholders, (ii) to make, execute, acknowledge, deliver and receive all such other agreements, guarantees, orders, receipts, endorsements, notices, requests, instructions, certificates, stock powers, letters and other writings, and, in general, to do any and all things and to take any and all action that the Selling Shareholder Representative, in its sole and absolute discretion, may consider necessary or proper or convenient in connection with or to carry out the transactions contemplated by this Agreement and all other agreements, documents or instruments referred to herein or therein or executed in connection herewith and therewith, (iii) to execute and deliver such waivers and consents in connection with this Agreement and the consummation of the transactions contemplated hereby

EHREN-WALIA 000074