| Date | Description | Name | Card | Amount | Type |
|---|---|---|---|---|---|
| 03/09/2015 | YOUMAIL INC 8007440013 CA | Arvind Walia | XXXXXXXXXXXX31009 | 5.00 | Business |
| 09/11/2015 | GREEN FAX COM 00-08DOYLESTOWN PA | Arvind Walia | XXXXXXXXXXXX31009 | 25.00 | Business |
| 09/12/2015 | PIZZA CUCINA WESTBURY NY | Arvind Walia | XXXXXXXXXXXX31009 | 208.87 | Business |
| 09/12/2015 | UBER UBER 888-576-1039 CA | Arvind Walia | XXXXXXXXXXXX31009 | 93.00 | Business |
| 03/13/2016 | MessageMedia Cambridge CA | Arvind Walia | XXXXXXXXXXXX31009 | 10.20 | Business |
| 09/14/2015 | GREEN FAX COM 00-08DOYLESTOWN PA | Arvind Walia | XXXXXXXXXXXX31009 | 25.00 | Business |
| 09/16/2015 | AVIS RENT A CAR HOUSTON TX | Arvind Walia | XXXXXXXXXXXX31009 | 205.01 | Business |
| 09/16/2015 | GREEN FAX COM 00-08DOYLESTOWN PA | Arvind Walia | XXXXXXXXXXXX31009 | 25.00 | Business |
| 09/16/2015 | HOLIDAY INN HOUSTON TX | Arvind Walia | XXXXXXXXXXXX31009 | 170.81 | Business |
| 09/16/2015 | "HOLIDAY INN HOUSTON TX | Arvind Walia | XXXXXXXXXXXX31009 | 252.38 | Business |
| 09/17/2015 | EZPASS PREPAID TOLL 800-333-8655 NY | Arvind Walia | XXXXXXXXXXXX31009 | 78.00 | Business |
| 09/17/2015 | LONG ISLAND GOURMET (516)248-2885 | Arvind Walia | XXXXXXXXXXXX31009 | 99.68 | Business |
| 09/17/2015 | RELIANCE COMMUNICATI- | Arvind Walia | XXXXXXXXXXXX31009 | 3.03 | Business |
| 09/17/2015 | UBER UBER 888-576-1039 CA | Arvind Walia | XXXXXXXXXXXX31009 | 91.20 | Business |
| 09/18/2015 | GOOGLE *GOOGLE STORAGOOGLE.COMCH CA | Arvind Walia | XXXXXXXXXXXX31009 | 50.00 | Business |
| 09/18/2015 | GREEN FAX COM 00-08DOYLESTOWN PA | Arvind Walia | XXXXXXXXXXXX31009 | 25.00 | Business |
| 09/18/2015 | GREEN FAX COM 00-08DOYLESTOWN PA | Arvind Walia | XXXXXXXXXXXX31009 | 25.00 | Business |
| 09/18/2015 | PIZZA CUCINA WESTBURY NY | Arvind Walia | XXXXXXXXXXXX31009 | 205.89 | Business |
| 09/19/2015 | UBER UBER 888-576-1039 CA | Arvind Walia | XXXXXXXXXXXX31009 | 7.71 | Business |
| 09/20/2015 | GOOGLE *GOOGLE STORAGOOGLE.COMCH CA | Arvind Walia | XXXXXXXXXXXX31009 | 9.99 | Business |
| 09/20/2015 | MESYRINGCENTRAL, INC6504724100 | Arvind Walia | XXXXXXXXXXXX31009 | 374.56 | Business |
| 09/21/2015 | AT&T*BILL PAYMENT 8SDALLAS TX | Arvind Walia | XXXXXXXXXXXX31009 | 784.35 | Business |
| 09/22/2015 | DELTA AIR LINES ATLANTA | Arvind Walia | XXXXXXXXXXXX31009 | 1,142.20 | Business |
| 09/23/2015 | PARASOL LIP PATIO BAR702-770-2540 NV | Arvind Walia | XXXXXXXXXXXX31009 | 25.00 | Business |
| 09/24/2015 | UBER UBER 888-576-1039 CA | Arvind Walia | XXXXXXXXXXXX31009 | 91.99 | Business |
| 09/24/2015 | READY REFRESH BY NESSTAMFORD CT | Arvind Walia | XXXXXXXXXXXX31009 | 14.60 | Business |
| 09/26/2015 | GREEN FAX COM 00-08DOYLESTOWN PA | Arvind Walia | XXXXXXXXXXXX31009 | 249.87 | Business |
| 09/26/2015 | AVIS RENT A CAR TOLLS866422000 NY | Arvind Walia | XXXXXXXXXXXX31009 | 25.00 | Business |
| 09/27/2015 | JETBLUE AIRWAYS 41C0FOREST HILLS NY | Arvind Walia | XXXXXXXXXXXX31009 | 12.65 | Business |
| 09/27/2015 | JETBLUE AIRWAYS 41C0FOREST HILLS NY | Arvind Walia | XXXXXXXXXXXX31009 | -346.10 | Business |
| 09/27/2015 | JETBLUE AIRWAYS 41C0FOREST HILLS NY | Arvind Walia | XXXXXXXXXXXX31009 | -70.00 | Business |
| 09/27/2015 | JETBLUE AIRWAYS 41C0FOREST HILLS NY | Arvind Walia | XXXXXXXXXXXX31009 | -70.00 | Business |
| 09/27/2015 | JETBLUE AIRWAYS 41C0FOREST HILLS NY | Arvind Walia | XXXXXXXXXXXX31009 | -5.60 | Business |
| 09/27/2015 | VIRGIN AMERICA 900005AN FRANCISCO CA | Arvind Walia | XXXXXXXXXXXX31009 | 1,850.20 | Business |
| 09/28/2015 | GREEN FAX COM 00-08DOYLESTOWN PA | Arvind Walia | XXXXXXXXXXXX31009 | 25.00 | Business |
| 09/28/2015 | HEALTHFORMS 8028685560 FL | Arvind Walia | XXXXXXXXXXXX31009 | 204.50 | Business |
| 09/28/2015 | UBER UBER 888-576-1039 CA | Arvind Walia | XXXXXXXXXXXX31009 | 15.05 | Business |
| 10/01/2015 | GREEN FAX COM 00-08DOYLESTOWN PA | Arvind Walia | XXXXXXXXXXXX31009 | 25.00 | Business |
| 10/01/2015 | GREEN FAX COM 00-08DOYLESTOWN PA | Arvind Walia | XXXXXXXXXXXX31009 | 25.00 | Business |
| 10/01/2015 | PAIR NETWORKS INC 04PITTSBURGH PA | Arvind Walia | XXXXXXXXXXXX31009 | 13.94 | Business |
| 10/02/2015 | 8X8 INC, SAN JOSE 888-898-8723 CA | Arvind Walia | XXXXXXXXXXXX31009 | 124.30 | Business |
| 10/02/2015 | 8X8 INC, SAN JOSE 888-898-8723 CA | Arvind Walia | XXXXXXXXXXXX31009 | 160.84 | Business |
| 10/02/2015 | GREEN FAX COM 00-08DOYLESTOWN PA | Arvind Walia | XXXXXXXXXXXX31009 | 364.18 | Business |
| 10/02/2015 | GREEN FAX COM 00-08DOYLESTOWN PA | Arvind Walia | XXXXXXXXXXXX31009 | 529.70 | Business |
| 10/02/2015 | LIVEPERSON, INC 86(1NEW YORK NY | Arvind Walia | XXXXXXXXXXXX31009 | 458.00 | Business |
| 10/02/2015 | PIZZA CUCINA WESTBURY NY | Arvind Walia | XXXXXXXXXXXX31009 | 205.87 | Business |

| Date | Description | Name | Account | Amount | Type |
|---|---|---|---|---|---|
| 12/28/2015 | APPTIX SHAREPOINT SHERNDON VA | Arvind Walla | XXXXXXXXXX31009 | 399.95 | Business |
| 12/08/2015 | Vonage.Com AMERICA 866-243-4357 NJ | Arvind Walla | XXXXXXXXXX31009 | 208.41 | Business |
| 10/09/2015 | PIZZA CUCINA WESTBURY NY | Arvind Walla | XXXXXXXXXX31009 | 217.99 | Business |
| 10/09/2015 | YOUMAIL INC 8003740013 CA | Arvind Walla | XXXXXXXXXX31009 | 5.00 | Business |
| 10/12/2015 | PORT AUTHORITY E-ZPASSTATEN ISLAND NY | Arvind Walla | XXXXXXXXXX31009 | 155.00 | Business |
| 12/12/2015 | GREEN FAX COM 00-09DDOYLESTOWN PA | Arvind Walla | XXXXXXXXXX31009 | 25.00 | Business |
| 10/14/2015 | MassageMedia Cambridge CA | Arvind Walla | XXXXXXXXXX31009 | 10.20 | Business |
| 10/14/2015 | EAST 54TH OPERATING-NEW YORK NY | Arvind Walla | XXXXXXXXXX31009 | 50.00 | Business |
| 10/14/2015 | GREEN FAX COM 00-09DDOYLESTOWN PA | Arvind Walla | XXXXXXXXXX31009 | 25.00 | Business |
| 10/15/2015 | GREEN FAX COM 00-09DDOYLESTOWN PA | Arvind Walla | XXXXXXXXXX31009 | 25.00 | Business |
| 10/15/2015 | KYLIE JENERYKYLIE JSANTA MONIC CA | Arvind Walla | XXXXXXXXXX31009 | 2.99 | Business |
| 10/15/2015 | PIZZA CUCINA WESTBURY NY | Arvind Walla | XXXXXXXXXX31009 | 182.47 | Business |
| 10/17/2015 | UBER UBER 866-576-1039 CA | Arvind Walla | XXXXXXXXXX31009 | 7.25 | Business |
| 12/17/2015 | GREEN FAX COM 00-09DDOYLESTOWN PA | Arvind Walla | XXXXXXXXXX31009 | 25.00 | Business |
| 10/19/2015 | RELIANCE COMMUNICATINEW YORK NY | Arvind Walla | XXXXXXXXXX31009 | 6.74 | Business |
| 12/22/2015 | LETTERSTREAM, INC SCOTTSDALE AZ | Arvind Walla | XXXXXXXXXX31009 | 500.00 | Business |
| 12/20/2015 | GOOGLE *GOOGLE STORAGOOGLE.COMCH CA | Arvind Walla | XXXXXXXXXX31009 | 129.99 | Business |
| 10/20/2015 | ACTI ANSWERCONNECT 8008315828 OR | Arvind Walla | XXXXXXXXXX31009 | 9.99 | Business |
| 10/20/2015 | PIZZA CUCINA WESTBURY NY | Arvind Walla | XXXXXXXXXX31009 | 372.96 | Business |
| 10/20/2015 | MESPRINGCENTRAL, INCBELMONT CA | Arvind Walla | XXXXXXXXXX31009 | 642.95 | Business |
| 10/21/2015 | AT&T*BILL PAYMENT 98DALLAS | Arvind Walla | XXXXXXXXXX31009 | 8.07 | Business |
| 10/21/2015 | GREEN FAX COM 00-09DDOYLESTOWN PA | Arvind Walla | XXXXXXXXXX31009 | 25.00 | Business |
| 10/26/2015 | GREEN FAX COM 00-09DDOYLESTOWN PA | Arvind Walla | XXXXXXXXXX31009 | 25.00 | Business |
| 10/28/2015 | READY REFRESH BY NESSTAMFORD CT | Arvind Walla | XXXXXXXXXX31009 | 388.22 | Business |
| 10/28/2015 | UBER UBER 866-576-1039 CA | Arvind Walla | XXXXXXXXXX31009 | 11.08 | Business |
| 10/29/2015 | UBER UBER 866-576-1039 CA | Arvind Walla | XXXXXXXXXX31009 | 11.37 | Business |
| 10/29/2015 | HOTEL INDIGO RIVERWASAN ANTONIO TX | Arvind Walla | XXXXXXXXXX31009 | 147.03 | Business |
| 10/29/2015 | INMOTION ENT SAT-1 SAN ANTONIO TX | Arvind Walla | XXXXXXXXXX31009 | 28.11 | Business |
| 10/29/2015 | UBER UBER 866-576-1039 CA | Arvind Walla | XXXXXXXXXX31009 | 6.07 | Business |
| 10/29/2015 | UBER UBER 866-576-1039 CA | Arvind Walla | XXXXXXXXXX31009 | 16.23 | Business |
| 10/29/2015 | UBER UBER 866-576-1039 CA | Arvind Walla | XXXXXXXXXX31009 | 17.21 | Business |
| 10/30/2015 | EZ PASS PREPAID TOLL800-333-8655 NY | Arvind Walla | XXXXXXXXXX31009 | 78.00 | Business |
| 10/31/2015 | UBER UBER 866-576-1039 CA | Arvind Walla | XXXXXXXXXX31009 | 5.00 | Business |
| 10/31/2015 | UBER UBER 866-576-1039 CA | Arvind Walla | XXXXXXXXXX31009 | 5.00 | Business |
| 10/31/2015 | Vonage.Com AMERICA 866-243-4357 NJ | Arvind Walla | XXXXXXXXXX31009 | 10.15 | Business |
| 11/01/2015 | UBER UBER 866-576-1039 CA | Arvind Walla | XXXXXXXXXX31009 | 0.97 | Business |
| 11/01/2015 | UBER UBER 866-576-1039 CA | Arvind Walla | XXXXXXXXXX31009 | 5.25 | Business |
| 12/08/2015 | APPTIX SHAREPOINT SHERNDON VA | Arvind Walla | XXXXXXXXXX31009 | 399.95 | Business |
| 12/08/2015 | GREEN FAX COM 00-09DDOYLESTOWN PA | Arvind Walla | XXXXXXXXXX31009 | 25.00 | Business |
| 12/09/2015 | YOUMAIL INC 8003740013 CA | Arvind Walla | XXXXXXXXXX31009 | 5.00 | Business |
| 12/11/2015 | PIZZA CUCINA WESTBURY NY | Arvind Walla | XXXXXXXXXX31009 | 202.02 | Business |
| 12/13/2015 | MassageMedia Cambridge CA | Arvind Walla | XXXXXXXXXX31009 | 10.20 | Business |
| 12/14/2015 | TRI STATE LIMO INC HGasville NY | Arvind Walla | XXXXXXXXXX31009 | 360.00 | Business |

619

| Date | Description | Name | Account | Amount | Category |
|---|---|---|---|---|---|
| 12/14/2015 | UBER 888-576-1039 CA | Arvind Walia | XXXXXXXXXX31009 | 79.79 | Business |
| 12/15/2015 | EDIBLE ARRANGEMENTS WALLINGFORD CT | Arvind Walia | XXXXXXXXXX31009 | 53.21 | Business |
| 12/17/2015 | RELIANCE COMMUNICATINEW YORK NY | Arvind Walia | XXXXXXXXXX31009 | 5.87 | Business |
| 12/18/2015 | 8X8 INC, SAN JOSE 888-898-8733 CA | Arvind Walia | XXXXXXXXXX31009 | 232.46 | Business |
| 12/20/2015 | GOOGLE *GOOGLE STORAGOOGLE.COMCH CA | Arvind Walia | XXXXXXXXXX31009 | 9.99 | Business |
| 12/20/2015 | MES*RINGCENTRAL, INCBELMONT CA | Arvind Walia | XXXXXXXXXX31009 | 372.96 | Business |
| 12/20/2015 | UBER UBER 866-576-1039 CA | Arvind Walia | XXXXXXXXXX31009 | 14.80 | Business |
| 12/20/2015 | UBER UBER 866-576-1039 CA | Arvind Walia | XXXXXXXXXX31009 | 15.72 | Business |
| 12/21/2015 | AT&T*BILL PAYMENT $6DALLAS | Arvind Walia | XXXXXXXXXX31009 | 820.47 | Business |
| 12/23/2015 | MES*RINGCENTRAL, INCBELMONT CA | Arvind Walia | XXXXXXXXXX31009 | 84.58 | Business |
| 12/23/2015 | READY REFRESH BY NESSTAMFORD CT | Arvind Walia | XXXXXXXXXX31009 | 394.76 | Business |
| 12/31/2015 | LETTERSTREAM, INC SCOTTSDALE AZ | Arvind Walia | XXXXXXXXXX31009 | 200.00 | Business |
| 01/01/2016 | ELIGIBLE API SAN FRANCISCO CA | Arvind Walia | XXXXXXXXXX31009 | 0.93 | Business |
| 01/01/2016 | PAIR NETWORKS INC 04PITTSBURGH PA | Arvind Walia | XXXXXXXXXX31009 | 13.94 | Business |
| 01/02/2016 | 8X8 INC, SAN JOSE 888-898-8733 CA | Arvind Walia | XXXXXXXXXX31009 | 122.45 | Business |
| 01/02/2016 | 8X8 INC, SAN JOSE 888-898-8733 CA | Arvind Walia | XXXXXXXXXX31009 | 124.30 | Business |
| 01/02/2016 | 8X8 INC, SAN JOSE 888-898-8733 CA | Arvind Walia | XXXXXXXXXX31009 | 160.64 | Business |
| 01/02/2016 | LIVEPERSON, INC 8610NEW YORK NY | Arvind Walia | XXXXXXXXXX31009 | 468.00 | Business |
| 01/03/2016 | ACTI ANSWERCONNECT 800631S828 OR | Arvind Walia | XXXXXXXXXX31009 | 129.98 | Business |
| 01/05/2016 | CONCUR DBA, TRIPIT 08877-801-4990 CA | Arvind Walia | XXXXXXXXXX31009 | 49.00 | Business |
| 01/04/2016 | AA AIR TICKET SALE 4DALLAS TX | Arvind Walia | XXXXXXXXXX31009 | 467.20 | Business |
| 01/04/2016 | AA MISC SALE/ TAXI FDALLAS TX | Arvind Walia | XXXXXXXXXX31009 | 40.00 | Business |
| 01/05/2016 | DELTA AIR LINES ATLANTA | Arvind Walia | XXXXXXXXXX31009 | 157.88 | Business |
| 01/05/2016 | GREEN FAX COM 00-096DOYLESTOWN PA | Arvind Walia | XXXXXXXXXX31009 | 786.20 | Business |
| 01/05/2016 | GREEN FAX COM 00-096DOYLESTOWN PA | Arvind Walia | XXXXXXXXXX31009 | 395.87 | Business |
| 01/07/2016 | Vonage.Com AMERICA 866-243-4357 NJ | Arvind Walia | XXXXXXXXXX31009 | 455.62 | Business |
| 01/08/2016 | APPTIX SHAREPOINT SHERNDON VA | Arvind Walia | XXXXXXXXXX31009 | 209.47 | Business |
| 01/08/2016 | HEALTHFORMS 8008856500 FL | Arvind Walia | XXXXXXXXXX31009 | 399.95 | Business |
| 01/08/2016 | PIZZA CUCINA WESTBURY NY | Arvind Walia | XXXXXXXXXX31009 | 204.60 | Business |
| 01/09/2016 | INDIAN SIZZLER 0587 NEWARK DE | Arvind Walia | XXXXXXXXXX31009 | 203.98 | Business |
| 01/09/2016 | UBER UBER 866-576-1039 CA | Arvind Walia | XXXXXXXXXX31009 | 38.95 | Business |
| 01/12/2016 | HOLIDAY INN EXPRESS TYLER TX | Arvind Walia | XXXXXXXXXX31009 | 81.32 | Business |
| 01/13/2016 | LAGUARDIA LOT2 001 NEW YORK NY | Arvind Walia | XXXXXXXXXX31009 | 122.10 | Business |
| 01/13/2016 | Message/Media Cambridge CA | Arvind Walia | XXXXXXXXXX31009 | 78.00 | Business |
| 01/13/2016 | OFFICE SOLUTIONS INCSYOSSET NY | Arvind Walia | XXXXXXXXXX31009 | 10.20 | Business |
| 01/14/2016 | UBER UBER 866-576-1039 CA | Arvind Walia | XXXXXXXXXX31009 | 674.62 | Business |
| 01/14/2016 | UBER UBER 866-576-1039 CA | Arvind Walia | XXXXXXXXXX31009 | 8.37 | Business |
| 01/15/2016 | PIZZA CUCINA WESTBURY NY | Arvind Walia | XXXXXXXXXX31009 | 203.44 | Business |
| 01/16/2016 | RELIANCE COMMUNICATINEW YORK NY | Arvind Walia | XXXXXXXXXX31009 | 3.03 | Business |
| 01/17/2016 | UBER UBER 866-576-1039 CA | Arvind Walia | XXXXXXXXXX31009 | 5.00 | Business |
| 01/17/2016 | LETTERSTREAM, INC SCOTTSDALE AZ | Arvind Walia | XXXXXXXXXX31009 | 500.00 | Business |
| 01/19/2016 | EZ PASS PREPAID TOLL800-333-8655 NY | Arvind Walia | XXXXXXXXXX31009 | 39.00 | Business |
| 01/20/2016 | GOOGLE *GOOGLE STORAGOOGLE.COMCH CA | Arvind Walia | XXXXXXXXXX31009 | 9.99 | Business |
| 01/20/2016 | GREEN FAX COM 00-096DOYLESTOWN PA | Arvind Walia | XXXXXXXXXX31009 | 25.00 | Business |
| 01/20/2016 | MES*RINGCENTRAL, INCBELMONT CA | Arvind Walia | XXXXXXXXXX31009 | 376.63 | Business |
| 01/21/2016 | AT&T*BILL PAYMENT $6DALLAS | Arvind Walia | XXXXXXXXXX31009 | 969.38 | Business |
| 01/22/2016 | PIZZA CUCINA WESTBURY NY | Arvind Walia | XXXXXXXXXX31009 | 207.09 | Business |

620

| Date | Description | Name | Account | Amount | Type |
|---|---|---|---|---|---|
| 01/23/2016 | MESPRINGCENTRAL, INCBELMONT CA | Arvind Walla | XXXXXXXXXXXX31009 | 85.39 | Business |
| 01/25/2016 | READY REFRESH BY NESSTAMFORD CT | Arvind Walla | XXXXXXXXXXXX31009 | 219.07 | Business |
| 01/28/2016 | VIANA-HOTEL & SPA WESTBURY | Arvind Walla | XXXXXXXXXXXX31009 | 280.56 | Business |
| 02/01/2016 | EZ PASS PREPAID TOLL800-333-8655 NY | Arvind Walla | XXXXXXXXXXXX31009 | 90.00 | Business |
| 02/01/2016 | PAR NETWORKS INC 04PITTSBURGH PA | Arvind Walla | XXXXXXXXXXXX31009 | 11.00 | Business |
| 02/02/2016 | 8X8 INC, SAN JOSE 888-898-8733 CA | Arvind Walla | XXXXXXXXXXXX31009 | 110.45 | Business |
| 02/02/2016 | 8X8 INC, SAN JOSE 888-898-8733 CA | Arvind Walla | XXXXXXXXXXXX31009 | 124.77 | Business |
| 02/02/2016 | 8X8 INC, SAN JOSE 888-898-8733 CA | Arvind Walla | XXXXXXXXXXXX31009 | 161.29 | Business |
| 02/02/2016 | ACT! ANSWERCONNECT 8008315828 OR | Arvind Walla | XXXXXXXXXXXX31009 | 129.98 | Business |
| 02/02/2016 | LONG ISMINEOLA NY | Arvind Walla | XXXXXXXXXXXX31009 | 373.20 | Business |
| 02/05/2016 | HOLIDAY INN EXPRESS MOLINE IL | Arvind Walla | XXXXXXXXXXXX31009 | 399.35 | Business |
| 02/17/2016 | Vonage.Com AMERICA 866-243-4357 NJ | Arvind Walla | XXXXXXXXXXXX31009 | 206.55 | Business |
| 02/08/2016 | APPTIX SHAREPOINT SHERNDON VA | Arvind Walla | XXXXXXXXXXXX31009 | 399.95 | Business |
| 02/09/2016 | YOUMAIL, INC 8003740013 CA | Arvind Walla | XXXXXXXXXXXX31009 | 5.00 | Business |
| 02/15/2016 | MessageMedia Cambridge CA | Arvind Walla | XXXXXXXXXXXX31009 | 10.20 | Business |
| 02/16/2016 | RELIANCE COMMUNICATINEW YORK NY | Arvind Walla | XXXXXXXXXXXX31009 | 7.95 | Business |
| 02/18/2016 | LETTERSTREAM, INC SCOTTSDALE AZ | Arvind Walla | XXXXXXXXXXXX31009 | 201.00 | Business |
| 02/20/2016 | GOOGLE *GOOGLE STORAGGOOGLE.COMCH CA | Arvind Walla | XXXXXXXXXXXX31009 | 9.99 | Business |
| 02/21/2016 | AT&T*BILL PAYMENT SIDALLAS | Arvind Walla | XXXXXXXXXXXX31009 | 989.95 | Business |
| 03/01/2016 | DOYLESTOWN PA | Arvind Walla | XXXXXXXXXXXX31009 | 25.00 | Business |
| 03/01/2016 | PITTSBURGH PA PAIR | Arvind Walla | XXXXXXXXXXXX31009 | 740.12 | Business |
| 03/02/2016 | 888-898-8733 CA | Arvind Walla | XXXXXXXXXXXX31009 | 110.46 | Business |
| 03/02/2016 | 888-898-8733 CA | Arvind Walla | XXXXXXXXXXXX31009 | 161.29 | Business |
| 03/02/2016 | 8X8 INC, SAN JOSE 888-898-8733 CA | Arvind Walla | XXXXXXXXXXXX31009 | 124.77 | Business |
| 03/02/2016 | ACT! ANSWERCONNECT 8008315828 OR | Arvind Walla | XXXXXXXXXXXX31009 | 129.98 | Business |
| 03/05/2016 | LIVEPERSON, INC 86NEW YORK NY | Arvind Walla | XXXXXXXXXXXX31009 | 468.00 | Business |
| 03/07/2016 | EZ PASS PREPAID TOLL800-333-8655 NY | Arvind Walla | XXXXXXXXXXXX31009 | 60.00 | Business |
| 03/08/2016 | GREEN! FAX COM 00-08DOYLESTOWN PA | Arvind Walla | XXXXXXXXXXXX31009 | 25.00 | Business |
| 03/08/2016 | APPTIX SHAREPOINT SHERNDON VA | Arvind Walla | XXXXXXXXXXXX31009 | 399.95 | Business |
| 03/08/2016 | BASS STREET CHOP HOUMOLINE IL | Arvind Walla | XXXXXXXXXXXX31009 | 310.00 | Business |
| 03/09/2016 | Vonage.Com AMERICA 866-243-4357 NJ | Arvind Walla | XXXXXXXXXXXX31009 | 255.24 | Business |
| 03/10/2016 | SCI MOLINE,LLC 0061 MOLINE IL | Arvind Walla | XXXXXXXXXXXX31009 | 399.95 | Business |
| 03/10/2016 | 575 LEX GARAGE NEW YORK NY | Arvind Walla | XXXXXXXXXXXX31009 | 118.56 | Business |
| 03/13/2016 | EZ PASS PREPAID TOLL800-333-8655 NY | Arvind Walla | XXXXXXXXXXXX31009 | 38.50 | Business |
| 03/13/2016 | MR KS RESTAURANT NEW YORK | Arvind Walla | XXXXXXXXXXXX31009 | 66.00 | Business |
| 03/13/2016 | DELTA AIR LINES ATLANTA | Arvind Walla | XXXXXXXXXXXX31009 | 139.01 | Business |
| 03/14/2016 | MessageMedia Cambridge CA | Arvind Walla | XXXXXXXXXXXX31009 | 779.20 | Business |
| 03/14/2016 | SCOTTSDALE AZ | Arvind Walla | XXXXXXXXXXXX31009 | 10.20 | Business |
| 03/16/2016 | EZ PASS PREPAID TOLL800-333-8655 NY | Arvind Walla | XXXXXXXXXXXX31009 | 1,000.00 | Business |
| 03/16/2016 | UBER UBER 866-576-1039 CA | Arvind Walla | XXXXXXXXXXXX31009 | 60.00 | Business |
| 03/16/2016 | UBER UBER 866-576-1039 CA | Arvind Walla | XXXXXXXXXXXX31009 | 14.79 | Business |
| 03/16/2016 | UBER UBER 866-576-1039 CA | Arvind Walla | XXXXXXXXXXXX31009 | 17.39 | Business |
| 03/17/2016 | EZ PASS PREPAID TOLL800-333-8655 NY | Arvind Walla | XXXXXXXXXXXX31009 | 28.90 | Business |
| 03/18/2016 | LETTERSTREAM, INC SCOTTSDALE AZ | Arvind Walla | XXXXXXXXXXXX31009 | 39.00 | Business |
| 03/18/2016 | GOOGLE *GOOGLE STORAG.COPAYHELP# CA | Arvind Walla | XXXXXXXXXXXX31009 | 500.00 | Business |
| 03/20/2016 | GOOGLE 'GOOGLE STORAG.COPAYHELP# CA | Arvind Walla | XXXXXXXXXXXX31009 | 9.99 | Business |
| 03/20/2016 | MESPRINGCENTRAL, INCBELMONT CA | Arvind Walla | XXXXXXXXXXXX31009 | 380.60 | Business |

| Date | Description | Name | Account | Amount | Category |
|---|---|---|---|---|---|
| 03/20/2016 | UBER UBER 886-576-1039 CA | Arvind Walia | XXXX-XXXXXXX-31009 | 12.88 | Business |
| 03/21/2016 | AT&T BILL PAYMENT 9SDALLAS | Arvind Walia | | 1,705.11 | Business |
| 03/22/2016 | MESYRINGCENTRAL, INCBELMONT CA | Arvind Walia | | 86.16 | Business |
| 03/25/2016 | READY REFRESH BY NESSTAMFORD CT | Arvind Walia | | 5.43 | Business |
| 03/28/2016 | EZ PASS PREPAID TOLL800-333-8655 NY | Arvind Walia | | 60.00 | Business |
| 03/31/2016 | SCOTTSDALE AZ | Arvind Walia | | 1,000.00 | Business |
| 03/31/2016 | UBER UBER 886-576-1039 CA | Arvind Walia | XXXX-XXXXXXX-31009 | 9.23 | Business |
| 03/31/2016 | UBER UBER 886-576-1039 CA | Arvind Walia | XXXX-XXXXXXX-31009 | 15.71 | Business |
| 03/31/2016 | UBER UBER 886-576-1039 CA | Arvind Walia | XXXX-XXXXXXX-31009 | 24.18 | Business |

| Bank account debited | |
|---|---|
| Mar-15 | 15615.94 |
| Apr-15 | - |
| May-15 | 12567.57 |
| Jun-15 | 9668.19 |
| Jul-15 | 13920.27 |
| Aug-15 | 35976.33 |
| Sep-15 | 30472.27 |
| Oct-15 | 4684.67 |
| Nov-15 | 8153.27 |
| Dec-15 | 2494.58 |
| Jan-16 | 3301.65 |
| Feb-16 | 10383.89 |
| Mar-16 | 8496.25 |
| Apr-16 | 4356.74 |
| | 88,548 |

Total Payments made for Porteck Chase account     160,092

Excess paid to be adjusted against Net assets payment     71,544

622

Paid On Behalf



*Deal fees paid*

| Payment Date | Payee | Amount |
|---|---|---|
| 4/6/2015 | Abstract Business Advisors | 23,000.00 |
| 4/6/2015 | GR Capital Management | 23,000.00 |
| 5/11/2015 | Abstract Business Advisors | 23,000.00 |
| 5/11/2015 | GR Capital Management | 23,000.00 |
| 6/15/2015 | GR Capital Management | 46,000.00 |
| 7/15/2015 | Abstract Business Advisors | 23,000.00 |
| 7/15/2015 | GR Capital Management | 23,000.00 |
| 8/17/2015 | Abstract Business Advisors | 23,000.00 |
| 8/17/2015 | GR Capital Management | 23,000.00 |
| 9/21/2015 | Abstract Business Advisors | 23,000.00 |
| 9/21/2015 | GR Capital Management | 23,000.00 |
| | **TOTAL** | **276,000.00** |

4:13 PM
06/24/15
Accrual Basis

## Porteck Corporation
## Balance Sheet
### As of May 31, 2015

| | Feb 28, 15 | | | |
|---|---|---|---|---|
| | Debit | Credit | Purchased | Purchased |
| Chase Bank | 35,759.38 | | | |
| People's United Bank (xx5949) | 10,412.70 | | | |
| 1200 · Accounts Receivable | 2,005,838.69 | | | |
| Accrued Income | 746,312.66 | | | |
| Prepaid Expense | | | 222.69 | |
| Prepaid Expense:Prepaid Software | | | 974.18 | |
| 1499 · Undeposited Funds | 7,332.85 | | | |
| AHMS Computer & Equipment | | | 162,937.50 | |
| AHMS Computer & Equipment:Accumulated Depreciation AHMS | | | | 162,937.50 |
| Car-Automobile | | | 122,467.40 | |
| Car-Automobile:Accumulated Depreciation Car-Au | | | | 122,467.40 |
| Computers & Equipment - 2012 | | | 5,532.48 | |
| Computers & Equipment - 2012:Acc. Depreciation - Comp Eq 12 | | | | 30,396.98 |
| Computers & Equipment - 2012:Doshi Computer Equipment | | | 24,864.50 | |
| Computers & Equipments | | | 111,400.00 | |
| Computers & Equipments:Accumulated Depreciation | | | | 111,400.00 |
| Computers & Equipments-2003 | | | 7,422.00 | |
| Computers & Equipments-2003:Acc. Depreciation-Comp. Equi.20 | | | | 7,422.00 |
| Computers & Equipments-2004 | | | 5,003.00 | |
| Computers & Equipments-2004:Acc. Depreciation-Comp. Equi.20 | | | | 5,003.00 |
| Furniture & Fixtures | | | 75,000.00 | |
| Furniture & Fixtures:Acc. Depreciation-Furniture & F | | | | 75,000.00 |
| PCA Computer & Equipment | | | 92,331.25 | |
| PCA Computer & Equipment:Accumulated Depreciation PCA | | | | 92,331.25 |
| Software-2003 | | | 4,671.00 | |
| Software-2003:Acc. Depreciation-Software | | | | 4,671.00 |
| Customer List & Contracts - PCA | | | 865,000.00 | |
| Customer List & Contracts -AHMS | | | 2,250,000.00 | |
| Customer List Add'l AHMS AR | | | 138,915.30 | |
| Goodwill - AHMS | | | 100,000.00 | |
| Goodwill - AHMS:Accumulated Impairment Loss | | | | 100,000.00 |
| Goodwill - PCA | | | 1,450,000.00 | |
| Trade Name | | | | |
| PARCS software | | | | |
| Customer contracts | | | | |
| Goodwill | | | | |
| Security Deposits | | | 9,716.00 | |
| 2000 · Accounts Payable | | 257,988.46 | | |
| Accrued Expenses | 27,828.43 | | | |
| 2100 · Payroll Liabilities:2102 · Accrued Payroll Liabilities | | 89,823.63 | | |
| Due to AHMS Add'l AR Purchase | | | | 81,033.90 |
| Loan from/to Shareholders | | | | (24,032.99) |
| Loan Payable - AHMS | | | | 592,800.59 |
| Loan Payable - Itria Ventures | | | | 486,083.22 |
| Loan Payable - PCA | | 552,699.51 | | |
| Loan Payable - Swift Financial | | | | 168,356.25 |
| Peoples Credit Line #0010 | | | | 596,184.00 |
| 3000 · Opening Bal Equity | | | | 210,000.30 |
| 3500 · Shareholder Distributions | | | | 475,691.92 |
| 3800 · Additional Paid-in Capital | | | | 500,000.00 |
| 3900 · Retained Earnings | | | | 3,261,684.09 |
| TOTAL | 2,833,484.71 | 900,511.60 | | |

627

| Type | Date | Num | P.O.# | Name | Terms | Due Date | Aging | Open Balance as of Feb 28 2015 | Open Balance as of April 3 2016 | Credit memo raised |
|---|---|---|---|---|---|---|---|---|---|---|
| Invoice | 02/11/2015 | X400075 | 01/01/2015-01/31/2015 | Adam Kolker, M.D. | Net 30 | 03/13/2015 | 362 | 5,055.67 | 0.00 | |
| Invoice | 02/21/2014 | 2782 | JANUARY 2014 | American Radiology Services | Net 10 | 02/21/2014 | 329 | 496.49 | 0.00 | |
| Invoice | 03/18/2014 | 2970 | FEBRUARY 2014 | American Radiology Services | Net 10 | 04/08/2014 | 329 | 512.76 | 0.00 | |
| Invoice | 11/05/2015 | 3444 | 12/01/2014-12/31/2014 | Arkady Bukh M.D. P.C. | Net 15 | 12/07/2014 | 54 | 2,570.00 | 0.00 | |
| Invoice | 02/13/2015 | 3578 | 12/01/2014-12/31/2015 | B&B Radiology | Net 15 | 01/05/2015 | 54 | 3,202.44 | 0.00 | |
| Payment | 01/06/2015 | 3488 | 12/01/2014-12/31/2014 | B&B Radiology | Net 15 | 01/21/2015 | 38 | (10.10) | | |
| Invoice | 02/22/2015 | 35415 | 01/01/2015-01/31/2015 | Bronx Lebanon Hospital | Net 30 | 02/02/2015 | 26 | 147.55 | 0.00 | |
| Invoice | 02/26/2015 | 35555 | 02/03/2015-02/09/2015 | Brooklyn Medical Eye Associates | Net 30 | 03/28/2015 | 26 | 255.01 | 0.00 | |
| Invoice | 02/18/2015 | 3572G | 02/10/2015-02/16/2015 | Brooklyn Medical Eye Associates | Net 30 | 02/18/2015 | 19 | 314.01 | 0.00 | |
| Invoice | 02/23/2015 | 35640 | 02/17/2015-02/23/2015 | Brooklyn Medical Eye Associates | Net 30 | 02/23/2015 | 5 | 732.94 | 0.00 | |
| Payment | 02/11/2015 | Ami0026 | 01/01/2015-01/31/2015 | Dalit Avarc, M.D. | Net 30 | 03/13/2015 | | 977.35 | | |
| Invoice | 01/01/2015 | R009 | 01/01/2015-01/31/2015 | David Rappart, M.D. | Net 10 | 02/07/2015 | 201 | 108.15 | 0.00 | |
| Invoice | 04/30/2014 | 188 | 12/01/2014-12/31/2014 | Doctors United Inc. | Net 10 | 06/11/2014 | | 4,828.65 | 0.00 | |
| Invoice | 02/11/2015 | 3557 | 01/01/2015-01/31/2015 | Doctors United Inc. | Net 30 | 03/13/2015 | 54 | 22,751.63 | 0.00 | |
| Invoice | 12/31/2014 | 3461 | 11/01/2014-11/30/2014 | Doctors United Inc. | Net 30 | 02/05/2015 | 58 | 21,000.00 | 0.00 | |
| Invoice | 01/07/2015 | 3739 | DOCUMENTED Reconciliation | Doctors United Inc. | Net 30 | 01/07/2015 | 58 | 3,341.25 | 3,341.25 | |
| Invoice | 01/07/2015 | 3741 | GFGMEDPC Reconciliation | Doctors United Inc.-GFG Medical P.C. | Net 30 | 01/07/2015 | 58 | 2,630.01 | 0.00 | |
| Invoice | 01/08/2015 | 3743 | 01/01/2015-01/31/2015 | Doctors United Inc.-Greater NY PT & Chiropractic P.C. | Net 30 | 01/07/2015 | 17 | 2,431.99 | 0.00 | |
| Invoice | 07/01/2015 | 3690 | 01/01/2015-01/31/2015 | Doctors United Inc.-Jaymson Medical PC | Net 30 | 01/07/2015 | 58 | 28,979.65 | 0.00 | |
| Invoice | 02/11/2015 | 3742 | GNYPLLC Reconciliation | Doctors United Inc.-Greater NY PT & Chiropractic PLLC | Net 30 | 01/07/2015 | 58 | 2,947.75 | 0.00 | |
| Invoice | 01/01/2015 | 3600 | JAYSON Reconciliation | Doctors United Inc.-Jaymson Medical PC | Net 30 | 01/07/2015 | 58 | 1,962.85 | 0.00 | |
| Invoice | 02/11/2015 | 3561 | 01/01/2015-01/31/2015 | Doctors United Inc.-Hudson Comprehensive Medical & Diagno | Net 30 | 01/07/2015 | 17 | 1,952.25 | 0.00 | |
| Invoice | 01/01/2015 | 3746 | MIDHUDSON Reconciliation | Doctors United Inc.-Hudson Comprehensive Medical & Diagno | Net 30 | 01/07/2015 | 58 | 2,046.75 | 0.00 | |
| Invoice | 01/08/2015 | 3574 | 04/01/2014-04/30/2014 | Docti Diagnostic | Due on receipt | 02/26/2014 | 194 | 75,300.00 | 0.00 | |
| Invoice | 04/30/2014 | 3025 | 04/01/2014-04/30/2014 | Docti Diagnostic | Due on receipt | 05/31/2014 | 273 | 2,045.00 | 0.00 | |
| Invoice | 05/31/2014 | 3323 | 05/01/2014-05/31/2014 | Docti Diagnostic | Due on receipt | 06/30/2014 | 273 | 1,808.00 | 44,504.00 | |
| Invoice | 04/29/2014 | 2954 | 04/01/2014-04/28/2014 | Docti Diagnostic | Due on receipt | 03/31/2014 | 334 | 45,000.00 | 0.00 | |
| Invoice | 02/26/2014 | 2754 | 02/01/2014-02/28/2014 | Docti Diagnostic | Due on receipt | 03/31/2014 | 334 | 38,373.24 | 0.00 | |
| Invoice | 11/30/2014 | 3391 | 11/01/2014-11/30/2014 | Docti Diagnostic | Due on receipt | 03/31/2014 | 387 | 38,373.24 | 0.00 | |
| Invoice | 05/20/2014 | 3065 | 05/01/2014-05/31/2014 | Docti Diagnostic | Due on receipt | 03/01/2014 | 343 | 237,186.55 | 237,186.55 | |
| Invoice | 01/30/2015 | 3943 | 01/01/2015-01/31/2015 | Docti Diagnostic | Due on receipt | 01/30/2015 | 29 | 60,000.00 | 60,000.00 | |
| Invoice | 02/28/2015 | 3597 | 01/01/2015-01/31/2015 | Docti Diagnostic | Due on receipt | 02/28/2015 | 7 | 211,756.11 | 21,756.41 | 24,153.32 |
| Invoice | 09/30/2014 | 3215 | 09/01/2014-09/30/2014 | Docti Diagnostic | Due on receipt | 09/30/2014 | 151 | 821.46 | 18,066.00 | |
| Invoice | 07/30/2014 | 3153 | 07/01/2014-07/31/2014 | Docti Diagnostic | Due on receipt | 07/30/2014 | 213 | 831.60 | 21,175.41 | |
| Invoice | 02/11/2015 | 10198 | JANUARY 2014 | Elan Singer, M.D. | Net 30 | 03/13/2015 | | 2,738.94 | 0.00 | 16.29 |
| Invoice | 02/20/2014 | 3845 | 01/01/2014-01/31/2014 | Frank Adjahin, M.D. | Net 30 | 03/10/2015 | 382 | 2,476.77 | 0.00 | |
| Invoice | 02/22/2015 | 3645 | 12/01/2014-12/31/2014 | Frardier Neurosurgery, PLLC | Net 30 | 03/03/2015 | 26 | 150.00 | 0.00 | |
| Invoice | 01/12/2015 | B31045 | 01/01/2015-01/31/2015 | Gelernter Associates of New Jersey | Net 30 | 01/12/2015 | 25 | 5,653.56 | 0.00 | |
| Invoice | 01/12/2015 | 12234 | 01/01/2015-01/31/2015 | Gillan Shepherd, M.D? Daniel Burian, M.D | Net 30 | 02/07/2015 | 25 | 225.75 | 0.00 | |
| Invoice | 01/30/2015 | Lat0105098 | | Hospital for Special Surgery/HSS Ortho | Due on receipt | | | (18.67) | 0.00 | |
| Payment | 02/11/2015 | Pax014 | | Hsiang Chen, M.D. | Net 30 | | 17 | 545.75 | 0.00 | 545.75 |
| Invoice | 02/20/2015 | 3577 | 12/01/2014-12/31/2015 | Huntington Medical Group | Net 30 | 02/20/2015 | 5 | 1,121.00 | 0.00 | |
| Invoice | 01/12/2015 | 3511 | 12/01/2014-12/31/2015 | Impression Imaging | Net 30 | 01/12/2015 | 37 | 6,454.12 | (283.00) | |
| Invoice | 02/11/2015 | 3533 | 12/01/2014-12/31/2015 | Impression Imaging | Net 30 | 02/28/2015 | 37 | 1,431.06 | 0.00 | |
| Invoice | 11/05/2015 | 3533 | 12/01/2014-12/31/2015 | inMed Diagnostic Services | Net 10 | 02/28/2015 | 37 | 6,420.69 | 0.00 | |
| Invoice | 02/08/2015 | 3455 | internal Medicine Associates | internal Medicine Associates | Net 10 | 01/05/2015 | 33 | 14,494.25 | 0.00 | |
| Invoice | 01/30/2015 | Nwc0013 | | International Cosmesis Surgery | Net 10 | 02/27/2015 | 7 | 3,051.74 | 0.00 | |
| Invoice | 12/30/2014 | ELIP0033 | 12/01/2014-12/31/2014 | Eastern LI Physicians Services | Net 30 | 01/07/2015 | 59 | 8,595.94 | 0.00 | |
| Invoice | 12/30/2014 | ELIP0132 | 11/01/2014-11/30/2014 | Eastern LI Physicians Services | Net 30 | 01/02/2015 | 57 | 6,915.54 | 0.00 | |
| Invoice | 02/09/2015 | 3278 | 01/01/2015-01/31/2015 | James Brady, M.D. | Net 10 | 02/20/2015 | | 3,037.07 | 0.00 | |
| Invoice | 01/30/2015 | DFCD33 | 01/01/2015-01/31/2015 | Jeremiah Rodriguez, M.D | Net 30 | 02/28/2015 | | 6,833.24 | 0.00 | |
| Invoice | 01/12/2015 | 1028PCA | 12/01/2014-12/31/2015 | Jimmy Borg M.D | Net 30 | 03/10/2015 | | 8,543.36 | 0.00 | |
| Invoice | 01/09/2015 | 9HF952 | 01/01/2015-01/31/2015 | John E Sherman M.D | Net 30 | 03/12/2015 | | 3,327.97 | 0.00 | |
| Invoice | 02/20/2015 | 3350 | 01/01/2015-01/31/2015 | John Gallagher M.D P.C. | Net 30 | 02/28/2015 | | 5,863.85 | 0.00 | |
| Invoice | 02/11/2015 | 12795PCA | 01/01/2015-01/31/2015 | Joseph DeAvella, M.D. | Net 30 | 03/13/2015 | 26 | 4,316.95 | 0.00 | |

AR-Feb 28 2015

628

| Invoice | 01/31/2015 5332 | 12/01/2014-12/31/2014 | Tri-State Imaging Consultants LLC | Due on receipt | 28 | 01/31/2015 | 330.85 | 0.00 |
| Invoice | 02/11/2015 T3056 | 01/01/2015-01/31/2015 | Tivella Plastic Surgery | Net 30 | | 03/13/2015 | 4,482.45 | 0.00 |
| Invoice | 02/01/2015 20150072 | January 2015 | University of Medicine and Dentistry NJ-ENT | Net 30 | | 03/01/2015 | 600.00 | 0.00 |
| Invoice | 02/01/2015 20150068 | January 2015 | University of Medicine and Dentistry NJ-Neuro Surgery | Net 30 | | 03/01/2015 | 651.50 | 0.00 |
| Payment | 02/09/2015 247297 | January 2015 | University of Medicine and Dentistry NJ-UMD NJ-Neurology | Net 75 | | | (382.00) | 0.00 |

| | 03/31/2015 3949 | | Doshi Balances due as of April 5 2016 that relate to October 2015 and Prior | | | | 625.51 |
| | 03/31/2015 3950 | | Doshi Diagnostic | | | | 350.00 |
| | 10/29/2015 INV-00121 | | Doshi Diagnostic | | | | 2,221.27 |
| | 11/13/2016 INV-00604 | | Doshi Diagnostic | | | | 200,433.86 |

| | 04/30/2015 3756 | | Ethix Imaging Balances due as of April 5 2016 that relate to October 2015 and Prior | | | | |
| | 06/24/2015 3948 | | Ethix Imaging | | | | |
| | 07/15/2015 4006 | | Ethix Imaging | | | | |

| | | | Write off on Ethix Imaging Balances due as of April 5 2016 that relate to October 2015 and Prior | | | | 22,884.00 |
| | 04/20/2015 3756 | | Ethix Imaging | | | | 127,213.33 |
| | 06/24/2015 3948 | | Ethix Imaging | | | | 56,193.00 |
| | 07/15/2015 4006 | | Ethix Imaging | | | | 1,758.18 |
| | | | Ethix Imaging | | | | 9,518.36 |
| | | | Ethix Imaging | | | | 21,887.55 |

| | | | Total | | | | 2,005,838.89 | 471,716.84 | 13,447.31 |
| | | | Uncollected % | | | | 21.25% |

| Revenue Type | Account Month | Type | Date | Num | Billing Period | Name | | Amount | Open Balance as of 2/28/15 / Credit memo raised |
|---|---|---|---|---|---|---|---|---|---|
| AHMS Income | January 2015 | Invoice | | | 01/01/2015-01/31/2015 | Rouslis Radiology | Collections for the period of 01/01/2015-01/31/2015 | 10,803.83 | |
| AHMS Income | January 2015 | Invoice | | | 01/01/2015-01/31/2015 | Professional Imaging Consultants | Total Net Collections for 01/01/2015-01/31/2015 | 144.46 | |
| AHMS Income | January 2015 | Invoice | | | 01/01/2015-01/31/2015 | Khurana Radiology MD PA | Collections for the period of 01/01/2015-01/31/2015 | 1,085.60 | |
| PCA Income | January 2015 | Invoice | | | 01/01/2015-01/31/2015 | Khurana Radiology MD PA | Medical Claim Procedure Billed for January 2015 | | |
| PCA Income | January 2015 | Invoice | | | 01/01/2015-01/31/2015 | Khurana Radiology MD PA | Eligibility and Verifications for January 2015 | | |
| AHMS Income | January 2015 | Invoice | | | 01/01/2015-01/31/2015 | John Olvera | Billing and Collections Services for the period 01/01/2015-01/31/2015 | | |
| AHMS Income | January 2015 | Levi002 | | | 12/04/2015-01/06/2015 | Pete Hoffman Stone & Associates/PHS - Baywalk | Billing and Collections Services for the month of | | |
| AHMS Income | January 2016 | Invoice | | | 12/04/2015-0108/2014 | Lloyd Galch, M.D. | Price Hoffman Stone & Associates/PHS | 250.00 | |
| AHMS Income | February 2015 | Invoice | | | 01/28/2015-02/28/2015 | Steven Levine/Dental Baker, M.D. | Total AR Collections for the period: 01/29/2015-02/28/2015 | 151.83 | |
| AHMS Income | February 2015 | Invoice | | | 01/29/2015-02/28/2015 | Edmund K. Kwei, M.D. | Total AR Collections for the period: 01/28/2015-02/28/2015 | 1,278.49 | |
| PCA Income | February 2015 | Invoice | | | 01/29/2015-02/28/2015 | Tabata Plastic Surgery | Total AR Collections for the period: 12/24/2015-02/28/2015 | | |
| PCA Income | February 2015 | Invoice | | | 01/28/2015-02/28/2015 | Kenneth Friedel, M.D. | Total AR Collections for the period: 01/29/2015-02/28/2015 | 309.77 | |
| PCA Income | February 2015 | Invoice | | | 01/28/2015-02/28/2015 | Rouslis Radiology | Total AR Collections for the period: 01/28/2015-02/28/2015 | 628.44 | |
| PCA Income | February 2015 | Invoice | | | 01/29/2015-02/28/2015 | Paragon Emergency Medicine | Total AR Collections for the period: 01/28/2015-02/28/2015 | 609.8 | |
| PCA Income | February 2015 | Invoice | | | 01/28/2015-02/28/2015 | Park Avenue Aesthetic Surgery | TotalAR Collections for the period: 01/28/2015-02/28/2015 | 5511.86 | |
| IT Income | February 2015 | Invoice | | | 01/28/2015-02/28/2015 | Park Avenue Aesthetic Surgery | Total AR Collections for the period: 01/28/2015-02/28/2015 | 159.83 | |
| IT Income | February 2015 | Invoice | | | 01/28/2015-02/28/2015 | SMS/600 | Central Nebraska Imaging | 35,000.00 | |
| IT Income | February 2015 | Invoice | | | 01/28/2015-02/28/2015 | SMS/600 | Work Order 21 - SMS/600 Maintenance Invoice for February | 71,500.00 | |
| IT Income | February 2015 | Invoice | | | 01/28/2015-02/28/2015 | SMS/600 | Billing and Collections for the period: 01/28/2015-02/28/2015 | 8,500.00 | |
| IT Income | February 2015 | Invoice | | | 01/28/2015-02/28/2015 | SMS/600 | Work Order 73 - Project Id: 14423 - Testing Complete with Acceptance | 148.50 | |
| IT Income | February 2015 | Invoice | | | 01/28/2015-02/28/2015 | SMS/600 | .02 Fee Expenses | 627.29 | |
| IT Income | February 2015 | Invoice | | | | February 2015 | | Collections for the period: 02/01/2015-02/28/2015 | 280.75 | |
| AHMS Income | February 2015 | Invoice | | | | February 2015 | Rouslis Radiology | Collections for the period: 02/01/2015-02/28/2015 | 266.07 | |
| AHMS Income | February 2015 | Invoice | | | 01/28/2015-02/28/2015 | Khurana Radiology MD PA | Collections for the month of: 02/01/2015-02/28/2015 | 26.4 | 45.44 |
| AHMS Income | February 2015 | Invoice | | | 02/01/2015-02/28/2015 | Paramount Imaging Group/University of Virginia | Billing and Collections Services for 02/01/2015-02/28/2015 | 193.28 | |
| AHMS Income | February 2015 | Invoice | | | 02/01/2015-02/28/2015 | Accurate Medical Diagnostic Services | Collections for the month of: 02/01/2015-02/28/2015 | 9,427.31 | |
| AHMS Income | February 2015 | Invoice | | | 02/01/2015-02/28/2015 | Rouslis Radiology | Medical Claim Procedure Billed for February 2015 | 1,500.00 | |
| AHMS Income | February 2015 | Invoice | | | 02/01/2015-02/28/2015 | Predom Imaging of New York | Collections for the period: 02/01/2015-02/28/2015 | 1,451.20 | 46.44 |
| AHMS Income | February 2015 | Invoice | | | 02/01/2015-02/28/2015 | Predom Imaging of New York | Collections for the period: 02/01/2015-02/28/2015 | 422.11 | |
| AHMS Income | February 2015 | Invoice | | | 02/01/2015-02/28/2015 | Northeast Nebraska Imaging | Billing and Collections Services for 02/01/2015-02/28/2015 | 12,593.75 | |
| AHMS Income | February 2015 | Invoice | | | 02/01/2015-02/28/2015 | Dr. Joseph Patel | Early Termination Fee for Contract | 1,425.18 | |
| AHMS Income | February 2015 | Invoice | | | | Termination Fee | Collections for the period: 02/01/2015-02/28/2015 | 1,425.18 | |
| AHMS Income | February 2015 | Invoice | | | | Inkjet Diagnostic Services | Total Net Collections for 02/01/2015-02/28/2015 | 881.35 | |
| AMBS Income | February 2015 | Invoice | | | | White River Imaging | Collections for the period of: 02/01/2015-02/28/2015 | 30.48 | |
| AHMS Income | February 2015 | Invoice | | | | Price Hoffman Stone & Associates/PHS - Baywalk | Billing and Collections Services for the month of | 2,926.87 | |
| AHMS Income | February 2015 | Invoice | | | | Open MRI of Purdio | Collections for the month of: 02/01/2015-02/28/2015 | 2,020.87 | |
| AHMS Income | February 2015 | Invoice | | | | Impression Imaging | Collections for the month of: February 2015 - CT Procedure Collections | 22.50 | |
| AHMS Income | February 2015 | Invoice | | | | Impression Imaging | Collections for the month of: February 2015 - MR Procedure Collections | 6,380.85 | |
| AHMS Income | February 2015 | Invoice | | | | Impression Imaging | Collections for the month of: February 2015 - PET CT Procedure Collections | 786.57 | |
| AHMS Income | February 2015 | Invoice | | | | Khurana Radiology MD PA | Collections for the month of: February 2015 - X-Ray Collections | 4,623.02 | |
| AMBS Income | February 2015 | Invoice | | | | Khurana Radiology MD PA | Medical Claims Procedure Billed for February 2015 | 450.82 | |
| NDA Income | February 2015 | Invoice | | | | Khurana Radiology MD PA | Eligibility & Authorization Services | 3,183.15 | |
| NDA Income | February 2015 | Invoice | | | | Orth and Cohen | Eligibility & Authorization Services | 80.00 | |
| MSA Income | 2016/10/02 | Invoice | | | | University of Medicine and Dentistry NJ/UMDNJ NJ/Shore Surgery | | 250.00 | |
| NDA Income | February 2015 | Invoice | | | | Orth and Cohen | | 278.50 | |
| | | | | | | | | 558.00 | |

*(handwritten, right margin)* Unbilled revenue Feb 28, 20..

| Category | Month | Type | Number | Date | Name | Description | Amount |
|---|---|---|---|---|---|---|---|
| MDA Income | February 2015 | Invoice | 03/01/2015 02/161127 | | Hospital for Special Surgery/USS Ortho | Eligibility & Authorization Services | 1,521.00 |
| MDA Income | February 2015 | Invoice | 03/01/2015 02/160111 | | University of Medicine and Dentistry NJ/UMDJ NABST | Eligibility & Authorization Services | 650.00 |
| MDA Income | February 2015 | Invoice | 03/01/2015 02/160112 | | St. Barnabas Hospital | Eligibility & Authorization Services | 797.00 |
| MDA Income | February 2015 | Invoice | 03/01/2015 02/160117 | | Queens Arthroscopy and Sports Medicine/Queens Arthroscopy MDA | Eligibility & Authorization Services | 77.00 |
| RCM Income | February 2015 | Invoice | 03/01/2015 02/160112 | | Hospital for Special Surgery | Eligibility & Authorization Services | 250.00 |
| RCM Income | February 2015 | Invoice | 03/01/2015 02/160107 | | David Nagman | Eligibility & Authorization Services | 155.00 |
| RCM Income | February 2015 | Invoice | 03/01/2015 02/160108 | | John Kennedy | Eligibility & Authorization Services | 7,744.28 |
| RCM Income | February 2015 | Invoice | 03/01/2015 02/150109 | | Montefiore Medical | Eligibility & Authorization Services | 75.00 |
| MDA Income | February 2015 | Invoice | 03/01/2015 02/150108 | | New York Spine Medicine | Eligibility & Authorization Services | 75.00 |
| MDA Income | February 2015 | Invoice | 03/01/2015 02/150016 | | Steven Murphy | Eligibility & Authorization Services | 75.00 |
| MDA Income | February 2015 | Invoice | 03/01/2015 02/150014 | | University Diagnostic Testing LLC | Eligibility & Authorization Services | 153.00 |
| RCM Revenue | February 2015 | Deposit | 03/01/2015 PAYPAL… | February 2015 | William Street Fixtures | PAYPAL TRANSFER PYO ID: PAYPAL/D01 | 5,667.15 |
| RCM Revenue | February 2015 | Deposit | 03/17/2015 PAYPAL… | February 2015 | MDI/neuromatrix | PAYPAL TRANSFER PYO ID: PAYPAL/D01 | 4,700.00 |
| RCM Revenue | February 2015 | Invoice | 03/24/2015 359640 | 02/24/2015-03/20/2015 | Paul Waterman | CPT 00213: Ulick $124.44 & Luck $48.80 | 648.37 |
| RCM Revenue | February 2015 | Invoice | 03/02/2015 359651 | 02/24/2015-03/20/2015 | Brooklyn Medical Eye Associates | Medical Claims Processing per Procedure Billed | 6.04 |
| RCM Revenue | February 2015 | Invoice | 03/02/2015 359600 | 02/24/2015-03/20/2015 | Brooklyn Medical Eye Associates | Medical billing services for the following period | 843.37 |
| RCM Revenue | February 2015 | Invoice | 03/02/2015 3599 | 02/24/2015-03/20/2015 | Geriatrics Association of New Jersey | Medical Billing Services for the period: 02/01/2015-02/28/2015 | 1,618.88 |
| RCM Revenue | February 2015 | Invoice | 03/02/2015 3601 | 02/01/2015-02/28/2015 | New York Spine Care | Medical billing services for the following period: 02/01/2015-02/28/2015 | 7,394.01 |
| RCM Revenue | February 2015 | Invoice | 03/02/2015 3599 | 02/01/2015-02/28/2015 | Hem Care Medical Clinic PC | Transcription Services for the billing period: 02/01/2015-02/28/2015 | 746.12 |
| RCM Revenue | February 2015 | Invoice | 03/02/2015 3008 | 02/01/2015-02/28/2015 | Hem Care Medical Clinic PC | Transcription Services for the billing period: 02/01/2015-02/28/2015 | -429.89 |
| RCM Revenue | February 2015 | Invoice | 03/02/2015 3811 | 02/01/2015-02/28/2015 | Greater Medicine Associates | Procedures for the billing period: 02/01/2015-02/28/2015 | -75.78 |
| RCM Revenue | February 2015 | Invoice | 03/03/2015 3812 | 02/01/2015-02/28/2015 | Rala Medical Health P.C. | Direct Patient Payments | -3,714.19 |
| RCM Revenue | February 2015 | Invoice | 03/03/2015 3892 | 02/01/2015-02/28/2015 | AlderKey Martin M.D., P.C. | Direct Patient Payments | -4,408.19 |
| RCM Revenue | February 2015 | Invoice | 03/03/2015 3823 | 02/01/2015-02/28/2015 | AlderKey Martin M.D., P.C. | Commercial, Government, and all other collections exclusive of Medicaid | -256.00 |
| RCM Revenue | February 2015 | Invoice | 03/03/2015 3839 | 02/01/2015-02/28/2015 | Paul Waterman | Commercial, Government, and all other collections exclusive of Medicaid | 1,000.00 |
| RCM Revenue | February 2015 | Invoice | 03/03/2015 3834 | 02/01/2015-02/28/2015 | Paul Waterman | Direct Patient Payments | 825.00 |
| RCM Revenue | February 2015 | Invoice | 03/03/2015 3818 | 02/01/2015-02/28/2015 | Queens Arthroscopy and Sports Medicine | Medical Billing Services (Excluding Medicaid Collections) | 2,329.42 |
| RCM Revenue | February 2015 | Invoice | 03/04/2015 3814 | 02/01/2015-02/28/2015 | Queens Arthroscopy and Sports Medicine | Workers' Compensation collections | 34.00 |
| RCM Revenue | February 2015 | Invoice | 03/04/2015 3813 | 02/01/2015-02/28/2015 | William Physical Medicine P.C. | Workers' Compensation collections | 382.81 |
| RCM Revenue | February 2015 | Invoice | 03/04/2015 3008 | 02/01/2015-02/28/2015 | Sports Radiology P.C. | Commercial and Medicare claims collections | 1,909.09 |
| RCM Revenue | February 2015 | Invoice | 03/05/2015 3811 | 02/01/2015-02/28/2015 | Internal Medicine Associates | Total Amount of Hours Spent for the period: 02/01/2015-02/28/2015 | 2,881.80 |
| RCM Revenue | February 2015 | Invoice | 03/05/2015 3816 | 02/01/2015-02/28/2015 | Sports Radiology P.C. | Transcription Services for the billing period: 02/01/2015-02/28/2015 | 322.20 |
| RCM Revenue | February 2015 | Invoice | 03/04/2015 3813 | 02/01/2015-02/28/2015 | Rala Medical Health P.C. | Total Amount of Hours Spent for the period: 02/01/2015-02/28/2015 | 54.75 |
| RCM Revenue | February 2015 | Invoice | 03/04/2015 3012 | 02/01/2015-02/28/2015 | Queens Medical Pavilion | New Patient Laser Ablation Procedures | 16.00 |
| RCM Revenue | February 2015 | Invoice | 03/05/2015 3014 | 02/01/2015-02/28/2015 | Sports Radiology P.C. | Patient Consult & Other Testing | 78.50 |
| RCM Revenue | February 2015 | Invoice | 03/05/2015 3013 | 02/01/2015-02/28/2015 | Sports Radiology P.C. | Total Amount of Hours Spent for the period: 02/01/2015-02/28/2015 | 900.44 |
| RCM Revenue | February 2015 | Invoice | 03/05/2015 3016 | 02/01/2015-02/28/2015 | Sports Railroad P.C. | Commercial, Government, and all other collections exclusive of Medicaid | 445.18 |
| RCM Revenue | February 2015 | Invoice | 03/02/2015 3618 | 02/07/2015-02/28/2015 | MEDSTAR | Check Client Processing Fee for Invoice# 8513 | 1,268.48 |
| RCM Revenue | February 2015 | Invoice | 03/02/2015 3644 | 02/07/2015-02/28/2015 | MEDSTAR | Financed for the period 02/01/2015-02/28/2015 | 13,981.01 |
| RCM Revenue | February 2015 | Invoice | 03/02/2015 3645 | 02/01/2015-02/28/2015 | MEDSTAR | Invoice & Workers' Compensation Collections for the period: 02/01/2015-02/28/2015 | 5,098.21 |
| RCM Revenue | February 2015 | Invoice | 02/07/2015-02/28/2015 | | Lenman Diagnostic Imaging | Development Billing - Client Collections for the period: 02/01/2015-02/28/2015 | 3,114.50 |
| RCM Revenue | February 2015 | Invoice | 03/02/2015 3646 | 02/07/2015-02/28/2015 | Electrophysiology Medical Diagnostic PC | Medicaid Secondary Collections for the period: 02/01/2015-02/28/2015 | 22.00 |
| RCM Revenue | February 2015 | Invoice | 03/03/2015 3642 | 02/01/2015-02/28/2015 | Doctors United Inc.-Gramam Medical PC | Collections, exclusive of Medicaid, as per the billing period: 02/01/2015-02/28/2015 | 5,575.00 |
| RCM Revenue | February 2015 | Invoice | 03/01/2015 3640 | 02/01/2015-02/28/2015 | Doctors United Inc.-Gramam Medical PC | Billing and Collections Services for the period: 02/25/2015-03/01/2015 | 3,045.00 |
| RCM Revenue | February 2015 | Invoice | 02/01/2015-02/28/2015 | | Doctors United Inc.-Graeter NY PT & Chiropractic PLLC | Count of Visits for the billing period: 02/25/2015-04/01/2015 | 2,229.50 |
| RCM Revenue | February 2015 | Invoice | 03/01/2015 3642 | 02/01/2015-02/28/2015 | Doctors United Inc.-GPB Medical P.C. | Count of Visits for the billing period: 02/01/2015-02/28/2015 | 18,379.55 |
| RCM Revenue | February 2015 | Invoice | 02/01/2015-02/28/2015 | | Doctors United Inc.-Hudson Comprehensive Medical & Diagno | Count of Visits for the billing period: 02/01/2015-02/28/2015 | 692.34 |
| RCM Revenue | February 2015 | Invoice | 02/01/2015-02/28/2015 | | Doctors United Inc. | Count of Visits for the billing period: 02/01/2015-02/28/2015 | 50,000.00 |
| RCM Revenue | February 2015 | Invoice | 03/01/2015 3646 | 02/01/2015-02/28/2015 | Doctors Diagnostic | Count of Visits for the billing period: 02/01/2015-02/28/2015 | 152,599.88 |
| RCM Revenue | February 2015 | Invoice | 03/01/2015 3650 | 02/01/2015-02/28/2015 | David Diagnostic | Collection Services for Claims with DOS Prior to 06/01/2013 | -981.00 |
| RCM Revenue | February 2015 | Invoice | 03/01/2015 3650 | 02/01/2015-02/28/2015 | David Diagnostic | Salary Invoice for Former DVI Employees | 1,311.00 |
| RCM Revenue | February 2015 | Invoice | 03/01/2015 3650 | 02/01/2015-02/28/2015 | David Diagnostic | Medical Billing & Collection Services for the month of February 2015 | 3,150.00 |
| RCM Revenue | February 2015 | Invoice | 03/01/2015 3650 | 02/01/2015-02/28/2015 | David Diagnostic | Salary | 3,280.00 |
| RCM Revenue | February 2015 | Invoice | 03/01/2015 3650 | 02/01/2015-02/28/2015 | David Diagnostic | Postage | 54,054.00 |
| RCM Revenue | February 2015 | Invoice | 03/01/2015 3650 | 02/01/2015-02/28/2015 | David Diagnostic | Missed Eligibility | 13,883.35 |
| RCM Revenue | February 2015 | Invoice | 03/01/2015 3650 | 02/01/2015-02/28/2015 | David Diagnostic | Accounting | 5,785.20 |
| RCM Revenue | February 2015 | Invoice | 03/01/2015 3820 | 02/01/2015-02/28/2015 | David Diagnostic | Meaningful Use Data | 5,790.20 |
| RCM Revenue | February 2015 | Invoice | 03/01/2015 3822 | 02/01/2015-02/28/2015 | Stuart Ferman, MD | Additional Resource Compliance | 3.13 |
| RCM Revenue | February 2015 | Invoice | | | | DG Coaching Transcriptions | 77.64 |
| RCM Revenue | February 2015 | Invoice | | | | EDG Brooklyn Transcriptions | |
| RCM Revenue | February 2015 | Invoice | | | | No-Fault Billing Services as per PARCS report - AutoRx | |
| RCM Revenue | February 2015 | Invoice | | | | Medical Billing Services as per PARCS report - Target MF DOS prior to 12/31/2013 | |

| Type | Month | Doc Type | Invoice # | Date | Provider / Description | Amount |
|---|---|---|---|---|---|---|
| RCM Revenue | February 2015 | Invoice | | | TriState Imaging Consultants LLC | |
| RCM Revenue | February 2015 | Invoice | | | MEDSTAR | |
| PCA Revenue | February 2015 | Invoice | | | Tufelik Plastic Surgery | |
| PCA Revenue | February 2015 | Invoice | | | Kevin Choi, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | Adam Kolker, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | Joshua S. Hyman, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | Dev Dutta, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | Rosa Crespo/man, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | David Rapaport, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | Kenneth Francis, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | Joseph Dababets, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | James Brady, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | Steven Cavanagh C.R.N.A. | |
| PCA Revenue | February 2015 | Invoice | | | Paragon Emergency Medicine | |
| PCA Revenue | February 2015 | Invoice | | | Peter Neumann, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | Jimmy Song M.D. | |
| PCA Revenue | February 2015 | Invoice | | | Frank Agljanov, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | Park Avenue Anesthetic Surgery | |
| PCA Revenue | February 2015 | Invoice | | | Ellen Seyyed, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | Mark Schwartz, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | John E Sherman M.D. | |
| PCA Revenue | February 2015 | Invoice | | | Jeremiah Roesbine, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | Mike Lira Plastic Surgery | |
| PCA Revenue | February 2015 | Invoice | | | Yael Halaas, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | Maimonides Medical Center | |
| PCA Revenue | February 2015 | Invoice | | | Eastern LI Physicians Services | |
| PCA Revenue | February 2015 | Invoice | | | James Paonesa, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | Gittos Shepherd, M.D./ Daniel Burton, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | Andrew Kornstain | |
| PCA Revenue | February 2015 | Invoice | | | Hsiang Chen, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | John Olivera | |
| PCA Revenue | February 2015 | Invoice | | | Loyd Goyle, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | G. Crumley Houston, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | The Breslow Center for Plastic Surgery | |
| PCA Revenue | February 2015 | Invoice | | | Edward K. Kwon, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | Maimonides Medical Center | |
| PCA Revenue | February 2015 | Invoice | | | Melinda Mrgua, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | Advanced Plastic Surgery | |
| PCA Revenue | February 2015 | Invoice | | | Robert Stich, M.D. | |
| PCA Revenue | February 2015 | Invoice | | | Steven LeAndroice/cei Baker, M.D. | |

| Type | Date | Num | Name | Due Date | Open Balance | Balance as of Apr 5 2 |
|------|------|-----|------|----------|--------------|----------------------|
| Bill | 12/31/2014 | 115968 | Abrams Fensterman | 01/30/2015 | 1,250.00 | 1,250.00 |
| Bill | 11/30/2014 | 114851 | Abrams Fensterman | 12/30/2014 | 1,960.00 | 1,960.00 |
| Bill | 10/31/2014 | 113541 | Abrams Fensterman | 11/30/2014 | 2,500.00 | 2,500.00 |
| Bill | 08/31/2014 | 111039 | Abrams Fensterman | 09/30/2014 | 2,500.00 | 0.00 |
| Bill | 09/30/2014 | 112491 | Abrams Fensterman | 10/30/2014 | 4,920.00 | 0.00 |
| Bill | 02/28/2015 | 150694886 | Acc Business | 04/26/2015 | 1,338.51 | 0.00 |
| Bill | 04/27/2014 | 141004886 | Acc Business | 05/27/2014 | 1,338.51 | 0.00 |
| Bill | 12/11/2014 | 0000119 | Adaptive Graphics (P.C.A) | 12/21/2014 | 500.00 | 0.00 |
| Bill | 02/28/2015 | 028324 | Aflac New York | 03/15/2015 | 1,037.92 | 0.00 |
| Bill | 01/28/2015 | 004895 | Aflac New York | 02/15/2015 | 877.32 | 0.00 |
| Bill | 08/14/2013 | 39041 | Alliant Group, LP | 07/14/2013 | 4,509.30 | 0.00 |
| Bill | 02/25/2015 | 30082623-1028 | Aon Service Corporation | 03/07/2015 | 20,190.71 | 0.00 |
| Bill | 01/28/2015 | 30082623-1013 | Aon Service Corporation | 02/07/2015 | 20,190.71 | 0.00 |
| Bill | 02/04/2015 | 309521 | Associated Supply Company | 03/21/2015 | 75.00 | 0.00 |
| Bill | 02/16/2015 | 6150 | Atlantic Imaging, LLC | 02/26/2015 | 3,031.93 | 0.00 |
| Bill | 01/31/2015 | 2015-01P | Avramych Consulting Inc. | 03/10/2015 | 950.00 | 0.00 |
| Bill | 02/28/2015 | 2015-02P | Avramych Consulting Inc. | 03/30/2015 | 850.00 | 0.00 |
| Bill | 12/31/2014 | 2014-12P | Avramych Consulting Inc. | 02/07/2015 | 850.00 | 0.00 |
| Bill | 01/29/2015 | 01292015 | Bibi Pillay | 02/28/2015 | 2,333.33 | 0.00 |
| Bill | 02/28/2015 | 03272015 | Bibi Pillay | 03/30/2015 | 2,333.33 | 0.00 |
| Bill | 12/29/2014 | 12292014 | Bibi Pillay | 01/28/2015 | 2,333.33 | 0.00 |
| Bill | 01/30/2015 | 1302015 | Christine Cohen | 01/30/2015 | 83.17 | 0.00 |
| Bill | 02/23/2015 | 02232015 | Christine Cohen | 02/23/2015 | 2,365.47 | 0.00 |
| Bill | 12/31/2014 | 12312014 | Christine Cohen | 12/31/2014 | 1,340.66 | 0.00 |
| Bill | 01/31/2015 | 8120085286 | Cintas | 03/10/2015 | 480.98 | 0.00 |
| Bill | 02/28/2015 | 8120085287 | Cintas | 03/30/2015 | 240.84 | 0.00 |
| Bill | 02/23/2015 | 10546 | Courtesy Express | 02/28/2015 | 37.80 | 0.00 |
| Bill | 02/01/2015 | 107376 | Criterions, LLC | 03/03/2015 | 8,265.00 | 8,265.00 |
| Bill | 02/01/2015 | 91872 | Dealers First Financial L.L.C | 02/10/2015 | 553.99 | 0.00 |
| Bill | 02/20/2015 | 140 | Decimal Cloud Technologies Inc | 03/01/2015 | 2,000.00 | 0.00 |
| Bill | 02/07/2015 | 77791259 | Dell Financial Services-001-6566692-000 | 02/17/2015 | 5,323.56 | 0.00 |
| Bill | 01/31/2015 | 150783 | Diamond Healthcare Communications | 03/04/2015 | 1,150.24 | 0.00 |
| Bill | 02/28/2015 | 153635 | Diamond Healthcare Communications | 04/01/2015 | 298.26 | 0.00 |
| Bill | 12/31/2014 | 149223 | Diamond Healthcare Communications | 02/01/2015 | 640.07 | 0.00 |
| Bill | 12/01/2014 | 147065 | Diamond Healthcare Communications | 12/31/2014 | 1,728.88 | 0.00 |
| Bill | 02/28/2015 | 64/2015 | E4E HealthCare Business Services (PCA) | 03/27/2015 | 1,373.00 | 0.00 |
| Bill | 01/31/2015 | 23/2015 | E4E HealthCare Business Services (PCA) | 02/17/2015 | 992.00 | 0.00 |
| Bill | 02/09/2015 | 2656113 | Element Financial Corp. | 03/01/2015 | 686.04 | 0.00 |
| Bill | 01/22/2015 | 2630962 | Element Financial Corp. | 02/15/2015 | 2,137.28 | 0.00 |
| Bill | 02/24/2015 | 2663800 | Element Financial Corp. | 02/15/2015 | 2,137.28 | 0.00 |
| Bill | 01/31/2015 | 424401 | Emdeon | 02/28/2015 | 130.00 | 0.00 |
| Bill | 01/31/2015 | 424404 | Emdeon | 02/28/2015 | 260.00 | 0.00 |
| Bill | 01/31/2015 | 424403 | Emdeon | 02/28/2015 | 130.00 | 0.00 |
| Bill | 01/31/2015 | 424416 | Emdeon | 02/28/2015 | 130.00 | 0.00 |
| Bill | 01/31/2015 | 424297 | Emdeon | 02/28/2015 | 350.00 | 0.00 |
| Bill | 01/31/2015 | 424296 | Emdeon | 02/28/2015 | 130.00 | 0.00 |
| Bill | 01/31/2015 | 424294 | Emdeon | 02/28/2015 | 140.00 | 0.00 |
| Bill | 01/31/2015 | 424293 | Emdeon | 02/28/2015 | 770.00 | 0.00 |
| Bill | 01/31/2015 | 424407 | Emdeon | 02/28/2015 | 560.00 | 0.00 |
| Bill | 01/31/2015 | 424316 | Emdeon | 02/28/2015 | 260.00 | 0.00 |
| Bill | 01/31/2015 | 424311 | Emdeon | 02/28/2015 | 130.00 | 0.00 |
| Bill | 01/31/2015 | 424308 | Emdeon | 02/28/2015 | 350.00 | 0.00 |
| Bill | 01/31/2015 | 424309 | Emdeon | 02/28/2015 | 130.00 | 0.00 |
| Bill | 01/31/2015 | 424791 | Emdeon | 02/28/2015 | 130.00 | 0.00 |

| Bill | 01/31/2015 424332 | Emdeon | 02/28/2015 | 130.00 | 0.00 |
|---|---|---|---|---|---|
| Bill | 01/31/2015 424328 | Emdeon | 02/28/2015 | 130.00 | 0.00 |
| Bill | 01/31/2015 424327 | Emdeon | 02/28/2015 | 130.00 | 0.00 |
| Bill | 01/31/2015 424320 | Emdeon | 02/28/2015 | 130.00 | 0.00 |
| Bill | 01/31/2015 424312 | Emdeon | 02/28/2015 | 770.00 | 0.00 |
| Bill | 01/31/2015 424295 | Emdeon | 02/28/2015 | 130.00 | 0.00 |
| Bill | 01/31/2015 424317 | Emdeon | 02/28/2015 | 260.00 | 0.00 |
| Bill | 01/31/2015 424402 | Emdeon | 02/28/2015 | 130.00 | 0.00 |
| Bill | 01/31/2015 417924 | Emdeon | 03/02/2015 | 754.70 | 0.00 |
| Bill | 01/31/2015 421299 | Emdeon | 03/02/2015 | 420.00 | 0.00 |
| Bill | 01/31/2015 421679 | Emdeon | 03/02/2015 | 140.00 | 0.00 |
| Bill | 02/28/2015 435602 | Emdeon | 03/10/2015 | 130.00 | 0.00 |
| Bill | 02/28/2015 435917 | Emdeon | 03/10/2015 | 130.00 | 0.00 |
| Bill | 02/28/2015 435622 | Emdeon | 03/10/2015 | 130.00 | 0.00 |
| Bill | 02/28/2015 435618 | Emdeon | 03/10/2015 | 130.00 | 0.00 |
| Bill | 02/28/2015 435615 | Emdeon | 03/10/2015 | 130.00 | 0.00 |
| Bill | 02/28/2015 435604 | Emdeon | 03/10/2015 | 130.00 | 0.00 |
| Bill | 02/28/2015 435603 | Emdeon | 03/10/2015 | 770.00 | 0.00 |
| Bill | 02/28/2015 435592 | Emdeon | 03/10/2015 | 130.00 | 0.00 |
| Bill | 02/28/2015 435590 | Emdeon | 03/10/2015 | 130.00 | 0.00 |
| Bill | 02/28/2015 438555 | Emdeon | 03/10/2015 | 210.00 | 0.00 |
| Bill | 02/28/2015 435584 | Emdeon | 03/10/2015 | 130.00 | 0.00 |
| Bill | 02/28/2015 435608 | Emdeon | 03/10/2015 | 130.00 | 0.00 |
| Bill | 02/28/2015 435577 | Emdeon | 03/10/2015 | 130.00 | 0.00 |
| Bill | 02/28/2015 435580 | Emdeon | 03/10/2015 | 350.00 | 0.00 |
| Bill | 02/28/2015 438773 | Emdeon | 03/10/2015 | 70.00 | 0.00 |
| Bill | 02/28/2015 435572 | Emdeon | 03/10/2015 | 130.00 | 0.00 |
| Bill | 02/28/2015 435574 | Emdeon | 03/10/2015 | 260.00 | 0.00 |
| Bill | 02/28/2015 435576 | Emdeon | 03/10/2015 | 130.00 | 0.00 |
| Bill | 02/28/2015 435581 | Emdeon | 03/10/2015 | 130.00 | 0.00 |
| Bill | 02/28/2015 435583 | Emdeon | 03/10/2015 | 350.00 | 0.00 |
| Bill | 02/28/2015 435587 | Emdeon | 03/10/2015 | 130.00 | 0.00 |
| Bill | 02/28/2015 435586 | Emdeon | 03/10/2015 | 140.00 | 0.00 |
| Bill | 02/28/2015 435578 | Emdeon | 03/10/2015 | 770.00 | 0.00 |
| Bill | 02/28/2015 435599 | Emdeon | 03/10/2015 | 260.00 | 0.00 |
| Bill | 02/28/2015 435598 | Emdeon | 03/10/2015 | 130.00 | 0.00 |
| Bill | 02/28/2015 435579 | Emdeon | 03/10/2015 | 130.00 | 0.00 |
| Bill | 02/28/2015 435595 | Emdeon | 03/30/2015 | 350.00 | 0.00 |
| Bill | 02/28/2015 430242 | Emdeon | 03/30/2015 | 866.70 | 0.00 |
| Bill | 02/28/2015 438841 | Emdeon | 03/30/2015 | 420.00 | 0.00 |
| Bill | 02/28/2015 438946 | Emdeon | 03/30/2015 | 140.00 | 0.00 |
| Bill | 12/31/2014 410927 | Emdeon | 01/29/2015 | 770.00 | 0.00 |
| Bill | 12/31/2014 410914 | Emdeon | 01/30/2015 | 130.00 | 0.00 |
| Bill | 12/31/2014 410898 | Emdeon | 01/30/2015 | 130.00 | 0.00 |
| Bill | 12/31/2014 405201 | Emdeon | 01/30/2015 | 878.13 | 0.00 |
| Bill | 12/31/2014 410906 | Emdeon | 01/30/2015 | 260.00 | 0.00 |
| Bill | 12/31/2014 410908 | Emdeon | 01/30/2015 | 130.00 | 0.00 |
| Bill | 12/31/2014 410907 | Emdeon | 01/30/2015 | 130.00 | 0.00 |
| Bill | 12/31/2014 410918 | Emdeon | 01/30/2015 | 130.00 | 0.00 |
| Bill | 12/31/2014 410935 | Emdeon | 01/30/2015 | 130.00 | 0.00 |
| Bill | 12/31/2014 410952 | Emdeon | 01/30/2015 | 130.00 | 0.00 |
| Bill | 12/31/2014 410922 | Emdeon | 01/30/2015 | 260.00 | 0.00 |
| Bill | 12/31/2014 410897 | Emdeon | 01/30/2015 | 130.00 | 0.00 |
| Bill | 12/31/2014 410893 | Emdeon | 01/30/2015 | 770.00 | 0.00 |
| Bill | 12/31/2014 410901 | Emdeon | 01/30/2015 | 130.00 | 0.00 |

| Bill | 12/31/2014 | 410889 | Emdeon | 01/30/2015 | 140.00 | 0.00 |
|------|------------|--------|--------|------------|--------|------|
| Bill | 12/31/2014 | 410911 | Emdeon | 01/30/2015 | 350.00 | 0.00 |
| Bill | 12/31/2014 | 410928 | Emdeon | 01/30/2015 | 130.00 | 0.00 |
| Bill | 12/31/2014 | 410925 | Emdeon | 01/30/2015 | 350.00 | 0.00 |
| Bill | 12/31/2014 | 410933 | Emdeon | 01/30/2015 | 130.00 | 0.00 |
| Bill | 12/31/2014 | 410930 | Emdeon | 01/30/2015 | 130.00 | 0.00 |
| Bill | 12/31/2014 | 410936 | Emdeon | 01/30/2015 | 130.00 | 0.00 |
| Bill | 12/31/2014 | 410923 | Emdeon | 01/30/2015 | 130.00 | 0.00 |
| Bill | 12/31/2014 | 410934 | Emdeon | 01/30/2015 | 130.00 | 0.00 |
| Bill | 12/31/2014 | 410926 | Emdeon | 01/30/2015 | 130.00 | 0.00 |
| Bill | 12/31/2014 | 414031 | Emdeon | 01/30/2015 | 70.00 | 0.00 |
| Bill | 12/31/2014 | 410956 | Emdeon | 01/30/2015 | 130.00 | 0.00 |
| Bill | 12/31/2014 | 414118 | Emdeon | 01/30/2015 | 210.00 | 0.00 |
| Bill | 12/31/2014 | 410912 | Emdeon | 01/30/2015 | 130.00 | 0.00 |
| Bill | 12/31/2014 | 410947 | Emdeon | 01/30/2015 | 130.00 | 0.00 |
| Bill | 12/31/2014 | 411912 | Emdeon | 01/30/2015 | 130.00 | 0.00 |
| Bill | 12/31/2014 | 414144 | Emdeon | 01/30/2015 | 140.00 | 0.00 |
| Bill | 01/31/2015 | 421335 | Emdeon | 02/10/2015 | 70.00 | 0.00 |
| Bill | 01/31/2015 | 424405 | Emdeon | 02/10/2015 | 630.00 | 0.00 |
| Bill | 01/31/2015 | 424298 | Emdeon | 02/10/2015 | 130.00 | 0.00 |
| Bill | 01/31/2015 | 424300 | Emdeon | 02/10/2015 | 130.00 | 0.00 |
| Bill | 01/31/2015 | 421654 | Emdeon | 02/10/2015 | 210.00 | 0.00 |
| Bill | 11/30/2014 | 398195 | Emdeon | 12/30/2014 | 130.00 | 0.00 |
| Bill | 11/30/2014 | 401431 | Emdeon | 12/30/2014 | 210.00 | 0.00 |
| Bill | 11/30/2014 | 398182 | Emdeon | 12/30/2014 | 130.00 | 0.00 |
| Bill | 11/30/2014 | 398532 | Emdeon | 12/30/2014 | 130.00 | 0.00 |
| Bill | 11/30/2014 | 398168 | Emdeon | 12/30/2014 | 130.00 | 0.00 |
| Bill | 11/30/2014 | 398166 | Emdeon | 12/30/2014 | 260.00 | 0.00 |
| Bill | 11/30/2014 | 399351 | Emdeon | 12/30/2014 | 130.00 | 0.00 |
| Bill | 11/30/2014 | 401454 | Emdeon | 12/30/2014 | 140.00 | 0.00 |
| Bill | 11/30/2014 | 398198 | Emdeon | 12/31/2014 | 260.00 | 0.00 |
| Bill | 12/01/2014 | 398172 | Emdeon | 12/31/2014 | 130.00 | 0.00 |
| Bill | 12/01/2014 | 398180 | Emdeon | 12/31/2014 | 130.00 | 0.00 |
| Bill | 12/31/2014 | 410894 | Emdeon | 01/10/2015 | 560.00 | 0.00 |
| Bill | 12/31/2014 | 410902 | Emdeon | 01/10/2015 | 630.00 | 0.00 |
| Bill | 12/31/2014 | 411090 | Emdeon | 01/10/2015 | 130.00 | 0.00 |
| Bill | 12/31/2014 | 4522 | Evans Marketing, Inc. | 05/01/2015 | 100.38 | 0.00 |
| Bill | 12/31/2014 | 4523 | Evans Marketing, Inc. | 05/01/2015 | 953.22 | 0.00 |
| Bill | 12/31/2014 | 4506 | Evans Marketing, Inc. | 02/04/2015 | 2,535.18 | 0.00 |
| Bill | 01/31/2015 | 246 | Excel Computer Network | 03/03/2015 | 7,650.00 | 0.00 |
| Bill | 02/28/2015 | 247 | Excel Computer Network | 04/01/2015 | 6,449.00 | 0.00 |
| Bill | 12/31/2014 | 245 | Excel Computer Network | 01/31/2015 | 8,986.00 | 0.00 |
| Bill | 12/01/2014 | 244 | Excel Computer Network | 12/11/2014 | 10,936.00 | 0.00 |
| Bill | 02/23/2015 | 2-947-32425 | Fed Ex | 03/10/2015 | 155.90 | 0.00 |
| Bill | 01/26/2015 | 2-918-28378 | Fed Ex | 02/10/2015 | 157.41 | 0.00 |
| Bill | 02/02/2015 | 88245 | Fuoco Group | 03/04/2015 | 1,250.00 | 0.00 |
| Bill | 12/30/2014 | 87725 | Fuoco Group | 01/29/2015 | 5,000.00 | 2,500.00 |
| Bill | 01/05/2015 | 87791 | Fuoco Group | 02/04/2015 | 1,250.00 | 0.00 |
| Bill | 11/03/2014 | 87032 | Fuoco Group | 12/03/2014 | 1,250.00 | 0.00 |
| Bill | 02/16/2015 | 1502163 | Green Office Solutions (PCA) | 03/03/2015 | 226.48 | 0.00 |
| Bill | 02/27/2015 | 1502279 | Green Office Solutions (PCA) | 03/14/2015 | 107.80 | 0.00 |
| Bill | 01/21/2015 | 1501211 | Green Office Solutions (PCA) | 02/05/2015 | 65.18 | 0.00 |
| Bill | 01/30/2015 | 1501305 | Green Office Solutions (PCA) | 02/14/2015 | 99.85 | 0.00 |
| Bill | 02/11/2015 | 1502112 | Green Office Solutions (PCA) | 02/26/2015 | 367.15 | 0.00 |
| Bill | 02/28/2015 | 8973 | Harmony Health Care IT (PCA) | 03/12/2015 | 870.70 | 0.00 |

| Bill | 02/01/2015 8644 | Harmony Health Care IT (PCA) | 02/01/2015 | 59.95 | 0.00 |
| Bill | 01/31/2015 8646 | Harmony Health Care IT (PCA) | 02/12/2015 | 655.55 | 0.00 |
| Bill | 02/27/2015 8497 | Harmony Health Care IT (PCA) | 02/27/2015 | 4,000.00 | 0.00 |
| Bill | 01/01/2015 8421 | Harmony Health Care IT (PCA) | 01/01/2015 | 59.95 | 0.00 |
| Bill | 12/31/2014 8422 | Harmony Health Care IT (PCA) | 01/12/2015 | 814.40 | 0.00 |
| Bill | 07/03/2014 0002485 | H-DOX | 07/03/2014 | 1,800.00 | 0.00 |
| Bill | 10/31/2014 0002497 | H-DOX | 11/10/2014 | 1,440.00 | 0.00 |
| Bill | 02/28/2015 961 | IHCFA  LLC | 03/30/2015 | 3,205.00 | 0.00 |
| Bill | 01/31/2015 15DO173283 | IVANS, INC. | 03/02/2015 | 66.80 | 0.00 |
| Bill | 02/28/2015 15DO173396 | IVANS, INC. | 04/02/2015 | 66.80 | 0.00 |
| Bill | 01/31/2015 31530 | J2 Global Communications | 03/02/2015 | 148.50 | 0.00 |
| Bill | 02/28/2015 32104 | J2 Global Communications | 03/30/2015 | 151.30 | 0.00 |
| Bill | 02/28/2015 2252015 | Jessica Lydon | 03/10/2015 | 116.00 | 0.00 |
| Bill | 02/05/2015 2418701134 | Lackmann Culinary Services | 02/05/2015 | 7.50 | 0.00 |
| Bill | 01/01/2015 2418701109 | Lackmann Culinary Services | 01/01/2015 | 22.64 | 0.00 |
| Bill | 01/01/2015 2418701114 | Lackmann Culinary Services | 01/11/2015 | 6.35 | 0.00 |
| Bill | 01/22/2015 2418701122 | Lackmann Culinary Services | 01/22/2015 | 13.58 | 0.00 |
| Bill | 11/13/2014 2418701075 | Lackmann Culinary Services | 11/13/2014 | 6.79 | 0.00 |
| Bill | 11/20/2014 2418701082 | Lackmann Culinary Services | 11/20/2014 | 17.26 | 0.00 |
| Bill | 11/27/2014 2418701086 | Lackmann Culinary Services | 11/27/2014 | 12.82 | 0.00 |
| Bill | 02/18/2015 31281 | Long Island Office Equipment (PCA) | 03/10/2015 | 203.67 | 0.00 |
| Bill | 01/28/2015 31271 | Long Island Office Equipment (PCA) | 02/17/2015 | 323.50 | 0.00 |
| Bill | 02/16/2015 13048914 | Marlin Business Bank (PCA) | 02/16/2015 | 320.45 | 0.00 |
| Bill | 01/19/2015 12980988 | Marlin Business Bank (PCA) | 01/19/2015 | 408.95 | 0.00 |
| Bill | 01/30/2015 8908947 | Medical Arts Press (PCA) | 02/09/2015 | 185.71 | 0.00 |
| Bill | 01/20/2015 8872653 | Medical Arts Press (PCA) | 02/19/2015 | 195.48 | 0.00 |
| Bill | 02/28/2015 5095 | Michael A. Markowitz P.C. | 03/02/2015 | 5,472.64 | 0.00 |
| Bill | 02/28/2015 5117 | Michael A. Markowitz P.C. | 03/31/2015 | 17.42 | 0.00 |
| Bill | 02/28/2015 5118 | Michael A. Markowitz P.C. | 03/31/2015 | 33.98 | 0.00 |
| Bill | 02/17/2015 NYAR77945 | Neopost | 03/19/2015 | 42.36 | 0.00 |
| Bill | 02/20/2015 02202015 | Optimum Business #07801-498474 | 03/07/2015 | 288.25 | 0.00 |
| Bill | 01/31/2015 18103116 | Optimum Lightpath #46874 | 03/03/2015 | 3,022.16 | 0.00 |
| Bill | 02/28/2015 18225117 | Optimum Lightpath #46874 | 03/31/2015 | 3,030.23 | 0.00 |
| Bill | 02/28/2015 1001121 | Panacea | 03/13/2015 | 900.00 | 0.00 |
| Bill | 01/30/2015 01302015 | PC Advantage Inc. | 01/30/2015 | 742.90 | 0.00 |
| Bill | 02/20/2015 02202015 | PC Advantage Inc. | 02/20/2015 | 1,315.69 | 0.00 |
| Bill | 01/31/2015 02112015 | Pitney Bowes (PCA) | 03/10/2015 | 1,941.59 | 0.00 |
| Bill | 02/28/2015 03112015 | Pitney Bowes (PCA) | 03/21/2015 | 1,254.48 | 0.00 |
| Bill | 12/31/2014 01112015 | Pitney Bowes (PCA) | 02/08/2015 | 1,594.71 | 0.00 |
| Bill | 02/26/2015 022615 | PSEG (PCA) | 03/08/2015 | 356.13 | 0.00 |
| Bill | 02/26/2015 02262015 | PSEG (PCA) | 03/08/2015 | 355.51 | 0.00 |
| Bill | 01/23/2015 01232015 | PSEG (PCA) | 02/02/2015 | 342.69 | 0.00 |
| Bill | 01/23/2015 012315 | PSEG (PCA) | 02/15/2015 | 343.31 | 0.00 |
| Bill | 02/20/2015 172 | Ramatech | 02/20/2015 | 6,000.00 | 0.00 |
| Bill | 02/18/2015 MM11899 | Ringhoff's Fuel Oil Co, Inc (PCA) | 03/20/2015 | 410.99 | 0.00 |
| Bill | 02/18/2015 MM11898 | Ringhoff's Fuel Oil Co, Inc (PCA) | 03/20/2015 | 618.48 | 0.00 |
| Bill | 02/25/2015 18633 | Ringhoff's Fuel Oil Co, Inc (PCA) | 03/26/2015 | 238.92 | 0.00 |
| Bill | 02/25/2015 18632 | Ringhoff's Fuel Oil Co, Inc (PCA) | 03/27/2015 | 238.92 | 0.00 |
| Bill | 01/31/2015 MM11121 | Ringhoff's Fuel Oil Co, Inc (PCA) | 02/10/2015 | 295.65 | 0.00 |
| Bill | 01/31/2015 MM11122 | Ringhoff's Fuel Oil Co, Inc (PCA) | 02/10/2015 | 454.06 | 0.00 |
| Bill | 12/31/2014 3194 | Sean R. Callagy, Esq. LLC | 01/10/2015 | 4,400.00 | 0.00 |
| Bill | 01/31/2015 201202-4906 | Sequel Systems | 02/28/2015 | 1,480.80 | 0.00 |
| Bill | 02/28/2015 201202-5188 | Sequel Systems | 04/28/2015 | 1,378.20 | 0.00 |
| Bill | 02/01/2015 201202-4771 | Sequel Systems | 01/30/2015 | 2,468.50 | 0.00 |
| Bill | 12/31/2014 201202-4772 | Sequel Systems | 01/15/2015 | 1,565.40 | 0.00 |

| Bill | 12/12/2014 201202-4632 | Sequel Systems | 12/22/2014 | 1,499.25 | 0.00 |
| Bill | 02/21/2015 02212015 | Slomins (PCA) | 03/03/2015 | 104.12 | 0.00 |
| Bill | 01/05/2015 139940 | Spectrum Designs | 01/20/2015 | 491.70 | 0.00 |
| Bill | 02/28/2015 28 | SRM ADVISORS INC | 03/13/2015 | 6,400.00 | 0.00 |
| Bill | 01/26/2015 25 | SRM ADVISORS INC | 02/05/2015 | 6,400.00 | 0.00 |
| Bill | 01/31/2015 3256123575 | Staples | 03/02/2015 | 488.65 | 0.00 |
| Bill | 01/31/2015 3256123573 | Staples | 03/02/2015 | 8.20 | 0.00 |
| Bill | 01/31/2015 3256123574 | Staples | 03/02/2015 | 61.91 | 0.00 |
| Bill | 01/31/2015 3256123570 | Staples | 03/02/2015 | 29.30 | 0.00 |
| Bill | 02/07/2015 3256813424 | Staples | 03/09/2015 | 1,722.04 | 0.00 |
| Bill | 02/07/2015 3256813423 | Staples | 03/09/2015 | 28.64 | 0.00 |
| Bill | 02/07/2015 3256813422 | Staples | 03/09/2015 | 63.76 | 0.00 |
| Bill | 02/07/2015 3256813421 | Staples | 03/09/2015 | 197.93 | 0.00 |
| Bill | 02/21/2015 3257903654 | Staples | 03/23/2015 | 266.55 | 0.00 |
| Bill | 02/28/2015 8033456030 | Staples | 03/30/2015 | 621.36 | 0.00 |
| Bill | 02/28/2015 8033800600 | Staples | 04/27/2015 | 902.64 | 0.00 |
| Bill | 02/06/2015 02062015 | Suffolk County Water Authority (PCA) | 02/16/2015 | 32.74 | 0.00 |
| Bill | 02/28/2015 452213 | TGI OFFICE AUTOMATION | 04/10/2015 | 523.63 | 0.00 |
| Bill | 02/24/2015 35676 | Trans-Continental Credit & Collection | 03/06/2015 | 216.40 | 0.00 |
| Bill | 02/10/2015 19284 | Trans-Continental Credit & Collection | 03/12/2015 | 25.00 | 0.00 |
| Bill | 02/24/2015 35604 | Trans-Continental Credit & Collection | 03/26/2015 | 72.75 | 0.00 |
| Bill | 02/24/2015 35590 | Trans-Continental Credit & Collection | 03/26/2015 | 166.06 | 0.00 |
| Bill | 12/30/2014 30759 | Trans-Continental Credit & Collection | 01/29/2015 | 577.50 | 0.00 |
| Bill | 01/28/2015 77072 | Trans-Continental Credit & Collection | 02/07/2015 | 50.00 | 0.00 |
| Bill | 01/28/2015 77056 | Trans-Continental Credit & Collection | 02/07/2015 | 776.50 | 0.00 |
| Bill | 02/10/2015 19280 | Trans-Continental Credit & Collection | 02/20/2015 | 82.69 | 0.00 |
| Bill | 01/28/2015 77054 | Trans-Continental Credit & Collection | 02/27/2015 | 6.25 | 0.00 |
| Bill | 01/28/2015 77057 | Trans-Continental Credit & Collection | 02/27/2015 | 25.00 | 0.00 |
| Bill | 02/22/2015 2222015 | Verizon (PCA) | 03/19/2015 | 78.58 | 0.00 |
| Bill | 01/22/2015 1222015 | Verizon (PCA) | 01/22/2015 | 82.19 | 0.00 |
| | | **TOTAL** | | 257,988.46 | 16,475.00 |

| | 2014 revenues | 2015 Revenues - Jan-Jul | 20% Adjustment to 2014 revenues | Purchase price adjustment |
|---|---|---|---|---|
| Canal Radiology | - | - | | |
| Centre Commons MRI & CT | - | - | | |
| Community Radiology of Virginia | - | - | | |
| Omaha Imaging | - | - | | |
| Open MRI of Daytona | - | - | | |
| Paramount Imaging Corporate | - | - | | |
| Park South Imaging Center | - | - | | |
| Presgar Imaging of Rockledge | - | - | | |
| Price Hoffman Stone & Associates;PHS | - | - | | |
| Price Hoffman Stone & Associates;PHS - Bayfront | - | - | | |
| Price Hoffman Stone & Associates;PHS - Baywalk | - | - | | |
| Price Hoffman Stone & Associates;PHS - Pinelas | - | - | | |
| Suncoast Imaging of Port Orange | - | - | | |
| University Open MRI of Augusta | - | - | | |
| USDL Pittsburgh Inc. | - | - | | |
| Central Nebraska Imaging | 22,230 | 19,747 | | |
| Clovis Open MRI | 31,517 | 32,370 | | |
| Dr. Joseph Peters | 9,163 | 7,010 | | |
| Impression Imaging | 56,678 | 88,331 | | |
| Khurana Radiology MD PA | 12,371 | 36,763 | | |
| Northeast Nebraska Imaging | 22,001 | 22,108 | | |
| Open MRI of Pueblo | 67,133 | 79,719 | | |
| Physicians Imaging Center of Florida | 171,208 | 127,506 | | |
| Precision Imaging of New York | 138,328 | 197,549 | | |
| Rosetta Radiology | 175,829 | 213,192 | | |
| White River Imaging | 39,509 | 31,373 | | |
| Accurate Medical Diagnostic Services | 80,437 | 105,625 | | |
| Advanced Medical Imaging | 6,400 | | 1,280 | 6,912.0 |
| Altec | 5,250 | | 1,050 | 5,670.0 |
| American Radiology Services | 941 | | 188 | 1,016.5 |
| Atlantic Health Solutions | 3,200 | | 640 | 3,456.0 |
| Pueblo Pediatrics/Parvin | 4,777 | | 955 | 5,159.7 |
| Diagnostic Imaging Associated, P.A | 6,206 | | 1,241 | 6,702.8 |
| Toledo Medical - MedPro Medical | 5,145 | | 1,029 | 5,557.0 |
| Kettering Medical Center | 33,000 | | 6,600 | 35,640.0 |
| Children's Clinic of Pueblo | 54,527 | | 10,905 | 58,889.5 |
| Professional Radiology Associates | 59,241 | | 11,848 | 63,980.1 |
| Professional Imaging Consultants | 4,600 | | 920 | 4,967.7 |
| Suncoast Vein and Vascular | 42,463 | | 8,491 | 45,848.9 |
| Price Hoffman Stone & Associates | 103,112 | | 20,622 | 111,360.5 |
| InMed Diagnostic Services | 507,475 | | 101,495 | 548,072.5 |
| BAB Radiology | 446,669 | | 89,734 | 484,563.0 |
| Paramount Imaging Group | 279,809 | | 55,962 | 302,193.4 |
| **Total** | **2,391,209** | **1,065,148** | | **1,689,989** |

AHMS-Revenue Adjustment

# EXHIBIT 3

Case 2:24-cv-03330-GRB   Document 4-7   Filed 06/03/24   Page 24 of 106 PageID #: 847

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

Index No.:
File No.: 22249

-------------------------------------------------------------------X

CRITERIONS, LLC,

Plaintiff,

**SUMMONS**

-against-

Place of Venue is the
Plaintiff's
Place of Business:

VISIENT CORP. D/B/A PORTECK CORPORATION,
PHYSICIANS PRACTICE PLUS LLC D/B/A
PORTECK CORPORATION, ARVIND WALIA
D/B/A PORTECK CORPORATION,
CONSTELLATION HEALTHCARE
TECHNOLOGIES, INC.,

18 Genevieve Place
Great Neck, NY 11021

Defendants.

-------------------------------------------------------------------X

To the above named Defendants:

YOU ARE HEREBY SUMMONED to appear in the SUPREME COURT OF THE
STATE OF NEW YORK, COUNTY OF NASSAU at the office of the Clerk of said
Court at 100 Supreme Court Drive, Mineola, New York , in the COUNTY OF NASSAU,
within the time provided by law as noted below and to file answer to the below complaint
with the clerk: upon failure to answer, judgment will be taken against you by default in
the sum of $61,490.00 plus interest from February 1, 2015, together with the costs and
disbursements of this action.

Dated: March 9, 2016
        Port Chester, New York

Kavulich & Associates, P.C.
By: Matthew Kasper, Esq.
181 Westchester Ave., Suite 500-C
Port Chester, NY 10573
(914) 355-2074

Defendants' Addresses:
VISIENT CORP.
c/o Arvind Walia
3 Farmwood Lane
Upper Brookville, NY 11545

PHYSICIANS PRACTICE PLUS LLC
300 Jericho Quadrangle, Suite 320
Jericho, NY 11753

Arvind Walia
27 Kettlepond Road
Jericho, NY 11753

Constellation Healthcare Technologies, Inc.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Note:  The law provides that: (a) If the summons is served by its delivery to you
personally within the City of New York, you must appear and answer within TWENTY
days after such service; or (b) If the summons is served by any means other than personal
delivery to you within the City of New York, you must appear and answer within
THIRTY days after proof of service thereof is filed with the Clerk of this Court.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

Index No.:
File No.: 22249

-------------------------------------------------------------X

CRITERIONS, LLC,

                                        Plaintiff,          **VERIFIED COMPLAINT**

                    -against-

VISIENT CORP. D/B/A PORTECK CORPORATION,
PHYSICIANS PRACTICE PLUS LLC D/B/A
PORTECK CORPORATION, ARVIND WALIA
D/B/A PORTECK CORPORATION,
CONSTELLATION HEALTHCARE
TECHNOLOGIES, INC.

                                        Defendants.

-------------------------------------------------------------X

        Plaintiff, CRITERIONS, LLC, by its attorneys, Kavulich & Associates, P.C., as

and for its Complaint alleges:

### THE PARTIES

    1.  Plaintiff, CRITERIONS, LLC (hereinafter "Plaintiff"), is a domestic limited

liability corporation.

    2.  Defendants, VISIENT CORP. D/B/A PORTECK CORPORATION (hereinafter

collectively "Defendants"), is upon information and belief, a domestic business

corporation.

    3.  Defendants, PHYSICIANS PRACTICE PLUS LLC D/B/A PORTECK

CORPORATION (hereinafter collectively "Defendants"), is upon information and belief,

a domestic business limited liability corporation.

    4.  Defendants, CONSTELLATION HEALTHCARE TECHNOLOGIES, INC.

(hereinafter collectively "Defendants"), is upon information and belief, a Delaware

corporation.

5.   Defendants, ARVIND WALIA D/B/A PORTECK CORPORATION (hereinafter collectively "Defendants"), is upon information and belief, an individual residing in the State or New York.

## BACKGROUND

6.   On or about August, 20, 2001, Complex Corporation and Presgar Imaging, LC &/or BAB Radiology executed a software license & Support Agreement.

7.   Thereafter, the agreement was assigned to Defendants with Plaintiff Criterions, LLC. as a party thereto.

8.   Said products and services were offered by Plaintiff and accepted by Defendants pursuant to the aforementioned agreement at an agreed value of $61,490.00.

9.   Contemporaneous with said tender, Plaintiff provided corresponding invoices to Defendants concerning the same, the terms of which were accepted by Defendants without any protest or objection thereto.

10. Defendants has represented to Plaintiff that no payments will be forthcoming.

11. Accordingly, there exists an unpaid balance of $61,490.00 which is currently due and owing from Defendants to Plaintiff.

12. To date, and despite Plaintiff's demand, said unpaid balance has not been satisfied by any source.

13. On or about March 17, 2015, Defendants PHYSICIANS PRACTICE PLUS LLC D/B/A PORTECK CORPORATION was acquired by CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. together with all debts, assets, and liabilities.

### AS AND FOR THE FIRST CAUSE OF ACTION
(Breach of Contract)

14. Plaintiff repeats the foregoing allegations as if fully set forth herein.

15. By failing to satisfy said unpaid balance of $61,490.00, Defendants have breached the terms of its agreement with Plaintiff as represented by the invoices, correspondence, and other documents associated with the underlying transactions.

16. Defendants' breach of said agreement caused harm to Plaintiff.

17. Consequently, Plaintiff demands judgment in the sum of $61,490.00 plus interest at the statutory rate of 9% per annum from February 1, 2015.

## AS AND FOR THE SECOND CAUSE OF ACTION
(Goods Sold and Delivered)

18. Plaintiff repeats the foregoing allegations as if fully set forth herein.

19. Pursuant to CPLR § 3016(f), Defendants owe Plaintiff for goods sold and delivered represented by invoices issued to Defendants in the total amount of $61,490.00.

20. Consequently, Plaintiff demands judgment in the sum of $61,490.00 plus interest at the statutory rate of 9% per annum from February 1, 2015.

## AS AND FOR THE THIRD CAUSE OF ACTION
(Account Stated)

21. Plaintiff repeats the foregoing allegations as if fully set forth herein.

22. Plaintiff provided Defendants with a true and complete account in the amount of $61,490.00 to which Defendants have made no objection.

23. Consequently, Plaintiff demands judgment in the sum of $61,490.00 plus interest at the statutory rate of 9% per annum from February 1, 2015.

## AS AND FOR THE FOURTH CAUSE OF ACTION
(Unjust Enrichment)

24. Plaintiff repeats the foregoing allegations as if fully set forth herein.

25. Defendants accepted the goods delivered to it by Plaintiff, and upon information and belief, resold the same to its customers for which it received or expects to receive payment.

26. As a result, Defendants derived a substantial benefit from the goods delivered to it by Plaintiff for which Plaintiff has not been paid.

27. Therefore, Defendants have been unjustly enriched in the amount of not less than $61,490.00 at the expense of Plaintiff.

28. Consequently, Plaintiff demands judgment in the sum of $61,490.00 plus interest at the statutory rate of 9% per annum from February 1, 2015.

**AS AND FOR THE FIFTH CAUSE OF ACTION**
(Quantum Meruit)

29. Plaintiff repeats the foregoing allegations as if fully set forth herein.

30. Plaintiff delivered said goods to Defendants in good faith and with the expectation of being paid by Defendants.

31. The fair and reasonable value of said goods received by Defendants from Plaintiff but not paid for by Defendants is at least $61,490.00.

32. Consequently, Plaintiff demands judgment in the sum of $61,490.00 plus interest at the statutory rate of 9% per annum from February 1, 2015.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

    a.  A money judgment upon the First, Second, Third, Fourth, and Fifth Causes of Action for the sum of $61,490.00 plus interest at the statutory rate of 9% per annum from February 1, 2015;

    b.  Together with costs and disbursements of this action; and

     c.   For such other and further relief as the Court deems just and proper.

Dated: March 9, 2016
     Port Chester, New York

Kavulich & Associates, P.C.
By: Matthew Kasper, Esq.
181 Westchester Ave., Suite 500-C
Port Chester, NY 10573
(914) 355-2074

## VERIFICATION

State of New York )
) ss
COUNTY OF NASSAU )

Rajeev Mathur, being duly sworn deposes and says:

I am the Vice President of the Plaintiff CRITERIONS, LLC I have read this Complaint and know the contents thereof to be true to my own knowledge except as to those matters stated on information and belief, and as to those matters I believe them to be true.

Sworn to before me this
8TH day of _March_, 2016

Notary Public

_____
Rajeev Mathur

LISA SCHOEN
Notary Public, State of New York
No. 01SC5025467
Qualified in Nassau County
Commission Expires May 09 20_18_

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU                                            Index No.:
-----------------------------------------------------------------X      File No.: 22249
CRITERIONS, LLC,
                              Plaintiff,

                    -against-

VISIENT CORP. D/B/A PORTECK CORPORATION,
PHYSICIANS PRACTICE PLUS LLC D/B/A
PORTECK CORPORATION, ARVIND WALIA
D/B/A PORTECK CORPORATION,
CONSTELLATION HEALTHCARE
TECHNOLOGIES, INC.
                              Defendants.
-----------------------------------------------------------------X
### NOTICE OF COMMENCEMENT OF ACTION
### SUBJECT TO MANDATORY ELECTRONIC FILING

     PLEASE TAKE NOTICE that the matter captioned above, which has been
commenced by filing of the accompanying documents with the County Clerk, is subject to
mandatory electronic filing pursuant to Section 202.5-bb of the Uniform Rules for the Trial
Courts.  This notice is being served as required by Subdivision (b) (3) of the Section.

     For information about electronic filing, including access to Section 202.5-bb, consult
the website of the New York State Courts Electronic Filing System ("NYSCEF") at
www.nycourts.gov/efile or contact the NYSCEF Resource Center at 646-386-3033 or
efile@ecourts.state.ny.us.
Dated: March 9, 2016
     Port Chester, New York

Kavulich & Associates, P.C.
By: Matthew D. Kasper, Esq.
181 Westchester Ave., Suite 500-C
Port Chester, NY 10573
(914) 355-2074

Defendants' Addresses:
VISIENT CORP.                                PHYSICIANS PRACTICE PLUS LLC
c/o Arvind Walia                             300 Jericho Quadrangle, Suite 320
3 Farmwood Lane                              Jericho, NY 11753
Upper Brookville, NY 11545

                                             Constellation Healthcare Technologies, Inc.
Arvind Walia                                 c/o The Corporation Trust Company
27 Kettlepond Road                           Corporation Trust Center
Jericho, NY 11753                            1209 Orange Street
                                             Wilmington, DE 19801

FILED: NASSAU COUNTY CLERK 11/30/2017 09:00 AM
INDEX NO. 601569/2016
NYSCEF DOC. NO. 57
RECEIVED NYSCEF: 12/01/2017



Maureen O'Connell
County Clerk
Mineola, NY 11501

---

**Ref ID#: EC 16 601569**          **Instrument Number: 2017- 00256647**
                                                As

**JE1 - ELECT JUDG SUPREME COURT MONEY**

Recorded On:  **November 30, 2017**
Parties:  Criterions LLC
                                                                    **Num Of Pages: 4**
    TO  VISIENT CORP
Recorded By:  KASPER                                **Comment:**

---

**** Examined and Charged as Follows: ****

JE1 - ELECT JUDG SUPREME CC          0.00

    Recording Charge:        0.00

---

**** THIS PAGE IS PART OF THE INSTRUMENT ****

I hereby certify that the within and foregoing was recorded in the Clerk's Office For:  Nassau County, NY

**File Information:**                    **Record and Return To:**
    Document Number:  2017- 00256647
    Receipt Number:  887490
    Recorded Date/Time:  November 30, 2017 01:46:23P
    Book-Vol/Pg:  Bk-K  Vl-165  Pg-291
    Cashier / Station:  0 KN  /  NCCL-2GXNV42

---



*Maureen O'Connell*

**County Clerk Maureen O'Connell**

649

At a IAS __4__ of The Supreme Court
of the State of New York, held in and
for the County of Nassau, at the
Supreme Courthouse at 100 Supreme
Court, Mineola, New York, on the
__28__ day of __Nov__, 2017

Present: **HON. ANTHONY L. PARGA**

---------------------------------------------------------------X

CRITERIONS LLC,                                    Index No.: 601569/16 [E F i L E D]

Plaintiff,

                                                   **JUDGMENT**

- against -

VISIENT CORP. D/B/A PORTECK
CORPORATION, PHYSICIANS PRACTICE
PLUS LLC D/B/A PORTECK CORPORATION,
ARVIND WALIA D/B/A PORTECK
CORPORATION, CONTELLATION
HEALTHCARE TECHNOLOGIES, INC.,                     Motion Date: 8/30/17
                                                   Sequence No. 003

Defendants.

---------------------------------------------------------------X

Plaintiff, CRITERIONS LLC by its attorneys Kavulich & Associates, P.C.,

having moved this Court for an order pursuant to 22 NYCRR §202.27(a) seeking a

default judgment in favor Plaintiff CRITERIONS LLC, and against the Defendants

VISIENT CORP. D/B/A PORTECK CORPORATION, PHYSICIANS PRACTICE

PLUS LLC D/B/A PORTECK CORPORATION, ARVIND WALIA D/B/A PORTECK

CORPORATION, CONTELLATION HEALTHCARE TECHNOLOGIES, INC., and

upon the Notice of Motion for default judgment dated August 9, 2017 and the supporting

Affirmation of Matthew Kasper, Esq. sworn AFFIRMED on August 9, 2017, together with the

affidavit of Raj Mathur, Plaintiff's vice president annexed thereto, and upon reading and

filing the aforesaid papers, and due deliberation having had thereon, and upon the

decision of Hon. Anthony L. Parga a Justice of this Court dated October 18, 2017

granting Plaintiff's motion in its entirety, a copy of which is annexed hereto;

NOW, upon motion of Matthew Kasper, Esq. attorneys for Plaintiff, it is

650

**ORDERED**, that the Plaintiff's motion for default judgment is hereby granted, and is further;

**ADJUDGED**, that Plaintiff CRITERIONS LLC located at 18 Genevieve Place, Grate Neck, NY 11021 be awarded judgment against Defendants VISIENT CORP. D/B/A PORTECK CORPORATION located at 3 Farmwood Lane, Upper Brookville, NY 11545, PHYSICIANS PRACTICE D/B/A PORTECK CORPORATION PLUS LLC located at 300 Jericho Quadrangle, Suite 320, Jericho, NY 11753, ARVIND D/B/A PORTECK CORPORATION WALIA residing at 27 Kettlepond Road, Jericho, NY 11753, CONTELLATION HEALTHCARE TECHNOLOGIES, INC. located at 3200 Wilcrest Drive, Suite 600, Houston, TX 77042, the sum of $61,490.00 together with statutory interest from February 1, 2015 in the amount of $ 15,662.26   together with costs and disbursements in the amount of $615.00   for a total of $77,767.26  ;

**ORDERED** that the Plaintiff shall have executive thereof.

ENTER:

HON. ANTHONY L. PARGA, JSC    RG AS TO FORM

**ENTERED**

NOV 3 0 2017

NASSAU COUNTY
COUNTY CLERK'S OFFICE

3 of 4

651

FILED: NASSAU COUNTY CLERK 11/30/2017 09:00 AM    INDEX NO. 601569/2016
NYSCEF DOC. NO. 57    Document 4-7    Filed 06/03/24    Page 35 of 106 PageID #: 858    RECEIVED NYSCEF: 12/01/2017

Case 2:24-cv-03330-GRB

INDEX NO. 601569/2016
NYSCEF DOC. NO. 55    RECEIVED NYSCEF: 11/14/2017

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

INDEX NO. 601569/2016E
FILE NO. 22249

--------------------------------------------------------X

CRITERIONS, LLC,

BILL OF COSTS

PLAINTIFF(S)

-AGAINST-

VISIENT CORP. D/B/A PORTECK CORPORATION,
PHYSIIANS PRACTICE PLUS LLC D/B/A
PORTECK CORPORATION,
ARVIND WALIA D/B/A PORTECK CORPORATION,
CONSTELLATION HEALTHCARE TECHNOLOGIES, INC.,

DEFENDANT(S)

--------------------------------------------------------X

COSTS for:

*ADJUSTED AT $ 615.00*
*THIS 30 DAY OF November 2017*
*(signature) CLERK, NASSAU CO.*

| | |
|---|---|
| Proceedings before Note of Issue is filed – CPLR § 8201(1).................... | $200.00 |
| Motion – CPLR § 8202 .................................................... | ~~$75.00~~ |
| | **SUBTOTAL** ~~$275.00~~ $200.00 |

FEES and DISBURSMENTS for:

| | |
|---|---|
| Index number of county clerks – CPLR § 8018 ........................... | $210.00 |
| Request for Judicial Intervention ....................................... | $ 95.00 |
| Note of Issue .......................................................... | $  0.00 |
| Serving summons and complaint – CPLR § 8011(h) ........................ | $ 25.00 |
| Prospective Marshal's Fee .............................................. | $ 40.00 |
| Motion | $ 45.00 |
| | **SUBTOTAL** ~~$370.00~~ $415.00 |
| | **TOTAL** $615.00 |

Attorney's Affirmation

STATE OF NEW YORK    )
                      )    ss.:
COUNTY OF WESTCHESTER )

The undersigned, Matthew D. Kasper. Esq., an attorney duly admitted to practice law in the courts of the State of New York, hereby affirms the following under penalty of perjury:

I am a member of the law firm of Kavulich & Associates, P.C., attorneys for the Plaintiff, herein. As such, I am fully familiar with the facts and circumstances of the above captioned action; that the foregoing costs are correct and were necessarily incurred in this action and are reasonable in amount; and that the services for which fees have been charged were actually and necessarily performed and are reasonable in amount.

Dated:    November 14, 2017
          Westchester, New York

*MK*

By: Matthew D. Kasper, Esq.
*Kavulich & Associates, P.C.*
181 Westchester Ave., Suite 500C
Port Chester, NY 10573
Attorney for Plaintiff

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------

| | |
|---|---|
| In re: | Chapter 11 |
| ORION HEALTHCORP, INC.[1], | Case No. 18-71748 (AST) |
| Debtors. | (Jointly Administered) |

------------------------------------------

| | |
|---|---|
| HOWARD M. EHRENBERG IN HIS CAPACITY AS LIQUIDATING TRUSTEE OF ORION HEALTHCORP, INC., ET AL., | Adv. Pro. No. 20-08049 (AST) |
| | [Filed Concurrently with Plaintiff's Response to Defendants' Separate Statement of Facts and Plaintiff's Additional Facts] |
| Plaintiff, | |
| v. | |
| ARVIND WALIA; NIKNIM MANAGEMENT, INC., | |
| Defendants. | |

------------------------------------------

## OPPOSITION TO MOTION OF DEFENDANTS ARVIND WALIA AND NIKNIM MANAGEMENT INC. FOR PARTIAL SUMMARY JUDGMENT DISMISSING CLAIMS ASSERTED IN THE COMPLAINT UNDER 11 U.S.C. §544

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Orion Healthcorp, Inc. (7246); Constellation Healthcare Technologies, Inc. (0135); NEMS Acquisition, LLC (7378); Northeast Medical Solutions, LLC (2703); NEMS West Virginia, LLC (unknown); Physicians Practice Plus Holdings, LLC (6100); Physicians Practice Plus, LLC (4122); Medical Billing Services, Inc. (2971); Rand Medical Billing, Inc. (7887); RMI Physician Services Corporation (7239); Western Skies Practice Management, Inc. (1904); Integrated Physician Solutions, Inc. (0543); NYNM Acquisition, LLC (unknown) Northstar FHA, LLC (unknown); Northstar First Health, LLC (unknown); Vachette Business Services, Ltd. (4672); Phoenix Health, LLC (0856); MDRX Medical Billing, LLC (5410); VEGA Medical Professionals, LLC (1055); Allegiance Consulting Associates, LLC (7291); Allegiance Billing & Consulting, LLC (7141); New York Network Management, LLC (7168). The corporate headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 303, Middletown, NJ 07748.

# TABLE OF CONTENTS

**Page**

I.   SUMMARY OF ARGUMENT ON OPPOSITION ................................................................. 1

    A.   THE COMPLAINT STATES FACTS MEMORIALIZING THE TRUSTEE'S POSITION FOR THE BENEFIT OF NUMEROUS UNSECURED CLAIMANTS AND THE EVIDENCE CONFIRMS THE EXISTENCE OF NUMEROUS LEGITIMATE UNSECURED CREDITORS ......................................................................................................... 2

II.  CONCLUSION ............................................................................................................................ 7

654

## TABLE OF AUTHORITIES

**Page**

### Cases

*45 John Lofts, LLC v. Meridian Capital Grp., LLC* (*In re 45 John Lofts, LLC*)
    599 B.R. 730 (Bankr. S.D.N.Y. 2019)...................................................................4

*9281 Shore Rd. Owners Corp. v. Seminole Realty Corp. (In re 9281 Shore Rd. Owners Corp.)*
    187 B.R. 837 (Bankr. E.D.N.Y. 1995)..................................................................3

*Babitt v. Schwartz (In re Lollipop, Inc.)*
    205 B.R. 682 (Bankr. E.D.N.Y., 1997)................................................................3

*Geron v. Schulman* (*In re Manshul Constr. Corp.*)
    2000 U.S. Dist. LEXIS 12576, 2000 WL 1228866, at *44 (S.D.N.Y. Aug. 30, 2000)...........5

*Global Crossing Estate Rep. v. Winnick*
    2006 U.S. Dist. LEXIS 53785, 2006 WL 2212776, at *11 (S.D.N.Y. Aug. 3, 2006).............4

*In re Leonard*
    125 F.3d 543 (7th Cir. 1997) ..............................................................................3

*In re RCM Global Long Term Cap. Appreciation Fund, Ltd.*
    200 B.R. 514 (Bankr. S.D.N.Y. 1996)..................................................................5

*Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide)*
    139 F. 3d 574 (7th Cir. 1998) ...............................................................................4

*Mendelsohn v. Kovalchuk* (*In re* APCO *Merch. Servs.*),
    585 B.R. 306 (Bankr. E.D.N.Y. 2018)...............................................................4, 5

*Musicland Holding Corp. v. Best Buy Co.* (*In re Musicland Holding Corp.*)
    398 B.R. 761 (Bankr. S.D.N.Y. 2008)..................................................................4

*Picard v. Avellino* (*In re Bernard L. Madoff Inv. Sec. LLC*),
    557 B.R. 89 (Bankr. S.D.N.Y. 2016)....................................................................4

*Picard v. Estate of Chais* (*In re Bernard L. Madoff Inv. Sec. LLC*)
    445 B.R. 206 (Bankr. S.D.N.Y. 2011)..................................................................4

*Picard v. Madoff* (*In re Bernard L. Madoff Inv. Sec. LLC*)
    458 B.R. 87 (Bankr. S.D.N.Y. 2011)....................................................................4

*Smith v. George* (*In re RCK Modular Homes Sys.*)
    402 B.R. 463 (Bankr. D. N.H. 2008) ...................................................................5

*Young v. Paramount Communications. Inc. (In re Wingspread Corp.)*
    178 B.R. 938 (Bankr. S.D.N.Y.).........................................................................3

**Statutes**

11 U.S.C. §544 ................................................................................................................ 1, 3, 4

**Other Authorities**

N.Y. Debt & Cred. Law §273 ............................................................................................... 3

N.Y. Debt. & Cred. Law §276 ............................................................................................. 3

COMES NOW, Plaintiff, Howard M. Ehrenberg in his capacity as Liquidating Trustee of Orion Healthcorp, Inc., *et al.* (the "<u>Plaintiff</u>" or the "<u>Liquidating Trustee</u>"), for the estates of the above-captioned Debtors in opposition (the "<u>Opposition</u>") to *Motion of Defendants Arvind Walia and Niknim Management Inc.* (the "<u>Defendants</u>") (collectively Plaintiff and Defendants are the "<u>Parties</u>") *For Partial Summary Judgment Dismissing Claims Asserted in the Complaint Under 11 U.S.C. §544* (the "<u>Motion</u>") [Dkt. No. 51].[2]

# I.

## <u>SUMMARY OF ARGUMENT ON OPPOSITION</u>

1.      Neither the law, the facts, nor the equity of the circumstances support Defendants' Motion.  Defendants Arvind Walia ("<u>Walia</u>") and his solely controlled company, NIKNIM Management, Inc., with the assistance of Paul Parmar ("<u>Parmar</u>"), absconded with millions of dollars of the Debtor's funds in 2016 and 2017 based off acquisition agreements intentionally designed to misrepresent the facts, acquire shell entities of no value and conceal kick-backs of funds to Parmar and Walia.  In this chapter, Parmar required the cooperation of an accomplice to divert millions of dollars away from creditors, so he installed Walia as an Officer of Orion and CHT in 2015.  Together, the two executives transferred millions of dollars out of the estate.

2.      The Trustee sets forth seventy-six (76) Undisputed Facts wherein Defendants admit Parmar and Walia misstated and concealed the true terms of the acquisitions and payments. (*See* Joint Statement of Undisputed Facts ("<u>JSOF</u>"), Dkt. No. 54). The underlying transactional documents confirm the Debtors received nothing in return for the payments. Similarly, the Debtors' books and records do not support either transfer as a payment of a legitimate corporate debt or record any consideration for the payments.  During the time frame of

---

[2] Defined terms are given the same meaning as utilized in the Plaintiff's Motion for Summary Judgment (Docket No. 53 (hereinafter "Dkt. No. 53")).

2015-2017, numerous unsecured creditors existed who were not paid and were forced to sue the Debtors while the executives diverted $4,020,000 to the Defendants (the "Transfers").  The allegations of Plaintiff are supported by documents and evidence produced during discovery. Defendants admitted these facts during the course of discovery and stipulated to the facts for the purposes of summary judgment.

3.     There is no cognizable defense to shield officers and/or insiders who divert monies of a debtor to one-another for no consideration while ignoring payment obligations to legitimate creditors.  Rather than file a motion to dismiss at the pleading stage, Defendants file a summary judgment motion at the close of discovery asserting a pleading standard to claim no triggering creditor is identified in the complaint.  Remarkably, Defendants do not dispute the existence of valid unsecured creditors, just that no creditor was identified by name in the First Amended Complaint ("FAC").  The Motion misstates the standard on a motion to dismiss.  A complaint is not required to identify a specific creditor but rather reference a fact pattern which establishes the existence of unsecured creditors.  The FAC adequately pleads facts supporting the existence of triggering creditors and identifies unsecured claimants who were recognized as having allowed unsecured claims in the bankruptcy case in excess of $100MM.  Framed as a motion for summary judgment, the Motion is without evidentiary support.  The evidence clearly establishes the existence of numerous unsatisfied judgment creditors, any of which can act as triggering creditors.  The creditors of the estate will benefit from any recovery in the present adversary.  Defendants' Motion is properly denied.

A.     **THE COMPLAINT STATES FACTS MEMORIALIZING THE TRUSTEE'S POSITION FOR THE BENEFIT OF NUMEROUS UNSECURED CLAIMANTS AND THE EVIDENCE CONFIRMS THE EXISTENCE OF NUMEROUS LEGITIMATE UNSECURED CREDITORS**

4.     Despite the fact the Trustee produced documents during discovery evidencing

numerous unsecured claimants who hold valid claims, and in fact held judgments, Defendants file in essence an untimely motion to dismiss. Defendants claim the Trustee's complaint is flawed as he must identify a single specific creditor by name in the FAC. The argument of law in the Motion is incorrect and procedurally flawed on summary judgment. Under Rule 56, on summary judgment, the question centers on "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Plaintiff has produced evidence during the course of discovery of the existence of multiple claimants, the legitimacy of their claims, and in fact Defendants stipulated to the existence of such predicate creditors. (*See* Plaintiff's JSOF, Dkt. No. 54, #23-24, 74-76)

5. Even at the motion to dismiss phase, Defendant's citation to the legal standard is erroneous. The Parties agree that pursuant to 11 U.S.C. §544(b), the Trustee may utilize state fraudulent conveyance law to avoid a transfer if there exists an actual unsecured creditor who could void the transfer under applicable law. *Babitt v. Schwartz (In re Lollipop, Inc.)*, 205 B.R. 682, 687 (Bankr. E.D.N.Y., 1997) citing to *Young v. Paramount Communications. Inc. (In re Wingspread Corp.)*, 178 B.R. 938, 945 (Bankr. S.D.N.Y.), aff'd, 186 Bankr. 803 (S.D.N.Y. 1995). To establish a predicate creditor, "the creditor need not have reduced his claim to a lien or judgment." *9281 Shore Rd. Owners Corp. v. Seminole Realty Corp. (In re 9281 Shore Rd. Owners Corp.),* 187 B.R. 837, 852 (Bankr. E.D.N.Y. 1995); N.Y. Debt. & Cred. Law §§273 and 276 are clearly applicable.

6. The existence of filed unsecured claims is sufficient to allow the Trustee to assume the position of any one of them. *See In re Leonard,* 125 F.3d 543, 544 (7th Cir. 1997).

The Motion cites to *Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide*), 139 F. 3d 574 (7th Cir. 1998) for the proposition the Trustee must name a single creditor in the complaint. (*See* Motion ¶41).  However, in *In re Image Worldwide,* the court held that pursuant to the strong-arm provision of the Bankruptcy Code, 11 U.S.C. §544(b), "*the trustee need not identify the creditor, so long as the unsecured creditor exists*."  *Id.* at 577.  Similarly, in New York, at the motion to dismiss stage, the Trustee need not identify in the complaint a single unsecured claimant, but rather, must only plead facts from which it can be plausibly concluded there is at least one legitimate creditor of the estate. *Mendelsohn v. Kovalchuk (In re* APCO *Merch. Servs.*), 585 B.R. 306, fn. 11 (Bankr. E.D.N.Y. 2018).  Plaintiff pled facts in the FAC wherein it cannot reasonably be disputed as to the existence of allowed unsecured claimants.

       7.     A plaintiff is not required in its complaint to identify a specific unsecured creditor holding an allowed claim. *45 John Lofts, LLC v. Meridian Capital Grp., LLC* (*In re 45 John Lofts, LLC*), 599 B.R. 730, 742 (Bankr. S.D.N.Y. 2019) citing to *Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC*), 557 B.R. 89, 120 (Bankr. S.D.N.Y. 2016) ("The Defendants' second challenge suggests that the Trustee must identify a specific unsecured creditor holding an allowed claim. The Defendants' position [is] contrary to the law of this District.") (citing *Global Crossing Estate Rep. v. Winnic*k, 2006 U.S. Dist. LEXIS 53785, 2006 WL 2212776, at *11 (S.D.N.Y. Aug. 3, 2006); *Picard v. Madoff* (*In re Bernard L. Madoff Inv. Sec. LLC*), 458 B.R. 87, 109 (Bankr. S.D.N.Y. 2011); *Picard v. Estate of Chais* (*In re Bernard L. Madoff Inv. Sec. LLC*), 445 B.R. 206, 234 (Bankr. S.D.N.Y. 2011); *Musicland Holding Corp. v. Best Buy Co*. (*In re Musicland Holding Corp.*), 398 B.R. 761, 780 (Bankr. S.D.N.Y. 2008); *In re RCM Global*

*Long Term Cap. Appreciation Fund, Ltd*., 200 B.R. 514, 523-24 (Bankr. S.D.N.Y. 1996)).
Indeed, there is ample authority to suggest that consideration of the qualifying creditor question
be left until motions for summary judgment, if not later. *Id*. at 743.  *See Geron v. Schulman* (*In
re Manshul Constr. Corp*.), 2000 U.S. Dist. LEXIS 12576, 2000 WL 1228866, at \*44 (S.D.N.Y.
Aug. 30, 2000) (considering the existence of qualifying creditors post-trial); *In re APCO*, 585
B.R. at 315 (same); *Smith v. George* (*In re RCK Modular Homes S*ys.), 402 B.R. 463, 469-70
(Bankr. D. N.H. 2008) (considering the existence of qualifying creditors on a motion for
summary judgment).

8.    The FAC alleges Plaintiff is the Liquidating Trustee under the Liquidation Trust
Agreement created according to the Plan in the bankruptcy case. (FAC, ¶¶1, 5, Dkt No. 22). The
Liquidation Trust was created specifically to make distributions to Allowed Claims and Allowed
Interests (FAC, ¶5, Dkt No. 22) and pursue causes of action for their benefit (Complaint ¶6, Dkt
No. 22).  Section 4.1(e) of the Plan confirmed the existence of General Unsecured Claims which
specifically included allowed secured lender deficiency claims in the amount of $108,287,223.
(*See* RJN, Ex. 1, p. 3).  It is clear that not only general unsecured creditors exist as identified, but
that such claims are allowed.  Monies recovered by the Trustee will inure to their benefit and in
fact a distribution has already been made.  Defendants' claim that the Adversary Action is being
prosecuted apparently to benefit equity holders such as Parmar is curious.

9.    During the course of discovery in August 2021, the Trustee produced documents
to Defendants evidencing various judgment creditors who the Trustee had the right to prosecute
the Adversary Action for their benefit.  The Trustee produced to Defendants the Final Judgment

of unsecured creditors Jack McBride and Alan Nottingham dated December 16, 2015, the Abstract of Judgment and the filed proof of claim in the Debtors' bankruptcy case. (*See* Plaintiff's Additional Statement of Fact ("ASOF"), #24). The Trustee produced Schedule 10, Summary of Legal Actions against the Debtors, which identified thirteen (13) separate lawsuits filed against the Debtors. (*See* Plaintiff's ASOF, #25) As part of the meet and confer process and the filing of the Plaintiff's Motion for Summary Judgment, it was not disputed that the creditor Criterion, LLC's litigation resulted in a valid judgment against various Debtors including CHT. (*See* JSOF, Dkt. No. 54, ##74-76) It was not disputed that the litigation by the creditor Cockerell Dermatopathology was pending and stayed by the Debtors following the filing of the Petition. (*See* JSOF, Dkt. No. 54, ##71, 72) Each of the judgments against the Debtors were unsatisfied as of the Petition Date. (*See* JSOF, Dkt. No.54, ##72, 73, 76). The facts are not in dispute that numerous unsecured claimants exist to act as a triggering creditor for the Adversary Proceeding and that Defendants' Motion is divorced from reality.

10.    Lastly, during the course of discovery the Trustee produced to Defendants the January 30, 2017 Credit Agreement which was executed by all of the Debtors as part of the Go-Private Transaction. (*See* Plaintiff's ASOF, #26). As part of the meet and confer process and the filing of the Plaintiff's Motion For Summary Judgment, it was not disputed by Defendants that the Credit Agreement with BOFA was between BOFA and all the Debtors as secured by all of the Debtors' assets. (JSOF, Dkt. No. 54, ##23, 24) It cannot be reasonably disputed that BOFA is yet another valid creditor.

## II.

## <u>CONCLUSION</u>

11.     The Trustee has identified creditors and produced the documents to support the legitimacy of the claims.  Any monies recovered will inure to the benefit of unsecured creditors as opposed to equity holders such as Parmar & Company. The Motion filed by Defendants is properly denied.

Dated:  February 22, 2023            Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Jeffrey P. Nolan*
Ilan D. Scharf, Esq.
Jeffrey P. Nolan, Esq. (Admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, New York 10017
Telephone:     (212) 561-7700
Facsimile:     (212) 561-7777

Counsel for Plaintiff, Howard M. Ehrenberg in his capacity as the Liquidating Trustee of Orion Healthcorp, Inc., *et al.*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

————————————————————————

|                                                              |     |                           |
| ------------------------------------------------------------ | --- | ------------------------- |
| In re:                                                       | :   | Chapter 11                |
|                                                              | :   |                           |
| ORION HEALTHCORP, INC.[1],                                   | :   | Case No. 18-71748 (AST)   |
|                                                              | :   |                           |
| _____ Debtors.                       | :   | (Jointly Administered)    |
|                                                              | :   |                           |
| HOWARD M. EHRENBERG IN HIS CAPACITY                          | :   |                           |
| AS LIQUIDATING TRUSTEE OF ORION                              | :   | Adv. Pro. No. 20-08049 (AST) |
| HEALTHCORP, INC., ET AL.,                                    | :   |                           |
|                                                              | :   |                           |
|                                          Plaintiff,          | :   |                           |
|                                                              | :   |                           |
| v.                                                           | :   |                           |
|                                                              | :   |                           |
| ARVIND WALIA; NIKNIM MANAGEMENT,                            | :   |                           |
| INC.,                                                        | :   |                           |
|                                                              | :   |                           |
|                                          Defendants.         | :   |                           |
|                                                              | :   |                           |

————————————————————————

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
SEPARATE STATEMENT OF FACTS AND
PLAINTIFF'S ADDITIONAL FACTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR,
IN THE ALTERNATIVE, SUMMARY ADJUDICATION**

Comes now, Plaintiff, Howard M. Ehrenberg in His Capacity as Liquidating Trustee of

Orion Healthcorp, Inc., *et al.*, and issues *Plaintiff's Response To Defendants' Separate Statement*

*of Facts* and *Plaintiff's Additional Facts*:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Orion Healthcorp, Inc. (7246); Constellation Healthcare Technologies, Inc. (0135); NEMS Acquisition, LLC (7378); Northeast Medical Solutions, LLC (2703); NEMS West Virginia, LLC (unknown); Physicians Practice Plus Holdings, LLC (6100); Physicians Practice Plus, LLC (4122); Medical Billing Services, Inc. (2971); Rand Medical Billing, Inc. (7887); RMI Physician Services Corporation (7239); Western Skies Practice Management, Inc. (1904); Integrated Physician Solutions, Inc. (0543); NYNM Acquisition, LLC (unknown) Northstar FHA, LLC (unknown); Northstar First Health, LLC (unknown); Vachette Business Services, Ltd. (4672); Phoenix Health, LLC (0856); MDRX Medical Billing, LLC (5410); VEGA Medical Professionals, LLC (1055); Allegiance Consulting Associates, LLC (7291); Allegiance Billing & Consulting, LLC (7141); New York Network Management, LLC (7168). The corporate headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 303, Middletown, NJ 07748.

## Defendants' Separate Statement of Facts

| | Defendants' Statement of Fact | Plaintiff's Response |
|---|---|---|
| 23 | Plaintiff's First Amended Complaint does not contain an allegation that either transfer at issue is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code. | Disputed; The First Amended Complaint ("FAC") alleges that both Transfers are avoidable pursuant to applicable law. (FAC, ¶13) The FAC identifies the Plaintiff in his capacity as the Liquidating Trustee under the Liquidation Trust Agreement, as created according to the Plan in the bankruptcy case. (FAC, ¶¶1, 5, 6) The Liquidation Trust was created specifically to make distributions to holders of Allowed Claims and Allowed Interests and to pursue causes of action for their benefit. (FAC, ¶7) Section 4.1(e) of the Plan confirmed the existence of General Unsecured Claims which specifically included allowed lender deficiency claims in the amount of $108,287,223. |

## Plaintiff's Additional Separate Statement of Facts in Opposition to Defendants' Motion for Summary Judgment

| | Plaintiff's Additional Statement of Fact | Evidentiary Support |
|---|---|---|
| 24 | During the course of discovery in August 2021, the Trustee produced to Defendants the Final Judgment of unsecured creditors Jack McBride and Alan Nottingham dated December 16, 2015, the Abstract of Judgment, and the filed proof of claim in the Debtors' bankruptcy case. | See, Proof of Claim of John G. McBride attaching the Final Judgment (Ehren-Walia 003171-3178), a true and correct copy is attached to the Affidavit of J. Nolan as Exhibit 8. |
| 25 | During the course of discovery, the Trustee produced Schedule 10, Summary of Legal Actions against the Debtors, which identified thirteen (13) separate lawsuits by creditors filed against the Debtors. | See, Schedule 10 (Ehren-Walia 00907-910), a true and correct copy is attached to the Affidavit of J. Nolan as Exhibit 9. |

DOCS_LA:347041.4 65004/003

| | Plaintiff's Additional Statement of Fact | Evidentiary Support |
|---|---|---|
| 26 | During the course of discovery, the Trustee produced to the Defendants the January 30, 2017 Credit Agreement with Bank of America, an Allowed Unsecured Claimant, in the bankruptcy cases. | See, Credit Agreement with Bank of America (Ehren-Walia 003504-3784), a true and correct copy is attached to the Affidavit of J. Nolan as Exhibit 10. |
| 27. | During the course of discovery, the Trustee produced the Debtors' Third Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code. | See, the Debtors' Third Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code (Ehren-Walia 003404-3463), a true and correct copy is attached to the Affidavit of J. Nolan as Exhibit 11. |

Dated:    February 22, 2023              PACHULSKI STANG ZIEHL & JONES LLP


By:    _/s/ Jeffrey P. Nolan_
       Ilan D. Scharf, Esq.
       Jeffrey P. Nolan, Esq. (admitted *pro hac vice*)
       780 Third Avenue, 34th Floor
       New York, New York 10017
       Telephone:    (212) 561-7700
       Facsimile:    (212) 561-7777

       Counsel for the Plaintiff,  Howard M.
       Ehrenberg in his capacity as Liquidating
       Trustee of Orion Healthcorp, Inc., *et al*.

3

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| ORION HEALTHCORP, INC.,[1] | : Case No. 18-71748 (AST) |
| | : |
| Debtors. | : (Jointly Administered) |

---------------------------------------------

| | |
|---|---|
| HOWARD M. EHRENBERG IN HIS CAPACITY | : |
| AS LIQUIDATING TRUSTEE OF ORION | : Adv. Pro. No. 20-08049 (AST) |
| HEALTHCORP, INC., ET AL., | : |
| | : |
| Plaintiff, | : |
| | : |
| | : |
| v. | : |
| | : |
| ARVIND WALIA; NIKNIM MANAGEMENT, | : |
| INC., | : |
| | : |
| Defendants. | : |
| | : |

---------------------------------------------

## AFFIDAVIT OF JEFFREY P. NOLAN
## IN SUPPORT OF OPPOSITION TO MOTION OF DEFENDANTS
## ARVIND WALIA AND NIKNIM MANAGEMENT, INC. FOR
## PARTIAL SUMMARY JUDGMENT DISMISSING CLAIMS
## ASSERTED IN THE COMPLAINT UNDER 11 U.S.C. §544

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Orion Healthcorp, Inc. (7246); Constellation Healthcare Technologies, Inc. (0135); NEMS Acquisition, LLC (7378); Northeast Medical Solutions, LLC (2703); NEMS West Virginia, LLC (unknown); Physicians Practice Plus Holdings, LLC (6100); Physicians Practice Plus, LLC (4122); Medical Billing Services, Inc. (2971); Rand Medical Billing, Inc. (7887); RMI Physician Services Corporation (7239); Western Skies Practice Management, Inc. (1904); Integrated Physician Solutions, Inc. (0543); NYNM Acquisition, LLC (unknown) Northstar FHA, LLC (unknown); Northstar First Health, LLC (unknown); Vachette Business Services, Ltd. (4672); Phoenix Health, LLC (0856); MDRX Medical Billing, LLC (5410); VEGA Medical Professionals, LLC (1055); Allegiance Consulting Associates, LLC (7291); Allegiance Billing & Consulting, LLC (7141); New York Network Management, LLC (7168). The corporate headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 303, Middletown, NJ 07748.

DOCS_LA:347064.2 65004/003

STATE OF CALIFORNIA      )
                             )   ss.:
COUNTY OF LOS ANGELES  )

JEFFREY P. NOLAN, being duly sworn, deposes and says:

1.     I am an attorney at law duly licensed to practice before all courts in the State of California.  I am an attorney with the law firm of Pachulski Stang Ziehl & Jones LLP, attorneys of record for Plaintiff, Howard M. Ehrenberg in his capacity as Liquidating Trustee of Orion Healthcorp, Inc., *et al.*, for the estates of the above-captioned Debtors, counsel of record in this adversary proceeding.  The facts stated herein are of my own personal knowledge, or made known to me from a review of the files and pleadings in this action which are maintained in the ordinary course of business.  If called upon as a witness to any facts set forth herein, I could and would competently testify thereto.

2.     Attached hereto as **Exhibit 8** is a true and correct copy of Proof of Claim of John G. McBride attaching the Final Judgment which was produced by Plaintiff in the litigation as evidenced by the bate-stamp numbers Ehren-Walia 003171-3178.

3.     Attached hereto as **Exhibit 9** is a true and correct copy of Schedule 10 which was produced by Plaintiff in the litigation as evidenced by the bate-stamp numbers Ehren-Walia 00907-910.

4.     Attached hereto as **Exhibit 10** is a true and correct copy of Credit Agreement with Bank of America which was produced by Plaintiff in the litigation as evidenced by the bate-stamp numbers Ehren-Walia 003504-3784.

5.     Attached hereto as **Exhibit 11** is a true and correct copy of Debtors' Third Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code which was

produced by Plaintiff in the litigation as evidenced by the bate-stamp numbers Ehren-Walia

003404-3463.

    I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

    Executed this 17th day of February, 2023, at Los Angeles, California.

_____
Jeffrey P. Nolan

SWORN TO AND SUBSCRIBED before me this
17th day of February, 2023.

_____
Sophia Louisa Lee, notary public

SOPHIA LOUISA LEE
Notary Public · California
Los Angeles County
Commission # 2337676
My Comm. Expires Dec 16, 2024

Case 8-20-08049-ast    Doc 162-7    Filed 05/03/24    Entered 05/03/24 16:02:27

# EXHIBIT 8



(/cases/CCT)

# Orion HealthCorp, Inc.

## Proof of Claim

Your entry was successfully submitted. Your claim number is:**0000010001**

Please keep this number for your records. A notification email has been sent to the address you provided during registration.

In the event you were unable to upload your supporting documentation electronically, you are permitted to submit it in hard copy form to the following address. **Do not send original documents; they may be destroyed after scanning.**

*\* You must include a copy of the Confirmation of Electronic Filing for your claim with the hard copy of your supporting documentation to ensure it is linked to the correct claim on the Debtor's claims register.*

**If by First-Class Mail:**

Orion HealthCorp, Inc. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
P.O. Box 4419
Beaverton, OR 97076-4419

**If by Hand-Delivery or Overnight Mail:**

Orion HealthCorp, Inc. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
10300 SW Allen Blvd
Beaverton, OR 97005

Thank You.

https://epiqworkflow.com/cases/CCT/10440/922/9221

5/10/2018

EHREN-WALIA 003171

EPIQ - Orion HealthCorp, Inc.

Page 2 of 2

⏻ Logout (/account/logoff)

☁ My Dashboard (/cases/CCT)

workflow (http://www.epiqsystems.com/)

Disclaimer (http://www.epiqsystems.com/disclaimer) | Terms of use (http://www.epiqsystems.com/terms-of-use) | Privacy policy (http://www.epiqsystems.com/privacy-statement)

People. Partnership. Performance.
© 2018 Epiq



# Orion HealthCorp, Inc.
(/cases/CCT)

## Proof of Claim



Previous · 503(b)(9) · Supporting Documentation · Electronic Signature · Previ · Next

**IT IS A VIOLATION OF FEDERAL LAW TO FILE A FRAUDULENT CLAIM. CONVICTION CAN RESULT IN A FINE OF UP TO $500,000 OR IMPRISONMENT OF UP TO FIVE YEARS OR BOTH. 18 U.S.C. §§ 152, 157, and 3571.**

Please select one(*)    ◉ I am the creditor

◌ I am the creditor's attorney or authorized agent

◌ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004

◌ I am a guarantor, surety, endorser, or other co-debtor. Bankruptcy Rule 3005

---

### Contact information for the person completing and signing this claim

| | |
|---|---|
| Name (*) | John G. McBride |
| Address line 1 (*) | c/o David K. Bissinger |
| Address line 2 | Bissinger, Oshman & Williams LLP |
| Address line 3 | 5850 San Felipe, Floor 5 |
| City (*) | Houston |
| | TX |

EHREN-WALIA 003173

| State | |
| ZIP Code (*) | 77057 |
| Country | USA |
| Contact Phone | 713-524-8811 |
| Contact email | dbissinger@bowllp.com |

Filing this claim electronically, FRBP5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

By clicking the Electronic Signature Acceptance box below, I understand that I am electronically signing this proof of claim form and affirming that all the information I have provided therein is true and correct to the best of my knowledge, information and belief. I intend this electronic signature to carry the same force and effect as my physical signature.

Signature(*)

Electronic Signature    ☑
Acceptance(*)

⊕ BACK                                                         NEXT ⊕

workflow   (http://www.epiqsystems.com/)

Disclaimer (http://www.epiqsystems.com/disclaimer) ¦ Terms of use (http://www.epiqsystems.com/terms-of-use) ¦ Privacy policy (http://www.epiqsystems.com/privacy-statement)

People. Partnership. Performance.

EHREN-WALIA 003174

United States District Court
Southern District of Texas

**ENTERED**

December 16, 2015

David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN G. "JACK" McBRIDE and | § | |
| ALAN NOTTINGHAM, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:14-2944 |
| | § | |
| ORION HEALTHCORP, INC. and | § | |
| THE ORION HEALTHCORP, INC. | § | |
| DEFERRED COMPENSATION | § | |
| PLAN, | § | |
| Defendants. | § | |

## FINAL JUDGMENT

In accordance with the Memorandum and Order issued this day, it is hereby

**ORDERED, ADJUDGED AND DECREED** that Plaintiffs John G. "Jack"

McBride and Alan Nottingham's Motion for Summary Judgment [Doc. # 22] is

**GRANTED**. It is further

**ORDERED, ADJUDGED AND DECREED** that Plaintiff McBride shall

have judgment against Defendants Orion HealthCorp, Inc. and The Orion

HealthCorp, Inc. Deferred Compensation Plan in the amount of $134,015.52 as of

June 3, 2014, plus prejudgment simple interest of 0.10% per annum from that date.

It is further

P:\ORDERS\11-2014\2944Finaljmt.docx   151216.1329

EHREN-WALIA 003175

**ORDERED, ADJUDGED AND DECREED** that Plaintiff Nottingham shall have judgment against Defendants Orion HealthCorp, Inc. and The Orion HealthCorp, Inc. Deferred Compensation Plan in the amount of $60,170.22 as of June 3, 2014, plus prejudgment simple interest of 0.10% per annum from that date. It is further

**ORDERED** that all taxable costs of court allowable under 28 U.S.C. § 1920 shall be paid by Defendants, who are liable jointly and severally. It is further

**ORDERED** that postjudgment interest shall be at 0.71 % per annum.

SIGNED at Houston, Texas, this _16th_ day of **December, 2015**.

Nancy F. Atlas
United States District Judge

P:\ORDERS\11-2014\2944F\nJmt.docx  151216.1329

EHREN-WALIA 003176

ABSTRACT OF JUDGMENT

CAUSE NO. 2016-36416

RECEIPT NO. 332957

JOHN G. "JACK" MCBRIDE and
ALAN NOTTINGHAM

VS.

ORION HEALTHCORP, INC. and THE
ORION HEALTHCORP, INC.
DEFERRED COMPENSATION PLAN

IN THE DISTRICT COURT

OF HARRIS COUNTY, TEXAS

215TH JUDICIAL DISTRICT

I, CHRIS DANIEL, DISTRICT CLERK of Harris County, Texas, do hereby certify that the following and foregoing is

a true and correct Abstract of the Judgment rendered in the 215TH DISTRICT COURT on the 2ND day of JUNE, 2016 in Cause No.

2016-36416 in favor of JOHN G. "JACK" MCBRIDE and ALAN NOTTINGHAM (AND ENFORCED IN THE UNITED

STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION; CIVIL ACTION NO.

4:14-2944; DECEMBER 16, 2015), Judgment Creditor(s), in Judgment, vs.

| JUDGMENT DEBTOR(S) | DOB | TDL | SS# |
|---|---|---|---|
| ORION HEALTHCORP INC and | N/A | N/A | N/A |
| THE ORION HEALTHCORP INC DEFERRED | N/A | N/A | N/A |
| COMPENSATION PLAN | | | |
| 3200 WILCREST STE 600 | | | |
| HOUSTON TX 77042 | | | |

Judgment debtor(s) in said Judgment, as appears of record in my office in Image No. 70726016 for the 215TH Judicial District Court of
Harris County, Texas.

| | |
|---|---|
| Amount of Judgment: | Awarded to John G. "Jack" McBride the amount of $134,015.52 as of June 3, 2014, plus prejudgment simple interest of 0.10% per annum from that date; Awarded to Alan Nottingham the amount of $60,170.22 as of June 3, 2014, plus prejudgment simple interest of 0.10% per annum from that date; |
| Rate of Interest: | Postjudgment interest shall be at 0.71% per annum; |
| Amount of Cost: | Plaintiff's Recoverable Costs: $270.00; |
| Amount of Credits: | None; |
| Amount Due: | Full Amount; |

Given under my hand and seal of said Court at Houston, Texas this 21st day of JULY, 2016, A.D.

Issued at the request of:
EDWARD L. FRIEDMAN
BAKER HOSTETLER LLP
811 MAIN ST STE 1100
HOUSTON TX 77002

Bar No.: 07462950

CHRIS DANIEL, District Clerk
HARRIS COUNTY, T E X A S

BY _____, Deputy
CRYSTAL LOPEZ

Judgment Creditor(s) Address:
JOHN G "JACK" MCBRIDE
1826 SOUTH BLVD
HOUSTON TX 77098

ALAN NOTTINGHAM
31 HELENA CT
COLDSPRING TX 77042

FJ-21   R11-12-90

EHREN-WALIA 003177

ABSTRACT OF JUDGMENT

CAUSE NO. 2016-36416

RECEIPT NO. 332953

JOHN G. "JACK" MCBRIDE and
ALAN NOTTINGHAM

VS.

ORION HEALTHCORP, INC. and THE
ORION HEALTHCORP, INC.
DEFERRED COMPENSATION PLAN

IN THE DISTRICT COURT

OF HARRIS COUNTY, TEXAS

215TH JUDICIAL DISTRICT

I, CHRIS DANIEL, DISTRICT CLERK of Harris County, Texas, do hereby certify that the following and foregoing is

a true and correct Abstract of the Judgment rendered in the 215TH DISTRICT COURT on the 2ND day of JUNE, 2016 in Cause No.

2016-36416 in favor of JOHN G. "JACK" MCBRIDE and ALAN NOTTINGHAM (AND ENFORCED IN THE UNITED

STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION; CIVIL ACTION NO.

4:14-2944; DECEMBER 16, 2015), Judgment Creditor(s), in Judgment, vs.

| JUDGMENT DEBTOR(S) | DOB | TDL | SS# |
|---|---|---|---|
| ORION HEALTHCORP INC and | N/A | N/A | N/A |
| THE ORION HEALTHCORP INC DEFERRED | N/A | N/A | N/A |
| COMPENSATION PLAN | | | |
| 3200 WILCREST STE 600 | | | |
| HOUSTON TX 77042 | | | |

Judgment debtor(s) in said Judgment, as appears of record in my office in Image No. 70726016 for the 215TH Judicial District Court of
Harris County, Texas.

| | |
|---|---|
| Amount of Judgment: | Awarded to John G. "Jack" McBride the amount of $134,015.52 as of June 3, 2014, plus prejudgment simple interest of 0.10% per annum from that date; Awarded to Alan Nottingham the amount of $60,170.22 as of June 3, 2014, plus prejudgment simple interest of 0.10% per annum from that date; |
| Rate of Interest: | Postjudgment interest shall be at 0.71% per annum; |
| Amount of Cost: | Plaintiff's Recoverable Costs: $270.00; |
| Amount of Credits: | None; |
| Amount Due: | Full Amount; |

Given under my hand and seal of said Court at Houston, Texas this 21st day of JULY, 2016, A.D.

Issued at the request of:
EDWARD L FRIEDMAN
BAKER HOSTETLER LLP
811 MAIN ST STE 1100
HOUSTON TX 77002

Bar No.: 07462950

CHRIS DANIEL, District Clerk
HARRIS COUNTY, T E X A S

BY _____, Deputy
CRYSTAL LOPEZ

Judgment Creditor(s) Address:
JOHN G "JACK" MCBRIDE          ALAN NOTTINGHAM
1826 SOUTH BLVD               31 HELENA CT
HOUSTON TX 77098             COLDSPRING TX 77042

PJ-21   R11-12-90

EHREN-WALIA 003178

# EXHIBIT 9

## SCHEDULE 10

### Summary of Legal Actions Against the Debtors

Pursuant to E.D.N.Y. LBR 1007-4(a)(xii), the following is a list of the nature and present status of each material action or proceeding, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

| | Litigation Matter | Plaintiff(s) | Defendant(s) | Date | Forum | Nature of Action | Status of Case |
|---|---|---|---|---|---|---|---|
| 1. | *American Express Travel Related Services Company, Inc. v. Constellation Healthcare Technologies, Inc.* (Index No. 657592/2017) | American Express Travel Related Services Company, Inc. | Constellation Healthcare Technologies, Inc. | 12/28/17 | Supreme Court of New York, County of New York | Breach of contract | Pending |
| 2. | *Kolb Radiology, PC v. Orion Healthcorp, Inc. d/b/a Porteck, LLC* (Case No. 1:16-cv-07824-GHW) | Kolb Radiology, PC ("Kolb") | Orion Healthcorp. d/b/a Porteck, LLC | 10/1/16 | SDNY | Breach of contract and conversion | Pending |
| 3. | *Parkersburg Radiology Services, Inc. v. Orion Healthcorp, Inc.* (Civil Action No. 17-C-291) | Parkersburg Radiology Services, Inc. ("PRS") | Orion North West Medical Solutions WV, LLC *(note: party improperly identified—should be NEMS West Virginia, LLC ("NEMS WV"))* | 8/12/17 | Circuit Court of Wood County, WV | Breach of contract, breach of fiduciary duty, negligent misrepresentation, and unjust enrichment | Pending |

EHREN-WALIA 00907

EAST\152114113.7

Case 8-18-71748-ast Doc 2 Filed 03/16/18 Entered 03/16/18 23:24:27

EHREN-WALIA 00908

| | Litigation Matter | Plaintiff(s) | Defendant(s) | Date | Forum | Nature of Action | Status of Case |
|---|---|---|---|---|---|---|---|
| 4. | *GeBBS Healthcare Solutions, Inc. v. Orion HealthCorp, Inc.* (Index No. 650346/2018) | GeBBS Healthcare Solutions, Inc. ("GeBBS") | Orion HealthCorp, Inc. | 1/23/18 | NY Supreme, County of NY | Breach of contract | Pending |
| 5. | *Criterions, LLC v. Visient Corp., et al.* (Index No. 601569/16) | Criterions, LLC | Visient Corp.<br><br>Arvind Walia<br><br>Constellation Healthcare Technologies<br><br>Physicians Practice Plus | 3/9/16 | New York Supreme Court— Nassau County | Breach of contract | Pending |
| 6. | *Steel Valley Emergency Physicians, LLC v. North East Medical Solutions, LLC, et al.* (Docket No. GD-16-01479) | Steel Valley Emergency Physicians, LLC ("SVEP") | North East Medical Solutions, LLC ("NEMS")<br><br>Orion Healthcorp, Inc ("Orion") | 8/16/16 | Court of Common Pleas, Allegheny County, PA | Breach of contract and breach of duty of loyalty | Pending |
| 7. | *Cohen, et al. v. Porteck Corporation, et al.* (Index No. 617280/2017) | Christine Cohen<br><br>Ronald Cohen | Porteck Corporation ("Porteck")<br><br>Visient Corp.<br><br>Orion Healthcorp, Inc. ("Orion") | 9/6/17 | Supreme Court of the State of NY, County of Suffolk | Breach of contract | Pending |

| | Litigation Matter | Plaintiff(s) | Defendant(s) | Date | Forum | Nature of Action | Status of Case |
|---|---|---|---|---|---|---|---|
| 8. | *GSS Infotech v. Orion HealthCorp, Inc. and Constellation Health, LLC* (Cause No. 2014-45701/ 2016/45701) | GSS Infotech ("GSS") | Orion HealthCorp, Inc. ("Orion") <br><br> Constellation Health, LLC ("Constellation Health") | 10/1/16 | District Court of Harris County, TX | Breach of contract, quantum meruit, and unjust enrichment | Pending |
| 9. | *Singh-Narayan and Yamraj v. Orion Healthcorp, Inc* (Index No. 709520/17) | Rookminee Singh-Narayan <br><br> Jairaj Yamrajibank | Orion HealthCorp, Inc. ("Orion") <br><br> Physicians Practice Plus, LLC ("PPP") | 7/13/17 | Supreme Court of the State of NY, County of Queens | Unpaid wages | Pending |
| 10. | *Orion HealthCorp, Inc. and RMI Physicians Services Corp. v. John G. McBride, et al.* (Case No. 2014-01758) <br><br> (Court of Appeals Number: 01-17-00131-CV) | Orion HealthCorp, Inc. ("Orion") <br><br> RMI Physicians Services Corp. ("RMI") | John G. McBride <br><br> Alan R. Nottingham <br><br> Chi T. Luu <br><br> On Q Operating Company, LLC <br><br> On Q Contact Center S.A. | 1/15/14 | District Court of Harris County, TX <br><br> Court of Appeals, First District | Breach of contract and fraud | Settlement pending. |
| 11. | *Ferrer, Claudio v. RMI Physician Services Corporation d/b/a Orion-RMI* (Case No. 15-CA-2537) | Ferrer, Claudio | RMI Physician Services Corporation | 9/30/15 | Circuit Court of 20th Judicial Circuit in Lee County, Florida | Class action for statutory damages | Settlement pending. |

EHREN-WALIA 00909

EAST\152114113.7



| | Litigation Matter | Plaintiff(s) | Defendant(s) | Date | Forum | Nature of Action | Status of Case |
|---|---|---|---|---|---|---|---|
| 12. | *1805 Old Alabama Road, LLC v. Orion Healthcorp, Inc.,* 16-EV-000241 | 1805 Old Alabama Road LLC | Orion Healthcorp, Inc. | 1/2016 | State Court of Fulton County, State of Georgia | Breach of contract | Final judgment entered for $227,473.59. |
| 13. | *Cockerell Dermatopathology, P.A. v. Medical Billing Services, Inc. d/b/a Orion MBS, et al.* (Cause No. DC-1602365) | Cockerell Dermatopathology, P.A. ("Cockerell") | Medical Billing Services, Inc. ("MBS") Orion HealthCorp, Inc. ("Orion") Joseph A. Seale Dale Brinkman Arvind Walia Ravi Sankar Chivukula | 2/29/16 | District Court of Dallas County, TX | Breach of contract and negligence | Case settled. Dismissal papers not yet filed. |

EHREN-WALIA 00910

EAST\152114113.7

# EXHIBIT 10

*EXECUTION VERSION*

**Published CUSIP Numbers:**
**Deal: 68627XAA5**
**Revolver: 68627XAB3**
**Term: 68627XAC1**

CREDIT AGREEMENT

Dated as of January 30, 2017

among

CHT MERGERSUB, INC.,
as the initial Borrower,

ORION HEALTHCORP, INC.,
as the Borrower after giving effect to the Closing Date Acquisition,

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC.,
as Holdings and a Guarantor,

CERTAIN SUBSIDIARIES OF THE BORROWER PARTY HERETO,
as Guarantors,

BANK OF AMERICA, N.A.,
as Administrative Agent, Swingline Lender and L/C Issuer,

BMO HARRIS BANK, N.A.,
as Syndication Agent,

and

THE LENDERS PARTY HERETO

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,
and
BMO CAPITAL MARKETS CORP.,
as Joint Lead Arrangers and Joint Bookrunners

# GROUP 10

EHREN-WALIA 003503

## TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ................................................................ 1
    1.01    Defined Terms. ........................................................................................ 1
    1.02    Other Interpretive Provisions. ............................................................ 44
    1.03    Accounting Terms. ............................................................................... 45
    1.04    Rounding. ............................................................................................. 48
    1.05    Times of Day. ....................................................................................... 48
    1.06    Letter of Credit Amounts. ................................................................... 48
    1.07    UCC Terms. .......................................................................................... 48
    1.08    Rates. .................................................................................................... 48

ARTICLE II COMMITMENTS AND CREDIT EXTENSIONS ...................................................... 48
    2.01    Initial Term Loans; Revolving Loans; Incremental Term Loans. .............................. 48
    2.02    Borrowings, Conversions and Continuations of Loans. ............................................. 49
    2.03    Letters of Credit. ................................................................................. 53
    2.04    Swingline Loans. ................................................................................. 62
    2.05    Prepayments. ....................................................................................... 64
    2.06    Termination or Reduction of Commitments. ...................................... 67
    2.07    Repayment of Loans. .......................................................................... 67
    2.08    Interest and Default Rate. .................................................................... 69
    2.09    Fees. ...................................................................................................... 69
    2.10    Computation of Interest and Fees; Retroactive Adjustments of Applicable Rate. ........................................................................................ 70
    2.11    Evidence of Debt. ................................................................................ 70
    2.12    Payments Generally; Administrative Agent's Clawback. ................... 71
    2.13    Sharing of Payments by Lenders. ....................................................... 72
    2.14    Cash Collateral. ................................................................................... 73
    2.15    Defaulting Lenders. ............................................................................ 74
    2.16    Dutch Auctions; Open Market Purchases. ......................................... 76
    2.17    Sponsor, Debt Fund Affiliate and Non-Debt Fund Affiliate Term Loan Purchases. ................................................................................. 79

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY ................................................ 80
    3.01    Taxes. ................................................................................................... 80
    3.02    Illegality and Designated Lenders. ..................................................... 84
    3.03    Inability to Determine Rates. .............................................................. 85
    3.04    Increased Costs; Reserves on Eurodollar Rate Loans. ....................... 86
    3.05    Compensation for Losses. ................................................................... 87
    3.06    Mitigation Obligations; Replacement of Lenders. ............................. 88
    3.07    Survival. ............................................................................................... 88

ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ...................................... 88
    4.01    Conditions of Initial Credit Extension. ............................................... 88
    4.02    Conditions to all Credit Extensions after the Initial Credit Extensions on the Closing Date. ...................................................................... 92

ARTICLE V REPRESENTATIONS AND WARRANTIES ............................................................ 93
    5.01    Existence, Qualification and Power. ................................................... 93

i

EHREN-WALIA 003505

| | | |
|---|---|---|
| 5.02 | Authorization; No Contravention. | 93 |
| 5.03 | Governmental Authorization; Other Consents. | 93 |
| 5.04 | Binding Effect. | 94 |
| 5.05 | Financial Statements; No Material Adverse Effect. | 94 |
| 5.06 | Litigation. | 95 |
| 5.07 | No Default. | 95 |
| 5.08 | Ownership of Property. | 95 |
| 5.09 | Environmental Compliance. | 95 |
| 5.10 | Insurance. | 96 |
| 5.11 | Taxes. | 96 |
| 5.12 | ERISA Compliance. | 96 |
| 5.13 | Margin Regulations; Investment Company Act. | 97 |
| 5.14 | Disclosure. | 97 |
| 5.15 | Compliance with Laws. | 98 |
| 5.16 | Solvency. | 98 |
| 5.17 | Sanctions Concerns; Anti-Corruption Laws; PATRIOT Act. | 98 |
| 5.18 | Subsidiaries; Equity Interests; Loan Parties. | 98 |
| 5.19 | Collateral Representations. | 99 |
| 5.20 | Regulation H. | 99 |
| 5.21 | Compliance with Health Care Laws. | 100 |
| 5.22 | EEA Financial Institutions. | 101 |

ARTICLE VI AFFIRMATIVE COVENANTS ........................................... 101

| | | |
|---|---|---|
| 6.01 | Financial Statements. | 101 |
| 6.02 | Certificates; Other Information. | 102 |
| 6.03 | Notices. | 105 |
| 6.04 | Payment of Taxes and Claims. | 105 |
| 6.05 | Preservation of Existence, Etc. | 106 |
| 6.06 | Maintenance of Properties. | 106 |
| 6.07 | Maintenance of Insurance. | 106 |
| 6.08 | Compliance with Laws. | 107 |
| 6.09 | Books and Records. | 107 |
| 6.10 | Inspection Rights. | 107 |
| 6.11 | Use of Proceeds. | 108 |
| 6.12 | Covenant to Guarantee Obligations. | 108 |
| 6.13 | Covenant to Give Security. | 108 |
| 6.14 | Further Assurances. | 109 |
| 6.15 | Anti-Corruption Laws. | 109 |

ARTICLE VII NEGATIVE COVENANTS ........................................... 109

| | | |
|---|---|---|
| 7.01 | Liens. | 109 |
| 7.02 | Indebtedness. | 112 |
| 7.03 | Investments. | 114 |
| 7.04 | Fundamental Changes. | 115 |
| 7.05 | Dispositions. | 115 |
| 7.06 | Restricted Payments. | 115 |
| 7.07 | Change in Nature of Business. | 117 |
| 7.08 | Transactions with Affiliates. | 117 |
| 7.09 | Burdensome Agreements. | 118 |
| 7.10 | Use of Proceeds. | 118 |
| 7.11 | Financial Covenants. | 118 |

EHREN-WALIA 003506

688

7.12    Amendments of Organization Documents; Fiscal Year; Legal Name, State of Organization; Form of Entity.................................................................. 119
7.13    Sale and Leaseback Transactions................................................................... 119
7.14    Prepayments of Junior Debt........................................................................... 120
7.15    Amendments, Etc. of Junior Debt.................................................................. 120
7.16    Sanctions......................................................................................................... 120
7.17    Anti-Corruption Laws.................................................................................... 121
7.18    Limitations on Holdings................................................................................. 121

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES................................................ 121

8.01    Events of Default............................................................................................ 121
8.02    Remedies upon Event of Default.................................................................... 123
8.03    Application of Funds....................................................................................... 124

ARTICLE IX ADMINISTRATIVE AGENT..................................................................... 125

9.01    Appointment and Authority............................................................................ 125
9.02    Rights as a Lender.......................................................................................... 126
9.03    Exculpatory Provisions................................................................................... 126
9.04    Reliance by Administrative Agent.................................................................. 127
9.05    Delegation of Duties....................................................................................... 128
9.06    Resignation of Administrative Agent............................................................. 128
9.07    Non-Reliance on Administrative Agent and Other Lenders........................... 130
9.08    No Other Duties, Etc....................................................................................... 130
9.09    Administrative Agent May File Proofs of Claim; Credit Bidding.................. 130
9.10    Collateral and Guaranty Matters.................................................................... 131
9.11    Secured Cash Management Agreements and Secured Hedge Agreements...... 132

ARTICLE X CONTINUING GUARANTY........................................................................ 132

10.01   Guaranty......................................................................................................... 132
10.02   Rights of Lenders........................................................................................... 133
10.03   Certain Waivers.............................................................................................. 133
10.04   Obligations Independent................................................................................. 134
10.05   Subrogation..................................................................................................... 134
10.06   Termination; Reinstatement............................................................................ 134
10.07   Stay of Acceleration....................................................................................... 134
10.08   Condition of Borrower.................................................................................... 134
10.09   Appointment of Borrower............................................................................... 135
10.10   Right of Contribution..................................................................................... 135
10.11   Keepwell......................................................................................................... 135
10.12   Additional Guarantor Waivers and Agreements............................................ 135

ARTICLE XI MISCELLANEOUS.................................................................................... 136

11.01   Amendments, Etc............................................................................................ 136
11.02   Notices; Effectiveness; Electronic Communications..................................... 138
11.03   No Waiver; Cumulative Remedies; Enforcement........................................... 140
11.04   Expenses; Indemnity; Damage Waiver.......................................................... 141
11.05   Payments Set Aside........................................................................................ 143
11.06   Successors and Assigns.................................................................................. 143
11.07   Treatment of Certain Information; Confidentiality......................................... 150
11.08   Right of Setoff............................................................................................... 151
11.09   Interest Rate Limitation.................................................................................. 152

CHAR1\1498335v12

EHREN-WALIA 003507

689

| 11.10 | Counterparts; Integration; Effectiveness. | 152 |
| 11.11 | Survival of Representations and Warranties. | 152 |
| 11.12 | Severability. | 153 |
| 11.13 | Replacement of Lenders. | 153 |
| 11.14 | Governing Law; Jurisdiction; Etc. | 154 |
| 11.15 | Waiver of Jury Trial. | 155 |
| 11.16 | Subordination. | 155 |
| 11.17 | No Advisory or Fiduciary Responsibility. | 155 |
| 11.18 | Electronic Execution. | 156 |
| 11.19 | USA PATRIOT Act Notice. | 156 |
| 11.20 | ENTIRE AGREEMENT. | 156 |
| 11.21 | Acknowledgement and Consent to Bail-In of EEA Financial Institutions. | 157 |

CHAR1\1498335v12

iv

EHREN-WALIA 003508

SCHEDULES

Schedule 1.01(a)          Certain Addresses for Notices
Schedule 1.01(b)          Initial Commitments and Applicable Percentages
Schedule 1.01(c)          Extraordinary Items and Quality of Earnings Adjustments
Schedule 5.10             Insurance
Schedule 5.18(a)          Subsidiaries, Joint Ventures, Partnerships and Other Equity Investments
Schedule 5.18(b)          Loan Parties
Schedule 5.19(b)          Intellectual Property
Schedule 5.19(c)          Real Properties
Schedule 7.01             Existing Liens
Schedule 7.02             Existing Indebtedness
Schedule 7.03             Existing Investments

EXHIBITS

Exhibit A                 Form of Assignment and Assumption
Exhibit B                 Form of Compliance Certificate
Exhibit C                 Form of Incremental Term Loan Lender Joinder Agreement
Exhibit D                 Form of Joinder Agreement
Exhibit E                 Form of Loan Notice
Exhibit F                 Form of Notice of Loan Prepayment
Exhibit G                 Form of Revolving Note
Exhibit H                 Form of Secured Party Designation Notice
Exhibit I                 Form of Solvency Certificate
Exhibit J                 Form of Swingline Loan Notice
Exhibit K                 Form of Term Note
Exhibit L                 Forms of U.S. Tax Compliance Certificates
Exhibit M                 Form of Affiliated Lender Assignment and Assumption
Exhibit N                 Form of Borrower Assignment, Assumption and Release

EHREN-WALIA 003509

# CREDIT AGREEMENT

This CREDIT AGREEMENT is entered into as of January 30, 2017, by and among CHT MERGERSUB, INC., a Delaware corporation (the "Mergersub"), as initial Borrower, ORION HEALTHCORP, INC., a Delaware corporation ("Orion"), as the Borrower after giving effect to the Closing Date Acquisition, the Guarantors, the Lenders, and BANK OF AMERICA, N.A., as Administrative Agent, Swingline Lender and L/C Issuer.

## PRELIMINARY STATEMENTS:

WHEREAS, Constellation Healthcare Technologies, Inc., a Delaware corporation ("Holdings"), CHT Holdco, LLC, a Delaware limited liability company, CC Capital Management, LLC, Orion, and the Mergersub entered into that certain Agreement and Plan of Merger, dated as of November 22, 2016 (including all schedules and exhibits thereto, the "Acquisition Agreement"), pursuant to which the Mergersub will merge with and into Holdings (in such capacity, the "Target") with Holdings as the surviving entity in accordance with the terms of the Acquisition Agreement (the "Closing Date Acquisition");

WHEREAS, the proceeds of the Closing Date Equity Contribution, the proceeds of the Seller Notes, a portion of the Revolving Facility, and the Initial Term Loans will be applied to fund the Closing Date Acquisition and to pay fees, costs and expenses incurred in connection with the Transaction;

WHEREAS, the Loan Parties have requested that the Lenders, the Swingline Lender and the L/C Issuer make loans and other financial accommodations to the Loan Parties in an aggregate amount of up to $145,000,000; and

WHEREAS, the Lenders, the Swingline Lender and the L/C Issuer have agreed to make such loans and other financial accommodations to the Loan Parties on the terms and subject to the conditions set forth herein.

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    **Defined Terms.**

As used in this Agreement, the following terms shall have the meanings set forth below:

"Acquisition" means the acquisition, whether through a single transaction or a series of related transactions, of (a) a majority of the Voting Stock or other controlling ownership interest in another Person (including the purchase of an option, warrant or convertible or similar type security to acquire such a controlling interest at the time it becomes exercisable by the holder thereof), whether by purchase of such equity or other ownership interest or upon the exercise of an option or warrant for, or conversion of securities into, such equity or other ownership interest, or (b) assets of another Person which constitute all or substantially all of the assets of such Person or of a division, line of business or other business unit of such Person.

"Acquisition Agreement" has the meaning specified in the Recitals.

"Additional Secured Obligations" means (a) all obligations arising under Secured Cash Management Agreements and Secured Hedge Agreements, and (b) all costs and expenses incurred in connection with enforcement and collection of the foregoing, including the fees, charges and disbursements of counsel, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, expenses and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof pursuant to any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, expenses and fees are allowed claims in such proceeding; provided, that, Additional Secured Obligations of a Guarantor shall exclude any Excluded Swap Obligations with respect to such Guarantor.

"Adjustment Period" has the meaning specified in the definition of "Cost Savings Schedule".

"Administrative Agent" means Bank of America in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 1.01(a), or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Affiliated Lender Assignment and Assumption" means an assignment and assumption entered into by a Lender and the Sponsor or a Non-Debt Fund Affiliate, and accepted by the Administrative Agent, in substantially the form of Exhibit M or any other form approved by the Administrative Agent.

"Aggregate Commitments" means the Commitments of all the Lenders.

"Agreement" means this Credit Agreement.

"All-In-Yield" means, with respect to any term loan facility (the Term Loans), the weighted average yield to maturity with respect to such loan facility which shall take into account interest rate margins and any interest rate floors or similar devices, and shall be deemed to include any original issue discount and any fees (other than facility arrangement, structuring, underwriting or other closing fees and expenses not paid for the account of, or distributed to, all Lenders providing such term loan facility) paid or payable in connection with such term loan facility, in each case, as reasonably determined by the Administrative Agent in a manner consistent with customary financial practice based on an assumed four-year life to maturity or, if less, the actual remaining life to maturity of such term loan facility, commencing from the borrowing date of such term loan facility and assuming that the interest rate (including the Applicable Rate) for such term loan facility in effect on such borrowing date (after giving effect to the Indebtedness incurred in connection with such term loan facility) shall be the interest rate for the entire Weighted Average Life to Maturity of such term loan facility.

"Applicable Discount" has the meaning specified in the definition "Dutch Auction".

"Applicable Discount Notice" has the meaning specified in the definition "Dutch Auction".

2

EHREN-WALIA 003511



"Applicable Order of Purchase" has the meaning specified in the definition "Dutch Auction".

"Applicable Percentage" means (a) in respect of the Initial Term Facility, with respect to any Term Lender at any time, the percentage (carried out to the ninth decimal place) of the Initial Term Facility represented by (i) on the Closing Date, such Term Lender's Initial Term Commitment at such time and (ii) at any time thereafter, the outstanding principal amount of such Term Lender's Initial Term Loans at such time, (b) in respect of the Revolving Facility, with respect to any Revolving Lender at any time, the percentage (carried out to the ninth decimal place) of the Revolving Facility represented by such Revolving Lender's Revolving Commitment at such time, subject to adjustment as provided in Section 2.15, and (c) in respect of an Incremental Term Facility, with respect to any Incremental Term Lender at any time, the percentage (carried out to the ninth decimal place) of such Incremental Term Facility represented by the outstanding principal amount of such Incremental Term Lender's Incremental Term Loans issued under such Incremental Term Facility at such time. If the Commitment of all of the Revolving Lenders to make Revolving Loans and the obligation of the L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 8.02, or if the Revolving Commitments have expired, then the Applicable Percentage of each Revolving Lender in respect of the Revolving Facility shall be determined based on the Applicable Percentage of such Revolving Lender in respect of the Revolving Facility most recently in effect, giving effect to any subsequent assignments. The Applicable Percentage of each Lender in respect of each Facility is set forth opposite the name of such Lender on Schedule 1.01(b), in the Assignment and Assumption or in any other documentation executed by such Lender pursuant to which such Lender becomes a party hereto, as applicable.

"Applicable Rate" means (a) with respect to the Incremental Term Loans made pursuant to any Incremental Term Loan Lender Joinder Agreement, the percentage(s) per annum set forth in such Incremental Term Loan Lender Joinder Agreement, and (b) with respect to Revolving Loans, Initial Term Loans, Swingline Loans, Letters of Credit and the Commitment Fee, the following percentages per annum, based upon the Consolidated Leverage Ratio as set forth in the most recent Compliance Certificate received by the Administrative Agent pursuant to Section 6.02(a):

| Pricing Tier | Consolidated Leverage Ratio | Commitment Fee | Letter of Credit Fee | Eurodollar Rate Loans | Base Rate Loans |
|---|---|---|---|---|---|
| I | ≥ 3.00 to 1.0 | 0.50% | 3.25% | 3.25% | 2.25% |
| II | < 3.00 to 1.0 but ≥ 2.00 to 1.0 | 0.40% | 3.00% | 3.00% | 2.00% |
| III | < 2.00 to 1.0 but ≥ 1.00 to 1.0 | 0.30% | 2.75% | 2.75% | 1.75% |
| IV | < 1.00 to 1.0 | 0.20% | 2.50% | 2.50% | 1.50% |

Any increase or decrease in the Applicable Rate resulting from a change in the Consolidated Leverage Ratio shall become effective as of the first (1st) Business Day immediately following the date a Compliance Certificate is delivered pursuant to Section 6.02(a); provided, however, that if a Compliance Certificate is not delivered when due in accordance with such Section, then, upon the request of the Required Lenders, Pricing Tier I shall apply as of the first (1st) Business Day after the date on which such Compliance Certificate was required to have been delivered and shall remain in effect until the first (1st) Business Day immediately following the date on which such Compliance Certificate is delivered in accordance with Section 6.02(a), whereupon the Applicable Rate shall be adjusted based upon the calculation of the Consolidated Leverage Ratio contained in such Compliance Certificate. The Applicable Rate in effect from the Closing Date to the first (1st) Business Day immediately following the date a Compliance Certificate is delivered pursuant to Section 6.02(a) for the fiscal quarter ending June 30, 2017 shall be determined based

3

EHREN-WALIA 003512

upon Pricing Tier II. Notwithstanding anything to the contrary contained in this definition, the determination of the Applicable Rate for any period shall be subject to the provisions of Section 2.10(b).

"Applicable Revolving Percentage" means with respect to any Revolving Lender at any time, such Revolving Lender's Applicable Percentage in respect of the Revolving Facility at such time.

"Appropriate Lender" means, at any time, (a) with respect to any Facility, a Lender that has a Commitment with respect to such Facility or holds a Loan under such Facility at such time, (b) with respect to the Letter of Credit Sublimit, (i) the L/C Issuer and (ii) if any Letters of Credit have been issued pursuant to Section 2.03, the Revolving Lenders and (c) with respect to the Swingline Sublimit, (i) the Swingline Lender and (ii) if any Swingline Loans are outstanding pursuant to Section 2.04(a), the Revolving Lenders.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Arrangers" means, collectively, MLPFS (or any of its designated Affiliates, including any other registered broker-dealer wholly-owned by Bank of America Corporation to which all or substantially all of Bank of America Corporation's or any of its subsidiaries' investment banking, commercial lending services or related businesses may be transferred following the date of this Agreement) and BMO Harris, N.A., in their capacities as joint lead arrangers and joint lead bookrunners.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.06(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit A or any other form (including an electronic documentation form generated by use of an electronic platform) approved by the Administrative Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease or other agreement or instrument were accounted for as a Capitalized Lease, (c) in respect of any Securitization Transaction, the outstanding principal amount of such financing, after taking into account reserve accounts and making appropriate adjustments, determined by the Administrative Agent in its reasonable judgment and (d) in respect of any Sale and Leaseback Transaction, the present value (discounted in accordance with GAAP at the debt rate implied in the applicable lease) of the obligations of the lessee for rental payments during the term of such lease.

"Auction Amount" has the meaning specified in the definition "Dutch Auction".

"Auction Expiration Time" has the meaning specified in the definition "Dutch Auction".

"Auction Manager" has the meaning specified in Section 2.16(a)(i).

"Auction Notice" has the meaning specified in the definition "Dutch Auction".

"Auction Party" has the meaning specified in Section 2.16(a)(i).

"Audited Financial Statements" means the audited consolidated balance sheet of Holdings and its Subsidiaries for the fiscal year ended December 31, 2015, and the related consolidated statements of income

4

EHREN-WALIA 003513

or operations, shareholders' equity and cash flows for such fiscal year of Holdings and its Subsidiaries, including the notes thereto.

"Auto-Extension Letter of Credit" has the meaning specified in Section 2.03(b)(iv).

"Auto-Reinstatement Letter of Credit" has the meaning specified in Section 2.03(b)(v).

"Availability Period" means the period from and including the Closing Date to the earliest of (a) the Revolving Facility Maturity Date, (b) the date of termination of the Revolving Commitments pursuant to Section 2.06, and (c) the date of termination of the Commitment of each Revolving Lender to make Revolving Loans and of the obligation of the L/C Issuer to make L/C Credit Extensions pursuant to Section 8.02.

"Available Amount" means, on any date of determination (the "Reference Date"), an amount (which shall not be less than zero) equal to:

(a)    the sum of, without duplication:

(i)    $5,000,000; plus

(ii)    for the Excess Cash Flow Period most recently ended on or prior to the Reference Date, (A) twenty-five percent (25%) of Excess Cash Flow if the Consolidated Leverage Ratio as of the end of such Excess Cash Flow Period is greater than 2.00 to 1.0, (B) fifty percent (50%) of Excess Cash Flow if the Consolidated Leverage Ratio as of the end of such Excess Cash Flow Period is less than or equal to 2.00 to 1.0 but greater than 1.00 to 1.0, or (C) one hundred percent (100%) of Excess Cash Flow if the Consolidated Leverage Ratio as of the end of such Excess Cash Flow Period is less than or equal to 1.00 to 1.0; plus

(iii)    the cumulative amount of all cash contributions to the common capital of the Borrower or the amount of Net Cash Proceeds actually received by the Borrower from the issuance of any Equity Interests other than Disqualified Equity Interests (excluding (x) Net Cash Proceeds of any issuance or sale of Equity Interests for a specifically identified purpose that were expended for such specifically identified purpose without a corresponding reduction of the Available Amount and (y) Cure Proceeds), plus

(iv)    an amount equal to any returns (including dividends, interest, distributions, returns of principal and profits on sale) actually received by the Borrower or any of the Restricted Subsidiaries in cash in respect of any Investments made after the Closing Date pursuant to Section 7.03(i) in an amount not to exceed the amount of the initial Investment, plus

(v)    the cumulative amount of all Investments in Unrestricted Subsidiaries that have been re-designated as Restricted Subsidiaries or that have been merged or consolidated with or into the Borrower or any of its Restricted Subsidiaries up to the lesser of (A) the fair market value of such Investments at the time of such re-designation or merger or consolidation and (B) the fair market value as of the original date of such Investments, minus

(b)    the sum of (i) the aggregate amount of all Restricted Payments made by the Borrower and its Restricted Subsidiaries using the Available Amount; plus (ii) the aggregate

CHAR\1498335v12

EHREN-WALIA 003514

amount of all Investments made by the Borrower and its Restricted Subsidiaries using the Available Amount; plus (iii) the aggregate amount of all prepayments, voluntary payments, distributions, redemptions, acquisitions, retirements, cancellations, terminations and repurchases, in each case, of Junior Debt and made by the Borrower and its Restricted Subsidiaries using the Available Amount.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bank of America" means Bank of America, N.A. and its successors.

"Bankruptcy Proceeding" has the meaning specified in Section 11.06(h).

"Base Rate" means for any day a fluctuating rate of interest per annum equal to the highest of (a) the Federal Funds Rate plus 0.50%, (b) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate," and (c) the Eurodollar Rate plus 1.00%; and if the Base Rate shall be less than zero, such rate shall be deemed zero for purposes of this Agreement. The "prime rate" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such prime rate announced by Bank of America shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Loan" means a Revolving Loan or a Term Loan that bears interest based on the Base Rate.

"Board of Directors" means (a) with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board; (b) with respect to a partnership, the Board of Directors of the general partner of the partnership; (c) with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Borrower" means (a) prior to the consummation of the Closing Date Acquisition, Mergersub, and (b) upon consummation of the Closing Date Acquisition and the execution and delivery of the Borrower Assignment, Assumption and Release and at all times thereafter, Orion.

"Borrower Assignment, Assumption and Release" means the Borrower Assignment, Assumption and Release dated as of the Closing Date in the form of Exhibit N to be executed by Mergersub, Orion, the Guarantors and the Administrative Agent.

"Borrower Materials" has the meaning specified in Section 6.02.

"Borrowing" means a Revolving Borrowing, a Swingline Borrowing, or a Term Borrowing, as the context may require.

CHAR1\1498335v12

EHREN-WALIA 003515

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located and, if such day relates to any Eurodollar Rate Loan, means any such date that is also a London Banking Day.

"Capital Expenditure" means, for any period, for the Borrower and its Restricted Subsidiaries, any expenditure in respect of the purchase or other acquisition of any fixed or capital asset during such period which, in accordance with GAAP, would be classified as a capital expenditure (excluding normal replacements and maintenance which are properly charged to current operations); provided, that, "Capital Expenditures" shall include capitalized costs and expenses associated with software development.

"Capitalized Leases" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"Captive Insurance Subsidiary" means any Subsidiary that is subject to regulation as an insurance company and was created solely for the purpose of purchasing or providing, or facilitating the provision of, insurance, in each case, to the extent that such insurance may be so purchased, provided, or facilitated in accordance with applicable requirements of Law.

"Cash Collateralize" means, to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the L/C Issuer or the Swingline Lender (as applicable) or the Lenders, as collateral for L/C Obligations, the Obligations in respect of Swingline Loans, or obligations of the Revolving Lenders to fund participations in respect of either thereof (as the context may require), (a) cash or deposit account balances, (b) backstop letters of credit entered into on terms, from issuers and in amounts satisfactory to the Administrative Agent and the L/C Issuer, and/or (c) if the Administrative Agent and the L/C Issuer or the Swingline Lender shall agree, in their sole discretion, other credit support, in each case, in Dollars and pursuant to documentation in form and substance satisfactory to the Administrative Agent and the L/C Issuer or the Swingline Lender (as applicable). "Cash Collateral" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"Cash Equivalents" means (a) readily marketable obligations issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof having maturities of not more than three hundred sixty days (360) days from the date of acquisition thereof; provided, that, the full faith and credit of the United States is pledged in support thereof; (b) time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i)(A) is a Lender or (B) is organized under the laws of the United States, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than one hundred eighty (180) days from the date of acquisition thereof; (c) commercial paper issued by any Person organized under the laws of any state of the United States and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than one hundred eighty (180) days from the date of acquisition thereof; or (d) Investments, classified in accordance with GAAP as current assets of the Borrower or any of its Restricted Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (a), (b) and (c) of this definition.

CHAR1\1498335v12

EHREN-WALIA 003516

"Cash Management Agreement" means any agreement to provide treasury or cash management services, including deposit accounts, overnight draft, credit cards, debit cards, p-cards (including purchasing cards and commercial cards), funds transfer, automated clearinghouse, zero balance accounts, returned check concentration, controlled disbursement, lockbox, account reconciliation and reporting and trade finance services and other cash management services.

"Cash Management Bank" means any Person in its capacity as a party to a Cash Management Agreement that (a) at the time it enters into a Cash Management Agreement with a Loan Party or any Subsidiary, is a Lender or an Affiliate of a Lender, (b) in the case of any Cash Management Agreement in effect on or prior to the Closing Date, is, as of the Closing Date or within thirty (30) days thereafter, a Lender or an Affiliate of a Lender and a party to a Cash Management Agreement with a Loan Party or any Subsidiary, or (c) within thirty (30) days after the time it enters into the applicable Cash Management Agreement with a Loan Party or any Subsidiary, becomes a Lender or an Affiliate of a Lender, in each case, in its capacity as a party to such Cash Management Agreement; provided, however, that for any of the foregoing to be included as a "Secured Cash Management Agreement" on any date of determination by the Administrative Agent, the applicable Cash Management Bank (other than the Administrative Agent or an Affiliate of the Administrative Agent) must have delivered a Secured Party Designation Notice to the Administrative Agent prior to such date of determination.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980.

"CERCLIS" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"CFC" means a Person that is a controlled foreign corporation under Section 957 of the Code.

"CFC Holdco" means any Domestic Subsidiary all or substantially all of the assets of which consist of the Equity Interests of one or more CFCs.

"Change in Law" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or a series of events by which:

     (a)     the Sponsor shall cease to own and control, of record and beneficially, directly or indirectly, more than fifty percent (50%) of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Holdings on a fully diluted basis (which for this purpose shall exclude all Equity Interests that have not yet vested); or

     (b)     the Sponsor shall cease to have the ability to elect (either through share ownership or contractual voting rights) a majority of the Board of Directors of Holdings; or

CHAR1\1498335v12

EHREN-WALIA 003517

(c)    a "change of control" (or similar event) shall occur in any document pertaining to Indebtedness with an aggregate principal amount in excess of the Threshold Amount; or

(d)    Holdings shall cease to own and control, of record and beneficially, directly or indirectly, one hundred percent (100%) of the Equity Interests of the Borrower.

"Claim" has the meaning specified in Section 11.06(h).

"Closing Date" means the date hereof.

"Closing Date Acquisition" has the meaning specified in the Recitals.

"Closing Date Equity Contribution" means, collectively, (a) cash contributions by the Sponsor to Holdings for the issuance of Qualified Equity Interests of Holdings in an amount of at least $82,502,158.97, and (b) with respect to Persons that have ownership interests in Orion immediately prior to the Closing Date, the exchange of at least $72,827,016.00 of Equity Interests in Orion for Qualified Equity Interests in Holdings.

"CMS" means the Centers for Medicare & Medicaid Services of HHS and any successor thereof and any predecessor thereof, including the Health Care Financing Administration.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means a collective reference to all real and personal property with respect to which Liens in favor of the Administrative Agent, for the benefit of the Secured Parties, are purported to be granted pursuant to and in accordance with the terms of the Collateral Documents; provided, that, "Collateral" shall not include any Excluded Property.

"Collateral Documents" means, collectively, the Security Agreement, the Pledge Agreement, each Mortgage, each Mortgaged Property Support Document, each Joinder Agreement, each of the mortgages, collateral assignments, security agreements, pledge agreements or other similar agreements delivered to the Administrative Agent pursuant to Section 6.13, and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties.

"Commitment" means a Revolving Commitment, an Initial Term Commitment, or an Incremental Term Commitment, as the context may require.

"Commitment Fee" has the meaning specified in Section 2.09(a).

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Company Material Adverse Effect" means a "Material Adverse Effect" as defined in the Acquisition Agreement.

"Competitor" means (i) any competitor of the Borrower or any of its Subsidiaries that is in the same or a similar line of business as the Borrower or any of its Subsidiaries and is designated in writing from time to time by the Borrower to the Administrative Agent and (ii) any Affiliate of a Person referred to in the foregoing clause (i) that is obviously (based solely on the similarity of the legal name of such Affiliate to the name of such Person referred to in the foregoing clause (i)) an Affiliate of such Person.

9

CHAR1\1498335v12

EHREN-WALIA 003518

"Compliance Certificate" means a certificate substantially in the form of Exhibit B.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated" means, when used with reference to financial statements or financial statement items of the Borrower and its Subsidiaries or any other Person, such statements or items on a consolidated basis in accordance with the consolidation principles of GAAP.

"Consolidated Cash Interest Charges" means, for any period, Consolidated Interest Charges paid in cash by the Borrower and its Restricted Subsidiaries during such period.

"Consolidated Cash Taxes" means, for any period, for the Borrower and its Restricted Subsidiaries on a Consolidated basis, the aggregate of all income taxes, as determined in accordance with GAAP, to the extent the same are paid in cash during such period.

"Consolidated EBITDA" means, for any period, for the Borrower and its Restricted Subsidiaries on a Consolidated basis in accordance with GAAP, the total of (a) Consolidated Net Income for such period, plus (b) the following (without duplication), in each case to the extent deducted (and not added back) in calculating such Consolidated Net Income (or, in the case of amounts pursuant to clause (b)(viii) below, not already included in Consolidated Net Income): (i) Consolidated Interest Charges for such period; (ii) the provision for federal, state, local and foreign income taxes payable for such period; (iii) depreciation and amortization expense for such period, (iv) non-recurring charges, fees, costs and expenses for such period; provided, that, the aggregate amount of add backs made pursuant to this clause (b)(iv) for any period, when added to the aggregate amount of add backs made pursuant to clause (b)(viii) below for such period, shall not exceed an amount equal to twenty percent (20%) of Consolidated EBITDA for such period (determined prior to giving effect to all such add backs); (v) non-cash losses and charges (including, without limitation, stock-based compensation expense, but excluding write-downs of accounts receivable) for such period which do not represent an accrual or reserve of a potential cash charge in such period or any future period; (vi) (A) extraordinary charges, fees, costs and expenses set forth on part I of Schedule 1.01(c) for such period, (B) extraordinary charges, fees, costs and expenses in respect of restructurings or other similar actions, including relocation costs, business process optimizations, integration costs, signing costs, retention or completion bonuses, employee replacement costs, transition costs, costs related to opening, closure and/or consolidation of facilities, severance charges in respect of employee terminations, and start-up losses related to new business ventures, (C) cash charges attributable to purchase accounting adjustments made in accordance with GAAP for such period, and (D) any other extraordinary charges, fees, costs and expenses for such period; provided, that, the aggregate amount of add backs made pursuant to clauses (b)(vi)(B), (b)(vi)(C) and (b)(vi)(D) hereof shall not exceed $5,000,000 for such period; (vii) management fees and expenses paid to the Sponsor for such period; provided, that, the aggregate amount of add backs made pursuant to this clause (b)(vii) shall not exceed an amount equal to four percent (4%) of Consolidated EBITDA for such period (determined prior to giving effect to the add backs set forth in clauses (iv) and (viii) of this definition); (viii)(A) the amount of cost savings, operating expense reductions and synergies related to the Transaction and Prior Acquisitions set forth on the Cost Savings Schedule delivered by the Borrower for the Transaction and the Prior Acquisitions, as applicable, for such period (which will be added to Consolidated EBITDA as so projected and calculated on a Pro Forma Basis as though such cost savings, operating expense reductions and synergies had been realized on the first (1st) day of such period), net of the amount of actual benefits realized during such period from such actions, and (B) the amount of cost savings, operating expense reductions and synergies related to Permitted Acquisitions set forth on the Cost Savings Schedule delivered by the Borrower for such Permitted Acquisition, as applicable, for such period (which will be added to Consolidated EBITDA as so projected and calculated on a Pro Forma Basis as though such cost savings, operating expense reductions and synergies had been realized on the first (1st)

10

EHREN-WALIA 003519

day of such period), net of the amount of actual benefits realized during such period from such actions; provided, that, the aggregate amount of add backs made pursuant to this clause (b)(viii) for any period, when added to the aggregate amount of add backs made pursuant to clause (b)(iv) above for such period, shall not exceed an amount equal to twenty percent (20%) of Consolidated EBITDA for such period (determined prior to giving effect to all such add backs), (ix) proceeds of business interruption insurance received in cash during such period; (x) charges, losses or expenses to the extent indemnified or insured or reimbursed by an unaffiliated third party to the extent such indemnification, insurance or reimbursement is actually received in cash for such period; provided, that, the aggregate amount of add backs made pursuant to this clause (b)(x) shall not exceed $1,000,000 for such period; (xi) to the extent not capitalized, fees, costs and expenses for such period related to the closing of this Agreement, any amendment, consent or waiver related thereto and the implementation of any Incremental Facility; (xii) to the extent not capitalized, non-recurring transaction expenses incurred (A) in connection with the Transactions (other than costs and expenses added back pursuant to clause (xi) above) and (B) after the Closing Date in connection with the consummation of any Specified Transaction and any incurrence of Indebtedness permitted hereunder, whether or not any such Specified Transaction or incurrence, as applicable, is consummated; provided, that, in each case, the add backs referred to in this clause (xii) shall be determined by the Borrower in consultation with the Administrative Agent; and (xiii) the quality of earnings adjustments set forth on part II of Schedule 1.01(c); minus (c) the following (without duplication), in each case to the extent included in calculating such Consolidated Net Income: all non-cash gains or income for such period; minus (d) the quality of earnings adjustments set forth on part III of Schedule 1.01(c). Notwithstanding the foregoing, "Consolidated EBITDA" for Vega Medical Professionals, LLC and its Subsidiaries (i) for the fiscal quarter ended June 30, 2016 shall be deemed to be $202,800.00, (ii) for the fiscal quarter ended September 30, 2016 shall be deemed to be $220,800.00 and (iii) for the fiscal quarter ended December 31, 2016, such amounts as agreed by the Administrative Agent and the Borrower.

For the avoidance of doubt, Consolidated EBITDA shall be determined on a Pro Forma Basis with respect to all Specified Transactions occurring during a Measurement Period in accordance with Section 1.03(d).

"Consolidated EBITDA Shortfall" means, at any time, the amount, if any, of additional Consolidated EBITDA necessary to cause the Loan Parties to be in compliance with Section 7.11(a) or Section 7.11(b), as applicable, for the applicable Measurement Period.

"Consolidated Fixed Charge Coverage Ratio" means, as of any date of determination, the ratio of (a) the total of (i) Consolidated EBITDA for the Measurement Period most recently completed on or prior to such date minus (ii) Consolidated Capital Expenditures for such period, minus (iii) Consolidated Cash Taxes for such period minus (iv) the aggregate amount of all Restricted Payments made pursuant to Section 7.06(c) for such period to (b) Fixed Charges for the Measurement Period most recently completed on or prior to such date.

"Consolidated Funded Indebtedness" means Funded Indebtedness of the Borrower and its Restricted Subsidiaries on a Consolidated basis.

"Consolidated Interest Charges" means, for any period, the sum of (a) all interest, premium payments, debt discount, fees, charges and related expenses in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets, in each case to the extent treated as interest in accordance with GAAP, plus (b) all interest paid or payable in connection with discontinued operations, plus (c) the portion of rent expense under Capitalized Leases that is treated as interest in accordance with GAAP, in each case, of or by the Borrower and its Restricted Subsidiaries on a Consolidated basis for such period.

11

EHREN-WALIA 003520

"Consolidated Leverage Ratio" means, as of any date of determination, the ratio of (a) Consolidated Funded Indebtedness as of such date to (b) Consolidated EBITDA for the Measurement Period most recently completed on or prior to such date.

"Consolidated Net Income" means, for any period, the net income (or loss) of the Borrower and its Restricted Subsidiaries on a Consolidated basis in accordance with GAAP; provided, that, Consolidated Net Income shall exclude (a) the net income of any Restricted Subsidiary during such period to the extent that the declaration or payment of dividends or similar distributions by such Restricted Subsidiary of such income is not permitted by operation of the terms of its Organization Documents or any agreement, instrument or Law applicable to such Restricted Subsidiary during such period, except that the Borrower's equity in any net loss of any such Restricted Subsidiary for such period shall be included in determining Consolidated Net Income, and (b) any income (or loss) for such period of any Person if such Person is not a Restricted Subsidiary, except that the Borrower's equity in the net income of any such Person for such period shall be included in Consolidated Net Income up to the aggregate amount of cash actually distributed by such Person during such period to the Borrower or a Restricted Subsidiary as a dividend or other distribution (and in the case of a dividend or other distribution to a Restricted Subsidiary, such Restricted Subsidiary is not precluded from further distributing such amount to the Borrower as described in clause (a) of this proviso).

"Consolidated Scheduled Funded Debt Payments" means, for any period, for the Borrower and its Restricted Subsidiaries on a Consolidated basis, the sum of all scheduled payments of principal on Consolidated Funded Indebtedness. For purposes of this definition, "scheduled payments of principal" (a) shall be determined without giving effect to any reduction of such scheduled payments resulting from the application of any voluntary or mandatory prepayments made during the applicable period, (b) shall be deemed to include the Attributable Indebtedness, and (c) shall not include any voluntary prepayments or mandatory prepayments required pursuant to Section 2.05.

"Consolidated Total Assets" means, as of any date of determination, the amount that would, in conformity with GAAP, be set forth opposite the caption "total assets" (or any like caption) on the most recent consolidated balance sheet of the Borrower and its Restricted Subsidiaries at such date.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto. Without limiting the generality of the foregoing, a Person shall be deemed to be Controlled by another Person if such other Person possesses, directly or indirectly, power to vote five percent (5%) or more of the securities having ordinary voting power for the election of directors, managing general partners or the equivalent.

"Controlled Investment Affiliate" means, as to any Person, any other Person that (a) directly or indirectly is in Control of, is Controlled by, or is under common Control with, such Person and (b) is organized by such Person primarily for the purpose of making equity investments in one or more companies.

"Cost Savings Schedule" means, with respect to the Transaction, any Prior Acquisition or any Permitted Acquisition, a schedule setting forth the cost savings, operating expense reductions and synergies related to the Transaction, such Prior Acquisition or such Permitted Acquisition, as applicable, that are certified by the chief financial officer of the Borrower to be reasonably identifiable, factually supportable and projected in good faith to result from actions that have been taken or are expected to be taken (in the

12

EHREN-WALIA 003521

good faith determination of the Borrower), in each case, within eighteen (18) months after the Transaction, such Prior Acquisition or such Permitted Acquisition (the "Adjustment Period"), as applicable; provided that each Cost Savings Schedule shall be mutually agreed by the Borrower and the Administrative Agent.

"Credit Extension" means each of the following: (a) a Borrowing and (b) an L/C Credit Extension.

"Cure Proceeds" has the meaning specified in Section 7.11(c).

"Debt Fund Affiliate" means any Affiliate of the Sponsor (other than any natural Person, Holdings, the Borrower or any Restricted Subsidiary) that is a bona fide debt fund and with respect to which the Sponsor and its Affiliates (other than Debt Fund Affiliates) do not, directly or indirectly, possess the power to direct or cause the direction of the investment policies of such entity.

"Debt Issuance" means (a) the issuance by the Borrower or any Restricted Subsidiary of any Indebtedness other than Indebtedness permitted under Section 7.02, and (b) the issuance by Holdings of any Indebtedness other than Indebtedness permitted by Section 7.18.

"Debtor Relief Laws" means the Bankruptcy Code of the United States and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means (a) with respect to any Obligation for which a rate is specified, a rate per annum equal to two percent (2%) in excess of the rate otherwise applicable thereto and (b) with respect to any Obligation for which a rate is not specified or available, a rate per annum equal to the Base Rate plus the Applicable Rate for Revolving Loans that are Base Rate Loans plus two percent (2%), in each case, to the fullest extent permitted by applicable Law.

"Defaulting Lender" means, subject to Section 2.15(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent, the L/C Issuer, the Swingline Lender or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in Letters of Credit or Swingline Loans) within two (2) Business Days of the date when due, (b) has notified the Borrower, the Administrative Agent, the L/C Issuer or the Swingline Lender in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided, that, such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of

CHAR1\1498335v12

EHREN-WALIA 003522

creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity, or (iii) become the subject of a Bail-In Action; provided, that, a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.15(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Borrower, the L/C Issuer, the Swingline Lender and each other Lender promptly following such determination.

"Designated Jurisdiction" means any country or territory to the extent that such country or territory is the subject of any Sanction.

"Discount Range" has the meaning specified in the definition "Dutch Auction".

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any Sale and Leaseback Transaction) of any property by any Loan Party or any Restricted Subsidiary (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith, but excluding: (a) any Involuntary Disposition, (b) the sale, transfer, license, lease or other disposition of inventory in the ordinary course of business, (c) the sale, transfer, license, lease or other disposition in the ordinary course of business of surplus, obsolete or worn out property no longer used or useful in the conduct of business of any Loan Party and its Subsidiaries, (d) any sale, transfer, license, lease or other disposition of property to any Loan Party or any Restricted Subsidiary; provided, that, if the transferor of such property is a Loan Party (i) the transferee thereof must be a Loan Party or (ii) to the extent such transaction constitutes an Investment, such transaction is permitted under Section 7.03, and (e) the sale, transfer, license, lease or other disposition of property the proceeds of which are less than $50,000 for any individual transaction and less than $500,000 for all transactions under this clause (e) in the aggregate in any fiscal year.

"Disqualified Equity Interests" means Equity Interests that by their terms (or by the terms of any security into which they are convertible or for which they are exchangeable), or the happening of any event, (a) require the payment of any cash dividends (other than dividends payable solely in shares of Qualified Equity Interests or, in the case of any pass through entity, in respect of taxes), (b) mature (excluding any maturity as the result of an optional redemption by the issuer thereof) or are mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or are redeemable at the option of the holder thereof, in whole or in part, prior to the ninety-first (91st) day after the Latest Maturity Date in effect on the date of the issuance thereof, (c) are convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Disqualified Equity Interests, in each case at any time prior to the ninety-first (91st) day after the Latest Maturity Date in effect on the date of the issuance thereof, or (d) contain any repurchase obligation which may come into effect prior to payment in full of all Obligations; provided, that, any Equity Interests that would not constitute Disqualified Equity Interests but for provisions thereof giving holders thereof (or the holders of any security into or for which such Equity Interests are convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem or repurchase such Equity Interests upon the occurrence of a change in control or an asset sale occurring prior to the ninety-first (91st) day after the Latest Maturity Date shall not constitute Disqualified Equity Interests if such Equity Interests

14

EHREN-WALIA 003523

provide that the issuer thereof will not redeem or repurchase any such Equity Interests pursuant to such provisions prior to the Facility Termination Date.

"Disqualified Institution" means (a) any bank, financial institution or institutional lender that, in each case, has been identified by legal name in writing to the Administrative Agent prior to November 24, 2016, (b) any Competitor that has been identified by legal name in writing to the Administrative Agent (i) prior to November 24, 2016 or (ii) following the date that is ninety (90) days after the Closing Date, or (c) any Affiliate of any Competitor identified pursuant to clause (b) that is obviously (based solely on the similarity of the legal name of such Affiliate to the name of such Competitor) an Affiliate of such Competitor; provided, that, the foregoing shall not apply to (x) retroactively disqualify any Person that has previously acquired an assignment or participation in the Loans or Commitments under this Agreement to the extent that any such Person was not a Disqualified Institution at the time of the applicable assignment or participation, as the case may be, or (y) any Fund whose managers are not involved with the equity investment decisions of any other Person described in clauses (a), (b) or (c).

"Dollar" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any political subdivision of the United States.

"Dutch Auction" means a Dutch auction in accordance with the following procedures:

    (a)    Notice Procedures. In connection with a Dutch Auction, the Auction Party will provide notification to the Auction Manager (for distribution to the Term Lenders of Initial Term Loans (the "Eligible Auction Lenders") and the Administrative Agent) of the principal amount of Initial Term Loans that will be the subject of the Dutch Auction (an "Auction Notice"). Each Auction Notice shall contain (i) the total cash value of the bid (the "Auction Amount"), in a minimum amount of $1,000,000 with minimum increments of $500,000, (ii) the discount to par, which shall be a range (the "Discount Range") of percentages of the par principal amount of Initial Term Loans (i.e., a five percent (5%) to ten percent (10%) Discount Range would represent $50,000 to $100,000 per $1,000,000 principal amount of Initial Term Loans, with a ten percent (10%) discount being deemed a "higher" discount than five percent (5%) for purposes of a Dutch Auction) at issue that represents the discounts applied to calculate the range of purchase prices that could be paid in the Dutch Auction (provided, that, the Discount Range may, at the option of the Auction Party, be a single percentage), (iii) the date on which the Dutch Auction will conclude, on which date Return Bids will be due at the time provided in the Auction Notice (such time, the "Auction Expiration Time"), as such date and time may be extended upon notice by the Auction Party to the Auction Manager before any prior Auction Expiration Time, and (iv) the identity of the Auction Manager, and shall indicate if such Auction Manager is an Affiliate of Holdings. Each offer to purchase Initial Term Loans in a Dutch Auction shall be offered on a *pro rata* basis to all the Eligible Auction Lenders.

    (b)    Reply Procedures. In connection with any Dutch Auction, each Eligible Auction Lender may, in its sole discretion, participate in such Dutch Auction and, if it elects to do so (any such participating Eligible Auction Lender, a "Participating Lender"), shall provide, prior to the Auction Expiration Time, the Auction Manager with a notice of participation (the "Return Bid") which shall be in a form and substance prepared by the Borrower and shall specify (i) a discount to par that must be expressed as a percentage of par principal amount of Initial Term Loans expressed in percentages (the "Reply Discount"), which must be within the Discount Range, and (ii) a principal amount of the Initial Term Loans, which must be in increments of $500,000, that such Eligible Auction Lender is willing to offer for sale at its Reply Discount (the "Reply Amount").

15

EHREN-WALIA 003524

An Eligible Auction Lender may avoid the minimum increment amount condition solely when submitting a Reply Amount equal to such Eligible Auction Lender's entire remaining amount of such Initial Term Loans. Eligible Auction Lenders may only submit one (1) Return Bid per Dutch Auction but each Return Bid may contain up to three (3) bids, only one of which can result in a Qualifying Bid (as defined below). In addition to the Return Bid, each Participating Lender must execute and deliver, to be irrevocable during the pendency of the Dutch Auction and held in escrow by the Auction Manager, an assignment agreement pursuant to which such Participating Lender shall make the representations and agreements substantially consistent with the terms of Section 2.16(a)(i)(F). Any Eligible Auction Lender that fails to submit a Return Bid at or prior to the Auction Expiration Time shall be deemed to have declined to participate in the Dutch Auction.

(c)     Acceptance Procedures.    Based on the Reply Discounts and Reply Amounts received by the Auction Manager, the Auction Manager, with the consent of the Auction Party, will, within ten (10) Business Days of the Auction Notice (or such other time agreed by the Borrower), determine the applicable discount (the "Applicable Discount") for the Dutch Auction, which will be the highest Reply Discount at which the Auction Party can complete the Dutch Auction at the Auction Amount; provided, that, in the event that the Reply Amounts are insufficient to allow the Auction Party to complete a purchase of the entire Auction Amount, the Auction Party shall either, at its election, (i) withdraw the Dutch Auction or (ii) complete the Dutch Auction as set forth below. Unless withdrawn, the Auction Party shall notify the Participating Lenders of the Applicable Discount no later than one (1) Business Day after it is determined (the "Applicable Discount Notice"). The Auction Party shall, within three (3) Business Days of the Applicable Discount Notice, purchase Initial Term Loans from each Participating Lender with a Reply Discount that is equal to or higher than the Applicable Discount ("Qualifying Bids") at a discount to par equal to the Reply Discount of such Participating Lender, with the applicable Initial Term Loans of the Participating Lender(s) with the highest Reply Discount being purchased first and then in descending order from such highest Reply Discount to and including the applicable Initial Term Loans of the Participating Lenders with a Reply Discount equal to the Applicable Discount (the "Applicable Order of Purchase"); provided, that, if the aggregate proceeds required to purchase all Initial Term Loans subject to Qualifying Bids would exceed the Auction Amount for such Dutch Auction, the Auction Party shall purchase such Initial Term Loans of the Participating Lenders in the Applicable Order of Purchase, but with the Initial Term Loans of Participating Lenders with Reply Discounts equal to the Applicable Discount being purchased pro rata until the Auction Amount has been so expended on such purchases. If a Participating Lender has submitted a Return Bid containing multiple bids at different Reply Discounts, only the bid with the highest Reply Discount that is equal to or more than the Applicable Discount will be deemed the Qualifying Bid of such Participating Lender. In no event shall any purchase of Initial Term Loans in a Dutch Auction be made at a Reply Discount lower than the Applicable Discount for such Dutch Auction.

(d)     Additional Procedures.    Once initiated by an Auction Notice, the Auction Party may withdraw or modify a Dutch Auction only prior to the delivery of the Applicable Discount Notice (and if any Dutch Auction is withdrawn or modified, notice thereof shall be delivered to the Administrative Agent and the Eligible Auction Lenders no later than the first (1st) Business Day after such withdrawal). Furthermore, in connection with any Dutch Auction, upon submission by a Participating Lender of a Qualifying Bid, such Participating Lender will be obligated to sell the entirety or its allocable portion of the Reply Amount, as the case may be, at the Applicable Discount.

"Earn Out Obligations" means, with respect to an Acquisition, all obligations of the Borrower or any Restricted Subsidiary to make earn out or other contingency payments (including purchase price adjustments, non-competition and consulting agreements, or other indemnity obligations) pursuant to the

16

EHREN-WALIA 003525

documentation relating to such Acquisition.  For purposes of determining the aggregate consideration paid for an Acquisition at the time of such Acquisition, the amount of any Earn Out Obligations shall be deemed to be the maximum amount of the earn-out payments in respect thereof as specified in the documents relating to such Acquisition.  For purposes of determining the amount of any Earn Out Obligations to be included in the definition of Funded Indebtedness, the amount of Earn Out Obligations shall be deemed to be the aggregate liability to be paid in cash in respect thereof to the extent stated on the balance sheet of the acquiring Person, as determined in accordance with GAAP.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assets" means property (other than current assets) that is used or useful in the same or a related line of business as the Borrower and its Restricted Subsidiaries were engaged in on the Closing Date (or any reasonable extensions or expansions thereof).

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 11.06 (subject to such consents, if any, as may be required under Section 11.06(b)(iii)).

"Eligible Auction Lenders" has the meaning specified in the definition "Dutch Auction".

"Employment and Consulting Agreements" means each of (a) that certain Consulting Agreement, dated as of November 24, 2016, by and among CHT Holdco, LLC, a Delaware limited liability company, Holdings and Alpha Cepheus, LLC, a Delaware limited liability company and (b) that certain Agreement, dated as of November 24, 2016, by and between Holdings and Paul Parmjit Parmar.

"Environmental Laws" means any and all federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, Environmental Permits, or governmental restrictions relating to pollution and the protection of the environment or the release of Hazardous Materials or pollutants into the environment, including those related to air emissions and wastewater discharges.

"Environmental Liability" means any actual liability (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of Holdings or any of its Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law or any Environmental Permit, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

17

EHREN-WALIA 003526

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan, (b) the withdrawal of the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA, (c) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization, (d) the filing of a notice of intent to terminate a Pension Plan or the treatment of a Pension Plan amendment as a termination of a Pension Plan under Section 4041 or 4041A of ERISA, (e) the institution by the PBGC of proceedings to terminate a Pension Plan, (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, (g) the determination that any Pension Plan is considered a plan in endangered or critical status within the meaning of Section 432 of the Code or Section 305 of ERISA, (h) the imposition of any material liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate or (i) a material failure by the Borrower or any ERISA Affiliate to meet all applicable requirements under the Pension Funding Rules in respect of a Pension Plan, whether or not waived, or the failure by the Borrower or any ERISA Affiliate to make any material required contribution to a Multiemployer Plan.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar Rate" means:

(a)     for any Interest Period, with respect to a Eurodollar Rate Loan, the rate per annum equal to the London Interbank Offered Rate ("LIBOR"), or a comparable or successor rate which rate is approved by the Administrative Agent, as published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) (in each case, the "LIBO Rate") at or about 11:00 a.m. (London time), two (2) Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period;

(b)     for any interest rate calculation with respect to a Base Rate Loan on any date, the rate per annum equal to the LIBO Rate, at or about 11:00 a.m. (London time) determined two (2) Business Days prior to such date for Dollar deposits being delivered in the London interbank market for deposits in Dollars with a term of one (1) month commencing that day;

CHAR1\1498335v12

EHREN-WALIA 003527

provided, that, (i) to the extent a comparable or successor rate is approved by the Administrative Agent in connection with any rate set forth in this definition, the approved rate shall be applied in a manner consistent with market practice; provided, further, that to the extent such market practice is not administratively feasible for the Administrative Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent and (ii) if the Eurodollar Rate shall be less than zero, such rate shall be deemed zero for purposes of this Agreement.

"Eurodollar Rate Loan" means a Loan that bears interest at a rate based on clause (a) of the definition of "Eurodollar Rate".

"Event of Default" has the meaning specified in Section 8.01.

"Excess Cash Flow" means, with respect to the Borrower and its Restricted Subsidiaries, an amount equal to the sum of (a) Consolidated EBITDA for such Excess Cash Flow Period minus (b) the unfinanced portion of Consolidated Capital Expenditures for such Excess Cash Flow Period minus (c) Consolidated Interest Charges actually paid in cash by the Borrower and its Subsidiaries for such Excess Cash Flow Period minus (d) cash taxes paid for such Excess Cash Flow Period minus (e) Consolidated Scheduled Funded Debt Payments for such Excess Cash Flow Period minus (f) the portion of the purchase price paid in cash during such Excess Cash Flow Period with respect to any Permitted Acquisitions minus (g) one-time transaction costs paid in cash for any Permitted Acquisition or Permitted Transfer during such Excess Cash Flow Period minus (h) amounts paid in cash during such Excess Cash Flow Period described in clauses (b)(iv), (b)(vi), (b)(vii) of the definition of Consolidated EBITDA.

"Excess Cash Flow Period" means, each fiscal year of the Borrower, commencing with the fiscal year ending on December 31, 2017.

"Exchange Act" means the Securities Exchange Act of 1934, including all amendments thereto and regulations promulgated thereunder.

"Excluded Property" means, with respect to any Loan Party, (a)(i) any owned or leased real or personal property which is located outside of the United States, (ii) any fee-owned real property with a fair market value of less than $5,000,000; provided, that the fair market value of all fee-owned real property constituting "Excluded Property" shall not exceed $15,000,000 in the aggregate, and (iii) any leasehold interest in real property; (b) unless requested by the Administrative Agent or the Required Lenders, any personal property (including motor vehicles, airplanes and other assets subject to certificates of title) in respect of which perfection of a Lien is not either (i) governed by the Uniform Commercial Code or (ii) effected by appropriate evidence of the Lien being filed in either the United States Copyright Office or the United States Patent and Trademark Office; (c) the Equity Interests of any Foreign Subsidiary or any CFC Holdco to the extent not required to be pledged to secure the Secured Obligations pursuant to Section 6.13; (d) any property which, subject to the terms of Section 7.02(c), is subject to a Lien of the type described in Section 7.01(i) pursuant to documents that prohibit such Loan Party from granting any other Liens in such property; (e) any general intangible, permit, lease, license, contract or other instrument of a Loan Party to the extent the grant of a security interest in such general intangible, permit, lease, license, contract or other instrument in the manner contemplated by the Collateral Documents, under the terms thereof or under applicable Law, is prohibited and would result in the termination thereof or give the other parties thereto the right to terminate, accelerate or otherwise alter such Loan Party's rights, titles and interests thereunder (including upon the giving of notice or the lapse of time or both); provided, that, (i) any such limitation described in the foregoing clause (e) on the security interests granted pursuant to the Collateral Documents shall only apply to the extent that any such prohibition could not be rendered ineffective pursuant to the UCC or any other applicable Law (including Debtor Relief Laws) or principles of equity and (ii) in the

19

EHREN-WALIA 003528

Case 8:20-cv-00049-sst Doc 162-37 Filed 05/03/24 Entered 05/03/24 16:02:27
Case 2:24-cv-03330-GRB    Document 4-7    Filed 06/03/24    Page 94 of 106 PageID #:
917

event of the termination or elimination of any such prohibition or the requirement for any consent contained in any applicable Law, general intangible, permit, lease, license, contract or other instrument, to the extent sufficient to permit any such item to become Collateral, or upon the granting of any such consent, or waiving or terminating any requirement for such consent, a security interest in such general intangible, permit, lease, license, contract or other instrument shall be automatically and simultaneously granted under the Collateral Documents and shall be included as Collateral; (f) pledges of, and security interests in, assets, which are prohibited by applicable Law; provided, that, (i) any such limitation described in this clause (f) on the security interests granted pursuant to the Collateral Documents shall only apply to the extent that any such prohibition could not be rendered ineffective pursuant to the UCC or any other applicable Law (including Debtor Relief Laws) or principles of equity and (ii) in the event of the termination or elimination of any such prohibition contained in any applicable Law, a security interest in such assets shall be automatically and simultaneously granted under the Collateral Documents and shall be included as Collateral; (g) any "intent-to-use" application for registration of a Trademark (as defined in the Security Agreement) of such Loan Party filed in the United States Patent and Trademark Office pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. §1051, prior to the filing of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act with respect thereto, solely to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of any registration that issues from such intent-to-use application under applicable federal law; and (h) any real or personal property as to which the Administrative Agent and the Borrower agree in writing that the costs or other consequences of obtaining a security interest or perfection thereof are excessive in view of the benefits to be obtained by the Secured Parties therefrom.

"Excluded Subsidiary" means any Subsidiary of Holdings (other than, for the avoidance of doubt, the Borrower) that is: (a) an Unrestricted Subsidiary; (b) an Immaterial Subsidiary; (c) prohibited or materially restricted by applicable Law or by a binding Contractual Obligation (including if the provision by such Subsidiary of a Guaranty would require governmental (including regulatory) consent, approval, license or authorization and such consent, approval, license or authorization has not been received); provided, that, such Contractual Obligation is permitted hereunder and is in existence on the Closing Date or at the time such Subsidiary is acquired and is not entered into by Holdings or any Subsidiary for the purpose of qualifying as an "Excluded Subsidiary" under this Agreement; provided, further, that, such exception shall only apply until such time as such prohibition or material restriction no longer exists; (d) to the extent that the provision by such Subsidiary of a Guaranty would result in material adverse tax consequences for the Borrower and its Restricted Subsidiaries, as reasonably determined by the Borrower in consultation with the Administrative Agent; (e) a CFC Holdco; (f) a special purpose entity; (g) a not-for-profit Subsidiary; (h) a Captive Insurance Subsidiary; or (i) a Subsidiary for which the Borrower and the Administrative Agent agree in writing that the cost or other consequences of obtaining a Guaranty from such Subsidiary would be excessive in view of the benefits to be obtained by the Secured Parties therefrom.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guaranty of such Guarantor of, or the grant by such Guarantor of a Lien to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to Section 10.11 and any other "keepwell," support or other agreement for the benefit of such Guarantor and any and all guarantees of such Guarantor's Swap Obligations by other Loan Parties) at the time the Guaranty of such Guarantor, or grant by such Guarantor of a Lien, becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a Master Agreement governing more than one Swap Contract, such exclusion shall apply only to the portion of such Swap Obligation that is attributable

CHAR1\1498335v12

EHREN-WALIA 003529

to Swap Contracts for which such Guaranty or Lien is or becomes excluded in accordance with the first sentence of this definition.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 11.13) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to Section 3.01(a)(ii), (a)(iii) or (c), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.01(e) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings and proceeds of Involuntary Dispositions), indemnity payments and any purchase price adjustments; provided, that, an Extraordinary Receipt shall not include cash receipts from proceeds of insurance or indemnity payments to the extent that such proceeds, awards or payments are received by any Person in respect of any third party claim against such Person and applied to pay (or to reimburse such Person for its prior payment of) such claim and the costs and expenses of such Person with respect thereto.

"Facility" means the Initial Term Facility, the Revolving Facility, or any Incremental Term Facility, as the context may require.

"Facility Termination Date" means the date as of which all of the following shall have occurred: (a) the Aggregate Commitments have terminated, (b) all Obligations have been paid in full in cash or immediately available funds (other than contingent indemnification obligations for which no claim has been asserted), and (c) all Letters of Credit have terminated or expired (other than Letters of Credit as to which other arrangements with respect thereto satisfactory to the Administrative Agent and the L/C Issuer shall have been made).

"FASB ASC" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code and any applicable intergovernmental agreements with respect thereto.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, that, (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no

CHAR1\1498335v12

EHREN-WALIA 003530

such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Bank of America on such day on such transactions as determined by the Administrative Agent.

"Fee Letter" means the fee letter agreement, dated January 20, 2017, among Bank of America, MLPFS and the Sponsor.

"Fixed Charges" means, for any period, the sum of (a) Consolidated Scheduled Funded Debt Payments for such period plus (b) Consolidated Cash Interest Charges for such period; provided that for purposes of calculating Fixed Charges: (1) Consolidated Scheduled Funded Debt Payments with respect to the Initial Term Loan for the period ending March 31, 2017 shall be the actual amount thereof for the period of one fiscal quarter then ended multiplied by four (4); (2) Consolidated Scheduled Funded Debt Payments with respect to the Initial Term Loan for the period ending June 30, 2017 shall be the actual amount thereof for the period of two fiscal quarters then ended multiplied by two (2); and (3) Consolidated Scheduled Funded Debt Payments with respect to the Initial Term Loan for the period ending September 30, 2017 shall be the actual amount thereof for the period of three fiscal quarters then ended multiplied by four-thirds (4/3); provided, further, for purposes of calculating Fixed Charges: (1) Consolidated Interest Charges for the period ending March 31, 2017 shall be the actual amount thereof for the period of one fiscal quarter then ended multiplied by four (4); (2) Consolidated Interest Charges for the period ending June 30, 2017 shall be the actual amount thereof for the period of two fiscal quarters then ended multiplied by two (2); and (3) Consolidated Interest Charges for the period ending September 30, 2017 shall be the actual amount thereof for the period of three fiscal quarters then ended multiplied by four-thirds (4/3).

"Flood Hazard Property" means any Mortgaged Property that is in an area designated by the Federal Emergency Management Agency as having special flood or mudslide hazards.

"Foreign Lender" means (a) if the Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if the Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fronting Exposure" means, at any time there is a Defaulting Lender that is a Revolving Lender, (a) with respect to the L/C Issuer, such Defaulting Lender's Applicable Percentage of the outstanding L/C Obligations, other than L/C Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Revolving Lenders or Cash Collateralized in accordance with the terms hereof, and (b) with respect to the Swingline Lender, such Defaulting Lender's Applicable Percentage of Swingline Loans other than Swingline Loans as to which such Defaulting Lender's participation obligation has been reallocated to other Revolving Lenders or Cash Collateralized in accordance with the terms hereof.

"Fund" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"Funded Indebtedness" means as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP: (a) all obligations, whether current or long-term, for borrowed money (including the Obligations) and all

22

CHAR1\1498335\12

EHREN-WALIA 003531



obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, (b) all purchase money Indebtedness, (c) the principal portion of all obligations under conditional sale or other title retention agreements relating to property purchased by such Person or any Subsidiary thereof (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business), (d) all obligations arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments, (e) all obligations in respect of the deferred purchase price of property or services, including, without limitation, any Earn Out Obligations (other than trade accounts payable in the ordinary course of business and, in each case, not past due for more than ninety (90) days after the due date thereof), (f) all Attributable Indebtedness, (g) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (h) all Funded Indebtedness of others secured by (or for which the holder of such Funded Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on, or payable out of the proceeds of production from, property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (i) all Guarantees with respect to Funded Indebtedness of the types specified in clauses (a) through (h) above of another Person, and (j) all Funded Indebtedness of the types referred to in clauses (a) through (i) above of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or joint venturer, except to the extent that such Funded Indebtedness is expressly made non-recourse to such Person. For purposes hereof, the amount of any direct obligation arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments shall be the maximum amount available to be drawn thereunder.

"Funding Indemnity Letter" means a funding indemnity letter, in form and substance satisfactory to the Administrative Agent.

"GAAP" means generally accepted accounting principles in the United States set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession) including the FASB Accounting Standards Codification that are applicable to the circumstances as of the date of determination, consistently applied and subject to Section 1.03.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supranational bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee

CHAR1\1498335v12

EHREN-WALIA 003532

714

against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guaranteed Obligations" has the meaning specified in Section 10.01.

"Guarantors" means, collectively, (a) Holdings, (b) with respect to (i) Additional Secured Obligations owing by any Loan Party or any Domestic Subsidiary and (ii) any Swap Obligation of a Specified Loan Party (determined before giving effect to Sections 10.01 and 10.11) under the Guaranty, in each case, the Borrower, (c) each Domestic Subsidiary of Holdings (other than any CFC Holdco) as is party to this Agreement on the Closing Date or may from time to time become party to this Agreement pursuant to Section 6.12, and (d) the successors and permitted assigns of the foregoing.

"Guaranty" means, collectively, (a) the Guarantee made by the Guarantors under Article X in favor of the Secured Parties, and (b) each other guaranty delivered pursuant to Section 6.12.

"Hazardous Materials" means all explosive or radioactive substances (other than naturally occurring radon) or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, natural gas, natural gas liquids, asbestos or asbestos-containing materials, polychlorinated biphenyls, toxic mold, infectious or medical wastes, and all other substances, wastes, chemicals, pollutants, contaminants or compounds of any nature in any form regulated pursuant to any Environmental Law.

"Health Care Laws" means all requirements of Law relating to (a) healthcare fraud and abuse (including the following statutes, as amended, modified or supplemented from time to time and any successor statutes thereto and regulations promulgated from time to time thereunder: the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)) other than the regulations at 42 C.F.R. § 1001.952; the Stark Law (42 U.S.C. § 1395nn and §1395(q)); the civil False Claims Act (31 U.S.C. § 3729 et seq.); Sections 1320a-7 and 1320a-7a and 1320a-7b of Title 42 of the United States Code; (b) Medicare Regulations, Medicaid Regulations, Laws regarding the Civilian Health and Medical Program of the Department of Veterans Affairs known as "CHAMPVA", the health program for certain active and retired members of the uniformed services and National Guard members and their families known as "TRICARE" or other Third Party Payor Programs; (c) the provision of, or payment for, health care services, items or supplies; (d) the billing, coding or submission of claims or collection of accounts receivable or refund of overpayments; (e) HIPAA; (f) fee-splitting prohibitions; (g) certificates of operations and authority; and (h) any and all other applicable federal or state health care laws, rules, codes, regulations and manuals.

"Health Care Permits" has the meaning specified in Section 5.21(b).

"Hedge Bank" means any Person in its capacity as a party to a Swap Contract that, (a) at the time it enters into a Swap Contract not prohibited under Article VI or VII, is a Lender or an Affiliate of a Lender, or (b) at the time it (or its Affiliate) becomes a Lender, is a party to a Swap Contract not prohibited under Article VI or VII, in each case, in its capacity as a party to such Swap Contract (even if such Person ceases to be a Lender or such Person's Affiliate ceased to be a Lender); provided, that, in the case of a Secured Hedge Agreement with a Person who is no longer a Lender (or Affiliate of a Lender), such Person shall be considered a Hedge Bank only through the stated termination date (without extension or renewal) of such

CHAR1\1498335v12

EHREN-WALIA 003533

Secured Hedge Agreement; provided, further, that for any of the foregoing to be included as a "Secured Hedge Agreement" on any date of determination by the Administrative Agent, the applicable Hedge Bank (other than the Administrative Agent or an Affiliate of the Administrative Agent) must have delivered a Secured Party Designation Notice to the Administrative Agent prior to such date of determination.

"HHS" means the United States Department of Health and Human Services and any successor thereof.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191, Aug. 21, 1996, 110 Stat. 1936, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"HMT" has the meaning specified in the definition of "Sanction(s)".

"Holdings" has the meaning specified in the Recitals.

"Honor Date" has the meaning specified in Section 2.03(c)(i).

"Immaterial Subsidiary" means, as of any date of determination, any Restricted Subsidiary (other than the Borrower) that (a) as of the last day of the Measurement Period most recently ended for which financial statements have been delivered pursuant to Section 6.01(a) or Section 6.01(b), did not have, together with the total assets as of such date of all other Immaterial Subsidiaries in the aggregate, total assets in excess of five percent (5%) of Consolidated Total Assets as of such date, or (b) for the Measurement Period most recently ended for which financial statements have been delivered pursuant to Section 6.01(a) or Section 6.01(b), did not represent, together with the Consolidated EBITDA for such Measurement Period attributable to all Immaterial Subsidiaries in the aggregate, Consolidated EBITDA in excess of five percent (5%) of Consolidated EBITDA of the Borrower and its Restricted Subsidiaries for such Measurement Period; provided, that, if, as of the date financial statements are delivered or required to be delivered pursuant to Section 6.01(a) or Section 6.01(b), (i) the total assets of any or all Immaterial Subsidiaries shall have, as of the last day of the Measurement Period most recently ended, exceeded the limit set forth in clause (a) above, or (ii) the Consolidated EBITDA attributable to any or all Immaterial Subsidiaries shall have, as of the Measurement Period most recent ended, exceeded the limit set forth in clause (b) above, then, in each case, within ten (10) Business Days (or such later date as agreed by the Administrative Agent in its reasonable discretion) after the date such financial statements are delivered or required to be delivered, the Borrower shall re-designate one or more Immaterial Subsidiaries, such that, as a result thereof, the total assets of, and Consolidated EBITDA attributable to, such Immaterial Subsidiary or all Immaterial Subsidiaries in the aggregate, as applicable, do not exceed such limits. Upon any such Restricted Subsidiary ceasing to be an Immaterial Subsidiary pursuant to the preceding sentence, such Restricted Subsidiary, to the extent not otherwise qualifying as an Excluded Subsidiary, shall comply with Sections 6.12 and 6.13, to the extent applicable.

"Impacted Loans" has the meaning specified in Section 3.03.

"Incremental Amount" has the meaning specified in Section 2.02(g)(i).

"Incremental Facility" has the meaning specified in Section 2.02(g)(i).

"Incremental Financing Commitments" has the meaning specified in Section 1.03(e)(ii).

"Incremental Revolving Facility" has the meaning specified in Section 2.02(g)(i).

CHAR1\1498335v12

EHREN-WALIA 003534

"Incremental Term Borrowing" means a borrowing consisting of simultaneous Incremental Term Loans of the same Type and, in the case of Eurodollar Rate Loans, having the same Interest Period made by Incremental Term Lenders pursuant to Section 2.01(c).

"Incremental Term Commitment" means, as to each Incremental Term Lender, its obligation to make an Incremental Term Loan hereunder pursuant to an Incremental Term Loan Lender Joinder Agreement; provided, that, at any time after the funding of an Incremental Term Loan, determination of "Required Lenders" shall include the Outstanding Amount of all Incremental Term Loans.

"Incremental Term Facility" means, at any time, with respect to any Incremental Term Loan Lender Joinder Agreement, the aggregate principal amount of all Incremental Term Loans made by Incremental Term Lenders pursuant to such Incremental Term Loan Lender Joinder Agreement that are outstanding at such time.

"Incremental Term Increase" has the meaning specified in Section 2.02(g)(i).

"Incremental Term Lender" means each of the Persons identified as an "Incremental Term Lender" in an Incremental Term Loan Lender Joinder Agreement, together with their respective successors and assigns.

"Incremental Term Loan" means an advance made by any Incremental Term Lender under an Incremental Term Facility.

"Incremental Term Loan Lender Joinder Agreement" means a joinder agreement, substantially in the form of Exhibit C, executed and delivered in connection with the incurrence of any Incremental Term Facility in accordance with the provisions of Section 2.02(g)(iv).

"Incremental Term Loan Maturity Date" with respect to any Incremental Term Facility, shall be as set forth in the applicable Incremental Term Loan Lender Joinder Agreement for such Incremental Term Facility.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP: (a) all Funded Indebtedness; (b) the Swap Termination Value of any Swap Contract; (c) all Guarantees with respect to outstanding Indebtedness of the types specified in clauses (a) and (b) above of any other Person; and (d) all Indebtedness of the types referred to in clauses (a) through (c) above of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person or a Subsidiary thereof is a general partner or joint venturer, unless such Indebtedness is expressly made non-recourse to such Person or such Subsidiary.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitee" has the meaning specified in Section 11.04(b).

"Information" has the meaning specified in Section 11.07(a).

"Initial Term Commitment" means, with respect to any Term Lender, its obligation to make an Initial Term Loan to the Borrower pursuant to Section 2.01(a) in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Term Lender's name on Schedule 1.01(b)

CHAR1\1498335v12

EHREN-WALIA 003535

under the caption "Initial Term Commitment" or opposite such caption in the Assignment and Assumption or such other document pursuant to which such Term Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.  The Initial Term Commitment of all of the Term Lenders on the Closing Date shall be $130,000,000.

"Initial Term Facility" means, (a) on the Closing Date, the aggregate amount of the Initial Term Commitments at such time, and (b) at any time thereafter, the aggregate principal amount of the Initial Term Loans of all Term Lenders outstanding at such time.

"Initial Term Facility Maturity Date" means January 30, 2022; provided, that, if such date is not a Business Day, the Initial Term Facility Maturity Date shall be the next preceding Business Day.

"Initial Term Loan" means a Term Loan made by a Term Lender to the Borrower on the Closing Date pursuant to Section 2.01(b).

"Insolvency Proceeding" means (a) any insolvency or bankruptcy case or proceeding or any receivership, liquidation, reorganization, readjustment, composition or other similar case or proceeding relating to any Person or its property, (b) any liquidation, dissolution, reorganization or winding up of any Person, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy proceedings or (c) any assignment for the benefit or creditors or any other marshalling of any Person's property.

"Intellectual Property" means all trademarks, trademark applications, service marks, trade names, copyrights, copyright applications, patents, patent applications, patent rights, franchises, licenses and other intellectual property rights.

"Intercompany Debt" has the meaning specified in Section 7.02(d).

"Interest Payment Date" means, (a) as to any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date of the Facility under which such Loan was made; provided, however, that if any Interest Period for a Eurodollar Rate Loan exceeds three (3) months, the respective dates that fall every three (3) months after the beginning of such Interest Period shall also be Interest Payment Dates, and (b) as to any Base Rate Loan or Swingline Loan, the last Business Day of each March, June, September and December and the Maturity Date of the Facility under which such Loan was made (with Swingline Loans being deemed made under the Revolving Facility for purposes of this definition).

"Interest Period" means, as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan and ending on the date one (1), two (2), three (3) or six (6) months thereafter (in each case, subject to availability), as selected by the Borrower in its Loan Notice, or such other period that is twelve (12) months or less requested by the Borrower and consented to by all of the Appropriate Lenders; provided, that:

(a)        any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)        any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

27

EHREN-WALIA 003536

(c)      no Interest Period shall extend beyond the Maturity Date of the Facility under which such Loan was made.

"Interim Financial Statements" has the meaning specified in Section 4.01(d)(ii).

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person (including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor guaranties Indebtedness of such other Person), or (c) an Acquisition.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"Involuntary Disposition" means any loss of, damage to or destruction of, or any condemnation or other taking for public use of, any property of any Loan Party or any Restricted Subsidiary.

"IRS" means the United States Internal Revenue Service.

"ISP" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice, Inc. (or such later version thereof as may be in effect at the time of issuance).

"Issuer Documents" means with respect to any Letter of Credit, the Letter of Credit Application, and any other document, agreement and instrument entered into by the L/C Issuer and the Borrower (or any Restricted Subsidiary) or in favor of the L/C Issuer and relating to such Letter of Credit.

"Joinder Agreement" means a joinder agreement substantially in the form of Exhibit D executed and delivered in accordance with the provisions of Section 6.12.

"Junior Debt" has the meaning specified in Section 7.14.

"Latest Maturity Date" means, at any date of determination, the latest of the Revolving Facility Maturity Date, the Initial Term Facility Maturity Date, and the then latest Incremental Term Loan Maturity Date.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the binding interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"L/C Advance" means, with respect to each Revolving Lender, such Lender's funding of its participation in any L/C Borrowing in accordance with its Applicable Revolving Percentage.

"L/C Borrowing" means an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made or refinanced as a Revolving Borrowing.

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

28

EHREN-WALIA 003537

"L/C Issuer" means Bank of America, in its capacity as issuer of Letters of Credit hereunder, or any successor issuer of Letters of Credit hereunder.

"L/C Obligations" means, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit plus the aggregate of all Unreimbursed Amounts (including all L/C Borrowings). For purposes of computing the amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.06. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"LCA Election" has the meaning specified in Section 1.03(e)(iii).

"LCA Test Date" has the meaning specified in Section 1.03(e)(iii).

"Lender" means each of the Persons identified as a "Lender" on the signature pages hereto, each other Person that becomes a "Lender" in accordance with this Agreement, and their respective successors and assigns and, unless the context requires otherwise, includes the Swingline Lender.

"Lending Office" means, as to the Administrative Agent, the L/C Issuer or any Lender, the office or offices of such Person described as such in such Person's Administrative Questionnaire, or such other office or offices as such Person may from time to time notify the Borrower and the Administrative Agent; which office may include any Affiliate of such Person or any domestic or foreign branch of such Person or such Affiliate.

"Letter of Credit" means any standby letter of credit issued hereunder.

"Letter of Credit Application" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the L/C Issuer.

"Letter of Credit Expiration Date" means the day that is seven (7) days prior to the Revolving Facility Maturity Date (or, if such day is not a Business Day, the next preceding Business Day).

"Letter of Credit Fee" has the meaning specified in Section 2.03(h).

"Letter of Credit Sublimit" means an amount equal to the lesser of (a) $5,000,000 and (b) the Revolving Facility. The Letter of Credit Sublimit is part of, and not in addition to, the Revolving Facility.

"LIBO Rate" has the meaning specified in the definition of "Eurodollar Rate".

"LIBOR" has the meaning specified in the definition of "Eurodollar Rate".

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property and any financing lease having substantially the same economic effect as any of the foregoing).

"Limited Condition Acquisition" means any Permitted Acquisition whose consummation is not conditioned on the availability of, or on obtaining, third-party financing.

CHAR1\1498335v12

EHREN-WALIA 003538

"Loan" means an extension of credit by a Lender to the Borrower in the form of a Revolving Loan, a Term Loan, or a Swingline Loan.

"Loan Documents" means, this Agreement, the Notes, the Guaranty, the Collateral Documents, the Fee Letter, the Borrower Assignment, Assumption and Release, each Issuer Document, each Incremental Term Loan Lender Joinder Agreement, each Joinder Agreement, any intercreditor or subordination agreement entered into for the benefit of, or by, the Administrative Agent in connection with any Indebtedness permitted hereunder, any other agreement, instrument or document designated by its terms as a "Loan Document", and any agreement creating or perfecting rights in Cash Collateral pursuant to the provisions of Section 2.14 (but specifically excluding any Secured Hedge Agreement and any Secured Cash Management Agreement).

"Loan Notice" means a notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other, or (c) a continuation of Eurodollar Rate Loans, pursuant to Section 2.02(a), which shall be substantially in the form of Exhibit E or such other form as may be approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent), appropriately completed and signed by a Responsible Officer of the Borrower.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"London Banking Day" means any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank market.

"Master Agreement" has the meaning specified in the definition of "Swap Contract."

"Material Adverse Effect" means any event, change or condition that, individually or in the aggregate, has had (a) a material adverse effect on the business, assets, results of operations, liabilities (actual or contingent) or financial condition of the Loan Parties and their respective Restricted Subsidiaries, taken as a whole, (b) a material adverse effect on the ability of the Loan Parties (taken as a whole) to fully and timely perform any of their payment obligations under any Loan Document to which the Borrower or any of the other Loan Parties is a party, or (c) a material adverse effect on the material rights and remedies (taken as a whole) of the Administrative Agent or any Lender under the Loan Documents (taken as a whole), including the legality, validity, binding effect or enforceability of the Loan Documents.

"Maturity Date" means the Revolving Facility Maturity Date, the Initial Term Facility Maturity Date, or the applicable Incremental Term Loan Maturity Date, as the context may require.

"Maximum Rate" has the meaning specified in Section 11.09.

"Measurement Period" means, at any date of determination, the four (4) fiscal quarters of the Borrower most recently completed on or prior to such date of determination.

"Medicaid" means that government-sponsored entitlement program under Title XIX, P.L. 89-97 of the Social Security Act, which provides federal grants to states for medical assistance based on specific eligibility criteria, as set forth on Section 1396, et seq. of Title 42 of the United States Code.

"Medicaid Regulations" means, collectively, (a) all federal statutes (whether set forth in Title XIX of the Social Security Act or elsewhere) affecting Medicaid and any statutes succeeding thereto; (b) all applicable provisions of all federal rules, regulations and manuals promulgated pursuant to or in connection with the statutes described in clause (a); (c) all state statutes for medical assistance enacted in connection with the statutes and provisions described in clauses (a) and (b); and (d) all applicable provisions of all

30

EHREN-WALIA 003539

rules, regulations and manuals of all Governmental Authorities promulgated pursuant to or in connection with the statutes described in clause (c).

"Medicare" means that government-sponsored insurance program under Title XVIII, P.L. 89-97, of the Social Security Act, which provides for a health insurance system for individuals 65 and older, certain disabled individuals and certain individuals with end-stage renal disease, as set forth at Section 1395, et seq. of Title 42 of the United States Code.

"Medicare Regulations" means, collectively, all federal statutes (whether set forth in Title XVIII of the Social Security Act or elsewhere) affecting Medicare and any statutes succeeding thereto; together with all applicable provisions of all rules, regulations and manuals of all Governmental Authorities (including, without limitation, CMS, the OIG, HHS, or any person succeeding to the functions of any of the foregoing) promulgated pursuant to or in connection with any of the foregoing.

"Mergersub" has the meaning specified in the introductory paragraph hereto.

"Minimum Collateral Amount" means, at any time, (a) with respect to Cash Collateral consisting of cash or deposit account balances provided to reduce or eliminate Fronting Exposure during any period when a Lender constitutes a Defaulting Lender, an amount equal to one hundred three percent (103%) of the Fronting Exposure of the L/C Issuer with respect to Letters of Credit issued and outstanding at such time, (b) with respect to Cash Collateral consisting of cash or deposit account balances provided in accordance with the provisions of Section 2.14(a)(i), (a)(ii) or (a)(iii), an amount equal to one hundred three percent (103%) of the Outstanding Amount of all L/C Obligations, and (c) otherwise, an amount determined by the Administrative Agent and the L/C Issuer in their sole discretion.

"MLPFS" means Merrill Lynch, Pierce, Fenner & Smith Incorporated.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" or "Mortgages" means, individually and collectively, as the context requires, each of the fee mortgages, deeds of trust and deeds executed by a Loan Party that purport to grant a Lien to the Administrative Agent (or a trustee for the benefit of the Administrative Agent) for the benefit of the Secured Parties in any Mortgaged Properties, in form and substance satisfactory to the Administrative Agent.

"Mortgaged Property" means any owned real property of a Loan Party listed on Schedule 5.19(c) (other than Excluded Property) and identified thereon as a "Mortgaged Property" and any other owned real property of a Loan Party that is or will become encumbered by a Mortgage in accordance with the terms of this Agreement.

"Mortgaged Property Support Documents" means with respect to any real property subject to a Mortgage:

(a)     a fully executed and notarized Mortgage encumbering the fee interest of a Loan Party in such real property;

(b)     if requested by the Administrative Agent in its sole discretion, maps or plats of an as-built survey of the sites of such real property certified to the Administrative Agent and the title insurance company issuing the policies referred to in clause (c) of this definition in a manner satisfactory to each of the Administrative Agent and such title insurance company, dated a date satisfactory to each of the Administrative Agent and such title insurance company by an independent professional licensed land surveyor, which maps or plats and the surveys on which

CHAR1\1498335v12

EHREN-WALIA 003540

722

they are based shall be sufficient to delete any standard printed survey exception contained in the applicable title policy and be made in accordance with the Minimum Standard Detail Requirements for Land Title Surveys jointly established and adopted by the American Land Title Association and the National Society of Professional Surveyors in 2016 with items 2, 3, 4, 6(a), 6(b), 7(a), 7(b)(1), 7(c), 8, 9, 13, 14, 16, 17, and 19 on Table A thereof completed;

(c)     ALTA mortgagee title insurance policies issued by a title insurance company acceptable to the Administrative Agent with respect to such real property, assuring the Administrative Agent that the Mortgage covering such real property creates a valid and enforceable first priority mortgage lien on such real property, free and clear of all defects and encumbrances except Permitted Liens, which title insurance policies shall otherwise be in form and substance satisfactory to the Administrative Agent and shall include such endorsements as are reasonably requested by the Administrative Agent;

(d)     evidence as to (i) whether such real property is a Flood Hazard Property and (ii) if such real property is a Flood Hazard Property, (A) whether the community in which such real property is located is participating in the National Flood Insurance Program, (B) the applicable Loan Party's written acknowledgement of receipt of written notification from the Administrative Agent (1) as to the fact that such real property is a Flood Hazard Property and (2) as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program and (C) copies of insurance policies or certificates of insurance of the Loan Parties and each Restricted Subsidiary evidencing flood insurance satisfactory to the Administrative Agent and naming the Administrative Agent and its successors and/or assigns as sole loss payee on behalf of the Secured Parties;

(e)     such environmental questionnaires, environmental site assessments and other environmental due diligence as the Administrative Agent requires with respect to such real property; and

(f)     if requested by the Administrative Agent in its sole discretion, an opinion of legal counsel to the Loan Party granting the Mortgage on such real property, addressed to the Administrative Agent and each Lender, in form and substance reasonably acceptable to the Administrative Agent.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five (5) plan years, has made or been obligated to make contributions.

"Multiple Employer Plan" means a Plan which has two or more contributing sponsors (including the Borrower or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"Net Cash Proceeds" means the aggregate cash or Cash Equivalents proceeds received by any Loan Party or any Subsidiary in respect of any Disposition, Debt Issuance or Involuntary Disposition, net of (a) direct costs incurred in connection therewith (including, without limitation, legal, accounting and investment banking fees and sales commissions), (b) taxes paid or payable as a result thereof, and (c) in the case of any Disposition or any Involuntary Disposition, the amount necessary to retire any Indebtedness secured by a Permitted Lien (ranking senior to any Lien of the Administrative Agent) on the related property; it being understood that "Net Cash Proceeds" shall include, without limitation, any cash or Cash Equivalents received upon the sale or other disposition of any non-cash consideration received by any Loan Party or any Subsidiary in any Disposition, Debt Issuance or Involuntary Disposition.

32

EHREN-WALIA 003541

723