holders (direct or indirect) of the Equity Interests of the Borrower may cure such violation(s) of the preceding subsections of this Section 7.11 by making a cash common equity investment (or other equity investment having terms reasonably acceptable to the Administrative Agent), directly or indirectly (it being understood that any such investment shall be contributed promptly to the Borrower), in the Borrower in an amount equal to the applicable Consolidated EBITDA Shortfall (such investments, "Cure Proceeds") not later than the date that is ten (10) Business Days after the date that the Borrower is required to deliver the financial statements required by Section 6.01(a) or Section 6.01(b), as applicable, with respect to the fiscal period to which such financial covenant violation relates. Cure Proceeds shall be included in the calculation of Consolidated EBITDA solely for determining compliance with this Section 7.11 for the fiscal quarter to which the cure applies and for the three subsequent fiscal quarters following such cure and shall be disregarded and shall not affect the calculation of Consolidated EBITDA for all other purposes (including the purpose of the calculation of other covenants (including the calculation of financial covenants on a Pro Forma Basis to determine whether a Specified Transaction is permitted hereunder) or for the purpose of the calculation of the Applicable Rate); provided, that, no payment of Indebtedness made with Cure Proceeds shall be given effect when determining compliance with this Section 7.11 as of the end of the fiscal quarter (but no other fiscal quarter) with respect to which such cure is made. The cure rights described in this Section 7.11(c) (i) may only be exercised four (4) times during the term of this Agreement, (ii) may only be exercised two (2) times with respect to any fiscal year and (iii) may not be exercised with respect to consecutive fiscal quarters.

Notwithstanding anything to the contrary contained herein, upon the Administrative Agent's receipt of a Notice of Intent to Cure and until the end of the tenth (10th) Business Day after the date that the Borrower is required to deliver the financial statements required by Section 6.01(a) or Section 6.01(b), as applicable, with respect to the fiscal period to which the financial covenant violation relates, to the extent that no Event of Default exists (other than in respect of this Section 7.11) at such time, the Administrative Agent and the Lenders shall not be permitted to (x) accelerate the Obligations, (y) terminate the Commitments or (z) exercise remedies under the Loan Documents (including against the Collateral), in each case, solely as a result of such Event(s) of Default under this Section 7.11, until the end of such ten (10) Business Day period.

Section 7.12    **Amendments of Organization Documents; Fiscal Year; Legal Name, State of Organization; Form of Entity.**

No Loan Party (other than Holdings) shall, nor shall it permit any Restricted Subsidiary to, directly or indirectly:

(a)    Amend any of its Organization Documents in a manner materially adverse to the Lenders.

(b)    Change its fiscal year.

(c)    Without providing ten (10) days prior written notice to the Administrative Agent (or such shorter notice as the Administrative Agent shall agree to accept in its sole discretion), change its name, state of organization, form of organization or principal place of business.

Section 7.13    **Sale and Leaseback Transactions.**

No Loan Party (other than Holdings) shall, nor shall it permit any Restricted Subsidiary to, directly or indirectly, enter into any Sale and Leaseback Transaction.

CHAR1\1498335v12

EHREN-WALIA 003628

Section 7.14    **Prepayments of Junior Debt.**

No Loan Party (other than Holdings) shall, nor shall it permit any Restricted Subsidiary to, directly or indirectly, make any voluntary payment, prepayment or other distribution (whether in cash, securities or other property), of or in respect of principal or interest, or such payment by way of the purchase, redemption, retirement, acquisition, cancellation or termination, in each case prior to the final scheduled maturity thereof, of (a) (i) any Indebtedness that is contractually subordinated in right of payment to any of the Secured Obligations (including, for the avoidance of doubt, the Seller Notes), or (ii) any Indebtedness that is secured by a lien on the Collateral that is junior to the liens on the Collateral securing the Secured Obligations (the Indebtedness described in clauses (a)(i) and (a)(ii) being "Junior Debt"), except for (v) the payment of regularly scheduled interest and principal payments (and fees, indemnities and expenses payable) as, and when due in respect of any Junior Debt to the extent permitted by any subordination or intercreditor provisions in respect thereof; (w) refinancings, replacements, substitutions, extensions, restructurings, exchanges and renewals of any Junior Debt to the extent such refinancing, replacement, exchange or renewed Indebtedness is permitted by Section 7.02 and any fees and expenses in connection therewith; (x) conversions, exchanges, redemptions, repayments or prepayments of Junior Debt into or for Qualified Equity Interests of Holdings; (y) so long as no Event of Default has occurred and is continuing or would result therefrom, "AHYDO" catch-up payments to the extent necessary to avoid the application of Section 163(e)(5) of the Code to such Indebtedness, and (z) payments, redemptions, repurchases, retirements, terminations or cancellations of Junior Debt in an aggregate amount not to exceed the Available Amount as such time; provided, that, (A) no Event of Default has occurred and is continuing or would result therefrom and (B) upon giving Pro Forma Effect to such payment, redemption, repurchase, retirement, termination or cancellation, (1) the Loan Parties would be in compliance with the financial covenants set forth in Section 7.11 as of the most recent fiscal quarter end for which the Borrower was required to deliver financial statements pursuant to Section 6.01(a) or (b), and (2) the Consolidated Leverage Ratio shall be less than 3.50 to 1.0 (or, if the ratio required to be maintained at such time by Section 7.11(a) is lower than 3.50 to 1.0, the Consolidated Leverage Ratio shall be 0.25 less than the ratio required to be maintained at such time by Section 7.11(a)) or (b) any unsecured Indebtedness for borrowed money if, at the time of such payment, an Event of Default exists.

Section 7.15    **Amendments, Etc. of Junior Debt.**

No Loan Party (other than Holdings) shall, nor shall it permit any Restricted Subsidiary to, directly or indirectly, amend, modify or otherwise change any document governing any Junior Debt or any unsecured Indebtedness for borrowed money, other than (a) any amendment or modification that is not adverse to the interests of the Lenders in any material respect, or (b) any amendment or modification that has been agreed by the Administrative Agent and the Borrower and which has not been objected to by the Required Lenders following five (5) Business Days after the notice thereof.

Section 7.16    **Sanctions.**

No Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly, use any Credit Extension or the proceeds of any Credit Extension, or lend, contribute or otherwise make available such Credit Extension or the proceeds of any Credit Extension to any Person, to fund any activities of or business with any Person, or in any Designated Jurisdiction, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as Lender, Arranger, Administrative Agent, L/C Issuer, Swingline Lender, or otherwise) of Sanctions.

CHAR1\1498335v12

EHREN-WALIA 003629

811

Section 7.17     **Anti-Corruption Laws**.

No Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly, use any Credit Extension or the proceeds of any Credit Extension for any purpose which would breach the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other similar anti-corruption legislation in other jurisdictions.

Section 7.18     **Limitations on Holdings**.

Holdings (a) shall not engage in any material business or material activity other than (i) the ownership of all of the outstanding Equity Interests in the Borrower (or, indirectly through the Borrower, other Equity Interests in accordance with <u>clause (b)</u> below) and activities incidental thereto, (ii) the consummation of the Transaction, (iii) corporate maintenance activities (including the payment and incurrence of taxes and similar administrative expenses associated with being a holding company), (iv) the performance of its obligations under the Loan Documents (including the purchase of Loans pursuant to Open Market Purchases or a Dutch Auction in accordance with the terms of this Agreement) and the Seller Notes, and (v) activities otherwise permitted pursuant to this <u>Section 7.18</u> (other than by reference to this <u>clause (a)</u>), (b) shall not own or acquire any material assets (other than (i) Equity Interests of the Borrower or, indirectly, any other direct or indirect Subsidiary of the Borrower, and (ii) cash and Cash Equivalents), (c) shall not create, incur, assume or permit to exist any Lien on the Equity Interests of the Borrower or its or any other assets, other than Liens under the Loan Documents, and (d) shall not engage in any transaction with the Borrower or any Subsidiary other than any transaction to the extent that the Borrower or such Subsidiary is expressly permitted to enter into or consummate such transaction with Holdings under this <u>Article VII</u>.

# ARTICLE VIII

# EVENTS OF DEFAULT AND REMEDIES

Section 8.01     **Events of Default.**

Any of the following shall constitute an Event of Default:

(a)     <u>Non-Payment</u>. Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or any L/C Obligation, or (ii) within three (3) Business Days after the same becomes due, any interest on any Loan or on any L/C Obligation, or any fee due hereunder, or deposit any funds as Cash Collateral in respect of L/C Obligations, or (iii) within five (5) Business Days after the same becomes due, any other amount payable hereunder or under any other Loan Document; or

(b)     <u>Specific Covenants</u>. Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of <u>Section 6.01</u>, <u>6.02(a)</u>, <u>6.02(b)</u>, <u>6.03(a)</u>, <u>6.03(b)</u>, <u>6.03(c)</u>, <u>6.05(a)</u>, <u>6.10</u>, <u>6.11</u> or <u>Article VII</u>; or

(c)     <u>Other Defaults</u>. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in <u>Section 8.01(a)</u> or <u>Section 8.01(b)</u> above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after the earlier of (i) the date on which a Responsible Officer of any Loan Party acquires knowledge thereof, and (ii) the date on which written notice thereof is delivered by the Administrative Agent or any Lender to the Borrower; or

121

EHREN-WALIA 003630

(d)    Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect (except to the extent such representation, warranty, certification or statement of fact specifically relates to an earlier date, in which case it shall not have been incorrect or misleading in any material respect as of such earlier date), or, in the case of any representation, warranty, certification or statement of fact qualified by materiality, in all respects, when made or deemed made; or

(e)    Cross-Default.  (i) Any Loan Party or any Restricted Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness or Guarantee (other than Indebtedness hereunder and Indebtedness under Swap Contracts) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded, or (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which a Loan Party or any Restricted Subsidiary thereof is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which a Loan Party or any Restricted Subsidiary thereof is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by such Loan Party or such Restricted Subsidiary as a result thereof is greater than the Threshold Amount; or

(f)    Insolvency Proceedings, Etc.  Any Loan Party or any Restricted Subsidiary thereof institutes or consents to the institution of any Insolvency Proceeding; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) days; or any Insolvency Proceeding relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) days, or an order for relief is entered in any such proceeding; or

(g)    Inability to Pay Debts; Attachment.  (i) Any Loan Party or any Restricted Subsidiary thereof becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within thirty (30) days after its issue or levy; or

(h)    Judgments.  There is entered against any Loan Party or any Restricted Subsidiary thereof (i) one or more final judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding the Threshold Amount (to the extent not covered

122

EHREN-WALIA 003631

813

by independent third-party insurance as to which the insurer has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of thirty (30) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(i)    ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party in an aggregate amount in excess of the Threshold Amount, or (ii) the Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of the Threshold Amount; or

(j)    Invalidity of Loan Documents.  (i) Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full in cash of all Obligations arising under the Loan Documents, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document; or it becomes unlawful for a Loan Party to perform any of its obligations under the Loan Documents or (ii) any subordination, standstill, payoff and insolvency related provision of any Seller Notes Documents shall, in whole or in part, terminate, cease to be effective or cease to be legally binding and enforceable against any holder of the Seller Notes; or

(k)    Collateral Documents.  Any Collateral Document after delivery thereof pursuant to the terms of the Loan Documents shall for any reason (other than (i) by reason of a release of Collateral in accordance with the terms hereof, (ii) as expressly permitted hereunder or under any other Loan Document or satisfaction in full in cash of all Obligations arising under the Loan Documents or (iii) as a result of any action of the Administrative Agent or any Lender or the failure of the Administrative Agent or any Lender to take any action that is within its control) ceases to create a valid and perfected first priority Lien (subject to Permitted Liens) on the Collateral purported to be covered thereby, or any Loan Party shall assert the invalidity of such Liens; or

(l)    Change of Control.  There occurs any Change of Control.

Without limiting the provisions of Article IX, if a Default shall have occurred under the Loan Documents, then such Default will continue to exist until it either is cured (to the extent the cure of such Default is specifically permitted) in accordance with the Loan Documents or is otherwise expressly waived by the Administrative Agent (with the approval of requisite Appropriate Lenders (in their sole discretion) as determined in accordance with Section 11.01); and once an Event of Default occurs under the Loan Documents, then such Event of Default will continue to exist until it is expressly waived by the requisite Appropriate Lenders or by the Administrative Agent with the approval of the requisite Appropriate Lenders, as required hereunder in Section 11.01.

Section 8.02    **Remedies upon Event of Default.**

If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

123

EHREN-WALIA 003632

814

    (a)    declare the Commitment of each Lender to make Loans and any obligation of the L/C Issuer to make L/C Credit Extensions to be terminated, whereupon such commitments and obligation shall be terminated;

    (b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

    (c)    require that the Borrower Cash Collateralize the L/C Obligations (in an amount equal to the Minimum Collateral Amount with respect thereto); and

    (d)    exercise on behalf of itself, the Lenders and the L/C Issuer all rights and remedies available to it, the Lenders and the L/C Issuer under the Loan Documents or applicable Law or equity;

provided, however, that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code of the United States or any other Debtor Relief Law, the obligation of each Lender to make Loans and any obligation of the L/C Issuer to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, and the obligation of the Borrower to Cash Collateralize the L/C Obligations as aforesaid shall automatically become effective, in each case without further act of the Administrative Agent or any Lender.

Section 8.03    **Application of Funds.**

After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable and the L/C Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to Section 8.02) or if at any time insufficient funds are received by and available to the Administrative Agent to pay fully all Secured Obligations then due hereunder, any amounts received on account of the Secured Obligations shall, subject to the provisions of Sections 2.14 and 2.15, be applied by the Administrative Agent in the following order:

    First, to payment of that portion of the Secured Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and amounts payable under Article III) payable to the Administrative Agent in its capacity as such;

    Second, to payment of that portion of the Secured Obligations constituting fees, indemnities and other amounts (other than principal, interest and Letter of Credit Fees) payable to the Lenders and the L/C Issuer (including fees, charges and disbursements of counsel to the respective Lenders and the L/C Issuer (including fees and time charges for attorneys who may be employees of any Lender or the L/C Issuer)) arising under the Loan Documents and amounts payable under Article III, ratably among them in proportion to the respective amounts described in this clause Second payable to them;

    Third, to payment of that portion of the Secured Obligations constituting accrued and unpaid Letter of Credit Fees and interest on the Loans, L/C Borrowings and other Secured Obligations arising under the Loan Documents, ratably among the Lenders and the L/C Issuer in proportion to the respective amounts described in this clause Third payable to them;

CHAR1\1498335v12

EHREN-WALIA 003633

*Fourth*, to payment of (a) that portion of the Secured Obligations constituting unpaid principal, (b) that portion of the Secured Obligations consisting of obligations then owing under the Secured Hedge Agreements and Secured Cash Management Agreements and (c) obligations owing to the Administrative Agent for the account of the L/C Issuer, to Cash Collateralize that portion of L/C Obligations comprised of the aggregate undrawn amount of Letters of Credit to the extent not otherwise Cash Collateralized by the Borrower pursuant to Sections 2.03 and 2.14, ratably among the Administrative Agent, the Lenders, the L/C Issuer, the Hedge Banks and the Cash Management Banks in proportion to the respective amounts described in this clause Fourth held by them; and

*Last*, the balance, if any, after all of the Secured Obligations (other than contingent indemnification obligations for which no claim has been made) have been indefeasibly paid in full in cash, to the Borrower or as otherwise required by Law.

Subject to Sections 2.03(c) and 2.14, amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Fourth above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Secured Obligations, if any, in the order set forth above. Excluded Swap Obligations with respect to any Guarantor shall not be paid with amounts received from such Guarantor or its assets, but appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to Secured Obligations otherwise set forth above in this Section 8.03.

Notwithstanding the foregoing, Secured Obligations arising under Secured Cash Management Agreements and Secured Hedge Agreements shall be excluded from the application described above if the Administrative Agent has not received a Secured Party Designation Notice, together with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank or Hedge Bank, as the case may be. Each Cash Management Bank or Hedge Bank not a party to this Agreement that has given the notice contemplated by the preceding sentence shall, by such notice, be deemed to have acknowledged and accepted the appointment of the Administrative Agent pursuant to the terms of Article IX for itself and its Affiliates as if a "Lender" party hereto.

## ARTICLE IX

## ADMINISTRATIVE AGENT

Section 9.01    **Appointment and Authority.**

(a)    Appointment. Each of the Lenders and the L/C Issuer hereby irrevocably appoints, designates and authorizes Bank of America to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders and the L/C Issuer, and neither the Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

CHAR1\1498335v12

EHREN-WALIA 003634

(b)    <u>Collateral Agent</u>. The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (including in its capacities as a potential Hedge Bank and a potential Cash Management Bank) and the L/C Issuer hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender and the L/C Issuer for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to <u>Section 9.05</u> for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this <u>Article IX</u> and <u>Article XI</u> (including <u>Section 11.04(c)</u>, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 9.02    <u>Rights as a Lender.</u>

The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of banking, trust, financial, advisory, underwriting or other business with any Loan Party or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders or to provide notice to or consent of the Lenders with respect thereto.

Section 9.03    <u>Exculpatory Provisions.</u>

The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, the Administrative Agent and its Related Parties:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); <u>provided</u>, <u>that</u>, the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty or responsibility to disclose, and shall not be liable for the failure to disclose, any

126

EHREN-WALIA 003635

817

information relating to any Loan Party or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

Neither the Administrative Agent nor any of its Related Parties shall be liable for any action taken or not taken by the Administrative Agent under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby or thereby (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary), or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 11.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given in writing to the Administrative Agent by the Borrower, a Lender or the L/C Issuer.

Neither the Administrative Agent nor any of its Related Parties have any duty or obligation to any Lender or participant or any other Person to ascertain or inquire into (A) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (B) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (C) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (D) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (E) the value or the sufficiency of any Collateral, or (F) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

The Administrative Agent and any assignor of a Loan or seller of a participation hereunder shall be entitled to rely conclusively on a representation of the assignee Lender or Participant in any document delivered in connection with the Credit Agreement, including the relevant Assignment and Assumption or participation agreement, as applicable, that such assignee or purchaser is not a Disqualified Institution. The Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Institutions. Without limiting the generality of the foregoing, the Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (y) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Disqualified Institution.

Section 9.04    **Reliance by Administrative Agent.**

The Administrative Agent shall be entitled to rely upon, and shall be fully protected in relying and shall not incur any liability for relying upon, any notice, request, certificate, communication, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall be fully protected in relying and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance, extension, renewal or increase of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the L/C Issuer, the Administrative Agent may presume that such condition is satisfactory to such Lender or the L/C Issuer unless the Administrative Agent shall have received notice to the contrary from such Lender or the L/C Issuer prior to the making of such Loan or the issuance of such Letter of Credit. The Administrative Agent may consult with legal counsel (who may be counsel for the Loan Parties), independent accountants and

127

EHREN-WALIA 003636

other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. For purposes of determining compliance with the conditions specified in Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objections.

Section 9.05    **Delegation of Duties.**

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Facilities as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 9.06    **Resignation of Administrative Agent.**

(a)    Notice.  The Administrative Agent may at any time give notice of its resignation to the Lenders, the L/C Issuer and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the consent of the Borrower (such consent not to be unreasonably withheld or delayed, provided, that no such consent of the Borrower shall be required while a Specified Event of Default has occurred and is continuing), to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to) on behalf of the Lenders and the L/C Issuer, appoint a successor Administrative Agent meeting the qualifications set forth above; provided, that, in no event shall any successor Administrative Agent be a Defaulting Lender or a Disqualified Institution. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)    Defaulting Lender.  If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Required Lenders may, to the extent permitted by applicable Law, by notice in writing to the Borrower and such Person remove such Person as Administrative Agent and, with the consent of the Borrower (such consent not to be unreasonably withheld or delayed, provided, that no such consent of the Borrower shall be required while a Specified Event of Default has occurred and is continuing), appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days (or such earlier day as shall be agreed by the Required Lenders) (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

128

EHREN-WALIA 003637

819

(c)     <u>Effect of Resignation or Removal</u>.  With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders or the L/C Issuer under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender and the L/C Issuer directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or removed) Administrative Agent (other than as provided in <u>Section 3.01(g)</u> and other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent as of the Resignation Effective Date or the Removal Effective Date, as applicable), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this <u>Section 9.06</u>).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and <u>Section 11.04</u> shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them (A) while the retiring or removed Administrative Agent was acting as Administrative Agent, and (B) after such resignation or removal for as long as any of them continues to act in any capacity hereunder or under the other Loan Documents, including (1) acting as collateral agent or otherwise holding any collateral security on behalf of any of the Secured Parties and (2) in respect of any actions taken in connection with transferring the agency to any successor Administrative Agent.

(d)     <u>L/C Issuer and Swingline Lender</u>.  Any resignation or removal by Bank of America as Administrative Agent pursuant to this <u>Section 9.06</u> shall also constitute its resignation as the L/C Issuer and Swingline Lender.  If Bank of America resigns as the L/C Issuer, it shall retain all the rights, powers, privileges and duties of the L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as the L/C Issuer and all L/C Obligations with respect thereto, including the right to require the Lenders to make Base Rate Loans or fund risk participations in Unreimbursed Amounts pursuant to <u>Section 2.03(c)</u>.  If Bank of America resigns as Swingline Lender, it shall retain all the rights of the Swingline Lender provided for hereunder with respect to Swingline Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Lenders to make Base Rate Loans or fund risk participations in outstanding Swingline Loans pursuant to <u>Section 2.04(c)</u>.  Upon the appointment by the Borrower of a successor L/C Issuer or Swingline Lender hereunder (which successor shall in all cases be a Lender other than a Defaulting Lender), (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer or Swingline Lender, as applicable, (ii) the retiring L/C Issuer and Swingline Lender shall be discharged from all of their respective duties and obligations hereunder or under the other Loan Documents, and (iii) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to Bank of America to effectively assume the obligations of Bank of America with respect to such Letters of Credit.

129

EHREN-WALIA 003638

Section 9.07    **Non-Reliance on Administrative Agent and Other Lenders.**

Each Lender and the L/C Issuer acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and the L/C Issuer also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 9.08    **No Other Duties, Etc.**

Anything herein to the contrary notwithstanding, none of the titles listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, a Lender or the L/C Issuer hereunder.

Section 9.09    **Administrative Agent May File Proofs of Claim; Credit Bidding.**

In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

  (a)  to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the L/C Issuer and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the L/C Issuer and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the L/C Issuer and the Administrative Agent under Sections 2.03(h) and (i), 2.09, 2.10(b) and 11.04) allowed in such judicial proceeding; and

  (b)  to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the L/C Issuer to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the L/C Issuer, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.09, 2.10(b) and 11.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or the L/C Issuer any plan of reorganization, arrangement, adjustment or composition affecting the Secured Obligations or the rights of any Lender or the L/C Issuer to authorize the Administrative Agent to vote in respect of the claim of any Lender or the L/C Issuer or in any such proceeding.

130

EHREN-WALIA 003639

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Secured Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Secured Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (i) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar Laws in any other jurisdictions to which a Loan Party is subject, (ii) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Law. In connection with any such credit bid and purchase, the Secured Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Secured Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid, (A) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (B) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided, that, any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 11.01 of this Agreement, (C) the Administrative Agent shall be authorized to assign the relevant Secured Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Equity Interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Secured Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (D) to the extent that Secured Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Secured Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Secured Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Secured Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

Section 9.10    **Collateral and Guaranty Matters.**

Each of the Lenders (including in its capacities as a potential Cash Management Bank and a potential Hedge Bank) and the L/C Issuer irrevocably authorize the Administrative Agent, at its option and in its discretion,

(a)    to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon the Facility Termination Date, (ii) that is sold or otherwise disposed of or to be sold or otherwise disposed of as part of or in connection with any sale or other disposition permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the Required Lenders in accordance with Section 11.01;

(b)    to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.01(i); and

131

EHREN-WALIA 003640

(c)    to release any Guarantor from its obligations under the Guaranty if such Person ceases to be a Restricted Subsidiary as a result of a transaction permitted under the Loan Documents.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this <u>Section 9.10</u>.  In each case as specified in this <u>Section 9.10</u>, the Administrative Agent will, at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this <u>Section 9.10</u>.

The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

Section 9.11    <u>Secured Cash Management Agreements and Secured Hedge Agreements.</u>

Except as otherwise expressly set forth herein, no Cash Management Bank or Hedge Bank that obtains the benefit of the provisions of <u>Section 8.03</u>, the Guaranty or any Collateral by virtue of the provisions hereof or any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) (or to notice of or to consent to any amendment, waiver or modification of the provisions hereof or of the Guaranty or any Collateral Document) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents.  Notwithstanding any other provision of this <u>Article IX</u> to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Secured Obligations arising under Secured Cash Management Agreements and Secured Hedge Agreements except to the extent expressly provided herein and unless the Administrative Agent has received a Secured Party Designation Notice of such Secured Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank or Hedge Bank, as the case may be.  The Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Secured Obligations arising under Secured Cash Management Agreements and Secured Hedge Agreements in the case of a Facility Termination Date.

## ARTICLE X

## CONTINUING GUARANTY

Section 10.01    <u>Guaranty.</u>

Each Guarantor hereby absolutely and unconditionally, jointly and severally guarantees, as primary obligor and as a guaranty of payment and performance and not merely as a guaranty of collection, prompt payment when due, whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise, and at all times thereafter, of any and all Secured Obligations (for each Guarantor, subject to the proviso in this sentence, its "<u>Guaranteed Obligations</u>"); <u>provided</u>, <u>that</u>: (i) the Guaranteed Obligations of a

132

EHREN-WALIA 003641

823

Guarantor shall exclude any Excluded Swap Obligations with respect to such Guarantor and (ii) the liability of each Guarantor individually with respect to this Guaranty shall be limited to an aggregate amount equal to the largest amount that would not render its obligations hereunder subject to avoidance under Section 548 of the Bankruptcy Code of the United States or any comparable provisions of any applicable state law or other applicable Law. Without limiting the generality of the foregoing, the Guaranteed Obligations shall include any such indebtedness, obligations, and liabilities, or portion thereof, which may be or hereafter become unenforceable or compromised or shall be an allowed or disallowed claim under any proceeding or case commenced by or against any Debtor under any Debtor Relief Laws. The Administrative Agent's books and records showing the amount of the Obligations shall be admissible in evidence in any action or proceeding, and shall be binding upon each Guarantor, and conclusive for the purpose of establishing the amount of the Secured Obligations. This Guaranty shall not be affected by the genuineness, validity, regularity or enforceability of the Secured Obligations or any instrument or agreement evidencing any Secured Obligations, or by the existence, validity, enforceability, perfection, non-perfection or extent of any collateral therefor, or by any fact or circumstance relating to the Secured Obligations which might otherwise constitute a defense to the obligations of the Guarantors, or any of them, under this Guaranty, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to any or all of the foregoing.

Section 10.02    **Rights of Lenders.**

Each Guarantor consents and agrees that the Secured Parties may, at any time and from time to time, without notice or demand, and without affecting the enforceability or continuing effectiveness hereof: (a) amend, extend, renew, compromise, discharge, accelerate or otherwise change the time for payment or the terms of the Secured Obligations or any part thereof, (b) take, hold, exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any security for the payment of this Guaranty or any Secured Obligations, (c) apply such security and direct the order or manner of sale thereof as the Administrative Agent, the L/C Issuer and the Lenders in their sole discretion may determine, and (d) release or substitute one or more of any endorsers or other guarantors of any of the Secured Obligations. Without limiting the generality of the foregoing, each Guarantor consents to the taking of, or failure to take, any action which might in any manner or to any extent vary the risks of such Guarantor under this Guaranty or which, but for this provision, might operate as a discharge of such Guarantor.

Section 10.03    **Certain Waivers.**

Each Guarantor waives (a) any defense arising by reason of any disability or other defense of the Borrower or any other guarantor, or the cessation from any cause whatsoever (including any act or omission of any Secured Party) of the liability of the Borrower or any other Loan Party, (b) any defense based on any claim that such Guarantor's obligations exceed or are more burdensome than those of the Borrower or any other Loan Party, (c) the benefit of any statute of limitations affecting any Guarantor's liability hereunder, (d) any right to proceed against the Borrower or any other Loan Party, proceed against or exhaust any security for the Secured Obligations, or pursue any other remedy in the power of any Secured Party whatsoever, (e) any benefit of and any right to participate in any security now or hereafter held by any Secured Party, and (f) to the fullest extent permitted by law, any and all other defenses or benefits that may be derived from or afforded by applicable Law limiting the liability of or exonerating guarantors or sureties. Each Guarantor expressly waives all setoffs and counterclaims and all presentments, demands for payment or performance, notices of nonpayment or nonperformance, protests, notices of protest, notices of dishonor and all other notices or demands of any kind or nature whatsoever with respect to the Secured Obligations, and all notices of acceptance of this Guaranty or of the existence, creation or incurrence of new or additional Secured Obligations. Each Guarantor waives any rights and defenses that are or may become available to it by reason of §§ 2787 to 2855, inclusive, and §§ 2899 and 3433 of the California Civil Code. The foregoing waivers and the provisions hereinafter set forth in this Guaranty which pertain to California law

CHAR1\1498335v12

EHREN-WALIA 003642

are included solely out of an abundance of caution, and shall not be construed to mean that any of the above-referenced provisions of California law are in any way applicable to this Guaranty or the Secured Obligations.

Section 10.04    **Obligations Independent.**

The obligations of each Guarantor hereunder are those of primary obligor, and not merely as surety, and are independent of the Secured Obligations and the obligations of any other guarantor, and a separate action may be brought against each Guarantor to enforce this Guaranty whether or not the Borrower or any other person or entity is joined as a party.

Section 10.05    **Subrogation.**

No Guarantor shall exercise any right of subrogation, contribution, indemnity, reimbursement or similar rights with respect to any payments it makes under this Guaranty until all of the Secured Obligations and any amounts payable under this Guaranty have been indefeasibly paid and performed in full and the Commitments and the Facilities are terminated. If any amounts are paid to a Guarantor in violation of the foregoing limitation, then such amounts shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Secured Parties to reduce the amount of the Secured Obligations, whether matured or unmatured.

Section 10.06    **Termination; Reinstatement.**

This Guaranty is a continuing and irrevocable guaranty of all Secured Obligations now or hereafter existing and shall remain in full force and effect until the Facility Termination Date. Notwithstanding the foregoing, this Guaranty shall continue in full force and effect or be revived, as the case may be, if any payment by or on behalf of the Borrower or a Guarantor is made, or any of the Secured Parties exercises its right of setoff, in respect of the Secured Obligations and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by any of the Secured Parties in their discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Laws or otherwise, all as if such payment had not been made or such setoff had not occurred and whether or not the Secured Parties are in possession of or have released this Guaranty and regardless of any prior revocation, rescission, termination or reduction. The obligations of each Guarantor under this paragraph shall survive termination of this Guaranty.

Section 10.07    **Stay of Acceleration.**

If acceleration of the time for payment of any of the Secured Obligations is stayed, in connection with any case commenced by or against a Guarantor or the Borrower under any Debtor Relief Laws, or otherwise, all such amounts shall nonetheless be payable by each Guarantor, jointly and severally, immediately upon demand by the Secured Parties.

Section 10.08    **Condition of Borrower.**

Each Guarantor acknowledges and agrees that it has the sole responsibility for, and has adequate means of, obtaining from the Borrower and any other guarantor such information concerning the financial condition, business and operations of the Borrower and any such other guarantor as such Guarantor requires, and that none of the Secured Parties has any duty, and such Guarantor is not relying on the Secured Parties at any time, to disclose to it any information relating to the business, operations or financial condition of

CHAR1\1498335v12

EHREN-WALIA 003643

the Borrower or any other guarantor (each Guarantor waiving any duty on the part of the Secured Parties to disclose such information and any defense relating to the failure to provide the same).

Section 10.09    **Appointment of Borrower.**

Each of the Loan Parties hereby appoints the Borrower to act as its agent for all purposes of this Agreement, the other Loan Documents and all other documents and electronic platforms entered into in connection herewith and agrees that (a) the Borrower may execute such documents and provide such authorizations on behalf of such Loan Parties as the Borrower deems appropriate in its sole discretion and each Loan Party shall be obligated by all of the terms of any such document and/or authorization executed on its behalf, (b) any notice or communication delivered by the Administrative Agent, the L/C Issuer or a Lender to the Borrower shall be deemed delivered to each Loan Party and (c) the Administrative Agent, the L/C Issuer or the Lenders may accept, and be permitted to rely on, any document, authorization, instrument or agreement executed by the Borrower on behalf of each of Loan Parties.

Section 10.10    **Right of Contribution.**

The Guarantors agree among themselves that, in connection with payments made hereunder, each Guarantor shall have contribution rights against the other Guarantors as permitted under applicable Law.

Section 10.11    **Keepwell.**

Each Loan Party that is a Qualified ECP Guarantor at the time the Guaranty or the grant of a Lien under the Loan Documents, in each case, by any Specified Loan Party becomes effective with respect to any Swap Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support to each Specified Loan Party with respect to such Swap Obligation as may be needed by such Specified Loan Party from time to time to honor all of its obligations under the Loan Documents in respect of such Swap Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Guarantor's obligations and undertakings under this Article X voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations and undertakings of each Qualified ECP Guarantor under this Section 10.11 shall remain in full force and effect until the Secured Obligations have been indefeasibly paid and performed in full. Each Loan Party intends this Section 10.11 to constitute, and this Section 10.11 shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Loan Party for all purposes of the Commodity Exchange Act.

Section 10.12    **Additional Guarantor Waivers and Agreements.**

(a)    Each Guarantor understands and acknowledges that if the Secured Parties foreclose judicially or nonjudicially against any real property security for the Secured Obligations, that foreclosure could impair or destroy any ability that such Guarantor may have to seek reimbursement, contribution, or indemnification from the Borrower or others based on any right such Guarantor may have of subrogation, reimbursement, contribution, or indemnification for any amounts paid by such Guarantor under this Guaranty. Each Guarantor further understands and acknowledges that in the absence of this paragraph, such potential impairment or destruction of such Guarantor's rights, if any, may entitle such Guarantor to assert a defense to this Guaranty based on Section 580d of the California Code of Civil Procedure as interpreted in Union Bank v. Gradsky, 265 Cal. App. 2d 40 (1968). By executing this Guaranty, each Guarantor freely, irrevocably, and unconditionally (i) waives and relinquishes that defense and agrees that it will be fully liable under this Guaranty even though the Secured Parties may foreclose, either by judicial

135

EHREN-WALIA 003644

826

foreclosure or by exercise of power of sale, any deed of trust securing the Secured Obligations; (ii) agrees that it will not assert that defense in any action or proceeding which the Secured Parties may commence to enforce this Guaranty; (iii) acknowledges and agrees that the rights and defenses waived by such Guarantor in this Guaranty include any right or defense that it may have or be entitled to assert based upon or arising out of any one or more of §§ 580a, 580b, 580d, or 726 of the California Code of Civil Procedure or § 2848 of the California Civil Code; and (iv) acknowledges and agrees that the Secured Parties are relying on this waiver in creating the Secured Obligations, and that this waiver is a material part of the consideration which the Secured Parties are receiving for creating the Secured Obligations.

(b)      Each Guarantor waives all rights and defenses that it may have because any of the Secured Obligations is secured by real property. This means, among other things, (i) the Secured Parties may collect from any Guarantor without first foreclosing on any real or personal property collateral pledged by the other Loan Parties; and (ii) if the Secured Parties foreclose on any real property collateral pledged by the other Loan Parties, (A) the amount of the Secured Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (B) the Secured Parties may collect from any Guarantor even if the Secured Parties, by foreclosing on the real property collateral, have destroyed any right such Guarantor may have to collect from the Borrower. This is an unconditional and irrevocable waiver of any rights and defenses each Guarantor may have because any of the Secured Obligations is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon § 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

(c)      Each Guarantor waives any right or defense it may have at law or equity, including California Code of Civil Procedure § 580a, to a fair market value hearing or action to determine a deficiency judgment after a foreclosure.

## ARTICLE XI

### MISCELLANEOUS

Section 11.01    **Amendments, Etc.**

Except as provided in Section 2.02(g) with respect to any Incremental Facility or as otherwise specifically provided below or otherwise provided herein or in any other Loan Document, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (or by the Administrative Agent with the consent of the Required Lenders) and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, that, no such amendment, waiver or consent shall:

(a)      extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written consent of such Lender (it being understood and agreed that a waiver of any condition precedent in Section 4.02, or the waiver of any covenant, Default, Event of Default or mandatory prepayment or mandatory reductions of the Commitments shall not be considered an extension or increase in Commitments of any Lender);

(b)      postpone any date fixed by this Agreement or any other Loan Document for any payment (excluding mandatory prepayments) of principal, interest, fees or other amounts due to

CHAR1\1498335v12

EHREN-WALIA 003645

the Lenders (or any of them) hereunder or under such other Loan Document without the written consent of each Lender entitled to such payment;

(c)     reduce the principal of, or the rate of interest specified herein on, any Loan or L/C Borrowing, or (subject to clause (iv) of the final proviso to this Section 11.01) any fees or other amounts payable hereunder or under any other Loan Document, without the written consent of each Lender entitled to such amount; provided, that, any waiver of Default or Event of Default or default interest, waiver of a mandatory prepayment or any modification, waiver or amendment to the manner of computation of any financial ratio (including any change in any applicable defined term) shall not constitute a reduction or forgiveness in the interest rates or the fees for purposes of this clause;

(d)     change Section 2.13 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender directly and adversely affected thereby;

(e)     change any provision of this Section 11.01 or the definition of "Required Lenders", "Required Revolving Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or thereunder or make any determination or grant any consent hereunder without the written consent of each Lender;

(f)     release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(g)     release all or substantially all of the Guarantors (except in connection with a merger or consolidation permitted under Section 7.04 or a Disposition permitted under Section 7.05), without the written consent of each Lender, except to the extent the release of any Restricted Subsidiary from the Guaranty is permitted pursuant to Section 9.10 (in which case such release may be made by the Administrative Agent acting alone); or

(h)     release the Borrower (other than pursuant to the Borrower Assignment, Assumption and Release) or permit the Borrower to assign or transfer any of its rights or obligations under this Agreement or the other Loan Documents without the consent of each Lender;

provided, further, that, notwithstanding anything herein to the contrary, (i) no amendment, waiver or consent shall, unless in writing and signed by the L/C Issuer in addition to the Lenders required above, affect the rights or duties of the L/C Issuer under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by the L/C Issuer, (ii) no amendment, waiver or consent shall, unless in writing and signed by the Swingline Lender in addition to the Lenders required above, affect the rights or duties of the Swingline Lender under this Agreement, (iii) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document, (iv) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto, (v) no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender, or all Lenders or each affected Lender under a Facility, may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (A) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (B) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender, or all Lenders or each affected Lender under a Facility, that by its terms affects any Defaulting

137

CHAR1\1498335v12

EHREN-WALIA 003646

Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender; (vi) each Lender is entitled to vote as such Lender sees fit on any bankruptcy reorganization plan that affects the Loans, and each Lender acknowledges that the provisions of Section 1126(c) of the Bankruptcy Code of the United States supersedes the unanimous consent provisions set forth herein, (vii) the Required Lenders shall determine whether or not to allow a Loan Party to use cash collateral in the context of a bankruptcy or insolvency proceeding and such determination shall be binding on all of the Lenders, (viii) in order to implement any additional Commitments in accordance with Section 2.02(g) in connection with any Incremental Facility, this Agreement may be amended for such purpose (but solely to the extent necessary to implement such additional Commitments and otherwise in accordance with Section 2.02(g)) by the Loan Parties, the Administrative Agent and each Lender providing a portion of such Incremental Facility, (ix) this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent, the Borrower, the other Loan Parties and the relevant Lenders providing such additional credit facilities (A) to add one or more additional credit facilities to this Agreement, to permit the extensions of credit from time to time outstanding hereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and the Revolving Loans and the accrued interest and fees in respect thereof and to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders, and (B) to change, modify or alter Section 2.13 or Section 8.03 or any other provision hereof relating to the pro rata sharing of payments among the Lenders to the extent necessary to effectuate any of the amendments (or amendments and restatements) enumerated in this clause (ix), (x) if following the Closing Date, the Administrative Agent and the Borrower shall have jointly identified an inconsistency, obvious error or omission of a technical or immaterial nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Loan Parties shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Documents if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof, and (xi) as to any amendment, amendment and restatement or other modifications otherwise approved in accordance with this Section 11.01, it shall not be necessary to obtain the consent or approval of any Lender that, upon giving effect to such amendment, amendment and restatement or other modification, would have no Commitment or outstanding Loans so long as such Lender receives payment in full of the principal of and interest accrued on each Loan made by, and all other amounts owing to, such Lender or accrued for the account of such Lender under this Agreement and the other Loan Documents at the time such amendment, amendment and restatement or other modification becomes effective.

Section 11.02    **Notices; Effectiveness; Electronic Communications.**

(a)     Notices Generally.    Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax transmission or e-mail transmission as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)     if to the Borrower or any other Loan Party, the Administrative Agent, the L/C Issuer, or the Swingline Lender, to the address, fax number, e-mail address or telephone number specified for such Person on Schedule 1.01(a); and

(ii)     if to any other Lender, to the address, fax number, e-mail address or telephone number specified in its Administrative Questionnaire (including, as appropriate, notices delivered solely to the Person designated by a Lender on its Administrative

138

EHREN-WALIA 003647

Questionnaire then in effect for the delivery of notices that may contain material non-public information relating to the Borrower).

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by fax transmission shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)    Electronic Communications.    Notices and other communications to the Administrative Agent, the Lenders, the Swingline Lender and the L/C Issuer hereunder may be delivered or furnished by electronic communication (including e-mail, FPML messaging and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; provided, that, the foregoing shall not apply to notices to any Lender, the Swingline Lender or the L/C Issuer pursuant to Article II if such Lender, the Swingline Lender or the L/C Issuer, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent, the Swingline Lender, the L/C Issuer or the Borrower may each, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided, that, approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement) and (ii) notices and other communications posted to an Internet or intranet website shall be deemed received by the intended recipient upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail address or other written acknowledgement) indicating that such notice or communication is available and identifying the website address therefor; provided, that, for both clauses (i) and (ii), if such notice or other communication is not sent during the normal business hours of the recipient, such notice, email or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(c)    The Platform.    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrower, any Lender, the L/C Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's, any Loan Party's or the

CHAR1\1498335v12

EHREN-WALIA 003648

Administrative Agent's transmission of Borrower Materials or notices through the Platform, any other electronic platform or electronic messaging service, or through the Internet.

    (d)    <u>Change of Address, Etc</u>. Each of the Borrower, the Administrative Agent, the L/C Issuer, and the Swingline Lender may change its address, fax number or telephone number or e-mail address for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, fax number or telephone number or e-mail address for notices and other communications hereunder by notice to the Borrower, the Administrative Agent, the L/C Issuer and the Swingline Lender.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, fax number and e-mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one (1) individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States federal or state securities laws.

    (e)    <u>Reliance by Administrative Agent, L/C Issuer and Lenders</u>.  The Administrative Agent, the L/C Issuer and the Lenders shall be entitled to rely and act upon any notices (including telephonic or electronic notices, Loan Notices, Letter of Credit Applications, Notice of Loan Prepayment and Swingline Loan Notices) purportedly given by or on behalf of any Loan Party even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Loan Parties shall indemnify the Administrative Agent, the L/C Issuer, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of a Loan Party.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

Section 11.03    <u>No Waiver; Cumulative Remedies; Enforcement.</u>

    No failure by any Lender, the L/C Issuer or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

    Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with <u>Section 8.02</u> for the benefit of all the Lenders and the L/C Issuer; <u>provided</u>, <u>however</u>, <u>that</u>, the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under

140

EHREN-WALIA 003649

the other Loan Documents, (b) the L/C Issuer or the Swingline Lender from exercising the rights and remedies that inure to its benefit (solely in its capacity as L/C Issuer or Swingline Lender, as the case may be) hereunder and under the other Loan Documents, (c) any Lender from exercising setoff rights in accordance with Section 11.08 (subject to the terms of Section 2.13), or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; provided, further, that, if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Section 11.04    <u>Expenses; Indemnity; Damage Waiver</u>.

(a)    <u>Costs and Expenses</u>.  The Loan Parties shall pay all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable and documented out-of-pocket expenses incurred by the L/C Issuer in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iii) all out-of-pocket expenses incurred by the Administrative Agent, any Lender or the L/C Issuer (including the fees, charges and disbursements of any counsel for the Administrative Agent, any Lender or the L/C Issuer), and shall pay all fees and time charges for attorneys who may be employees of the Administrative Agent, any Lender or the L/C Issuer, in connection with the enforcement or protection of its rights (1) in connection with this Agreement and the other Loan Documents, including its rights under this Section 11.04, or (2) in connection with Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.

(b)    <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender and the L/C Issuer, and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable and documented fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all reasonable and documented fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Borrower or any other Loan Party) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents (including in respect of any matters addressed in Section 3.01), (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned

CHAR1\1498335v12

EHREN-WALIA 003650

or operated by a Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to a Loan Party or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE**; provided, that, such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from (x) the gross negligence or willful misconduct of such Indemnitee, or (y) any proceeding that does not involve or arise from an act or omission by any Loan Party or any of their respective Affiliates and that is brought by an Indemnitee against any other Indemnitee (other than any claims against the Administrative Agent, a Lender, the L/C Issuer or any Arranger in its capacity or in fulfilling its role as the Administrative Agent, Lender, L/C Issuer or Arranger or any similar role under this Agreement). Without limiting the provisions of Section 3.01(c), this Section 11.04(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    Reimbursement by Lenders. To the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section 11.04 to be paid by it to the Administrative Agent (or any sub-agent thereof), the L/C Issuer, the Swingline Lender or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), the L/C Issuer, the Swingline Lender or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's share of the Total Credit Exposure at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender), such payment to be made severally among them based on such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought); provided, that, the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), the L/C Issuer or the Swingline Lender in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), the L/C Issuer or the Swingline Lender in connection with such capacity. The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).

(d)    Waiver of Consequential Damages, Etc. To the fullest extent permitted by applicable Law, no party hereto shall assert, and each party hereto hereby waives, and acknowledges that no other Person shall have, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof; provided that the foregoing shall in no event limit the Loan Parties' indemnification obligations under clause (b) above to the extent such special, indirect, consequential or punitive damages are included in any third-party claim in connection with which such Indemnitee is otherwise entitled to indemnification hereunder. No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

CHAR1\1498335v12

EHREN-WALIA 003651

(e)     <u>Payments</u>.  All amounts due under this <u>Section 11.04</u> shall be payable not later than ten (10) Business Days after demand therefor.

(f)     <u>Survival</u>.  The agreements in this <u>Section 11.04</u> and the indemnity provisions of <u>Section 11.02(e)</u> shall survive the resignation of the Administrative Agent, the L/C Issuer and the Swingline Lender, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

Section 11.05     <u>Payments Set Aside.</u>

To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent, the L/C Issuer or any Lender, or the Administrative Agent, the L/C Issuer or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, the L/C Issuer or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender and the L/C Issuer severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, <u>plus</u> interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders and the L/C Issuer under <u>clause (b)</u> of the preceding sentence shall survive payment in full in cash of the Obligations and the termination of this Agreement.

Section 11.06     <u>Successors and Assigns.</u>

(a)     <u>Successors and Assigns Generally</u>.  The provisions of this Agreement and the other Loan Documents shall be binding upon and inure to the benefit of the parties hereto and thereto and their respective successors and assigns permitted hereby, except neither the Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of <u>subsection (b)</u> of this <u>Section 11.06</u>, (ii) by way of participation in accordance with the provisions of <u>subsection (d)</u> of this <u>Section 11.06</u>, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>subsection (e)</u> of this <u>Section 11.06</u> (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in <u>subsection (d)</u> of this <u>Section 11.06</u> and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the L/C Issuer and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     <u>Assignments by Lenders</u>.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement and the other Loan Documents (including all or a portion of its Commitment(s) and the Loans (including for purposes of this <u>subsection (b)</u>, participations in L/C Obligations and in Swingline Loans) at the time owing to it); <u>provided</u>, <u>that</u>, in each case with respect to any Facility, any such assignment shall be subject to the following conditions:

(i)     <u>Minimum Amounts</u>.

EHREN-WALIA 003652

(A)    In the case of an assignment of the entire remaining amount of the assigning Lender's Commitment under any Facility and/or the Loans at the time owing to it (in each case with respect to any Facility) or contemporaneous assignments to related Approved Funds (determined after giving effect to such Assignments) that equal at least the amount specified in paragraph (b)(i)(B) of this Section 11.06 in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in subsection (b)(i)(A) of this Section 11.06, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000, in the case of any assignment in respect of any Term Loans, and $2,500,000, in the case of any assignment in respect of Revolving Commitments (or Revolving Loans outstanding under such Revolving Commitments), unless each of the Administrative Agent and, so long as no Specified Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed).

(ii)    Proportionate Amounts.    Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement and the other Loan Documents with respect to the Loans and/or the Commitment assigned, except that this clause (ii) shall not (A) apply to the Swingline Lender's rights and obligations in respect of Swingline Loans or (B) prohibit any Lender from assigning all or a portion of its rights and obligations among separate Facilities on a non-pro rata basis.

(iii)    Required Consents.    No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section 11.06 and, in addition:

(A)    the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (1) a Specified Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; provided, that, the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof; provided, further, that, the Borrower's consent shall not be required during the primary syndication of the Facilities;

(B)    the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of (1) any unfunded Term Commitment or any Revolving Commitment, in each case, if such assignment is to a Person that is not a Lender with a Commitment in respect of the applicable Facility, an Affiliate of such Lender or an Approved Fund with respect to such Lender or (2) any Term Loan to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund; and

CHAR1\1498335v12

EHREN-WALIA 003653

835

(C)   the consent of the L/C Issuer and the Swingline Lender (such consent not to be unreasonably withheld or delayed) shall be required for any assignment in respect of the Revolving Facility.

(iv)   <u>Assignment and Assumption</u>. The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; <u>provided</u>, <u>however</u>, <u>that</u>, the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)   <u>No Assignment to Certain Persons</u>. No such assignment shall be made (A) to the Sponsor or any of its Affiliates, or Holdings or any of its Subsidiaries or Affiliates, except as permitted under <u>Section 2.16</u> or <u>Section 2.17</u>, (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this <u>clause (B)</u>, (C) to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of a natural Person), or (D) to any Disqualified Institution.

(vi)   <u>Certain Additional Payments</u>. In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (A) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent, the L/C Issuer or any Lender hereunder (and interest accrued thereon) and (B) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit and Swingline Loans in accordance with its Applicable Revolving Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to <u>subsection (c)</u> of this <u>Section 11.06</u>, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of <u>Sections 3.01</u>, <u>3.04</u>, <u>3.05</u> and <u>11.04</u> with respect to facts and circumstances occurring prior to the effective date of such assignment); <u>provided</u>, <u>that</u>, except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Upon request, the Borrower (at its expense)

145

EHREN-WALIA 003654

shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection (b) (other than any assignment or transfer to a Disqualified Institution) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section 11.06.

Notwithstanding the foregoing, any sale or assignment pursuant to this Section 11.06(b) to the Sponsor or any Non-Debt Fund Affiliate shall be made pursuant to an Affiliated Lender Assignment and Assumption, and otherwise in accordance with the provisions of Section 2.17 and this Section 11.06(b).

(c)    Register.  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower (and such agency being solely for tax purposes), shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans and L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)    Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than (i) to the Sponsor or any of its Affiliates, or Holdings or any of its Subsidiaries or Affiliates, (ii) to any Defaulting Lender, (iii) to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of a natural Person), or (iv) to any Disqualified Institution) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans (including such Lender's participations in L/C Obligations and/or Swingline Loans) owing to it); provided, that, (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, the Lenders and the L/C Issuer shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 11.04(c) without regard to the existence of any participations.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided, that, such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 11.01 that affects such Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and limitations therein, including the requirements under Section 3.01(e) (it being understood that the documentation required under Section 3.01(e) shall be delivered to the Lender who sells the participation)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 11.06; provided, that, such Participant (1) agrees to be subject to the provisions of Sections 3.06 and 11.13 as if it were an assignee under paragraph (b) of this Section 11.06 and (2) shall not be entitled to receive any greater payment under Sections

146

EHREN-WALIA 003655

3.01 or 3.04, with respect to any participation, than the Lender from whom it acquired the applicable participation would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 3.06 with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.08 as though it were a Lender; provided, that, such Participant agrees to be subject to Section 2.13 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided, that, no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)     Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note or Notes, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided, that, no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)     Resignation as L/C Issuer or Swingline Lender after Assignment. Notwithstanding anything to the contrary contained herein, if at any time Bank of America assigns all of its Revolving Commitment and Revolving Loans pursuant to subsection (b) above, Bank of America may, (i) upon thirty (30) days' notice to the Borrower and the Lenders, resign as the L/C Issuer and/or (ii) upon thirty (30) days' notice to the Borrower, resign as Swingline Lender. In the event of any such resignation as the L/C Issuer or Swingline Lender, the Borrower shall be entitled to appoint from among the Lenders a successor L/C Issuer or Swingline Lender hereunder; provided, however, that, no failure by the Borrower to appoint any such successor shall affect the resignation of Bank of America as the L/C Issuer or Swingline Lender, as the case may be. If Bank of America resigns as the L/C Issuer, it shall retain all the rights, powers, privileges and duties of the L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as the L/C Issuer and all L/C Obligations with respect thereto (including the right to require the Lenders to make Base Rate Loans or fund risk participations in Unreimbursed Amounts pursuant to Section 2.03(c)). If Bank of America resigns as Swingline Lender, it shall retain all the rights of the Swingline Lender provided for hereunder with respect to Swingline Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Lenders to make Base Rate Loans or fund risk participations in outstanding Swingline Loans pursuant to Section 2.04(c). Upon the appointment of a successor L/C Issuer and/or Swingline Lender, (A) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer, or Swingline Lender, as the case may be, and (B) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at

147

EHREN-WALIA 003656

838

the time of such succession or make other arrangements satisfactory to Bank of America to effectively assume the obligations of Bank of America with respect to such Letters of Credit.

(g) <u>Borrower Repurchases</u>. The Borrower and its Restricted Subsidiaries shall be entitled to purchase (from Lenders) outstanding principal of Initial Term Loans in accordance with the provisions of <u>Section 2.16</u>, which purchases shall be evidenced by assignments (in form reasonably satisfactory to the Administrative Agent) from the applicable Lender to the Borrower or such Restricted Subsidiary, as applicable. No such transfer or assignment shall be effective until recorded by the Administrative Agent (in a manner consistent with the following sentence) on the Register pursuant to the terms hereof. All Initial Term Loans purchased pursuant to <u>Section 2.16</u> shall be immediately and automatically cancelled and retired, and in no event shall the Borrower or any Restricted Subsidiary become a Lender hereunder. To the extent of any assignment described in this <u>clause (g)</u>, the assigning Lender shall be relieved of its obligations hereunder with respect to the assigned Initial Term Loans.

(h) <u>Affiliated Entity Repurchases.</u> The Sponsor, any Non-Debt Fund Affiliates and Debt Fund Affiliates shall be entitled to purchase (from Lenders) outstanding principal of Initial Term Loans in accordance with the provisions of <u>Section 2.17</u>. The Sponsor and each Non-Debt Fund Affiliate, solely in its capacity as a Lender, hereby agrees, and each Affiliated Lender Assignment and Assumption shall provide a confirmation, that, if any Loan Party shall be subject to any voluntary or involuntary proceeding commenced under the Bankruptcy Code or any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar Debtor Relief Laws of the United States or other applicable jurisdictions now or hereafter in effect ("<u>Bankruptcy Proceedings</u>"), (i) the Sponsor and each such Non-Debt Fund Affiliate shall not take any step or action in such Bankruptcy Proceeding to object to, impede, or delay the exercise of any right or the taking of any action by the Administrative Agent (or the taking of any action by a third party that is supported by the Administrative Agent) in relation to the Sponsor or any such Non-Debt Fund Affiliate's claim with respect to its Initial Term Loans (a "<u>Claim</u>") (including objecting to any debtor in possession financing, use of cash collateral, grant of adequate protection, sale or disposition, compromise, or plan of reorganization) so long as the Sponsor or such Non-Debt Fund Affiliate is treated in connection with such exercise or action on the same or better terms as the other Lenders, and (ii) with respect to any matter requiring the vote of Lenders during the pendency of a Bankruptcy Proceeding (including voting on any plan of reorganization), the Initial Term Loans held by the Sponsor and such Non-Debt Fund Affiliate (and any Claim with respect thereto) shall be deemed to be voted by the Sponsor and such Non-Debt Fund Affiliate (and the Sponsor and each Non-Debt Fund Affiliate hereby designate and appoint the Administrative Agent, and each of its designees or agents, as attorney-in-fact, irrevocably and with power of substitution, with authority to vote on behalf of the Sponsor and each Non-Debt Fund Affiliate) to act in the same proportion as the allocation of voting with respect to such matter by Lenders who are not the Sponsor or Non-Debt Fund Affiliates, so long as the Sponsor and such Non-Debt Fund Affiliates are treated in connection with the exercise of such right or taking of such action on the same or better terms as the other Lenders. For the avoidance of doubt, the Lenders, the Sponsor and each Non-Debt Fund Affiliate agree and acknowledge that the provisions set forth in this <u>Section 11.06(h)</u> constitute a "subordination agreement" as such term is contemplated by, and utilized in, Section 510(a) of the Bankruptcy Code, and, as such, would be enforceable for all purposes in any case where a Loan Party has filed for protection under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect applicable to such Loan Party.

(i) <u>Disqualified Institutions</u>. No assignment or participation shall be made to any Person that was a Disqualified Institution as of the date (the "<u>Trade Date</u>") on which the applicable

CHAR1\1498335v12

EHREN-WALIA 003657

Lender entered into an Assignment and Assumption or participation agreement, as applicable, with such Person (unless the Borrower has consented to such assignment to such entity, in which case such entity will not be considered a Disqualified Institution for the purpose of such assignment); provided, however, that during the continuation of a Specified Event of Default, no consent of the Borrower shall be required to make an assignment or participation to a Disqualified Institution. For the avoidance of doubt, with respect to any assignee or participant that becomes a Disqualified Institution after the applicable Trade Date (including as a result of the delivery of a notice pursuant to the definition of "Disqualified Institution"), such assignee or participant shall not retroactively be considered a Disqualified Institution. Any assignment in violation of this Section 11.06(i) shall not be void, but the provisions of the paragraphs below shall apply.

If any assignment or participation is made to any Disqualified Institution without the Borrower's prior written consent, or if any Person becomes a Disqualified Institution after the applicable Trade Date, the Borrower may, at its sole expense and effort, upon notice to the applicable Disqualified Institution and the Administrative Agent, (A) terminate any Revolving Commitment of such Disqualified Institution and repay all obligations of the Borrower owing to such Disqualified Institution in connection with such Revolving Commitment (provided, that, no such purchase or prepayment shall be made with the proceeds of any Revolving Borrowing), (B) in the case of outstanding Term Loans held by Disqualified Institutions, purchase or prepay such Term Loans by paying the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such Term Loans, in each case, plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder (provided, that, no such purchase or prepayment shall be made with the proceeds of any Revolving Borrowing) and/or (C) require such Disqualified Institution to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in this Section 11.06), all of its interest, rights and obligations under this Agreement to one or more Eligible Assignees at the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such Term Loans, in each case, plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder; provided, that, (x) the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in this Section 11.06, and (y) such assignment does not conflict with applicable Laws.

Notwithstanding anything to the contrary contained in this Agreement, Disqualified Institutions (1) will not (x) have the right to receive information, reports or other materials provided to the Lenders by the Borrower, the Administrative Agent or any other Lender, (y) attend or participate in meetings attended by the Lenders and the Administrative Agent, or (z) access the Platform or any other electronic site established for the Lenders or confidential communications from counsel to or financial advisors of the Administrative Agent and the Lenders and (2)(x) for purposes of any consent to any amendment, waiver or modification of, or any action under, and for purpose of any direction to the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) under this Agreement or any other Loan Document, each Disqualified Institution will be deemed to have consented in the same proportion as the Lenders that are not Disqualified Institutions consented to such matter, and (y) for purposes of voting on any plan of reorganization or plan of liquidation pursuant to any Debtor Relief Laws ("Plan of Reorganization"), each Disqualified Institution hereby agrees (I) not to vote on such Plan of Reorganization, (II) if such Disqualified Institution does vote on such Plan of Reorganization notwithstanding the foregoing clause (I), such vote will be deemed not to have been in good faith and shall be "designated" pursuant to Section 1126(e) of the Bankruptcy Code of the United States (or any similar provision of any other Debtor Relief Laws), and such vote shall not be counted in determining whether the applicable class has accepted or rejected such Plan of Reorganization in accordance with Section 1126(c) of the Bankruptcy Code of the United States (or any similar

149

EHREN-WALIA 003658

840

provision of any other Debtor Relief Laws), and (III) not to contest any request by any party for a determination by the Bankruptcy Court (or other applicable court of competent jurisdiction) effectuating the foregoing clause (II).

The Administrative Agent shall have the right, and the Loan Parties hereby expressly authorize the Administrative Agent, to post the list of Disqualified Institutions provided by the Borrower (including any updates thereto from time to time) on the Platform, including that portion of the Platform that is designated for "public side" Lenders.

(j)     Arranger Assignment.   The parties hereby agree that MLPFS (and any of its Affiliates) may, without notice to any Person, assign its rights and obligations under this Agreement as an Arranger to any other registered broker-dealer wholly-owned by Bank of America Corporation to which all or substantially all of Bank of America Corporation's or any of its subsidiaries' investment banking, commercial lending services or related businesses may be transferred after the Closing Date.

Section 11.07   **Treatment of Certain Information; Confidentiality.**

(a)     Treatment of Certain Information.   Each of the Administrative Agent, the Lenders and the L/C Issuer agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its Affiliates, to its auditors and to its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (ii) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (iii) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (iv) to any other party hereto, (v) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (vi) subject to an agreement containing provisions substantially the same as those of this Section 11.07, to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement or any Eligible Assignee invited to be a Lender pursuant to Section 2.02(g), or (B) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder (it being understood that the list of Disqualified Institutions may be disclosed to any assignee or participant, or prospective assignee or participant, in reliance on this clause (vi)), (vii) on a confidential basis to (A) any rating agency in connection with rating Holdings or its Subsidiaries or the credit facilities provided hereunder, (B) the provider of any Platform or other electronic delivery service used by the Administrative Agent, the L/C Issuer and/or the Swingline Lender to deliver Borrower Materials or notices to the Lenders, or (C) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers or other market identifiers with respect to the credit facilities provided hereunder, or (viii) with the consent of the Borrower or to the extent such Information (1) becomes publicly available other than as a result of a breach of this Section 11.07 or (2) becomes available to the Administrative Agent, any Lender, the L/C Issuer or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower.   For purposes of this Section 11.07, "Information" means all information received from any Loan Party or any Subsidiary relating to any Loan Party or any Subsidiary or any of their respective businesses, other than any such information that is available to the Administrative Agent, any Lender or the L/C Issuer on a nonconfidential basis prior to disclosure by any Loan party or any Subsidiary; provided, that, in the case of information received from any

150

EHREN-WALIA 003659

Loan Party or any Subsidiary after the Closing Date, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this <u>Section 11.07</u> shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information. In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Administrative Agent, the Arrangers and the Lenders in connection with the administration of this Agreement, the other Loan Documents and the Commitments.

(b)    <u>Non-Public Information</u>.  Each of the Administrative Agent, the Lenders and the L/C Issuer acknowledges that (i) the Information may include material non-public information concerning a Loan Party or a Subsidiary, as the case may be, (ii) it has developed compliance procedures regarding the use of material non-public information and (iii) it will handle such material non-public information in accordance with applicable Law, including United States federal and state securities Laws.

(c)    <u>Press Releases</u>.  The Loan Parties and their Affiliates agree that they will not in the future issue any press releases or other public disclosure using the name of the Administrative Agent or any Lender or their respective Affiliates or referring to this Agreement or any of the Loan Documents without the prior written consent of the Administrative Agent, unless (and only to the extent that) the Loan Parties or such Affiliate is required to do so under law and then, in any event the Loan Parties or such Affiliate will consult with such Person before issuing such press release or other public disclosure.

(d)    <u>Customary Advertising Material</u>.  The Loan Parties consent to the publication by the Administrative Agent or any Lender of customary advertising material relating to the transactions contemplated hereby using the name, product photographs, logo or trademark of the Loan Parties.

Section 11.08    **Right of Setoff**.

If an Event of Default shall have occurred and be continuing, each Lender, the L/C Issuer and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent, to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, the L/C Issuer or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the obligations of the Borrower or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender or the L/C Issuer or their respective Affiliates, irrespective of whether or not such Lender, the L/C Issuer or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured, secured or unsecured, or are owed to a branch, office or Affiliate of such Lender or the L/C Issuer different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness; <u>provided</u>, <u>that</u>, in the event that any Defaulting Lender shall exercise any such right of setoff, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of <u>Section 2.15</u> and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the L/C Issuer and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Secured

CHAR1\1498335v12

EHREN-WALIA 003660

Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender, the L/C Issuer and their respective Affiliates under this Section 11.08 are in addition to other rights and remedies (including other rights of setoff) that such Lender, the L/C Issuer or their respective Affiliates may have. Each Lender and the L/C Issuer agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; provided, that, the failure to give such notice shall not affect the validity of such setoff and application. Notwithstanding the provisions of this Section 11.08, if at any time any Lender, the L/C Issuer or any of their respective Affiliates maintains one or more deposit accounts for the Borrower or any other Loan Party into which Medicare and/or Medicaid receivables are deposited, such Person shall waive the right of setoff set forth herein.

Section 11.09    **Interest Rate Limitation.**

Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 11.10    **Counterparts; Integration; Effectiveness.**

This Agreement and each of the other Loan Documents may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents, and any separate letter agreements with respect to fees payable to the Arrangers, the Administrative Agent or the L/C Issuer, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement or any other Loan Document, or any certificate delivered thereunder, by fax transmission or e-mail transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement or such other Loan Document or certificate. Without limiting the foregoing, to the extent a manually executed counterpart is not specifically required to be delivered under the terms of any Loan Document, upon the request of any party, such fax transmission or e-mail transmission shall be promptly followed by such manually executed counterpart.

Section 11.11    **Survival of Representations and Warranties.**

All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding.

152

EHREN-WALIA 003661

Section 11.12    **Severability.**

If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 11.12, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, the L/C Issuer or the Swingline Lender, as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 11.13    **Replacement of Lenders.**

If the Borrower is entitled to replace a Lender pursuant to the provisions of Section 3.06, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 11.06), all of its interests, rights (other than its existing rights to payments pursuant to Sections 3.01 and 3.04) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided, that:

(a)    the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 11.06(b);

(b)    such Lender shall have received payment of an amount equal to one hundred percent (100%) of the outstanding principal of its Loans and L/C Advances, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

(d)    such assignment does not conflict with applicable Laws; and

(e)    in the case of an assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

CHAR1\1498335v12

EHREN-WALIA 003662

844

Section 11.14    <u>Governing Law; Jurisdiction; Etc.</u>

(a)    <u>GOVERNING LAW</u>.    THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)    <u>SUBMISSION TO JURISDICTION</u>.    THE BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE ADMINISTRATIVE AGENT, ANY LENDER, THE L/C ISSUER, OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THAN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS  AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT, ANY LENDER OR THE L/C ISSUER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ANY OTHER LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    <u>WAIVER OF VENUE</u>. THE BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN <u>PARAGRAPH (B)</u> OF THIS <u>SECTION 11.14</u>.    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    <u>SERVICE OF PROCESS</u>.    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN <u>SECTION 11.02</u>. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY

CHAR1\1498335v12

EHREN-WALIA 003663

PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 11.15    **Waiver of Jury Trial.**

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.15</u>.

Section 11.16    **Subordination.**

Each Loan Party (a "<u>Subordinating Loan Party</u>") hereby subordinates the payment of all obligations and indebtedness of any other Loan Party owing to it, whether now existing or hereafter arising, including but not limited to any obligation of any such other Loan Party to the Subordinating Loan Party as subrogee of the Secured Parties or resulting from such Subordinating Loan Party's performance under the Guaranty, to the indefeasible payment in full in cash of all Obligations. If the Secured Parties so request, any such obligation or indebtedness of any such other Loan Party to the Subordinating Loan Party shall be enforced and performance received by the Subordinating Loan Party as trustee for the Secured Parties and the proceeds thereof shall be paid over to the Secured Parties on account of the Secured Obligations, but without reducing or affecting in any manner the liability of the Subordinating Loan Party under this Agreement. Without limitation of the foregoing, so long as no Default has occurred and is continuing, the Loan Parties may make and receive payments with respect to Intercompany Debt; <u>provided</u>, <u>that</u>, in the event that any Loan Party receives any payment of any Intercompany Debt at a time when such payment is prohibited by this <u>Section 11.16</u>, such payment shall be held by such Loan Party, in trust for the benefit of, and shall be paid forthwith over and delivered, upon written request, to the Administrative Agent.

Section 11.17    **No Advisory or Fiduciary Responsibility.**

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower and each other Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (a)(i) the arranging and other services regarding this Agreement provided by the Administrative Agent and any Affiliate thereof, the Arrangers and the Lenders are arm's-length commercial transactions between the Borrower, each other Loan Party and their respective Affiliates, on the one hand, and the Administrative Agent and, as applicable, its Affiliates (including MLPFS) and the Lenders and their Affiliates (collectively, solely for purposes of this <u>Section 11.17</u>, the "<u>Lenders</u>"), on the other hand, (ii) the Borrower and the other Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii) the Borrower and each other Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents, (b) (i) the Administrative Agent and its Affiliates (including MLPFS) and each Lender each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary, for the Borrower, any other

EHREN-WALIA 003664

Loan Party or any of their respective Affiliates, or any other Person and (ii) neither the Administrative Agent, any of its Affiliates (including MLPFS) nor any Lender has any obligation to the Borrower, any other Loan Party or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents, and (c) the Administrative Agent and its Affiliates (including MLPFS) and the Lenders may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, the other Loan Parties and their respective Affiliates, and neither the Administrative Agent, any of its Affiliates (including MLPFS) nor any Lender has any obligation to disclose any of such interests to the Borrower, any other Loan Party or any of their respective Affiliates. To the fullest extent permitted by law, the Borrower and each other Loan Party hereby waives and releases any claims that it may have against the Administrative Agent, any of its Affiliates (including MLPFS) or any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transactions contemplated hereby.

Section 11.18    **Electronic Execution.**

The words "delivery," "execute," "execution," "signed," "signature," and words of like import in any Loan Document or any other document executed in connection herewith shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided, that, notwithstanding anything contained herein to the contrary the Administrative Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it; provided, further, that, without limiting the foregoing, upon the request of the Administrative Agent, any electronic signature shall be promptly followed by such manually executed counterpart.

Section 11.19    **USA PATRIOT Act Notice.**

Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower and the other Loan Parties that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "PATRIOT Act"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the PATRIOT Act. The Borrower and the Loan Parties agree to, promptly following a request by the Administrative Agent or any Lender, provide all such other documentation and information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

Section 11.20    **ENTIRE AGREEMENT.**

**THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.**

CHAR1\1498335v.12

EHREN-WALIA 003665

847

Section 11.21   <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions.</u>

Solely to the extent any Lender or the L/C Issuer that is an EEA Financial Institution is a party to this Agreement and notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender or the L/C Issuer that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by (a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender or the L/C Issuer that is an EEA Financial Institution; and (b) the effects of any Bail-In Action on any such liability, including, if applicable, (i) a reduction in full or in part or cancellation of any such liability; (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or (iii) the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

CHAR1\1498335v12

EHREN-WALIA 003666

848

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

INITIAL BORROWER:

CHT MERGERSUB, INC.,
a Delaware corporation, as initial Borrower

By: _Paul Parmar_
Name: Paul Parmjit Parmar
Title: Chief Executive Officer

HOLDINGS:

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC.,
a Delaware corporation

By: _Paul Parmar_
Name: Paul Parmjit Parmar
Title: Chief Executive Officer

GUARANTORS:

ALLEGIANCE BILLING & CONSULTING, LLC,
a New York limited liability company

ALLEGIANCE CONSULTING ASSOCIATES, LLC,
a New York limited liability company

INTEGRATED PHYSICIAN SOLUTIONS, INC.,
a Delaware corporation

MDRX MEDICAL BILLING, LLC,
a Delaware limited liability company

MEDICAL BILLING SERVICES, INC.,
a Texas corporation

NEMS ACQUISITION LLC,
a Delaware limited liability company

NEMS WEST VIRGINIA, LLC,
a Pennsylvania limited liability company

NORTHEAST MEDICAL SOLUTIONS, LLC,
a Pennsylvania limited liability company

By: _Paul Parmar_
Name: Paul Parmjit Parmar
Title: Chief Executive Officer

NORTHSTAR FHA, LLC,
a Delaware limited liability company

NORTHSTAR FIRST HEALTH, LLC,
a Delaware limited liability company

PHOENIX HEALTH, LLC,
a Delaware limited liability company

PHYSICIANS PRACTICE PLUS HOLDINGS LLC,
a Delaware limited liability company

PHYSICIANS PRACTICE PLUS LLC,
a Delaware limited liability company

RAND MEDICAL BILLING, INC.,
a California corporation

RMI PHYSICIAN SERVICES CORPORATION,
a Texas corporation

VACHETTE BUSINESS SERVICES, LTD.,
an Ohio limited liability company

VEGA MEDICAL PROFESSIONALS, LLC,
a Delaware limited liability company

WESTERN SKIES PRACTICE MANAGEMENT, INC.,
a Colorado corporation

By: _____
Name: Paul Parmjit Parmar
Title: Chief Executive Officer

ADMINISTRATIVE AGENT:       BANK OF AMERICA, N.A.,
as Administrative Agent

By:

Name: Brenda Schriner
Title: Vice President

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC.
CREDIT AGREEMENT

EHREN-WALIA-003669

Case 8-20-08049-ast    Doc 162-9    Filed 05/03/24    Entered 05/03/24 16:02:27

BMO HARRIS BANK, N.A.,
as Lender

By: _____
Name: Michael Pincus
Title: Managing Director

EHRENWALIA-003670

**Schedule 1.01(a)**
**Certain Addresses for Notices**

| **Loan Parties:** | **Administrative Agent:** |
|---|---|
| Paul Parmar<br>19 Colts Gait Lane<br>Colts Neck, NJ 07722<br><br>With a copy to:<br>Adam J. Greene, Esq.<br>Robinson Brog Leinwand Greene Genovese &<br>Gluck PC<br>875 Third Avenue/9th Floor<br>New York, NY 10022<br><br>CC Capital, Attn: Douglas Newton<br>555 Madison Avenue, 26th Floor<br>New York, NY 10022<br>Phone: 212 207 8647<br>Fax: 212 588 8713<br>newton@cc.capital | **For payments and Requests for Credit Extensions**<br><br>Bank of America, N.A.<br>Credit Services<br>TX1-492-14-11<br>901 MAIN ST<br>Dallas TX 75202-3714<br>Attention: Ryan Miller<br>Telephone: 972-338-3796<br>Facsimile: 214.290.8302<br>E-mail: rmiller24@baml.com<br><br>*Wiring instructions:*<br><br>Bank of America, N.A.<br>New York NY<br>ABA #: 026009593<br>Acct #: 1366072250600<br>Account Name: Corporate Credit Services<br>Ref: Orion Healthcorp, Inc.<br><br>**Other Notices for Administrative Agent**<br><br>Brenda Schriner<br>Vice President<br>Agency Management<br>Port Orchard BC<br>1497 Olney Ave SE<br>Port Orchard WA 98366-4035<br>Telephone: 206-358-0048<br>Facsimile: 415-343-0557<br>Electronic Mail: brenda.schriner@baml.com |
| **L/C Issuer:** | **Swingline Lender:** |
| Bank of America, N.A.<br>Trade Operations<br>One Fleet Way, 2nd Floor<br>Mail Code PA6-580-02-30<br>Scranton, PA 18507<br>Phone: 800-370-7519<br>Email: Scranton_standby_lc@bankofamerica.com<br>Fax Number: 800-755-8743 | Bank of America, N.A.<br>Credit Services<br>TX1-492-14-11<br>901 MAIN ST<br>Dallas TX 75202-3714<br>Attention: Ryan Miller<br>Telephone: 972-338-3796<br>Facsimile: 214.290.8302 |

EHREN-WALIA 003671

E-mail: rmiller24@baml.com


*Wiring instructions:*

Bank of America, N.A.
New York NY
ABA #:  026009593
Acct #:   1366072250600
Account Name:  Corporate Credit Services
Ref:     Orion Healthcorp, Inc.

EHREN-WALIA 003672

**Schedule 1.01(b)**
**Initial Commitments and Applicable Percentages**

| Lender | Revolving Commitment | Applicable Percentage of Revolving Commitment | Initial Term Commitment | Applicable Percentage of Initial Term Commitment |
|---|---|---|---|---|
| Bank of America, N.A. | $10,344,827.59 | 68.965517267% | $89,655,172.41 | 68.965517238% |
| BMO Harris Bank N.A. | $4,655,172.41 | 31.034482733% | $40,344,827.59 | 31.034482762% |
| **Total** | **$15,000,000.00** | **100.000000000%** | **$130,000,000.00** | **100.000000000%** |

EHREN-WALIA 003673

Case 8-20-08049-ast   Doc 162-49   Filed 05/03/24   Entered 05/03/24 16:02:27

**Schedule 1.01(c)**
**Extraordinary Items and Quality of Earnings Adjustments**

[see attached]

EHREN-WALIA 003674

| | LTM 3/31/2017 | LTM 6/30/2017 | LTM 9/30/2017 | LTM 12/31/2017 |
|---|---|---|---|---|
| | | | Add-back Schedule | |
| **Part I - Extraordinary Expenses** | | | | |
| Severance Payment - Ex Employee | $    - | $    - | $    - | $    - |
| Consulting Fees - Deal Fee on Acquisition not consummated | 9,444 | 9,444 | 9,444 | - |
| Initial IPO Accountants Payment - on Behalf of Grant Thornton | - | - | - | - |
| NEMS - Earnout payment | - | - | - | - |
| Debt Amendment - RAI Legal Fee | - | - | - | - |
| Franchise Tax payments | 76,469 | 17,245 | 9,898 | - |
| Consulting Fees - Deal Fee on Acquisition not consummated | 77,500 | 77,500 | - | - |
| Consulting Fees - Deal Fee on Acquisition not consummated | 25,000 | - | - | - |
| Proskauer Rose - RAI Legal Fees to Close out Loan | 145,000 | 145,000 | - | - |
| 2011 Legal Settlement | 45,000 | - | - | - |
| Duff & Phelps - Special Committee Advisors | 325,000 | 325,000 | - | - |
| VEGA Acquisition - Deal Fees | 2,400,000 | 2,400,000 | - | - |
| Warrant Settlement - One Time Payment RAI | 5,700,000 | 5,700,000 | - | - |
| **Extraordiany Expense Total** | $ 8,803,413 | $ 8,674,190 | $ 19,343 | $    - |
| | | | | |
| **Part II - QoE Adjustments** | | | | |
| Pubic Company Costs | $ 456,000 | $ 342,000 | $ 228,000 | $ 114,000 |
| Unposted Audit Adjustment | 21,000 | 15,750 | 10,500 | 5,250 |
| | | | | |
| **Part III - QoE Adjustments** | | | | |
| Upgrade Finance Staff | (500,000) | (375,000) | (250,000) | (125,000) |
| CEO Comp | (1,000,000) | (750,000) | (500,000) | (250,000) |
| **QoE Adjustments Total** | $ (1,023,000) | $ (767,250) | $ (511,500) | $ (255,750) |
| | Apr - Dec | Jul - dec | oct - dec | |

(1) Change in the carrying value of the earnouts for NEMS
(2) Change in the carrying value of the earnouts for PPP, Northstar, Phoenix & MDRX

EHREN-WALIA 003675

Schedule 5.10
Insurance

| Policy Holder | Carrier | Policy Number | Type of Insurance | Amount/Deductibles | Expiration Date |
|---|---|---|---|---|---|
| Constellation Healthcare Technologies, Inc. | PSC Insurance Group | BO723EI00943A17 | **Directors, Officers and Company Liability Insurance** | Limits:<br>Aggregate: $5,000,000 Aggregate, except Management Liability<br>Separate excess aggregate limit for directors under Management Liability: $1,000,000 | 1/7/2018 |
| Constellation Healthcare Technologies, Inc. | GENATT V LLC | I2UUNBH3438 | **Commercial General Liability Insurance** | Each Occurrence Limit: $1,000,000<br>Damage to Rented Premises Limit: $300,000<br>Med Exp (Any one person) Limit: $10,000<br>Personal & Adv Injury Limit: $1,000,000<br>General Aggregate Limit: $2,000,000<br>Product – Comp/OP Agg Limit: $2,000,000 | 3/5/2017 |
| Constellation Healthcare Technologies, Inc. | GENATT V LLC | I2UUNBH3438 | **Commercial Property** | Amount: $710,000<br>Deductible: $5,000 | 3/5/2017 |
| Constellation Healthcare Technologies, Inc. | Westchester Fire Insurance Company | G27541963 002 | **Professional Liability** | Limits:<br>Each Claim: $1,000,000<br>Aggregate Limit: $1,000,000<br>Disciplinary Proceeding Claims Expenses: $5,000 (in addition to the Each Claim and Aggregate Limits set forth above) | 2/7/2017 |
| Constellation Healthcare Technologies, Inc. | Lloyd's of London | ELL015013201 | **Employment Practices Liability Insurance** | Each Employment Practices Violation: $1,000,000<br>Each Third Party Violation: $1,000,000 | 7/17/17 |

EHREN-WALIA 003676

Maximum aggregate for the Policy Period: $1,000,000.

EHREN-WALIA 003677

**Schedule 5.18(a)**

**Subsidiaries, Joint Ventures, Partnerships and Other Equity Investments**

| Subsidiary | Number of shares of each class of Equity Interests in each Subsidiary outstanding | Number and percentage of outstanding shares of each class of Equity Interests owned by the Loan Parties and their Subsidiaries | Class or nature of such Equity Interests (i.e. voting, non-voting, preferred, etc.) | Excluded Subsidiary Y/N (if Yes, list the type) |
|---|---|---|---|---|
| ORION HEALTHCORP, INC. | 1,000 | 100% | Voting | No |
| MEDICAL BILLING SERVICES, INC. | 1,000 | 100% | Voting | No |
| RAND MEDICAL BILLING, INC. | 50,000 | 100% | Voting | No |
| RMI PHYSICIAN SERVICES CORPORATION | 607.142858 | 100% | Voting | No |
| Western Skies Practice Management, Inc. | 2,000 | 100% | Voting | No |
| Integrated Physician Solutions, Inc. | 1,000 | 100% | Voting | No |
| NEMS ACQUISITION LLC | 1 | 100% | Voting | No |
| Physicians Practice Plus LLC | 1 | 100% | Voting | No |
| NORTHSTAR FHA, LLC | 1 | 100% | Voting | No |
| Phoenix Health, LLC | 1 | 100% | Voting | No |
| MDRX Medical Billing, LLC | N/A | 100% | Voting | No |
| Vega Medical Professionals, LLC | N/A | 100% | Voting | No |
| Northeast Medical Solutions, LLC | 1 | 100% | Voting | No |
| NEMS West Virginia, LLC | 1 | 100% | Voting | No |

EHREN-WALIA 003678

| | | | | |
|---|---|---|---|---|
| Physicians Practice Plus Holdings LLC | 1 | 100% | Voting | No |
| NorthStar First Health, LLC | 1 | 100% | Voting | No |
| Vachette Business Services, Ltd. | 1 | 100% | Voting | No |
| Allegiance Billing & Consulting, LLC | N/A | 100% | Voting | No |
| Allegiance Consulting Associates, LLC | N/A | 100% | Voting | No |

EHREN-WALIA 003679

Schedule 5.18(b)
Loan Parties

| Exact legal name | Any former legal names in the four (4) months prior to the Closing Date | Jurisdiction of its incorporation or organization | Jurisdictions in which such it is qualified to do business | Chief executive office address | Principal place of business address (if different from Chief Executive Office) | U.S. federal taxpayer identification number | Organization identification number |
|---|---|---|---|---|---|---|---|
| Constellation Healthcare Technologies, Inc. | None | Delaware | Delaware | 3400 Highway 35 South Suite 9A, Hazlet, NJ 07730 | N/A | 47-2320135 | 5596678 |
| CHT MERGERSUB, INC. | None | Delaware | Delaware | 3400 Highway 35 South Suite 9A, Hazlet, NJ 07730 | N/A | 81-1230483 | 6119641 |
| ORION HEALTHCORP, INC. | None | Delaware | Delaware, Georgia | 3400 Highway 35 South Suite 9A, Hazlet, NJ 07730 | N/A | 58-1597246 | 2040278 |
| MEDICAL BILLING SERVICES, INC. | None | Texas | Texas | 100 Jericho Quadrangle Suite 235 Jericho, NY 11753 | N/A | 76-0162971 | 77042200 |
| NEMS ACQUISITION LLC | None | Delaware | Delaware | 100 Jericho Quadrangle Suite 235 Jericho, NY 11753 | N/A | 46-5137378 | 5491788 |
| NORTHSTAR FHA, LLC | None | Delaware | Delaware | 3400 Highway 35 South Suite 9A, Hazlet, NJ 07730 | N/A | 47-2320135 | 5810284 |

EHREN-WALIA 003680

| Entity | | State | State(s) | Address | | EIN | Number |
|---|---|---|---|---|---|---|---|
| Phoenix Health, LLC | None | Delaware | Delaware | 3400 Highway 35 South Suite 9A, Hazlet, NJ 07730 | N/A | 47-5650856 | 5823105 |
| MDRX Medical Billing, LLC | None | Delaware | Delaware | 3400 Highway 35 South Suite 9A, Hazlet, NJ 07730 | N/A | 81-1785410 | 5901044 |
| Vega Medical Professionals, LLC | None | Delaware | Delaware | 3400 Highway 35 South Suite 9A, Hazlet, NJ 07730 | N/A | 81-2851055 | 5953261 |
| RAND MEDICAL BILLING, INC. | None | California | California | 100 Jericho Quadrangle Suite 235 Jericho, NY 11753 | N/A | 95-3967887 | 1269599 |
| RMI PHYSICIAN SERVICES CORPORATION | None | Texas | Texas, Colorado, Florida, New Mexico | 100 Jericho Quadrangle Suite 235 Jericho, NY 11753 | N/A | 76-0437239 | 131275100 |
| Western Skies Practice Management, Inc. | None | Colorado | Colorado, Montana, Missouri, Alabama | 100 Jericho Quadrangle Suite 235 Jericho, NY 11753 | N/A | 84-1031904 | 19871681684 |
| Integrated Physician Solutions, Inc. | None | Delaware | Delaware, Ohio, Texas, Illinois | 100 Jericho Quadrangle Suite 235 Jericho, NY 11753 | N/A | 58-2260543 | 2666486 |
| Northeast Medical Solutions, LLC | None | Pennsylvania | Delaware, Pennsylvania | 100 Jericho Quadrangle Suite 235 | N/A | 25-1872703 | 2949916 |

EHREN-WALIA 003681

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| NEMS West Virginia, LLC | None | Pennsylvania | Pennsylvania | Jericho, NY 11753 | N/A | 46-1449624 | 4148394 |
| Physicians Practice Plus LLC | None | Delaware | Delaware | 100 Jericho Quadrangle Suite 235 Jericho, NY 11753 | N/A | 47-3214122 | 5696422 |
| Physicians Practice Plus Holdings LLC | None | Delaware | Delaware | 100 Jericho Quadrangle Suite 235 Jericho, NY 11753 | N/A | 47-3206100 | 5696416 |
| NorthStar First Health, LLC | None | Delaware | Delaware | 100 Jericho Quadrangle Suite 235 Jericho, NY 11753 | N/A | 47-4501522 | 5766071 |
| Vachette Business Services, Ltd. | None | Ohio | Ohio | 3400 Highway 35 South Suite 9A, Hazlet, NJ 07730 | N/A | 30-0664672 | 1288538 |
| Allegiance Billing & Consulting, LLC | None | New York | New York | 3400 Highway 35 South Suite 9A, Hazlet, NJ 07730 | N/A | 52-2297141 | 2608525 |
| Allegiance Consulting Associates, LLC | None | New York | New York | 3400 Highway 35 South Suite 9A, Hazlet, NJ 07730 | N/A | 46-1557291 | 4327371 |

EHREN-WALIA 003682

**Schedule 5.19(b)**
**Intellectual Property**

**Patent Registrations**
None.

**Copyright Registrations**

| Loan Party | Copyright | Registration Number | Registration Date | Jurisdiction |
|---|---|---|---|---|
| RMI PHYSICIAN SERVICES CORPORATION | Charge Data Transfer (CDT) version 1 | TXu001118910 | 18-APRIL-2003 | United States |
| Northeast Medical Solutions, LLC | FastClaim | TXu001154119 | 12-DECEMBER, 2003 | United States |

**Trademark Registrations**

| Loan Party | Trademark | Registration Number | Registration Date | Jurisdiction |
|---|---|---|---|---|
| ORION HEALTHCORP, INC. | STRONG RELATIONSHIPS STELLAR RESULTS | Reg. No. 3869274 | Registered 02-NOV-2010 | United States |

**Patent Applications**
None.

**Copyright Applications**
None.

**Trademark Applications**
None.

EHREN-WALIA 003683

**Schedule 5.19(c)**
**Real Properties**

| Loan Party | Address (including city, county, state and zip code) | If leased, name of lessor | Mortgaged Property/Excluded Property |
|---|---|---|---|
| Allegiance Consulting Associates, LLC | 440 Franklin Street, Bloomfield, New Jersey 07003 | Broad Street Associates, LLC | Excluded Property |
| ORION HEALTHCORP, INC. | 100 Jericho Quadrangle, Suite 235, Jericho, New York 11753 | JQ1 Associates, LLC | Excluded Property |
| Allegiance Billing & Consulting, LLC | Units #20 and #22 Copperfield Circle Lititz, Pennsylvania 17543 | HBT Partners | Excluded Property |
| Allegiance Billing & Consulting, LLC | Units #34 and #36 Copperfield Circle Lititz, Pennsylvania 17543 | HBT Partners | Excluded Property |
| Integrated Physician Solutions, Inc. | 331 North Breiel Boulevard, Middletown, Ohio 45042 | Growth and Development Company | Excluded Property |
| ORION HEALTHCORP, INC./ Integrated Physician Solutions, Inc. | 3140 Dayton Xenia Road, Beavercreek, Ohio 45434 | John H. Buerschen Trust | Excluded Property |
| ORION HEALTHCORP, INC. | 465 Avenue of the Cities, Suite C, East Moline, Illinois 61244 | Synergy Property Holdings, LLC | Excluded Property |
| Vachette Business Services, Ltd. | 105 W. Jefferson, Blissfield, Michigan 49228 | LBT Investments, LLC | Excluded Property |
| ORION HEALTHCORP, INC./ MEDICAL BILLING SERVICES, INC. | 714 FM 1960 West, Suite 206, Houston, Texas 77090 | Northwood Professional Building | Excluded Property |
| ORION HEALTHCORP, INC./ MEDICAL BILLING SERVICES, INC. | 3200 Wilcrest, Suites 600 and 415, Houston, Texas 77042 | Houston Texas Westchase III Properties, L.P. | Excluded Property |

EHREN-WALIA 003684

| | | |
|---|---|---|
| ORION HEALTHCORP, INC., (Pediatric Associates of Dayton, Inc.) | 9000 North Main Street, Suite 332 and Storage Unit #14, Dayton, Ohio 45415 | Good Samaritan Hospital | Excluded Property |
| Integrated Physician Solutions, Inc. | 5450 Far Hills Avenue, Suite 110, Kettering, Ohio 45429 | Rahn Foundation Plaza Partnership | Excluded Property |
| ORION HEALTHCORP, INC. | 3824 Northern Pike, Suite 600, Monroeville, Pennsylvania 15146 | Rahn Foundation Plaza Partnership | Excluded Property |
| RAND MEDICAL BILLING, INC. | 1633 Erringer Road, First Floor Suite 101, Simi Valley, California 93065 | The Retsky Family Trust | Excluded Property |
| RMI PHYSICIAN SERVICES CORPORATION | 712 N. Washington Avenue, Suite No. 414, Dallas, Texas 75246 | Washington Tower L.P. | Excluded Property |
| Western Skies Practice Management, Inc. (sublet to another party) | 8740 Lucent Boulevard, 6th Floor, Highlands Ranch, Colorado 80129 | Avaya Inc. | Excluded Property |
| Western Skies Practice Management, Inc. | 7175 West Jefferson Avenue, Suite 2500, Lakewood, Colorado 80235 | Eaglecreek Associates V | Excluded Property |
| ORION HEALTHCORP, INC. | 3824 Northern Pike, Suite 600, Monroeville, Pennsylvania 15146 | One Monroeville Center Associates | Excluded Property |
| Northeast Medical Solutions, LLC | 417 Grand Park Drive, Unit 204, Parkersburg, West Virginia 26105 | The PM Company, Inc. | Excluded Property |
| ORION HEALTHCORP, INC.., as successor-in-interest to Pediatric Physician Alliance, Inc. | 1805 Old Alabama Road, Suite 350, Roswell, GA 30076 | Old Alabama Road, LLC | Excluded Property |
| Constellation Healthcare Technologies, Inc. d/b/a ORION HEALTHCORP, INC. | 368 West Pike Street, Suites 102 and 103, Lawrenceville, GA 30046 | Camelot Enterprises Inc. | Excluded Property |
| Physicians Practice Plus LLC | 1402 W. Swann Avenue, Suite 600, Monroeville, PA 15146 | One Monroeville Center Associates | Excluded Property |

EHREN-WALIA 003685

## Schedule 7.01
### Existing Liens

None.

EHREN-WALIA 003686

Case 8-20-08049-ast    Doc 122-9    Filed 06/03/24    Entered 06/03/24 16:02:27

<u>**Schedule 7.02**</u>
**Existing Indebtedness**

None.

EHREN-WALIA 003687

<u>Schedule 7.03</u>
**Existing Investments**

None.

EHREN-WALIA 003688

<u>Exhibit A</u>

FORM OF ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (this "<u>Assignment and Assumption</u>") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "<u>Assignor</u>") and [*Insert name of Assignee*] (the "<u>Assignee</u>"). Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement identified below (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "<u>Credit Agreement</u>"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto in the amount[s] and equal to the percentage interest[s] identified below of all the outstanding rights and obligations of the Assignor under the respective facilities identified below (including Letters of Credit and Guarantees included in such facilities) and (ii) to the extent permitted to be assigned under applicable Law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at Law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as, the "<u>Assigned Interest</u>"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.  Assignor:          _____
                       [Assignor [is][is not] a Defaulting Lender.]

2.  Assignee:          _____
                       [and is an [Affiliate][Approved Fund] of [*identify Lender*][1]]

3.  Borrower:          ORION HEALTHCORP, INC., a Delaware corporation, as the Borrower after giving effect to the Closing Date Acquisition

4.  Administrative Agent: Bank of America, N.A., as the administrative agent under the Credit Agreement

5.  Credit Agreement:  Credit Agreement, dated as of January 30, 2017, by and among CHT MERGERSUB, INC., a Delaware corporation, as the initial Borrower, ORION HEALTHCORP, INC., a Delaware corporation, as the Borrower after giving effect to the Closing Date Acquisition, the Guarantors party

---

[1] Select as applicable.

CHAR1\1500011v7

EHREN-WALIA 003689

thereto, the Lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, Swingline Lender and L/C Issuer

6.    Assigned Interest:

| Facility Assigned[2] | Aggregate Amount of Commitment/Loans for all Lenders* | Amount of Commitment/Loans Assigned* | Percentage Assigned of Commitment/Loans[3] |
|---|---|---|---|
|  | $ | $ | % |
|  | $ | $ | % |
|  | $ | $ | % |

[7.    Trade Date:    _____]4

Effective Date: _____, 20___  [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

[signature pages follow]

---

[2] Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment and Assumption (e.g. "Revolving Commitment", "Initial Term Commitment", etc.)
* Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.
[3] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.
[4] To be completed if the Assignor and the Assignee intend that the minimum assignment amount is to be determined as of the Trade Date.

CHAR1\1500011v7

EHREN-WALIA 003690

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR
[NAME OF ASSIGNOR]

By:_____
Name:
Title:

ASSIGNEE
[NAME OF ASSIGNEE]

By:_____
Name:
Title:

[Consented to and][5] Accepted:

BANK OF AMERICA, N.A.,
as Administrative Agent

By:_____
Name:
Title:

[Consented to:][6]

[BANK OF AMERICA, N.A.,
as [Swingline Lender][and L/C Issuer]

By:_____
Name:
Title:]

[ORION HEALTHCORP, INC.,
a Delaware corporation

By:_____
Name:
Title:]

---

[5]To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.
[6]To be added only if the consent of the Borrower and/or other parties (e.g. L/C Issuer) is required by the terms of the Credit Agreement.

CHAR1\1500011v7

EHREN-WALIA 003691



ANNEX 1

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.    <u>Representations and Warranties</u>.

1.1    <u>Assignor</u>.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby, (iv) it is **[not]** a Defaulting Lender, (v) it has reviewed the list of Disqualified Institutions provided to the Administrative Agent and (vi) it is not a Disqualified Institution; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2    <u>Assignee</u>.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets the requirements to be an Eligible Assignee, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 6.01 thereof and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest, (vi) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest, (vii) if it is a Foreign Lender, attached hereto is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee, (viii) it has reviewed the list of Disqualified Institutions provided to the Administrative Agent, and (ix) is not a Disqualified Institution; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.    <u>Payments</u>.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.  Notwithstanding the foregoing, the Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to the Assignee.

EHREN-WALIA 003692

3.    <u>General Provisions</u>.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy or other electronic communication shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the Law of the State of New York.

EHREN-WALIA 003693

**Exhibit B**

FORM OF COMPLIANCE CERTIFICATE

For the fiscal [year][quarter] ended _____, 20___.

Date:_____

I, _____, [Chief Executive Officer][Chief Financial Officer][Treasurer][Controller] of ORION HEALTHCORP, INC., a Delaware corporation (the "Borrower"), hereby certify that, to the best of my knowledge and belief, in my capacity as [Chief Executive Officer][Chief Financial Officer][Treasurer][Controller] and not in my individual capacity, with respect to that certain Credit Agreement, dated as of January 30, 2017 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"; capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement), by and among CHT MERGERSUB, INC., a Delaware corporation, as the initial Borrower, ORION HEALTHCORP, INC., a Delaware corporation, as the Borrower after giving effect to the Closing Date Acquisition, the Guarantors party thereto, the Lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, Swingline Lender and L/C Issuer:

*[Use following paragraph 1 for fiscal year-end financial statements:]*

[1.     Attached hereto as Schedule 1 are the year-end audited financial statements required by Section 6.01(a) of the Credit Agreement for the fiscal year of the Borrower ended as of the above date, together with the report and opinion of [_____] or an independent certified public accountant required by such section. The consolidating statements required by Section 6.01(a) of the Credit Agreement are fairly stated in all material respects when considered in relation to the Consolidated financial statements of the Borrower and its Subsidiaries.]

*[Use following paragraph 1 for fiscal quarter-end financial statements:]*

[1.     Attached hereto as Schedule 1 are the unaudited financial statements required by Section 6.01(b) of the Credit Agreement for the fiscal quarter of the Borrower ended as of the above date. The Consolidated financial statements required by Section 6.01(b) of the Credit Agreement fairly present in all material respects the financial condition, results of operations, shareholders' equity and cash flows of the Borrower and its Subsidiaries as at such date and for such period, subject only to normal year-end audit adjustments and the absence of footnotes. The consolidating financial statements required by Section 6.01(b) of the Credit Agreement are fairly stated in all material respects when considered in relation to the Consolidated financial statements of the Borrower and its Subsidiaries.]

2.     The undersigned has reviewed and is familiar with the terms of the Credit Agreement and has made, or has caused to be made, a review of the transactions and financial condition of the Loan Parties and their respective Restricted Subsidiaries during the accounting period covered by the attached financial statements.

3.     A review of the activities of the Loan Parties and their respective Restricted Subsidiaries during such fiscal period has been made under the supervision of the undersigned with a view to determining whether during such fiscal period the Loan Parties and their respective Restricted Subsidiaries were in Default with respect to any covenant or condition of the Loan Documents applicable to them, and

*[select one:]*

EHREN-WALIA 003694

[to the knowledge of the undersigned during such fiscal period, the Loan Parties and their respective Restricted Subsidiaries are not in Default with respect to any covenant or condition of the Loan Documents applicable to them.]

[*or:*]

[the following is a list of the nature and status of each Default:]

4.      The financial covenant analyses and calculations, as of the last day of and for the Measurement Period ending on the last day of the period covered by the financial statements delivered herewith and set forth on Schedule 2 attached hereto, are true and accurate on and as of the date of this Compliance Certificate.

5.      Attached hereto as Schedule 3 is (x) if the Borrower or any of its Restricted Subsidiaries has consummated an Acquisition during the fiscal period of the Borrower ended as of the above date and is adding back amounts pursuant to clause (viii) of the definition of "Consolidated EBITDA", a Cost Savings Schedule with respect to such Acquisition (it being understood that the Borrower has delivered a Cost Savings Schedule prior to the Closing Date with respect to each of the Prior Acquisitions) and (y) if a Cost Savings Schedule has previously been delivered with respect to an Acquisition, an updated Cost Savings Schedule with respect to the remaining portion of the Adjustment Period.[7]

6.      Attached hereto as Schedule 4 is a listing of (a) all applications with the United States Patent and Trademark Office or the United States Copyright Office by any Loan Party, if any, for any Intellectual Property made since the date of the most recently delivered Compliance Certificate (or, in the case of the first Compliance Certificate, the Closing Date), (b) all issuances of registrations or letters on existing applications with the United States Patent and Trademark Office or the United States Copyright Office by any Loan Party, if any, for any Intellectual Property received since the date of such prior Compliance Certificate (or, in the case of the first Compliance Certificate, the Closing Date), and (c) all licenses relating to any Intellectual Property registered with the United States Patent and Trademark Office or the United States Copyright Office entered into by any Loan Party since the date of such prior Compliance Certificate (or, in the case of the first Compliance Certificate, the Closing Date).[8]

7.      Attached hereto as Schedule 5 is a copy of management's discussion and analysis with respect to the financial statements delivered herewith.

[*Use following paragraphs 8 and 9 for fiscal year-end financial statements:*]

8.      Attached hereto as Schedule 6 is a detailed analysis and calculation of Excess Cash Flow for the fiscal year of the Borrower ended as of the above date.[9]

9.      Attached hereto as Schedule 7 is any updated insurance binder or other evidence of insurance for any insurance coverage of any Loan Party or any Restricted Subsidiary that was renewed, replaced or modified during the period covered by this Compliance Certificate.[10]

[*signature page follows*]

---

[7] If no such updates are applicable, Schedule 3 should reflect "None".
[8] If no such updates are applicable, Schedule 4 should reflect "None".
[9] Beginning with the fiscal year ended December 31, 2017.
[10] If no such updates are applicable, Schedule 7 should reflect "None".

CHAR1\1500011v7

EHREN-WALIA 003695

Case 8-20-08049-ast    Doc 122-9    Filed 05/03/24    Entered 05/03/24 16:02:27

IN WITNESS WHEREOF, the undersigned has executed this Compliance Certificate as of the date first written above.

ORION HEALTHCORP, INC.,
a Delaware corporation

By:_____
Name:
Title:

CHAR1\1500011v7

EHREN-WALIA 003696

Case 8-20-08049-ast    Doc 122-9    Filed 05/03/24    Entered 05/03/24 16:02:27

Schedule 1 to Compliance Certificate

**Financial Statements**

EHREN-WALIA 003697

<u>Schedule 2 to Compliance Certificate</u>

**Computation of Financial Covenants**

Capitalized terms used but not otherwise defined herein have the meanings set forth in the Credit Agreement. In the event of conflict between the provisions and formulas set forth in this <u>Schedule 2</u> and the provisions and formulas set forth in the Credit Agreement, the provisions and formulas of the Credit Agreement shall prevail.

I.    **Section 7.11(a) – Consolidated Leverage Ratio.**

A.    Consolidated Funded Indebtedness as of the above date for the Borrower and its Restricted Subsidiaries on a Consolidated basis, the sum (without duplication) of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

1.    all obligations, whether current or long-term, for borrowed money (including the Obligations) and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments:                                          $ _____

2.    all purchase money Indebtedness:                                          $ _____

3.    the principal portion of all obligations under conditional sale or other title retention agreements relating to property purchased by such Person or any Subsidiary thereof (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business):                                          $ _____

4.    all obligations arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments:                                          $ _____

5.    all obligations in respect of the deferred purchase price of property or services, including, without limitation, any Earn Out Obligations (other than trade accounts payable in the ordinary course of business and, in each case, not past due for more than ninety (90) days after the due date thereof):                                          $ _____

6.    all Attributable Indebtedness:                                          $ _____

7.    all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends:                                          $ _____

8.    all Funded Indebtedness of others secured by (or for which the holder of such Funded Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on, or payable out of the proceeds of production from, property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed:                                          $ _____

9.    all Guarantees with respect to Funded Indebtedness of the types specified in Lines 1 through 8 above of another Person:                                          $ _____

10.    all Funded Indebtedness of the types referred to in Lines 1 through 9 above of any partnership or joint venture (other than a joint venture that is itself a corporation or                                          $ _____

CHAR1\1500011v7

EHREN-WALIA 003698

limited liability company) in which such Person is a general partner or joint venturer, except to the extent that such Funded Indebtedness is expressly made non-recourse to such Person:

    11.    Consolidated Funded Indebtedness[11] (Lines I.A.1 + 2 + 3 + 4 + 5 + 6 + 7 + 8 + 9 + 10):    $_____

B.    Consolidated EBITDA for the Measurement Period (see Line 17 of Exhibit A attached hereto):    $_____

C.    Consolidated Leverage Ratio (Line I.A.11 ÷ Line I.B):    _____to 1.00[12]

## II.    Section 7.11(b) – Consolidated Fixed Charge Coverage Ratio.

A.    Consolidated EBITDA for the Measurement Period (see Line I.B):    $_____

B.    Consolidated Capital Expenditures for the Measurement Period:    $_____

C.    Consolidated Cash Taxes for the Measurement Period:    $_____

D.    the aggregate amount of all Restricted Payments made pursuant to Section 7.06(c) of the Credit Agreement for the Measurement Period:    $_____

E.    Fixed Charges for the Measurement Period for the Borrower and its Subsidiaries on a consolidated basis, the sum (without duplication) of the following:

    1.    Consolidated Scheduled Funded Debt Payments for the Measurement Period:    $_____

    2.    Consolidated Cash Interest Charges for the Measurement Period:    $_____

    3.    Fixed Charges[13] (Lines II.E.1 + 2):    $_____

---

[11] For purposes hereof, the amount of any direct obligation arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments shall be the maximum amount available to be drawn thereunder

[12] Shall not be greater than (i) 3.75 to 1.0, for any fiscal quarter ending during the period from the Closing Date through and including September 30, 2017, (ii) 3.50 to 1.0, for any fiscal quarter ending during the period from October 1, 2017 through and including September 30, 2018, and (iii) 3.00 to 1.0, for any fiscal quarter ending thereafter.

[13] For purposes of calculating Fixed Charges, (a)(1) Consolidated Scheduled Funded Debt Payments with respect to the Initial Term Loan for the period ending March 31, 2017 shall be the actual amount thereof for the period of one fiscal quarter then ended multiplied by four (4); (2) Consolidated Scheduled Funded Debt Payments with respect to the Initial Term Loan for the period ending June 30, 2017 shall be the actual amount thereof for the period of two fiscal quarters then ended multiplied by two (2); and (3) Consolidated Scheduled Funded Debt Payments with respect to the Initial Term Loan for the period ending September 30, 2017 shall be the actual amount thereof for the period of three fiscal quarters then ended multiplied by four-thirds (4/3) and (b)(1) Consolidated Interest Charges for the period ending March 31, 2017 shall be the actual amount thereof for the period of one fiscal quarter then ended multiplied by four (4); (2) Consolidated Interest Charges for the period ending June 30, 2017 shall be the actual amount thereof for the period of two fiscal quarters then ended multiplied by two (2); and (3) Consolidated Interest Charges for the period ending September 30, 2017 shall be the actual amount thereof for the period of three fiscal quarters then ended multiplied by four-thirds (4/3).

CHAR1\1500011v7

EHREN-WALIA 003699

F. Consolidated Fixed Charge Coverage Ratio ((Lines II.A – B – C – D) ÷ Line II.E.3):  _____to 1.00[14]

---

[14] Shall not be less than 1.25 to 1.00.

CHAR1\1500011v7

EHREN-WALIA 003700

Exhibit A to Schedule 2 to Compliance Certificate

**Computation of Consolidated EBITDA ($ in 000's)**
(in accordance with the definition of Consolidated EBITDA
as set forth in the Agreement)

| | | Consolidated EBITDA[15] | Quarter Ended | Quarter Ended | Quarter Ended | Quarter Ended | Twelve Months Ended |
|---|---|---|---|---|---|---|---|
| 1. | | Consolidated Net Income for the Measurement Period: | | | | | |
| | | the following (without duplication), in each case to the extent deducted (and not added back) in calculating such Consolidated Net Income (or, in the case of amounts pursuant to Line 9 below, not already included in Consolidated Net Income): | | | | | |
| 2. | + | Consolidated Interest Charges for the Measurement Period: | | | | | |
| 3. | + | the provision for federal, state, local and foreign income taxes payable for the Measurement Period: | | | | | |
| 4. | + | depreciation and amortization expense for the Measurement Period: | | | | | |
| 5. | + | non-recurring charges, fees, costs and expenses for the Measurement Period; provided, that, the aggregate amount of add backs made pursuant to this Line 5 for any period, when added to the aggregate amount of add backs made pursuant to Line 9 below for the Measurement Period, shall not exceed an amount equal to twenty percent (20%) of Consolidated EBITDA for the Measurement Period (determined prior to giving effect to all such add backs): | | | | | |
| 6. | + | non-cash losses and charges (including, without limitation, stock-based compensation expense, but excluding write-downs of accounts receivable) for the Measurement Period which do not represent an accrual or reserve of a potential cash charge in the Measurement Period or any future period: | | | | | |
| 7. | + | (A) extraordinary charges, fees, costs and expenses set forth on part I of Schedule 1.01(c) of the Credit Agreement for the Measurement Period, (B) extraordinary charges, fees, costs and expenses in respect of restructurings or other similar actions, including relocation costs, business process optimizations, integration costs, signing costs, retention or completion bonuses, employee replacement costs, transition costs, costs related to opening, closure and/or consolidation of facilities, severance charges in respect of employee terminations, and start-up losses related to new business ventures, (C) cash charges attributable to | | | | | |

[15] For the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP.

CHAR1\1500011v7

EHREN-WALIA 003701

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | purchase accounting adjustments made in accordance with GAAP for the Measurement Period, and (D) any other extraordinary charges, fees, costs and expenses for the Measurement Period; provided, that, the aggregate amount of add backs made pursuant to clauses (B), (C) and (D) hereof shall not exceed $5,000,000 for the Measurement Period: | | | | | |
| 8. | + | management fees and expenses paid to the Sponsor for the Measurement Period; provided, that, the aggregate amount of add backs made pursuant to this Line 8 shall not exceed an amount equal to four percent (4%) of Consolidated EBITDA for the Measurement Period (determined prior to giving effect to the add backs set forth in Lines 5 and 9): | | | | | |
| 9. | + | (A) the amount of cost savings, operating expense reductions and synergies related to the Transaction and Prior Acquisitions set forth on the Cost Savings Schedule delivered by the Borrower for the Transaction and the Prior Acquisitions, as applicable, for the Measurement Period (which will be added to Consolidated EBITDA as so projected and calculated on a Pro Forma Basis as though such cost savings, operating expense reductions and synergies had been realized on the first (1st) day of the Measurement Period), net of the amount of actual benefits realized during the Measurement Period from such actions, and (B) the amount of cost savings, operating expense reductions and synergies related to Permitted Acquisitions set forth on the Cost Savings Schedule delivered by the Borrower for such Permitted Acquisition, as applicable, for the Measurement Period (which will be added to Consolidated EBITDA as so projected and calculated on a Pro Forma Basis as though such cost savings, operating expense reductions and synergies had been realized on the first (1st) day of the Measurement Period), net of the amount of actual benefits realized during the Measurement Period from such actions; provided, that, the aggregate amount of add backs made pursuant to this Line 9 for any period, when added to the aggregate amount of add backs made pursuant to Line 5 above for the Measurement Period, shall not exceed an amount equal to twenty percent (20%) of Consolidated EBITDA for the Measurement Period (determined prior to giving effect to all such add backs): | | | | | |
| 10. | + | proceeds of business interruption insurance received in cash during the Measurement Period: | | | | | |
| 11. | + | charges, losses or expenses to the extent indemnified or insured or reimbursed by an unaffiliated third party to the extent such indemnification, insurance or reimbursement is actually received in cash for the Measurement Period; provided, that, the aggregate amount of add | | | | | |

CHAR1\1500011v7

EHREN-WALIA 003702

| | | | | | | |
|---|---|---|---|---|---|---|
| | | backs made pursuant to this clause Line 11 shall not exceed $1,000,000 for the Measurement Period: | | | | |
| 12. | + | to the extent not capitalized, fees, costs and expenses for the Measurement Period related to the closing of the Credit Agreement, any amendment, consent or waiver related thereto and the implementation of any Incremental Facility: | | | | |
| 13. | + | to the extent not capitalized, non-recurring transaction expenses incurred (A) in connection with the Transactions (other than costs and expenses added back pursuant to Line 12 above) and (B) after the Closing Date in connection with the consummation of any Specified Transaction and any incurrence of Indebtedness permitted hereunder, whether or not any such Specified Transaction or incurrence, as applicable, is consummated; _provided_, _that_, in each case, the add backs referred to in this Line 13 shall be determined by the Borrower in consultation with the Administrative Agent: | | | | |
| 14. | + | the quality of earnings adjustments set forth on part II of Schedule 1.01(c) of the Credit Agreement: | | | | |
| | | the following (without duplication), in each case to the extent included in calculating such Consolidated Net Income: | | | | |
| 15. | – | all non-cash gains or income for the Measurement Period: | | | | |
| 16. | – | the quality of earnings adjustments set forth on part III of Schedule 1.01(c): | | | | |
| 17. | = | Consolidated EBITDA of the Borrower and its Subsidiaries[16] | | | | |

---

[16] Notwithstanding the foregoing, "Consolidated EBITDA" for Vega Medical Professionals, LLC and its Subsidiaries (i) for the fiscal quarter ended June 30, 2016 shall be deemed to be $202,800.00, (ii) for the fiscal quarter ended September 30, 2016 shall be deemed to be $220,800.00 and (iii) for the fiscal quarter ended December 31, 2016, such amounts as agreed by the Administrative Agent and the Borrower. For the avoidance of doubt, Consolidated EBITDA shall be determined on a Pro Forma Basis with respect to all Specified Transactions occurring during a Measurement Period in accordance with Section 1.03(d).

CHAR1\1500011v7

EHREN-WALIA 003703

<u>Schedule 3 to Compliance Certificate</u>

**Cost Savings Schedule**

CHAR1\1500011v7

EHREN-WALIA 003704

Schedule 4 to Compliance Certificate

**Intellectual Property**

CHAR1\1500011v7

EHREN-WALIA 003705

<u>Schedule 5 to Compliance Certificate</u>

**Management's Discussion and Analysis**

CHAR1\1500011v7

EHREN-WALIA 003706

Schedule 6 to Compliance Certificate

**Excess Cash Flow**

Capitalized terms used but not otherwise defined herein have the meanings set forth in the Credit Agreement. In the event of conflict between the provisions and formulas set forth in this Schedule 5 and the provisions and formulas set forth in the Credit Agreement, the provisions and formulas of the Credit Agreement shall prevail.

With respect to the Borrower and its Restricted Subsidiaries, an amount equal to the sum of:

A.   Consolidated EBITDA for such Excess Cash Flow Period:                                      $_____

B.   the unfinanced portion of Consolidated Capital Expenditures for such Excess Cash Flow Period:                                                                                   $_____

C.   Consolidated Interest Charges actually paid in cash by the Borrower and its Subsidiaries for such Excess Cash Flow Period;                                                       $_____

D.   cash taxes paid for such Excess Cash Flow Period:                                          $_____

E.   Consolidated Scheduled Funded Debt Payments for such Excess Cash Flow Period:              $_____

F.   the portion of the purchase price paid in cash during such Excess Cash Flow Period with respect to any Permitted Acquisitions:                                                 $_____

G.   one-time transaction costs paid in cash for any Permitted Acquisition or Permitted Transfer during such Excess Cash Flow Period:                                                $_____

H.   amounts paid in cash during such Excess Cash Flow Period described in clauses (b)(iv), (b)(vi), (b)(vii) of the definition of Consolidated EBITDA:                              $_____

I.   Excess Cash Flow (A – B – C – D – E – F – G – H):                                          $_____

CHAR1\1500011v7

EHREN-WALIA 003707

Case 8-20-08049-ast   Doc 122-9   Filed 05/03/24   Entered 05/03/24 16:02:27

<u>Schedule 7 to Compliance Certificate</u>

**Insurance**

CHAR1\1500011v7

EHREN-WALIA 003708

**Exhibit C**

FORM OF INCREMENTAL TERM LOAN LENDER JOINDER AGREEMENT

THIS INCREMENTAL TERM LOAN LENDER JOINDER AGREEMENT dated as of _____, 20__ (this "Agreement") is by and among each of the Persons identified as "Incremental Term Lenders" on the signature pages hereto (each, an "Incremental Term Lender"), ORION HEALTHCORP, INC., a Delaware corporation (the "Borrower"), the Guarantors party hereto and Bank of America, N.A., as Administrative Agent. Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement.

WITNESSETH

WHEREAS, pursuant to that certain Credit Agreement, dated as of January 30, 2017 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"), by and among CHT MERGERSUB, INC., a Delaware corporation, as the initial Borrower, ORION HEALTHCORP, INC., a Delaware corporation, as the Borrower after giving effect to the Closing Date Acquisition, the Guarantors party thereto, the Lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, Swingline Lender and L/C Issuer, the Lenders have agreed to provide the Borrower with the credit facilities provided for therein;

WHEREAS, pursuant to Section 2.02(g) of the Credit Agreement, the Borrower has requested that each Incremental Term Lender provide an Incremental Term Loan under the Credit Agreement; and

WHEREAS, each Incremental Term Lender has agreed to provide an Incremental Term Loan on the terms and conditions set forth herein and to become an "Incremental Term Lender" under the Credit Agreement in connection therewith.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Each Incremental Term Lender severally agrees to make an Incremental Term Loan in a single advance to the Borrower on the date hereof in the amount of its respective Incremental Term Commitment established pursuant to this Agreement; provided, that, after giving effect to such advances, the Outstanding Amount of all Incremental Term Loans advanced pursuant to this Agreement shall not exceed the aggregate amount of the Incremental Term Commitments of the Incremental Term Lenders established pursuant to this Agreement. The Incremental Term Commitments of each of the Incremental Term Lenders established pursuant to this Agreement and the Applicable Percentage of the Incremental Term Facility for each of the Incremental Term Lenders established pursuant to this Agreement shall be as set forth on Schedule 1.01(b) attached hereto. The existing Schedule 1.01(b) to the Credit Agreement shall be deemed to be amended to include the information set forth on Schedule 1.01(b) attached hereto.

2.    The Applicable Rate with respect to the Incremental Term Loans advanced pursuant to this Agreement shall be (a) [__] percent ([__]%), with respect to Eurodollar Rate Loans, and (b) [__] percent ([__]%), with respect to Base Rate Loans.

3.    The Incremental Term Loan Maturity Date for the Incremental Term Facility established pursuant to this Agreement shall be [__].

CHAR1\1500011v7

EHREN-WALIA 003709

891

4.    The Borrower shall repay to the Incremental Term Lenders the principal amount of the Incremental Term Loans advanced pursuant to this Agreement in quarterly installments on the dates set forth below as follows:

| Date | Principal Amortization Payment | Date | Principal Amortization Payment |
|------|-------------------------------|------|-------------------------------|
|  |  |  |  |
|  | Incremental Term Loan Maturity Date for the Incremental Term Facility established pursuant to this Agreement | Outstanding Amount |  |
| Total: |  |  |  |

5.    Each Incremental Term Lender party hereto (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Agreement and to consummate the transactions contemplated hereby and to become an Incremental Term Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) it has reviewed the list of Disqualified Institutions provided to the Administrative Agent, (iv) it is not a Disqualified Institution, (v) from and after the date hereof, it shall be bound by the provisions of the Credit Agreement as an Incremental Term Lender thereunder and shall have the obligations of an Incremental Term Lender thereunder, (vi) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 6.01 thereof and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Agreement on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, and (vii) if it is a Foreign Lender, it has delivered any documentation required to be delivered by it pursuant to the terms of the Credit Agreement; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as an Incremental Term Lender.

6.    Each of the Administrative Agent, the Borrower, and each Guarantor agrees that, as of the date hereof, each Incremental Term Lender shall (a) be a party to the Credit Agreement and the other Loan Documents, (b) be an "Incremental Term Lender" for all purposes of the Credit Agreement and the other Loan Documents and (c) have the rights and obligations of an Incremental Term Lender under the Credit Agreement and the other Loan Documents.

7.    The address of each Incremental Term Lender for purposes of all notices and other communications is as set forth on the Administrative Questionnaire delivered by such Incremental Term Lender to the Administrative Agent.

8.    This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall

CHAR1\1500011v7

EHREN-WALIA 003710

constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement by fax transmission or e-mail transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement.

9.      THIS AGREEMENT AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

10.      EACH OF THE UNDERSIGNED HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO THE JURISDICTION PROVISION SET FORTH IN SECTION 11.14(b) OF THE CREDIT AGREEMENT AND IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY THE LAW, ANY RIGHT IT MAY HAVE TO A JURY TRIAL IN ACCORDANCE WITH SECTION 11.15 OF THE CREDIT AGREEMENT.

*[signature pages follow]*

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed by a duly authorized officer as of the date first above written.

INCREMENTAL TERM LENDERS:    [INCREMENTAL TERM LENDER]

By:_____
Name:
Title:

ADMINISTRATIVE AGENT:    BANK OF AMERICA, N.A.,
as Administrative Agent

By:_____
Name:
Title:

BORROWER:    ORION HEALTHCORP, INC.,
a Delaware corporation

By:_____
Name:
Title:

GUARANTORS:    [GUARANTOR]

By:_____
Name:
Title:

CHAR1\1500011v7

EHREN-WALIA 003712

## Exhibit D

### FORM OF JOINDER AGREEMENT

THIS JOINDER AGREEMENT (this "Agreement"), dated as of _____, 20__, is by and between _____, a _____ (the "New Subsidiary"), and BANK OF AMERICA, N.A., in its capacity as Administrative Agent under that certain Credit Agreement, dated as of January 30, 2017 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"), by and among CHT MERGERSUB, INC., a Delaware corporation, as the initial Borrower, ORION HEALTHCORP, INC., a Delaware corporation, as the Borrower after giving effect to the Closing Date Acquisition, the Guarantors party thereto, the Lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, Swingline Lender and L/C Issuer. Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement.

The Loan Parties are required by Section 6.12 of the Credit Agreement to cause the New Subsidiary to become a "Guarantor". Accordingly, the New Subsidiary hereby agrees as follows with the Administrative Agent, for the benefit of the Secured Parties:

1.      The New Subsidiary hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the New Subsidiary will be deemed to be a party to the Credit Agreement and a "Guarantor" for all purposes of the Credit Agreement, and shall have all of the obligations of a Guarantor thereunder as if it had executed the Credit Agreement. The New Subsidiary hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions applicable to the Guarantors contained in the Credit Agreement. Without limiting the generality of the foregoing terms of this paragraph 1, the New Subsidiary hereby jointly and severally together with the other Guarantors, guarantees to each Secured Party, as provided in Article X of the Credit Agreement, prompt payment when due, whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise, and at all times thereafter, of any and all Secured Obligations strictly in accordance with the terms thereof.

2.      The New Subsidiary hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the New Subsidiary will be deemed to be a party to the Security Agreement, and shall have all the obligations of a "Grantor" (as such term is defined in the Security Agreement) thereunder as if it had executed the Security Agreement. The New Subsidiary hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Security Agreement. Without limiting generality of the foregoing terms of this paragraph 2, the New Subsidiary hereby grants to the Administrative Agent, for the benefit of the Secured Parties, a continuing security interest in, and a right to set off against, any and all right, title and interest of the New Subsidiary in and to the Collateral (as such term is defined in Section 2 of the Security Agreement) of the New Subsidiary.

3.      The New Subsidiary hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the New Subsidiary will be deemed to be a party to the Pledge Agreement, and shall have all the obligations of an "Pledgor" (as such term is defined in the Pledge Agreement) thereunder as if it had executed the Pledge Agreement. The New Subsidiary hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Pledge Agreement. Without limiting generality of the foregoing terms of this paragraph 3, the New Subsidiary hereby grants to the Administrative Agent, for the benefit of the Secured Parties, a continuing security interest in, and a right to set off against, any and all right, title

CHAR1\1500011v7

EHREN-WALIA 003713

895

and interest of the New Subsidiary in and to the Pledged Collateral (as such term is defined in Section 2 of the Pledge Agreement) of the New Subsidiary.

      4.      The New Subsidiary hereby represents and warrants to the Administrative Agent, for the benefit of the Secured Parties, that:

      (a)      Set forth on <u>Schedule 1</u> attached hereto is complete and accurate list as of the date hereof of (i) all Subsidiaries, joint ventures and partnerships and other equity investments of the New Subsidiary, (ii) the number of shares of each class of Equity Interests in each such Subsidiary outstanding, (iii) the number and percentage of outstanding shares of each class of Equity Interests of each such Subsidiary owned by the New Subsidiary (and, if such Equity Interests are certificated, the certificate number and number of shares represented by each such certificate), (iv) the class or nature of such Equity Interests (i.e. voting, non-voting, preferred, etc.), and (v) an indication as to whether such Subsidiary is an Excluded Subsidiary (and, if so, the type (i.e. an Immaterial Subsidiary) of such Excluded Subsidiary), a Restricted Subsidiary and/or an Unrestricted Subsidiary.  The outstanding Equity Interests in all Restricted Subsidiaries of the New Subsidiary are validly issued, fully paid and non-assessable and are owned free and clear of all Liens, except for Liens created under the Collateral Documents and any Permitted Liens.  There are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to the Equity Interests of the New Subsidiary or any Restricted Subsidiary thereof, except as contemplated in connection with the Loan Documents.

      (b)      Set forth on <u>Schedule 2</u> attached hereto is a complete and accurate list as of the date hereof of the New Subsidiary's (i) exact legal name, (ii) former legal names in the four (4) months prior to the date hereof, if any, (iii) jurisdiction of its incorporation or organization, as applicable, (iv) type of organization, (v) jurisdictions in which the New Subsidiary is qualified to do business, (vi) chief executive office address, (vii) principal place of business address, (viii) U.S. federal taxpayer identification number, and (ix) organization identification number.

      (c)      Set forth on <u>Schedule 3</u> attached hereto is a list of all Intellectual Property registered or pending registration with the United States Copyright Office or the United States Patent and Trademark Office and owned by the New Subsidiary as of the date hereof.  Except for such claims and infringements that could not reasonably be expected to have a Material Adverse Effect, no claim has been asserted and is pending by any Person challenging or questioning the use of such Intellectual Property or the validity or effectiveness of such Intellectual Property, nor does the New Subsidiary know of any such claim, and, to the knowledge of the New Subsidiary, the use of such Intellectual Property by the New Subsidiary or any of its Restricted Subsidiaries or the granting of a right or a license in respect of such Intellectual Property from the New Subsidiary or any of its Restricted Subsidiaries does not infringe on the rights of any Person.  As of the date hereof, none of the Intellectual Property owned by the New Subsidiary or any of its Restricted Subsidiaries is subject to any licensing agreement or similar arrangement (other than non-exclusive outbound licenses entered into in the ordinary course of business) except as set forth on <u>Schedule 3</u> attached hereto.

      (d)      Set forth on <u>Schedule 4</u> attached hereto is a list of all real property located in the United States that is owned or leased by the New Subsidiary as of the date hereof (in

EHREN-WALIA 003714

each case, including (i) the number of buildings located on such property, (ii) the property address, (iii) the city, county, state and zip code which such property is located, and (iv) a designation as to whether such real property is Mortgaged Property or Excluded Property).

(e)     Set forth on Schedule 5 attached hereto is a list of all Commercial Tort Claims (as defined in the Security Agreement) by or in favor of the New Subsidiary seeking damages in excess of $500,000 that constitute Collateral as of the date hereof.

(f)     Set forth on Schedule 6 attached hereto is a list of any merger, consolidation or other change in structure to which the New Subsidiary was party or any tradename used by the New Subsidiary, in each case, in the five (5) years preceding the date hereof.

(g)     Set forth on Schedule 7 attached hereto is a list of all Instruments, Documents or Tangible Chattel Paper (each as defined in the Security Agreement) of the New Subsidiary required to be pledged and delivered to the Administrative Agent pursuant to Section 4(a) of the Security Agreement.

5.     The address and contact information of the New Subsidiary for purposes of all notices and other communications is [__].

6.     This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement by fax transmission or e-mail transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement.

7.     THIS AGREEMENT AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

*[signature pages follow]*

EHREN-WALIA 003715

IN WITNESS WHEREOF, the New Subsidiary has caused this Agreement to be duly executed by an authorized officer, and the Administrative Agent has caused the same to be accepted by an authorized officer, as of the day and year first above written.

[NEW SUBSIDIARY]

By: _____
Name:
Title:

Acknowledged and accepted:

BANK OF AMERICA, N.A.,
as Administrative Agent

By: _____
Name:
Title:

CHAR1\1500011v7

EHREN-WALIA 003716

Schedule 1

[Subsidiaries, Joint Ventures, Partnerships and Other Equity Investments]

Schedule 2

[New Subsidiary Information]

CHAR1\1500011v7

EHREN-WALIA 003718

<u>Schedule 3</u>

[Intellectual Property]

<u>Schedule 4</u>

[Real Properties]

<u>Schedule 5</u>

[Commercial Tort Claims]

CHAR1\1500011v7

EHREN-WALIA 003721

Case 8-20-08049-ast    Doc 122-9    Filed 06/03/24    Entered 06/03/24 16:02:27

Schedule 6

[Mergers; Consolidations; Change in Structure; or Use of Tradenames]

CHAR1\1500011v7

EHREN-WALIA 003722

Schedule 7

[Instruments, Documents and Tangible Chattel Paper]

EHREN-WALIA 003723

**Exhibit E**

FORM OF LOAN NOTICE

Date: _____, _____

To:    Bank of America, N.A., as Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement, dated as of January 30, 2017 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"), by and among CHT MERGERSUB, INC., a Delaware corporation, as the initial Borrower, ORION HEALTHCORP, INC., a Delaware corporation, as the Borrower after giving effect to the Closing Date Acquisition, the Guarantors party thereto, the Lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, Swingline Lender and L/C Issuer. Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement.

The Borrower hereby requests (select one):

☐ A Borrowing of [Revolving Loans][Initial Term Loans][Incremental Term Loans]

☐ A conversion or continuation of [Revolving Loans][Initial Term Loans][Incremental Term Loans]

1.    On:_____(a Business Day)

2.    In the amount of: $_____

3.    Comprised of:_____
      [Type of Loan requested]

4.    For Eurodollar Rate Loans: with an Interest Period of _____

With respect to such Borrowing, the Borrower hereby represents and warrants that such request complies with the requirements of the Credit Agreement. The Borrower hereby represents and warrants that the conditions set forth in Sections 4.02(a) and (b) of the Credit Agreement will have been satisfied on and as of the date of such Borrowing.

Delivery of an executed counterpart of a signature page of this Loan Notice by fax transmission or e-mail transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Loan Notice.

*[signature page follows]*

EHREN-WALIA 003724

IN WITNESS WHEREOF, the Borrower has caused this Loan Notice to be executed by a duly authorized officer as of the date first written above.

[CHT MERGERSUB, INC.,
a Delaware corporation

By:_____
Name:
Title:]

[ORION HEALTHCORP, INC.,
a Delaware corporation

By:_____
Name:
Title:]

CHAR1\1500011v7

EHREN-WALIA 003725

**Exhibit F**

FORM OF NOTICE OF LOAN PREPAYMENT

Date: _____, _____

To:    Bank of America, N.A., as [Administrative Agent][and Swingline Lender]

Re:    Credit Agreement, dated as of January 30, 2017 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"), by and among CHT MERGERSUB, INC., a Delaware corporation, as the initial Borrower, ORION HEALTHCORP, INC., a Delaware corporation, as the Borrower after giving effect to the Closing Date Acquisition, the Guarantors party thereto, the Lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, Swingline Lender and L/C Issuer. Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement.

Ladies and Gentleman:

The Borrower hereby notifies the [Administrative Agent][and the Swingline Lender] that on _____, pursuant to the terms of Section 2.05 of the Credit Agreement, the Borrower intends to prepay/repay the following Loans as more specifically set forth below:

☐    Voluntary prepayment of [Revolving Loans][Initial Term Loans][Incremental Term Loans] in the following amount(s):

        ☐    Eurodollar Rate Loans: $_____
                Applicable Interest Period(s):_____

        ☐    Base Rate Loans: $_____

☐    Voluntary prepayment of Swingline Loans in the following amount(s): $_____

Delivery of an executed counterpart of a signature page of this Notice of Loan Prepayment by fax transmission or e-mail transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Notice of Loan Prepayment.

*[signature page follows]*

IN WITNESS WHEREOF, the Borrower has caused this Notice of Loan Prepayment to be executed by a duly authorized officer as of the date first written above.

ORION HEALTHCORP, INC.,
a Delaware corporation


By:_____
Name:
Title:

EHREN-WALIA 003727

**Exhibit G**

FORM OF REVOLVING NOTE

FOR VALUE RECEIVED, the undersigned (the "Borrower"), hereby promises to pay to _____ or its registered assigns (the "Lender"), in accordance with the provisions of the Credit Agreement (as hereinafter defined), the principal amount of each Revolving Loan [and each Swingline Loan] from time to time made by the Lender to the Borrower under that certain Credit Agreement, dated as of January 30, 2017 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"), by and among CHT MERGERSUB, INC., a Delaware corporation, as the initial Borrower, the Borrower, the Guarantors party thereto, the Lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, Swingline Lender and L/C Issuer. Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement.

The Borrower promises to pay interest on the unpaid principal amount of each Revolving Loan [and each Swingline Loan] from the date of such Revolving Loan [and such Swingline Loan] until such principal amount is paid in full, at such interest rates and at such times as provided in the Credit Agreement. [Except as set forth in Section 2.04(f) of the Credit Agreement with respect to Swingline Loans, all][All] payments of principal and interest shall be made to the Administrative Agent for the account of the Lender Dollars in immediately available funds at the Administrative Agent's Office. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Credit Agreement.

This Revolving Note is one of the Revolving Notes referred to in the Credit Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein. Upon the occurrence and continuation of one or more of the Events of Default specified in the Credit Agreement, all amounts then remaining unpaid on this Revolving Note shall become, or may be declared to be, immediately due and payable as provided in the Credit Agreement. Revolving Loans [and Swingline Loans] made by the Lender shall be evidenced by one or more loan accounts or records maintained by the Lender in the ordinary course of business. The Lender may also attach schedules to this Revolving Note and endorse thereon the date, amount and maturity of its Revolving Loans [and Swingline Loans] and payments with respect thereto.

The Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Revolving Note.

THIS REVOLVING NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK.

*[signature page follows]*

CHAR1\1500011v7

EHREN-WALIA 003728

IN WITNESS WHEREOF, the Borrower has caused this Revolving Note to be duly executed and delivered by its officer thereunto duly authorized.

ORION HEALTHCORP, INC.,
a Delaware corporation


By:_____
Name:
Title:

EHREN-WALIA 003729

### Exhibit H

## FORM OF SECURED PARTY DESIGNATION NOTICE

To:    Bank of America, N.A., as Administrative Agent

Date: _____, _____

Ladies and Gentlemen:

THIS SECURED PARTY DESIGNATION NOTICE is made by _____, a _____ (the "Designor"), to BANK OF AMERICA, N.A., as Administrative Agent under that certain Credit Agreement referenced below (in such capacity, the "Administrative Agent"). Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement.

### W I T N E S S E T H :

WHEREAS, CHT MERGERSUB, INC., a Delaware corporation, as the initial Borrower, ORION HEALTHCORP, INC., a Delaware corporation, as the Borrower after giving effect to the Closing Date Acquisition, the Guarantors party thereto, the Lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, Swingline Lender and L/C Issuer, have entered into that certain Credit Agreement, dated as of January 30, 2017 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement") pursuant to which certain loans and financial accommodations have been made to the Borrower;

WHEREAS, in connection with the Credit Agreement, a Lender or Affiliate of a Lender is permitted to designate its [Cash Management Agreement][Swap Contract] as a ["Secured Cash Management Agreement"]["Secured Hedge Agreement"] under the Credit Agreement and the Collateral Documents;

WHEREAS, the Credit Agreement requires that the Designor deliver this Secured Party Designation Notice to the Administrative Agent; and

WHEREAS, the Designor has agreed to execute and deliver this Secured Party Designation Notice.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Designation.  The Designor hereby designates the [Cash Management Agreement][Swap Contract] described on Schedule 1 hereto to be a ["Secured Cash Management Agreement"]["Secured Hedge Agreement"] and hereby represents and warrants to the Administrative Agent that such [Cash Management Agreement][Swap Contract] satisfies all the requirements under the Loan Documents to be so designated.  By executing and delivering this Secured Party Designation Notice, the Designor, as provided in the Credit Agreement, hereby agrees to be bound by all of the provisions of the Loan Documents which are applicable to it as a provider of a [Secured Cash Management Agreement][Secured Hedge Agreement] and hereby (a) confirms that it has received a copy of the Loan Documents and such other documents and information as it has deemed appropriate to make its own decision to enter into this Secured Party Designation Notice, (b) appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Credit Agreement, the other Loan Documents or any other instrument or document furnished pursuant thereto as are delegated to the Administrative Agent by the terms thereof, together with such powers as are incidental thereto (including the provisions of Section 9.01 of the Credit Agreement), and (c) agrees that it will be bound by the

CHAR1\1500011v7

EHREN-WALIA 003730

provisions of the Loan Documents and will perform in accordance with its terms all the obligations which by the terms of the Loan Documents are required to be performed by it as a provider of a [Cash Management Agreement][Swap Contract].  Without limiting the foregoing, the Designor agrees to indemnify the Administrative Agent as contemplated by Section 11.04(c) of the Credit Agreement.

2.    GOVERNING LAW.  THIS SECURED PARTY DESIGNATION NOTICE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

3.    This Secured Party Designation Notice may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Secured Party Designation Notice by fax transmission or e-mail transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Secured Party Designation Notice.

*[signature pages follow]*

IN WITNESS WHEREOF, the undersigned have caused this Secured Party Designation Notice to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

[DESIGNOR]

By:_____
Name:
Title:

BANK OF AMERICA, N.A.,
as Administrative Agent

By:_____
Name:
Title:

CHAR1\1500011v7

EHREN-WALIA 003732

Schedule 1

CHAR1\1500011v7

EHREN-WALIA 003733

<u>Exhibit I</u>

FORM OF SOLVENCY CERTIFICATE

January 30, 2017

To the Administrative Agent and each of the Lenders party to the Credit Agreement referred to below:

I, the undersigned chief financial officer of CHT MERGERSUB, INC., a Delaware corporation (the "<u>Borrower</u>"), in that capacity only and not in my individual capacity (and without personal liability), do hereby certify as of the date hereof, and based upon facts and circumstances as they exist as of the date hereof (and disclaiming any responsibility for changes in such facts and circumstances after the date hereof), that:

1.      This certificate is furnished to the Administrative Agent and the Lenders pursuant to Section 4.01(h) of the Credit Agreement, dated as of the date hereof, among CHT MERGERSUB, INC., a Delaware corporation, as the initial Borrower, ORION HEALTHCORP, INC., a Delaware corporation, as the Borrower after giving effect to the Closing Date Acquisition, the Guarantors party thereto, the Lenders party thereto and Bank of America, N.A., as Administrative Agent, Swingline Lender and L/C Issuer (the "<u>Credit Agreement</u>").  Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement.

2.      For purposes of this certificate, the terms below shall have the following definitions:

(a)      "Fair Value"

The amount at which the assets (both tangible and intangible), in their entirety, of the Borrower and its Subsidiaries taken as a whole would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act.

(b)      "Present Fair Salable Value"

The amount that could be obtained by an independent willing seller from an independent willing buyer if the assets of the Borrower and its Subsidiaries taken as a whole are sold with reasonable promptness in an arm's-length transaction under present conditions for the sale of comparable business enterprises insofar as such conditions can be reasonably evaluated.

(c)      "Liabilities"

The recorded liabilities (including contingent liabilities that would be recorded in accordance with GAAP) of the Borrower and its Subsidiaries taken as a whole, as of the date hereof after giving effect to the consummation of the Transactions, determined in accordance with GAAP consistently applied.

(d)      "Will be able to pay their Liabilities as they mature"

For the period from the date hereof through the Maturity Date, the Borrower and its Subsidiaries taken as a whole will have sufficient assets and cash flow to pay their Liabilities as those liabilities mature or (in the case of contingent Liabilities) otherwise become payable, in light

CHAR1\1500011v7

EHREN-WALIA 003734

of business conducted or anticipated to be conducted by the Loan Parties as reflected in the projected financial statements and in light of the anticipated credit capacity.

(e)     "Do not have Unreasonably Small Capital"

The Borrower and its Subsidiaries taken as a whole after consummation of the Transactions do not have unreasonably small capital to conduct its business.  I understand that "unreasonably small capital" depends upon the nature of the particular business or businesses conducted or to be conducted, and I have reached my conclusion based on the needs and anticipated needs for capital of the business conducted or anticipated to be conducted by the Loan Parties as reflected in the projected financial statements and in light of the anticipated credit capacity.

3.     For purposes of this certificate, I, or officers of the Borrower under my direction and supervision, have performed the following procedures as of and for the periods set forth below.

(a)     I have reviewed the financial statements (including the pro forma financial statements) referred to in Section 4.01(d) of the Credit Agreement.

(b)     I have knowledge of and have reviewed to my satisfaction the Credit Agreement.

(c)     As chief financial officer of the Borrower, I am familiar with the financial condition of the Borrower and its Subsidiaries.

4.     Based on and subject to the foregoing, after giving effect to the consummation of the Transactions, (i) the Fair Value of the assets of the Borrower and its Subsidiaries taken as a whole exceeds their Liabilities, (ii) the Present Fair Salable Value of the assets of the Borrower and its Subsidiaries taken as a whole exceeds their Liabilities; (iii) the Borrower and its Subsidiaries taken as a whole do not have Unreasonably Small Capital; and (iv) the Borrower and its Subsidiaries taken as a whole will be able to pay their Liabilities as they mature.

*[signature page follows]*

CHAR1\1500011v7

EHREN-WALIA 003735

Case 8-20-08049-ast    Doc 162-9    Filed 06/03/24    Entered 06/03/24 16:02:27

IN WITNESS WHEREOF, the Borrower has caused this certificate to be executed on its behalf by chief financial officer as of the date first written above.

CHT MERGERSUB, INC.,
a Delaware corporation

By:_____
Name:
Title:    Chief Financial Officer

CHAR1\1500011v7

EHREN-WALIA 003736

**Exhibit J**

FORM OF SWINGLINE LOAN NOTICE

Date: _____, _____

To:     Bank of America, N.A., as Swingline Lender

Cc:     Bank of America, N.A., as Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement, dated as of January 30, 2017 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"), by and among CHT MERGERSUB, INC., a Delaware corporation, as the initial Borrower, ORION HEALTHCORP, INC., a Delaware corporation, as the Borrower after giving effect to the Closing Date Acquisition, the Guarantors party thereto, the Lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, Swingline Lender and L/C Issuer. Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement.

The Borrower hereby requests a Swingline Loan:

1.      On:_____(a Business Day)

2.      In the amount of: $_____

With respect to such Swingline Borrowing, the Borrower hereby represents and warrants that (i) such request complies with the requirements of the Credit Agreement and (ii) the conditions set forth in Sections 4.02(a) and (b) of the Credit Agreement will have been satisfied on and as of the date of such Swingline Borrowing.

Delivery of an executed counterpart of a signature page of this Swingline Loan Notice by fax transmission or e-mail transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Swingline Loan Notice.

*[signature page follows]*

CHAR1\1500011v7

EHREN-WALIA 003737

IN WITNESS WHEREOF, the Borrower has caused this Swingline Loan Notice to be executed by a duly authorized officer as of the date first written above.

ORION HEALTHCORP, INC.,
a Delaware corporation

By:_____
Name:
Title:

CHAR1\1500011v7

EHREN-WALIA 003738

## Exhibit K

### FORM OF TERM NOTE

FOR VALUE RECEIVED, the undersigned (the "Borrower"), hereby promises to pay to _____ or its registered assigns (the "Lender"), in accordance with the provisions of the Credit Agreement (as hereinafter defined), the principal amount of each Term Loan made by the Lender to the Borrower under that certain Credit Agreement, dated as of January 30, 2017 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"), by and among CHT MERGERSUB, INC., a Delaware corporation, as the initial Borrower, the Borrower, the Guarantors party thereto, the Lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, Swingline Lender and L/C Issuer. Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement.

The Borrower promises to pay interest on the unpaid principal amount of each Term Loan from the date of such Term Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the Credit Agreement. All payments of principal and interest shall be made to the Administrative Agent for the account of the Lender in Dollars in immediately available funds at the Administrative Agent's Office. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Credit Agreement.

This Term Note is one of the Term Notes referred to in the Credit Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein. Upon the occurrence and continuation of one or more of the Events of Default specified in the Credit Agreement, all amounts then remaining unpaid on this Term Note shall become, or may be declared to be, immediately due and payable as provided in the Credit Agreement. Each Term Loan made by the Lender shall be evidenced by one or more loan accounts or records maintained by the Lender in the ordinary course of business. The Lender may also attach schedules to this Term Note and endorse thereon the date, amount and maturity of its Term Loans and payments with respect thereto.

The Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Term Note.

THIS TERM NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK.

*[signature page follows]*

Case 8-20-08049-ast    Doc 162-9    Filed 05/03/24    Entered 05/03/24 16:02:27

IN WITNESS WHEREOF, the Borrower has caused this Term Note to be duly executed and delivered by its officer thereunto duly authorized.

ORION HEALTHCORP, INC.,
a Delaware corporation


By:_____
Name:
Title:

CHAR1\1500011v7

EHREN-WALIA 003740

**Exhibit L-1**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit Agreement, dated as of January 30, 2017 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"), by and among CHT MERGERSUB, INC., a Delaware corporation, as the initial Borrower, ORION HEALTHCORP, INC., a Delaware corporation, as the Borrower after giving effect to the Closing Date Acquisition, the Guarantors party thereto, the Lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, Swingline Lender and L/C Issuer. Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement.

Pursuant to the provisions of Section 3.01(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN-E (or W-8BEN, as applicable). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By:_____
Name:
Title:

Date:_____, 20____

CHAR1\1500011v7

EHREN-WALIA 003741

**Exhibit L-2**

### FORM OF U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit Agreement, dated as of January 30, 2017 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"), by and among CHT MERGERSUB, INC., a Delaware corporation, as the initial Borrower, ORION HEALTHCORP, INC., a Delaware corporation, as the Borrower after giving effect to the Closing Date Acquisition, the Guarantors party thereto, the Lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, Swingline Lender and L/C Issuer. Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement.

Pursuant to the provisions of Section 3.01(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN-E (or W-8BEN, as applicable). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By:_____
Name:
Title:

Date:_____, 20____

EHREN-WALIA 003742

**Exhibit L-3**

FORM OF U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit Agreement, dated as of January 30, 2017 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"), by and among CHT MERGERSUB, INC., a Delaware corporation, as the initial Borrower, ORION HEALTHCORP, INC., a Delaware corporation, as the Borrower after giving effect to the Closing Date Acquisition, the Guarantors party thereto, the Lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, Swingline Lender and L/C Issuer. Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement.

Pursuant to the provisions of Section 3.01(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN-E (or W-8BEN, as applicable) or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN-E (or W-8BEN, as applicable) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By:_____
Name:
Title:

Date:_____, 20___

CHAR1\1500011v7

EHREN-WALIA 003743

<u>Exhibit L-4</u>

FORM OF U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit Agreement, dated as of January 30, 2017 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "<u>Credit Agreement</u>"), by and among CHT MERGERSUB, INC., a Delaware corporation, as the initial Borrower, ORION HEALTHCORP, INC., a Delaware corporation, as the Borrower after giving effect to the Closing Date Acquisition, the Guarantors party thereto, the Lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, Swingline Lender and L/C Issuer. Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement.

Pursuant to the provisions of Section 3.01(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN-E (or W-8BEN, as applicable) or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN-E (or W-8BEN, as applicable) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By:_____
Name:
Title:

Date:_____, 20____

EHREN-WALIA 003744

<u>Exhibit M</u>

FORM OF AFFILIATED LENDER ASSIGNMENT AND ASSUMPTION

This Affiliated Lender Assignment and Assumption (this "<u>Assignment and Assumption</u>") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "<u>Assignor</u>") and [*Insert name of Assignee*] (the "<u>Assignee</u>"). Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement identified below (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "<u>Credit Agreement</u>"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto in the amount[s] and equal to the percentage interest[s] identified below of all the outstanding rights and obligations of the Assignor under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable Law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at Law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as, the "<u>Assigned Interest</u>"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.   Assignor:            _____
                          [Assignor [is][is not] a Defaulting Lender.]

2.   Assignee:            _____
                          The Assignee is [the Sponsor][a Non-Debt Fund Affiliate].

3.   Borrower:            ORION HEALTHCORP, INC., a Delaware corporation, as the Borrower
                          after giving effect to the Closing Date Acquisition

4.   Administrative Agent: Bank of America, N.A., as the administrative agent under the Credit
                          Agreement

5.   Credit Agreement:    Credit Agreement, dated as of January 30, 2017, by and among CHT
                          MERGERSUB, INC., a Delaware corporation, as the initial Borrower,
                          ORION HEALTHCORP, INC., a Delaware corporation, as the Borrower
                          after giving effect to the Closing Date Acquisition, the Guarantors party
                          thereto, the Lenders from time to time party thereto and Bank of America,
                          N.A., as Administrative Agent, Swingline Lender and L/C Issuer

6.   Assigned Interest:

CHAR1\1500011v7

EHREN-WALIA 003745

| Aggregate Amount of Initial Term Loans for all Lenders* | Amount of Initial Term Loans Assigned* | Percentage of Initial Term Loans Assigned[17] |
|---|---|---|
| $ | $ | % |
| $ | $ | % |
| $ | $ | % |

[7.     Trade Date:                                    ][18]

Effective Date:                            , 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

*[signature pages follow]*

---

[17] Set forth, to at least 9 decimals, as a percentage of the Initial Term Loans of all Lenders.
[18] To be completed if the Assignor and the Assignee intend that the minimum assignment amount is to be determined as of the Trade Date.

EHREN-WALIA 003746

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR
[NAME OF ASSIGNOR]


By:_____
Name:
Title:


ASSIGNEE
[NAME OF ASSIGNEE]


By:_____
Name:
Title:


Consented to and Accepted:

BANK OF AMERICA, N.A.,
as Administrative Agent


By:_____
Name:
Title:

[Consented to:][19]

[ORION HEALTHCORP, INC.,
a Delaware corporation


By:_____
Name:
Title:]

---

[19]To be added only if the consent of the Borrower is required by the terms of the Credit Agreement.

CHAR1\1500011v7

EHREN-WALIA 003747



ANNEX 1

STANDARD TERMS AND CONDITIONS FOR
AFFILIATED LENDER ASSIGNMENT AND ASSUMPTION

1.    Representations and Warranties.

1.1    Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby, (iv) it is [not] a Defaulting Lender, (v) it has reviewed the list of Disqualified Institutions provided to the Administrative Agent and (vi) it is not a Disqualified Institution; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2    Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it is an Affiliate of the Loan Parties, it has identified itself to the Assignor as an Affiliate of the Loan Parties, and it meets the requirements to be an Eligible Assignee, (iii) after giving effect to this Assignment and Assumption, the aggregate principal amount of all Initial Term Loans owned or held by the Sponsor or any Non-Debt Fund Affiliate at any time shall not exceed, in the aggregate, as calculated at the time of the consummation of this Assignment and Assumption on the Effective Date, twenty percent (20%) of the Outstanding Amount of all Initial Term Loans, (iv) after giving effect to this Assignment and Assumption, the number of Non-Debt Fund Affiliates (together with the Sponsor) that hold the Initial Term Loans shall not exceed three (3) such Lenders, (v) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (vi) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (vii) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 6.01 thereof and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest, (viii) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest, (ix) if it is a Foreign Lender, it has delivered any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee, (x) it has reviewed the list of Disqualified Institutions provided to the Administrative Agent, and (xi) is not a Disqualified Institution; and (b) agrees that (i) it shall at all times be subject to the provisions and restrictions set forth in the Credit Agreement, (ii) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, (iii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender, and (iv) if any Loan Party shall be subject to any Bankruptcy Proceedings, (A) it shall

CHAR1\1500011v7

EHREN-WALIA 003748

930

not take any step or action in such Bankruptcy Proceeding to object to, impede, or delay the exercise of any right or the taking of any action by the Administrative Agent (or the taking of any action by a third party that is supported by the Administrative Agent) in relation to a Claim (including objecting to any debtor in possession financing, use of cash collateral, grant of adequate protection, sale or disposition, compromise, or plan of reorganization) so long as it is treated in connection with such exercise or action on the same or better terms as the other Lenders, and (B) with respect to any matter requiring the vote of the Lenders during the pendency of a Bankruptcy Proceeding (including voting on any plan of reorganization), the Initial Term Loans held by it (and any Claim with respect thereto) shall be deemed to be voted by it (and it hereby designates and appoints the Administrative Agent, and each of Administrative Agent's designees or agents, as attorney-in-fact, irrevocably and with power of substitution, with authority to vote on its behalf) to act in the same proportion as the allocation of voting with respect to such matter by the Lenders who are not the Sponsor or Non-Debt Fund Affiliates, so long as it is treated in connection with the exercise of such right or taking of such action on the same or better terms as the other Lenders.

        2.    <u>Payments</u>. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date. Notwithstanding the foregoing, the Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to the Assignee.

        3.    <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy or other electronic communication shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the Law of the State of New York.

EHREN-WALIA 003749