<u>Exhibit N</u>

FORM OF BORROWER ASSIGNMENT, ASSUMPTION AND RELEASE

This ASSIGNMENT, ASSUMPTION AND RELEASE AGREEMENT (this "Assignment"), dated as of January 30, 2017, is by and among CHT MERGERSUB, INC., a Delaware corporation, as assignor (the "Assignor"), ORION HEALTHCORP, INC., a Delaware corporation, as assignee (the "Assignee"), the Guarantors and BANK OF AMERICA, N.A., as administrative agent for the Lenders party to the Credit Agreement (as defined below) (the "Administrative Agent").

WHEREAS, the Assignor has entered into that certain Credit Agreement, dated as of January 30, 2017 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"; capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement), by and among the Assignor, as the initial Borrower, the Assignee, as the Borrower after giving effect to the Closing Date Acquisition, the Guarantors party thereto, the Lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, Swingline Lender and L/C Issuer;

WHEREAS, the Assignor has agreed to assign to the Assignee all of its rights, interests, duties, obligations and liabilities in, to and under the Credit Agreement as the "Borrower" thereunder;

WHEREAS, the Assignee desires to accept the assignment of all of the Assignor's rights, interests, duties, obligations and liabilities in, to and under the Credit Agreement as the "Borrower" thereunder; and

WHEREAS, the Assignor has requested that the Administrative Agent, on behalf of the Lenders, release the Assignor from all of its obligations as the Borrower under the Credit Agreement.

NOW, THEREFORE, in consideration of the foregoing and of other good and valuable consideration, the receipt of which are hereby acknowledged, the parties hereto agree as follows:

1.      <u>Assignment of Credit Agreement</u>.    Effective as of the date hereof (but after the consummation of the Closing Date Acquisition), the Assignor hereby absolutely assigns, transfers and conveys to the Assignee all of its rights, interests, duties, obligations and liabilities as the Borrower in, to and under the Credit Agreement.

2.      <u>Assumption of Credit Agreement</u>.    Effective as of the date hereof (but after the consummation of the Closing Date Acquisition), the Assignee hereby absolutely accepts the assignment described in Section 1 and assumes all of the duties, obligations and liabilities as the Borrower of the Assignor in, to and under the Credit Agreement to the same extent as if the Assignee had executed the Credit Agreement as the Borrower.  The Assignee hereby ratifies, as of the date hereof, and agrees to be bound by the terms and provisions of the Credit Agreement and accepts all of the Assignor's rights, interests, duties, obligations and liabilities as the Borrower thereunder.  Without limiting the generality of the foregoing terms of this Section 2, the Assignee hereby (a) acknowledges, agrees and confirms that (i) by its execution of this Assignment, the Assignee shall be deemed to be a party to the Credit Agreement and the "Borrower" for all purposes of the Credit Agreement, (ii) the Assignee shall have all of the obligations of the Borrower thereunder as if it had executed the Credit Agreement and (iii) this Assignment shall be deemed a "Loan Document" for all purposes of the Credit Agreement, (b) reaffirms the representations and warranties set forth in the Credit Agreement and each other Loan Document, or any document which has been furnished in connection therewith, (c) agrees to be bound by the affirmative and negative covenants set forth in Articles VI and VII of the Credit Agreement and (d) promises to pay to the Lenders and the

Administrative Agent all Secured Obligations outstanding at, or incurred on or after, the date hereof, all as provided in the Loan Documents.

3.    <u>Release</u>. The Administrative Agent, on behalf of the Lenders, confirms that, from and after the execution and delivery of this Assignment by each of the Assignor and the Assignee, the Assignor is released and forever discharged from any and all duties, obligations and liabilities of the Borrower under the Credit Agreement and each other Loan Document. The release contained herein is intended to be final and binding upon the parties hereto, the Lenders and their respective heirs, successors and assigns. Each party agrees to cooperate in good faith and to execute such further documents as may be necessary to effect the provisions of this Assignment.

4.    <u>Acknowledgement</u>. Each of the parties hereto acknowledges that its execution and delivery of this Assignment has not been the result of any coercion or duress.

5.    <u>Notices to Assignee</u>. The address of the Assignee for purposes of all notices and other communications is [_____] Attention of [_____] (Facsimile No. [_____]).

6.    <u>No Modifications</u>. Except as expressly provided for herein, nothing contained in this Assignment shall amend or modify, or be deemed to amend or modify, the Credit Agreement or any other Loan Document.

7.    <u>GOVERNING LAW</u>. **THIS ASSIGNMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

8.    <u>Counterparts</u>. This Assignment may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Assignment by fax transmission or e-mail transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Assignment.

7.    <u>Binding Nature</u>. This Assignment shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns.

*[signature pages follow]*

EHREN-WALIA 003751

IN WITNESS WHEREOF, each of the parties hereto has caused this Assignment to be executed by a duly authorized officer as of the date first written above.

ASSIGNOR:                        CHT MERGERSUB, INC.,
                                 a Delaware corporation


                                 By:_____
                                 Name:
                                 Title:

ASSIGNEE:                        ORION HEALTHCORP, INC.,
                                 a Delaware corporation


                                 By:_____
                                 Name:
                                 Title:

GUARANTORS:                      CONSTELLATION HEALTHCARE TECHNOLOGIES, INC.,
                                 a Delaware corporation


                                 By:_____
                                 Name:
                                 Title:

                                 ALLEGIANCE BILLING & CONSULTING, LLC,
                                 a New York limited liability company


                                 By:_____
                                 Name:
                                 Title:

                                 ALLEGIANCE CONSULTING ASSOCIATES, LLC,
                                 a New York limited liability company


                                 By:_____
                                 Name:
                                 Title:

                                 INTEGRATED PHYSICIAN SOLUTIONS, INC.,
                                 a Delaware corporation


                                 By:_____
                                 Name:
                                 Title:

CHAR1\1500011v7

EHREN-WALIA 003752

MDRX MEDICAL BILLING, LLC,
a Delaware limited liability company


By:_____
Name:
Title:


MEDICAL BILLING SERVICES, INC.,
a Texas corporation


By:_____
Name:
Title:


NEMS ACQUISITION, LLC,
a Delaware limited liability company


By:_____
Name:
Title:


NEMS WEST VIRGINIA, LLC,
a Pennsylvania limited liability company


By:_____
Name:
Title:


NORTHEAST MEDICAL SOLUTIONS, LLC,
a Pennsylvania limited liability company


By:_____
Name:
Title:


NORTHSTAR FHA, LLC,
a Delaware limited liability company


By:_____
Name:
Title:


NORTHSTAR FIRST HEALTH, LLC,
a Delaware limited liability company


By:_____
Name:
Title:

CHAR1\1500011v7

EHREN-WALIA 003753

PHOENIX HEALTH, LLC,
a Delaware limited liability company

By:_____
Name:
Title:

PHYSICIANS PRACTICE PLUS HOLDINGS LLC,
a Delaware limited liability company

By:_____
Name:
Title:

PHYSICIANS PRACTICE PLUS LLC,
a Delaware limited liability company

By:_____
Name:
Title:

RAND MEDICAL BILLING, INC.,
a California corporation

By:_____
Name:
Title:

RMI PHYSICIAN SERVICES CORPORATION,
a Texas corporation

By:_____
Name:
Title:

VACHETTE BUSINESS SERVICES, LTD.,
an Ohio limited liability company

By:_____
Name:
Title:

VEGA MEDICAL PROFESSIONALS, LLC,
a Delaware limited liability company

By:_____
Name:
Title:

CHAR1\1500011v7

EHREN-WALIA 003754

WESTERN SKIES PRACTICE MANAGEMENT, INC.,
a Colorado corporation

By:_____
Name:
Title:

ADMINISTRATIVE AGENT:     BANK OF AMERICA, N.A.,
as Administrative Agent

By:_____
Name:
Title:

EHREN-WALIA 003756

# REVOLVING NOTE

FOR VALUE RECEIVED, the undersigned (the "Borrower"), hereby promises to pay to BMO HARRIS BANK, N.A. or its registered assigns (the "Lender"), in accordance with the provisions of the Credit Agreement (as hereinafter defined), the principal amount of each Revolving Loan from time to time made by the Lender to the Borrower under that certain Credit Agreement, dated as of January 30, 2017 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"), by and among CHT MERGERSUB, INC., a Delaware corporation, as the initial Borrower, the Borrower, the Guarantors party thereto, the Lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, Swingline Lender and L/C Issuer. Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement.

The Borrower promises to pay interest on the unpaid principal amount of each Revolving Loan from the date of such Revolving Loan such principal amount is paid in full, at such interest rates and at such times as provided in the Credit Agreement. All payments of principal and interest shall be made to the Administrative Agent for the account of the Lender Dollars in immediately available funds at the Administrative Agent's Office. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Credit Agreement.

This Revolving Note is one of the Revolving Notes referred to in the Credit Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein. Upon the occurrence and continuation of one or more of the Events of Default specified in the Credit Agreement, all amounts then remaining unpaid on this Revolving Note shall become, or may be declared to be, immediately due and payable as provided in the Credit Agreement. Revolving Loans made by the Lender shall be evidenced by one or more loan accounts or records maintained by the Lender in the ordinary course of business. The Lender may also attach schedules to this Revolving Note and endorse thereon the date, amount and maturity of its Revolving Loans and payments with respect thereto.

The Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Revolving Note.

THIS REVOLVING NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK.

*[signature page follows]*

CHAR1\1506395v2

EHREN-WALIA 003757

IN WITNESS WHEREOF, the Borrower has caused this Revolving Note to be duly executed and delivered by its officer thereunto duly authorized.

ORION HEALTHCORP, INC.,
a Delaware corporation

By: _____

Name: Paul Parmjit Parmar
Title: Chief Executive Officer

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC.
REVOLVING NOTE
EHREN-WALIA 003758

## TERM NOTE

FOR VALUE RECEIVED, the undersigned (the "Borrower"), hereby promises to pay to BMO HARRIS BANK, N.A. or its registered assigns (the "Lender"), in accordance with the provisions of the Credit Agreement (as hereinafter defined), the principal amount of each Term Loan made by the Lender to the Borrower under that certain Credit Agreement, dated as of January 30, 2017 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"), by and among CHT MERGERSUB, INC., a Delaware corporation, as the initial Borrower, the Borrower, the Guarantors party thereto, the Lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, Swingline Lender and L/C Issuer. Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement.

The Borrower promises to pay interest on the unpaid principal amount of each Term Loan from the date of such Term Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the Credit Agreement. All payments of principal and interest shall be made to the Administrative Agent for the account of the Lender in Dollars in immediately available funds at the Administrative Agent's Office. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Credit Agreement.

This Term Note is one of the Term Notes referred to in the Credit Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein. Upon the occurrence and continuation of one or more of the Events of Default specified in the Credit Agreement, all amounts then remaining unpaid on this Term Note shall become, or may be declared to be, immediately due and payable as provided in the Credit Agreement. Each Term Loan made by the Lender shall be evidenced by one or more loan accounts or records maintained by the Lender in the ordinary course of business. The Lender may also attach schedules to this Term Note and endorse thereon the date, amount and maturity of its Term Loans and payments with respect thereto.

The Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Term Note.

THIS TERM NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK.

*[signature page follows]*

CHAR1\1506396v2

EHREN-WALIA 003759

941

IN WITNESS WHEREOF, the Borrower has caused this Term Note to be duly executed and delivered by its officer thereunto duly authorized.

ORION HEALTHCORP, INC.,
a Delaware corporation

By: _Paul Parmar_

Name: Paul Parmjit Parmar
Title: Chief Executive Officer

BORROWER ASSIGNMENT, ASSUMPTION AND RELEASE

This ASSIGNMENT, ASSUMPTION AND RELEASE AGREEMENT (this "Assignment"), dated as of January 30, 2017, is by and among CHT MERGERSUB, INC., a Delaware corporation, as assignor (the "Assignor"), ORION HEALTHCORP, INC., a Delaware corporation, as assignee (the "Assignee"), the Guarantors and BANK OF AMERICA, N.A., as administrative agent for the Lenders party to the Credit Agreement (as defined below) (the "Administrative Agent").

WHEREAS, the Assignor has entered into that certain Credit Agreement, dated as of January 30, 2017 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"; capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement), by and among the Assignor, as the initial Borrower, the Assignee, as the Borrower after giving effect to the Closing Date Acquisition, the Guarantors party thereto, the Lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, Swingline Lender and L/C Issuer;

WHEREAS, the Assignor has agreed to assign to the Assignee all of its rights, interests, duties, obligations and liabilities in, to and under the Credit Agreement as the "Borrower" thereunder;

WHEREAS, the Assignee desires to accept the assignment of all of the Assignor's rights, interests, duties, obligations and liabilities in, to and under the Credit Agreement as the "Borrower" thereunder; and

WHEREAS, the Assignor has requested that the Administrative Agent, on behalf of the Lenders, release the Assignor from all of its obligations as the Borrower under the Credit Agreement.

NOW, THEREFORE, in consideration of the foregoing and of other good and valuable consideration, the receipt of which are hereby acknowledged, the parties hereto agree as follows:

1.    Assignment of Credit Agreement.  Effective as of the date hereof (but after the consummation of the Closing Date Acquisition), the Assignor hereby absolutely assigns, transfers and conveys to the Assignee all of its rights, interests, duties, obligations and liabilities as the Borrower in, to and under the Credit Agreement.

2.    Assumption of Credit Agreement.  Effective as of the date hereof (but after the consummation of the Closing Date Acquisition), the Assignee hereby absolutely accepts the assignment described in Section 1 and assumes all of the duties, obligations and liabilities as the Borrower of the Assignor in, to and under the Credit Agreement to the same extent as if the Assignee had executed the Credit Agreement as the Borrower.  The Assignee hereby ratifies, as of the date hereof, and agrees to be bound by the terms and provisions of the Credit Agreement and accepts all of the Assignor's rights, interests, duties, obligations and liabilities as the Borrower thereunder.  Without limiting the generality of the foregoing terms of this Section 2, the Assignee hereby (a) acknowledges, agrees and confirms that (i) by its execution of this Assignment, the Assignee shall be deemed to be a party to the Credit Agreement and the "Borrower" for all purposes of the Credit Agreement, (ii) the Assignee shall have all of the obligations of the Borrower thereunder as if it had executed the Credit Agreement and (iii) this Assignment shall be deemed a "Loan Document" for all purposes of the Credit Agreement, (b) reaffirms the representations and warranties set forth in the Credit Agreement and each other Loan Document, or any document which has been furnished in connection therewith, (c) agrees to be bound by the affirmative and negative covenants set forth in Articles VI and VII of the Credit Agreement and (d) promises to pay to the Lenders and the Administrative Agent all Secured Obligations outstanding at, or incurred on or after, the date hereof, all as provided in the Loan Documents.

CHAR1\1506398v2

EHREN-WALIA 003761

943

3.　　Release. The Administrative Agent, on behalf of the Lenders, confirms that, from and after the execution and delivery of this Assignment by each of the Assignor and the Assignee, the Assignor is released and forever discharged from any and all duties, obligations and liabilities of the Borrower under the Credit Agreement and each other Loan Document. The release contained herein is intended to be final and binding upon the parties hereto, the Lenders and their respective heirs, successors and assigns. Each party agrees to cooperate in good faith and to execute such further documents as may be necessary to effect the provisions of this Assignment.

4.　　Acknowledgement. Each of the parties hereto acknowledges that its execution and delivery of this Assignment has not been the result of any coercion or duress.

5.　　Notices to Assignee. The address of the Assignee for purposes of all notices and other communications is the address designated for all Loan Parties on Schedule 1.01(a) to the Credit Agreement.

6.　　No Modifications. Except as expressly provided for herein, nothing contained in this Assignment shall amend or modify, or be deemed to amend or modify, the Credit Agreement or any other Loan Document.

7.　　**GOVERNING LAW. THIS ASSIGNMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

8.　　Counterparts. This Assignment may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Assignment by fax transmission or e-mail transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Assignment.

7.　　Binding Nature. This Assignment shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns.

*[signature pages follow]*

CHAR1\1506398v2

EHREN-WALIA 003762

IN WITNESS WHEREOF, each of the parties hereto has caused this Assignment to be executed by a duly authorized officer as of the date first written above.

ASSIGNOR:                           CHT MERGERSUB, INC.,
                                    a Delaware corporation

                                    By: _____
                                    Name: Paul Parmjit Parmar
                                    Title: Chief Executive Officer

ASSIGNEE:                           ORION HEALTHCORP, INC.,
                                    a Delaware corporation

                                    By: _____
                                    Name: Paul Parmjit Parmar
                                    Title: Chief Executive Officer

GUARANTORS:                         CONSTELLATION HEALTHCARE TECHNOLOGIES, INC.,
                                    a Delaware corporation

                                    ALLEGIANCE BILLING & CONSULTING, LLC,
                                    a New York limited liability company

                                    ALLEGIANCE CONSULTING ASSOCIATES, LLC,
                                    a New York limited liability company

                                    INTEGRATED PHYSICIAN SOLUTIONS, INC.,
                                    a Delaware corporation

                                    MDRX MEDICAL BILLING, LLC,
                                    a Delaware limited liability company

                                    MEDICAL BILLING SERVICES, INC.,
                                    a Texas corporation

                                    NEMS ACQUISITION LLC,
                                    a Delaware limited liability company

                                    By: _____
                                    Name: Paul Parmjit Parmar
                                    Title: Chief Executive Officer

NEMS WEST VIRGINIA, LLC,
a Pennsylvania limited liability company

NORTHEAST MEDICAL SOLUTIONS, LLC,
a Pennsylvania limited liability company

NORTHSTAR FHA, LLC,
a Delaware limited liability company

NORTHSTAR FIRST HEALTH, LLC,
a Delaware limited liability company

PHOENIX HEALTH, LLC,
a Delaware limited liability company

PHYSICIANS PRACTICE PLUS HOLDINGS LLC,
a Delaware limited liability company

PHYSICIANS PRACTICE PLUS LLC,
a Delaware limited liability company

RAND MEDICAL BILLING, INC.,
a California corporation

RMI PHYSICIAN SERVICES CORPORATION,
a Texas corporation

VACHETTE BUSINESS SERVICES, LTD.,
an Ohio limited liability company

VEGA MEDICAL PROFESSIONALS, LLC,
a Delaware limited liability company

WESTERN SKIES PRACTICE MANAGEMENT, INC.,
a Colorado corporation

By: _____
Name: Paul Parmjit Parmar
Title: Chief Executive Officer

ADMINISTRATIVE AGENT:          BANK OF AMERICA, N.A.,
                               as Administrative Agent

                               By:
                               Name: Brenda Schriner
                               Title: Vice President

EHREN-WALIA 003765

SECURITY AGREEMENT

THIS SECURITY AGREEMENT, dated as of January 30, 2017 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, this "Security Agreement"), is by and among the parties identified as "Grantors" on the signature pages hereto and such other parties that may become Grantors after the date hereof (individually a "Grantor", and collectively the "Grantors") and BANK OF AMERICA, N.A., as administrative agent (in such capacity, the "Administrative Agent") for the Secured Parties.

WITNESSETH

WHEREAS, pursuant to that certain Credit Agreement, dated as of January 30, 2017 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"), by and among CHT MERGERSUB, INC., a Delaware corporation, as the initial Borrower, ORION HEALTHCORP, INC., a Delaware corporation, as the Borrower after giving effect to the Closing Date Acquisition, the Guarantors party thereto, the Lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, Swingline Lender and L/C Issuer, the Lenders have agreed to make Loans and the L/C Issuer has agreed to issue Letters of Credit upon the terms and subject to the conditions set forth therein; and

WHEREAS, in consideration thereof, this Security Agreement is required by the terms of the Credit Agreement.

NOW, THEREFORE, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Definitions.

     (a)     Capitalized terms used and not otherwise defined herein shall have the meanings provided in the Credit Agreement.

     (b)     The following terms shall have the meanings set forth in the UCC: Accession, Account, As-Extracted Collateral, Chattel Paper, Commercial Tort Claim, Consumer Goods, Deposit Account, Document, Electronic Chattel Paper, Equipment, Farm Products, Fixtures, General Intangible, Goods, Instrument, Inventory, Investment Property, Letter-of-Credit Right, Manufactured Home, Money, Proceeds, Securities Account, Security Entitlement, Securities Intermediary, Software, Supporting Obligation and Tangible Chattel Paper.

     (c)     As used herein, the following terms shall have the meanings set forth below:

          "Collateral" has the meaning provided in Section 2 hereof.

          "Copyright License" means any agreement providing for the grant by or to a Grantor of any right with respect to any Copyright.

          "Copyrights" means (a) all copyrights registered in the United States in all Works, now existing or hereafter created or acquired, all registrations and recordings thereof, and all applications in connection therewith, including registrations, recordings and applications in the United States Copyright Office or in any similar office or agency of the United States, any state thereof or political subdivision thereof, and (b) all renewals thereof.

          "Patent License" means any agreement providing for the grant by or to a Grantor of any right with respect to any Patent.

CHAR1\15004983-4

EHREN-WALIA 003766

"Patents" means (a) all letters patent of the United States, any state thereof or any political subdivision thereof and all reissues and extensions thereof, and (b) all applications for letters patent of the United States, any state thereof or any political subdivision thereof and all divisions, continuations and continuations-in-part thereof.

"Trademark License" means any agreement providing for the grant by or to a Grantor of any right with respect to any Trademark.

"Trademarks" means (a) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers, and the goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any political subdivision thereof, and (b) all renewals thereof.

"Work" means any work that is subject to copyright protection pursuant to Title 17 of the United States Code.

2.     Grant of Security Interest in the Collateral.  To secure the prompt payment and performance in full when due, whether by lapse of time, acceleration, mandatory prepayment or otherwise, of the Secured Obligations, each Grantor hereby grants to the Administrative Agent, for the benefit of the Secured Parties, a continuing security interest in, and a right to set off against, any and all right, title and interest of such Grantor in and to all of the following, whether now owned or existing or owned, acquired, or arising hereafter (collectively, the "Collateral"):

(a)     all Accounts;

(b)     all Chattel Paper;

(c)     those Commercial Tort Claims identified on Schedule 2(c) attached hereto;

(d)     all Copyrights;

(e)     all Copyright Licenses;

(f)     all Deposit Accounts;

(g)     all Documents;

(h)     all Equipment;

(i)     all Fixtures;

(j)     all General Intangibles;

(k)     all Goods;

(l)     all Instruments;

2

EHREN-WALIA 003767

949

(m)    all Inventory;

(n)    all Investment Property;

(o)    all Letter-of-Credit Rights;

(p)    all Money;

(q)    all Patents;

(r)    all Patent Licenses;

(s)    all Software;

(t)    all Supporting Obligations;

(u)    all Trademarks;

(v)    all Trademark Licenses; and

(w)    all Accessions and all Proceeds of any and all of the foregoing.

Notwithstanding anything to the contrary contained herein, the security interests granted under this Security Agreement shall not extend to any Excluded Property and no Excluded Property shall constitute Collateral.

The Grantors and the Administrative Agent, on behalf of the Secured Parties, hereby acknowledge and agree that the security interest created hereby in the Collateral (x) constitutes continuing collateral security for all of the Secured Obligations, whether now existing or hereafter arising, and (y) is not and shall not be construed as an assignment of any Copyrights, Copyright Licenses, Patents, Patent Licenses, Trademarks or Trademark Licenses.

3.    <u>Representations and Warranties</u>.    Each Grantor hereby represents and warrants to the Administrative Agent, for the benefit of the Secured Parties, that:

(a)    <u>Ownership</u>.  Such Grantor is the legal and beneficial owner of its Collateral and has the right to pledge, sell, assign or transfer the same.

(b)    <u>Security Interest/Priority</u>.  This Security Agreement creates a valid security interest in favor of the Administrative Agent, for the benefit of the Secured Parties, in the Collateral of such Grantor and, when properly perfected by the filing of a UCC financing statement, shall constitute a valid, perfected, first priority security interest in such Collateral, to the extent such security interest can be perfected by the filing of a financing statement under the UCC, free and clear of all Liens except for Permitted Liens.  The taking possession by the Administrative Agent of all Instruments, Documents and Tangible Chattel Paper constituting Collateral will perfect and establish the first priority of the Administrative Agent's security interest in such Instruments, Documents and Tangible Chattel Paper.

(c)    <u>Types of Collateral</u>.  None of the Collateral consists of, or is the Proceeds of, As-Extracted Collateral, Consumer Goods, Farm Products, Manufactured Homes, or standing timber.

3

CHAR1\1500498v4

EHREN-WALIA 003768

950

(d)    Accounts. (i) Each Account of such Grantor and the papers and documents relating thereto are genuine and in all material respects what they purport to be, (ii) each such Account arises out of (A) a bona fide sale of goods sold and delivered by such Grantor (or is in the process of being delivered) or (B) services theretofore actually rendered by such Grantor to, the account debtor named therein, (iii) no such Account is evidenced by any Instrument or Chattel Paper unless, to the extent required under Section 4(a) hereof, such Instrument or Chattel Paper has been endorsed over and delivered to, or submitted to the control of, the Administrative Agent, (iv) no surety bond was required or given in connection with any such Account or the contracts or purchase orders out of which they arose and (v) the right to receive payment under each such Account is assignable.

(e)    Equipment and Inventory. With respect to any Equipment and/or Inventory of such Grantor, such Grantor has exclusive possession and control of such Equipment and Inventory of such Grantor except for (i) Equipment leased by such Grantor as a lessee or (ii) Equipment or Inventory in transit with common carriers. No Inventory of such Grantor is held by a Person other than such Grantor pursuant to consignment, sale or return, sale on approval or similar arrangement.

(f)    [Reserved].

(g)    Mergers, Etc. Other than as set forth on Schedule 3(g) hereto, such Grantor has not been party to a merger, consolidation or other change in structure or used any tradename in the five (5) years preceding the Closing Date.

(h)    Consents, etc. Except for (i) the filing or recording of UCC financing statements, (ii) the filing of appropriate notices with the United States Patent and Trademark Office and the United States Copyright Office, (iii) obtaining control to perfect the Liens created by this Security Agreement (to the extent required under Section 4(a) hereof) and (iv) consents, authorizations, filings or other actions which have been obtained or made, no consent or authorization of, filing with, or other act by or in respect of, any arbitrator or Governmental Authority and no consent of any other Person (including any stockholder, member or creditor of such Grantor), is required for (A) the grant by such Grantor of the security interest in the Collateral granted hereby or for the execution, delivery or performance of this Security Agreement by such Grantor, (B) the perfection of such security interest (to the extent such security interest can be perfected by the filing of a financing statement under the UCC, the granting of control (to the extent required under Section 4(a) hereof) or by filing an appropriate notice with the United States Patent and Trademark Office or the United States Copyright Office) or (C) the exercise by the Administrative Agent or the Secured Parties of the rights and remedies provided for in this Security Agreement.

(i)    Commercial Tort Claims. As of the Closing Date, such Grantor does not have any Commercial Tort Claims seeking damages in excess of $500,000 other than those listed on Schedule 2(c).

(j)    No Other Instruments, Etc. As of the date hereof, such Grantor does not hold any Instruments, Documents or Tangible Chattel Paper required to be pledged and delivered to the Administrative Agent pursuant to Section 4(a) of this Security Agreement other than as set forth on Schedule 3(j) hereto. To the extent required under Section 4(a) hereof, all such Instruments, Documents and Tangible Chattel Paper have been or will promptly be delivered to the Administrative Agent.

(j)    Copyrights, Patents and Trademarks.

4

EHREN-WALIA 003769

(i)     To the best of such Grantor's knowledge, each Copyright, Patent and Trademark of such Grantor which is material for the business of the Borrower and its Subsidiaries is valid, subsisting, unexpired, enforceable and has not been abandoned.

(ii)    To the best of such Grantor's knowledge, no holding, decision or judgment has been rendered by any Governmental Authority that would limit, cancel or question the validity of any Copyright, Patent or Trademark of such Grantor which is material for the business of the Borrower and its Subsidiaries.

(iii)   No action or proceeding is pending seeking to limit, cancel or question the validity of any Copyright, Patent or Trademark of such Grantor which is material for the business of the Borrower and its Subsidiaries, or that, if adversely determined, could reasonably be expected to have a Material Adverse Effect on the value of any such Copyright, Patent or Trademark of such Grantor.

(iv)    All applications pertaining to the Copyrights, Patents and Trademarks which is material for the conduct of business of such Grantor have been duly and properly filed, and all registrations or letters pertaining to such Copyrights, Patents and Trademarks have been duly and properly filed and issued.

(v)     Such Grantor has not made any assignment or agreement in conflict with the security interest in the Copyrights, Patents or Trademarks of such Grantor hereunder.

4.      <u>Covenants</u>.  Each Grantor covenants that until the Facility Termination Date, such Grantor shall:

(a)     <u>Control</u>.

(i)     If any amount in excess of $500,000 payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument or Tangible Chattel Paper, or if any property constituting Collateral valued in excess of $500,000 shall be stored or shipped subject to a Document, ensure that such Instrument, Tangible Chattel Paper or Document is either in the possession of such Grantor at all times or, if requested by the Administrative Agent to perfect its security interest in such Collateral, is delivered to the Administrative Agent duly endorsed in a manner satisfactory to the Administrative Agent. Such Grantor shall ensure that any of the Collateral consisting of Tangible Chattel Paper evidencing an amount payable in excess of $500,000 is marked with a legend acceptable to the Administrative Agent indicating the Administrative Agent's security interest in such Tangible Chattel Paper.

(ii)    Execute and deliver all agreements, assignments, instruments or other documents as reasonably requested by the Administrative Agent for the purpose of obtaining and maintaining control with respect to any of the Collateral consisting of (i) Investment Property, (ii) Letter-of-Credit Rights and (iii) Electronic Chattel Paper.

(b)     <u>Filing of Financing Statements, Notices, etc</u>.  Execute and deliver to the Administrative Agent such agreements, assignments or instruments (including affidavits, notices, reaffirmations and amendments and restatements of existing documents, as the Administrative Agent may reasonably request) and do all such other things as the Administrative Agent may reasonably deem necessary or appropriate (i) to assure to the Administrative Agent its security interests hereunder, including (A) such instruments as the Administrative Agent may from time to time reasonably request

CHAR1\1500498v4

EHREN-WALIA 003770

952

in order to perfect and maintain the security interests granted hereunder in accordance with the UCC, (B) with regard to Copyrights, a Notice of Grant of Security Interest in Copyrights for filing with the United States Copyright Office in the form of Exhibit 4(b)(i)(B), (C) with regard to Patents, a Notice of Grant of Security Interest in Patents for filing with the United States Patent and Trademark Office in the form of Exhibit 4(b)(i)(C) hereto and (D) with regard to Trademarks, a Notice of Grant of Security Interest in Trademarks for filing with the United States Patent and Trademark Office in the form of Exhibit 4(b)(i)(D) hereto, (ii) to consummate the transactions contemplated hereby and (iii) to otherwise protect and assure the Administrative Agent of its rights and interests hereunder. Furthermore, such Grantor also hereby irrevocably makes, constitutes and appoints the Administrative Agent, its nominee or any other person whom the Administrative Agent may designate, as such Grantor's attorney in fact with full power and for the limited purpose to sign in the name of such Grantor any financing statements, or amendments and supplements to financing statements, renewal financing statements, notices or any similar documents which in the Administrative Agent's reasonable discretion would be necessary or appropriate in order to perfect and maintain perfection of the security interests granted hereunder, such power, being coupled with an interest, being and remaining irrevocable until the Facility Termination Date. Such Grantor hereby agrees that a carbon, photographic or other reproduction of this Security Agreement or any such financing statement is sufficient for filing as a financing statement by the Administrative Agent without notice thereof to such Grantor wherever the Administrative Agent may in its sole discretion desire to file the same.

(c)    Collateral Held by Warehouseman, Bailee, etc.  If any of the Collateral with a value in excess of $500,000 is at any time in the possession or control of a warehouseman, bailee or any agent or processor of such Grantor and the Administrative Agent so requests (i) notify such Person in writing of the Administrative Agent's security interest therein, (ii) instruct such Person to hold all such Collateral for the Administrative Agent's account and subject to the Administrative Agent's instructions and (iii) use commercially reasonable efforts to obtain a written acknowledgment from such Person that it is holding such Collateral for the benefit of the Administrative Agent.

(d)    Treatment of Accounts.  Not grant or extend the time for payment of any Account, or compromise or settle any such Account for less than the full amount thereof, or release any person or property, in whole or in part, from payment thereof, or allow any credit or discount thereon, in each case, other than in the ordinary course of such Grantor's business.

(e)    Commercial Tort Claims.  (i) Promptly forward to the Administrative Agent an updated Schedule 2(c) listing any and all Commercial Tort Claims by or in favor of such Grantor seeking damages in excess of $500,000 and (ii) execute and deliver such statements, documents and notices and do and cause to be done all such things as may be required by the Administrative Agent, or required by Law to create, preserve, perfect and maintain the Administrative Agent's security interest in any such Commercial Tort Claims.

(f)    Nature of Collateral.  At all times maintain the Collateral as personal property and not affix any of the Collateral to any real property in a manner which would change its nature from personal property to real property or a Fixture to real property, unless the Administrative Agent shall have a perfected Lien on such Fixture or real property.

(g)    Intellectual Property.

(i)    (A) Not do any act or omit to do any act whereby any Copyright of such Grantor material to the business of the Borrower and its Subsidiaries may become invalidated; (B) not do any act, or omit to do any act, whereby any such Copyright may become injected into the public domain; (C) notify the Administrative Agent immediately if it knows that any

CHAR1\1500498v4

EHREN-WALIA 003771

such Copyright may become injected into the public domain or of any materially adverse determination or development (including the institution of, or any such determination or development in, any court or tribunal in the United States or any other country) regarding such Grantor's ownership of any such Copyright or its validity; (D) take such actions as it shall reasonably deem appropriate under the circumstances, to maintain and pursue each application (and to obtain the relevant registration) of each such Copyright owned by such Grantor and to maintain each registration of each such Copyright owned by such Grantor, including filing of applications for renewal where necessary; and (E) promptly notify the Administrative Agent of any material infringement of any such Copyright of such Grantor of which it becomes aware and take such actions as it shall reasonably deem appropriate under the circumstances to protect such Copyright, including, where appropriate, the bringing of suit for infringement, seeking injunctive relief and seeking to recover any and all damages for such infringement.

(ii)    Not make any assignment or agreement in conflict with the security interest in the Copyrights of such Grantor hereunder (except as permitted by the Credit Agreement).

(iii)    (A) Continue to use each Trademark of such Grantor material to the business of the Borrower and its Subsidiaries on each and every trademark class of goods applicable to its current line as reflected in its current catalogs, brochures and price lists in order to maintain such Trademark in full force free from any claim of abandonment for non-use, (B) maintain as in the past the quality of products and services offered under such Trademark, (C) employ such Trademark with the appropriate notice of registration, if applicable, (D) not adopt or use any mark that is confusingly similar or a colorable imitation of such Trademark unless the Administrative Agent, for the ratable benefit of the Secured Parties, shall obtain a perfected security interest in such mark pursuant to this Security Agreement, and (E) not (and not permit any licensee or sublicensee thereof to) do any act or omit to do any act whereby any such Trademark may become invalidated.

(iv)    Not do any act, or omit to do any act, whereby any Patent of such Grantor material to the business of the Borrower and its Subsidiaries may become abandoned or dedicated.

(v)    Notify the Administrative Agent immediately if it knows that any application or registration relating to any Patent or Trademark of such Grantor which is material to the business of the Borrower and its Subsidiaries may become abandoned or dedicated, or of any materially adverse determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office or any court or tribunal in any country) regarding such Grantor's ownership of any such Patent or Trademark or its right to register the same or to keep and maintain the same.

(vi)    Take all steps as it shall reasonably deem appropriate, including, in any proceeding before the United States Patent and Trademark Office, or any similar office or agency in any other state or any political subdivision thereof, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of each Patent and Trademark of such Grantor material to the business of the Borrower and its Subsidiaries, including filing of applications for renewal, affidavits of use and affidavits of incontestability where necessary.

(vii)    Promptly notify the Administrative Agent after it learns that any Patent or Trademark of such Grantor material to the business of the Borrower and its Subsidiaries is infringed, misappropriated or diluted by a third party and, to the extent such Grantor

7

CHAR1\1500498v4

EHREN-WALIA 003772

reasonably deems appropriate, promptly sue for infringement, misappropriation or dilution, to seek injunctive relief where appropriate and to recover any and all damages for such infringement, misappropriation or dilution, or to take such other actions as it shall reasonably deem appropriate under the circumstances to protect such Patent or Trademark.

(viii)    Not make any assignment or agreement in conflict with the security interest in the Patents or Trademarks of such Grantor hereunder (except as permitted by the Credit Agreement).

Notwithstanding the foregoing, such Grantor may, in its reasonable business judgment, fail to maintain, pursue, preserve or protect any Copyright, Patent or Trademark which is not material to the business of the Borrower or its Subsidiaries.

5.      <u>Authorization to File Financing Statements</u>.    Each Grantor hereby authorizes the Administrative Agent to prepare and file such financing statements (including continuation statements) or amendments thereof or supplements thereto or other instruments as the Administrative Agent may from time to time deem necessary or appropriate in order to perfect and maintain the security interests granted hereunder in accordance with the UCC (including authorization to describe the Collateral as "all personal property", "all assets" or words of similar meaning).

6.      <u>Advances</u>.    On failure of any Grantor to perform any of the covenants and agreements contained herein or in any other Loan Document, the Administrative Agent may, at its sole option and in its sole discretion, perform the same and in so doing may expend such sums as the Administrative Agent may reasonably deem advisable in the performance thereof, including the payment of any insurance premiums, the payment of any taxes, a payment to obtain a release of a Lien or potential Lien, expenditures made in defending against any adverse claim and all other expenditures that the Administrative Agent may make for the protection of the security hereof or that may be compelled to make by operation of Law. All such sums and amounts so expended shall be repayable by the Grantors on a joint and several basis promptly upon timely notice thereof and demand therefor, shall constitute additional Secured Obligations and shall bear interest from the date of such demand at the Default Rate. No such performance of any covenant or agreement by the Administrative Agent on behalf of any Grantor, and no such advance or expenditure therefor, shall relieve the Grantors of any Default or Event of Default. The Administrative Agent may make any payment hereby authorized in accordance with any bill, statement or estimate procured from the appropriate public office or holder of the claim to be discharged, without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax assessment, sale, forfeiture, tax lien, title or claim except to the extent such payment is being contested in good faith by a Grantor in appropriate proceedings and against which adequate reserves are being maintained in accordance with GAAP.

7.    <u>Remedies</u>.

(a)      <u>General Remedies</u>.    Upon the occurrence of an Event of Default and during the continuation thereof, the Administrative Agent shall have, in addition to the rights and remedies provided herein, in the Loan Documents, in any other documents relating to the Secured Obligations, or by Law (including levy of attachment, garnishment and the rights and remedies set forth in the UCC of the jurisdiction applicable to the affected Collateral), the rights and remedies of a secured party under the UCC (regardless of whether the UCC is the Law of the jurisdiction where the rights and remedies are asserted and regardless of whether the UCC applies to the affected Collateral) and, further, the Administrative Agent may, with or without judicial process or the aid and assistance of others, (i) to the extent permitted by law, enter on any premises on which any of the Collateral may be located and, without resistance or interference by the Grantors, take possession of the Collateral, (ii) dispose of any of the Collateral on any such premises, (iii) require the Grantors to assemble and make

8

EHREN-WALIA 003773

available to the Administrative Agent at the expense of the Grantors any of the Collateral at any place and time designated by the Administrative Agent that is reasonably convenient to both parties, (iv) remove any of the Collateral from any such premises for the purpose of effecting sale or other disposition thereof, and/or (v) without demand and without advertisement, notice (other than to the extent notice cannot be legally waived), hearing or process of Law, all of which each of the Grantors hereby waives to the fullest extent permitted by Law, at any place and time or times, sell and deliver any or all Collateral held by or for it at public or private sale, by one or more contracts, in one or more parcels, for Money, upon credit or otherwise, at such prices and upon such terms as the Administrative Agent deems advisable, in its sole discretion (subject to any and all mandatory legal requirements). Each of the Grantors acknowledges that any private sale referenced above may be at prices and on terms less favorable to the seller than the prices and other terms that might have been obtained at a public sale and, notwithstanding the foregoing, agrees that such private sale shall be deemed to have been made in a commercially reasonable manner. Neither the Administrative Agent's compliance with applicable Law nor its disclaimer of warranties relating to the Collateral shall be considered to adversely affect the commercial reasonableness of any sale. In addition to all other sums due the Administrative Agent and the Secured Parties with respect to the Secured Obligations, to the extent payable pursuant to Section 11.04 of the Credit Agreement, the Grantors shall pay the Administrative Agent and each of the Secured Parties the costs and expenses incurred by the Administrative Agent or any such Secured Party, in enforcing its remedies hereunder, in obtaining or liquidating the Collateral, in enforcing payment of the Secured Obligations, or in the prosecution or defense of any action or proceeding by or against the Administrative Agent or the Secured Parties or the Grantors concerning any matter arising out of or connected with this Security Agreement, any of the Collateral or the Secured Obligations, including any of the foregoing arising in, arising under or related to a case under the Debtor Relief Laws. To the extent the rights of notice cannot be legally waived hereunder, each Grantor agrees that any requirement of reasonable notice shall be met if such notice, specifying the place of any public sale or the time after which any private sale is to be made, is personally served on or mailed, postage prepaid, to the Borrower in accordance with the notice provisions of Section 11.02 of the Credit Agreement at least ten (10) days before the time of sale or other event giving rise to the requirement of such notice. The Administrative Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. The Administrative Agent shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given. To the extent permitted by Law, any Secured Party may be a purchaser at any such sale. To the extent permitted by Law, each of the Grantors hereby waives all of its rights of redemption with respect to any such sale. Subject to the provisions of applicable Law, the Administrative Agent may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, to the extent permitted by Law, be made at the time and place to which the sale was postponed, or the Administrative Agent may further postpone such sale by announcement made at such time and place.

(b)     Remedies relating to Accounts. Upon the occurrence of an Event of Default and during the continuation thereof, whether or not the Administrative Agent has exercised any or all of its rights and remedies hereunder, (i) each Grantor will promptly upon request of the Administrative Agent instruct all account debtors to remit all payments in respect of Accounts to a mailing location selected by the Administrative Agent and (ii) the Administrative Agent shall have the right to enforce any Grantor's rights against its customers and account debtors, and the Administrative Agent or its designee may notify (or require any Grantor to notify) any Grantor's customers and account debtors that the Accounts of such Grantor have been assigned to the Administrative Agent or of the Administrative Agent's security interest therein, and may (either in its own name or in the name of a Grantor or both) demand, collect (including by way of a lockbox arrangement), receive, take receipt for, sell, sue for, compound, settle, compromise and give acquittance for any and all amounts due or

9

EHREN-WALIA 003774

to become due on any Account, and, in the Administrative Agent's discretion, file any claim or take any other action or proceeding to protect and realize upon the security interest of the Secured Parties in the Accounts. Each Grantor acknowledges and agrees that the Proceeds of its Accounts remitted to or on behalf of the Administrative Agent in accordance with the provisions hereof shall be solely for the Administrative Agent's own convenience and that such Grantor shall not have any right, title or interest in such Accounts or in any such other amounts except as expressly provided herein. The Administrative Agent and the Secured Parties shall have no liability or responsibility to any Grantor for acceptance of a check, draft or other order for payment of money bearing the legend "payment in full" or words of similar import or any other restrictive legend or endorsement or be responsible for determining the correctness of any remittance. Furthermore, upon the occurrence of an Event of Default and during the continuation thereof, (x) the Administrative Agent shall have the right, but not the obligation, to make test verifications of the Accounts in any manner and through any medium that it reasonably considers advisable, and the Grantors shall cause independent public accountants or others satisfactory to the Administrative Agent to furnish all such assistance and information as the Administrative Agent may require in connection with such test verifications, (y) upon the Administrative Agent's request and at the expense of the Grantors, the Grantors shall cause independent public accountants or others satisfactory to the Administrative Agent to furnish to the Administrative Agent reports showing reconciliations, aging and test verifications of, and trial balances for, the Accounts and (z) the Administrative Agent in its own name or in the name of others may communicate with account debtors on the Accounts to verify with them to the Administrative Agent's satisfaction the existence, amount and terms of any Accounts.

(c)    Deposit Accounts.  Upon the occurrence of an Event of Default and during the continuation thereof, the Administrative Agent may prevent withdrawals or other dispositions of funds in Deposit Accounts maintained with the Administrative Agent.

(d)    Access.  In addition to the rights and remedies hereunder, upon the occurrence of an Event of Default and during the continuation thereof, to the extent permitted by law, the Administrative Agent shall have the right to enter and remain upon the various premises of the Grantors without cost or charge to the Administrative Agent, and use the same, together with materials, supplies, books and records of the Grantors for the purpose of collecting and liquidating the Collateral, or for preparing for sale and conducting the sale of the Collateral, whether by foreclosure, auction or otherwise. In addition, the Administrative Agent may remove Collateral, or any part thereof, from such premises and/or any records with respect thereto, in order to effectively collect or liquidate such Collateral.

(e)    Nonexclusive Nature of Remedies.  Failure by the Administrative Agent or the Secured Parties to exercise any right, remedy or option under this Security Agreement, any other Loan Document, any other documents relating to the Secured Obligations, or as provided by Law, or any delay by the Administrative Agent or the Secured Parties in exercising the same, shall not operate as a waiver of any such right, remedy or option. No waiver hereunder shall be effective unless it is in writing, signed by the party against whom such waiver is sought to be enforced and then only to the extent specifically stated, which in the case of the Administrative Agent or the Secured Parties shall only be granted as provided herein. To the extent permitted by Law, neither the Administrative Agent, the Secured Parties, nor any party acting as attorney for the Administrative Agent or the Secured Parties, shall be liable hereunder for any acts or omissions or for any error of judgment or mistake of fact or Law other than their gross negligence or willful misconduct hereunder. The rights and remedies of the Administrative Agent and the Secured Parties under this Security Agreement shall be cumulative and not exclusive of any other right or remedy that the Administrative Agent or the Secured Parties may have.

10

EHREN-WALIA 003775

(f)    Retention of Collateral.  In addition to the rights and remedies hereunder, the Administrative Agent may, in compliance with Sections 9-620 and 9-621 of the UCC or otherwise complying with the requirements of applicable Law of the relevant jurisdiction, accept or retain the Collateral in satisfaction of the Secured Obligations.  Unless and until the Administrative Agent shall have provided such notices, however, the Administrative Agent shall not be deemed to have accepted or retained any of the Collateral in satisfaction of any Secured Obligations for any reason.

(g)    Deficiency.  In the event that the proceeds of any sale, collection or realization are insufficient to pay all amounts to which the Administrative Agent or the Secured Parties are legally entitled, the Grantors shall be jointly and severally liable for the deficiency, together with interest thereon at the Default Rate, together with the costs of collection and expenses in connection therewith, all as further provided in the Credit Agreement.  Any surplus remaining after the full payment and satisfaction of the Secured Obligations shall be returned to the Grantors or to whomsoever a court of competent jurisdiction shall determine to be entitled thereto.

8.    Rights of the Administrative Agent.

(a)    Power of Attorney.  In addition to other powers of attorney contained herein, each Grantor hereby designates and appoints the Administrative Agent, on behalf of the Secured Parties, and each of its designees or agents, as attorney-in-fact of such Grantor, irrevocably and with power of substitution, with authority to take any or all of the following actions upon the occurrence of an Event of Default and during the continuation thereof:

(i)    to demand, collect, settle, compromise, adjust and give discharges and releases concerning the Collateral, all as the Administrative Agent may reasonably deem appropriate;

(ii)    to commence and prosecute any actions at any court for the purposes of collecting the Collateral and enforcing any other right in respect thereof;

(iii)    to defend, settle or compromise any action, suit or proceeding brought and, in connection therewith, give such discharge or release as the Administrative Agent may reasonably deem appropriate;

(iv)    to receive and open mail addressed to such Grantor and endorse checks, notes, drafts, acceptances, money orders, bills of lading, warehouse receipts or other instruments or documents evidencing payment, shipment or storage of the goods giving rise to the Collateral on behalf of and in the name of such Grantor, or securing, or relating to such Collateral;

(v)    to pay or discharge taxes, liens (other than Permitted Liens), security interests or other encumbrances levied or placed on or threatened against the Collateral;

(vi)    to direct any parties liable for any payment in connection with any of the Collateral to make payment of any and all monies due and to become due thereunder directly to the Administrative Agent or as the Administrative Agent shall direct;

(vii)    to receive payment of and receipt for any and all monies, claims, and other amounts due and to become due at any time in respect of or arising out of any of the Collateral;

11

EHREN-WALIA 003776

(viii)   to sell, assign, transfer, make any agreement in respect of, or otherwise deal with or exercise rights in respect of, any of the Collateral or the goods or services that have given rise thereto, as fully and completely as though the Administrative Agent were the absolute owner thereof for all purposes;

(ix)   to adjust and settle claims under any insurance policy relating thereto;

(x)   to execute and deliver all assignments, conveyances, statements, financing statements, renewal financing statements, pledge agreements, affidavits, notices and other agreements, instruments and documents that the Administrative Agent may deem necessary in order to perfect and maintain the security interests and liens granted in this Security Agreement and in order to fully consummate all of the transactions contemplated therein;

(xi)   to institute any foreclosure proceedings that the Administrative Agent may reasonably deem appropriate;

(xii)   to sign and endorse any drafts, assignments, verifications, notices and other documents relating to the Collateral; and

(xiii)   to do and perform all such other acts and things as the Administrative Agent may reasonably deem appropriate in connection with the Collateral.

This power of attorney is a power coupled with an interest and shall be irrevocable until the Facility Termination Date.  The Administrative Agent shall be under no duty to exercise or withhold the exercise of any of the rights, powers, privileges and options expressly or implicitly granted to the Administrative Agent in this Security Agreement, and shall not be liable for any failure to do so or any delay in doing so.  The Administrative Agent shall not be liable for any act or omission or for any error of judgment or any mistake of fact or Law in its individual capacity or its capacity as attorney-in-fact except acts or omissions resulting from its gross negligence or willful misconduct.  This power of attorney is conferred on the Administrative Agent solely to protect, preserve and realize upon its security interest in the Collateral.

(b)   Assignment by the Administrative Agent.  The Administrative Agent may from time to time assign the Secured Obligations to a successor Administrative Agent appointed in accordance with the Credit Agreement, and such successor shall be entitled to all of the rights and remedies of the Administrative Agent under this Security Agreement in relation thereto.

(c)   The Administrative Agent's Duty of Care.  Other than the exercise of reasonable care to assure the safe custody of the Collateral while being held by the Administrative Agent hereunder, the Administrative Agent shall have no duty or liability to preserve rights pertaining thereto, it being understood and agreed that the Grantors shall be responsible for preservation of all rights in the Collateral, and the Administrative Agent shall be relieved of all responsibility for the Collateral upon surrendering it or tendering the surrender of it to the Grantors.  The Administrative Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Administrative Agent accords its own property, which shall be no less than the treatment employed by a reasonable and prudent agent in the industry, it being understood that the Administrative Agent shall not have responsibility for taking any necessary steps to preserve rights against any parties with respect to any of the Collateral.  In the event of a public or private sale of Collateral pursuant to Section 7 hereof, the Administrative Agent shall have no responsibility for (i) ascertaining or taking action with respect to any matters relating to any of the Collateral, whether or not the Administrative Agent has or is deemed

12

EHREN-WALIA 003777



to have knowledge of such matters, or (ii) taking any steps to clean, repair or otherwise prepare the Collateral for sale.

(d)      Liability with Respect to Accounts.  Anything herein to the contrary notwithstanding, each Grantor shall remain liable under each of the Accounts to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise to each such Account. Neither the Administrative Agent nor any Secured Party shall have any obligation or liability under any Account (or any agreement giving rise thereto) by reason of or arising out of this Security Agreement or the receipt by the Administrative Agent or any Secured Party of any payment relating to such Account pursuant hereto, nor shall the Administrative Agent or any Secured Party be obligated in any manner to perform any of the obligations of a Grantor under or pursuant to any Account (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party under any Account (or any agreement giving rise thereto), to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(e)      Releases of Collateral.  If any of the Collateral shall be sold, transferred or otherwise disposed of by any Grantor in a transaction permitted by the Credit Agreement, then the liens granted herein shall be deemed to be automatically released and the Administrative Agent, at the request and sole expense of such Grantor, shall promptly execute and deliver to such Grantor all releases and other documents, and take such other actions, reasonably necessary for the release of the Liens created hereby or by any other Collateral Document on such Collateral.

9.      Application of Proceeds.  Upon the acceleration of the Obligations pursuant to Section 8.02 of the Credit Agreement, any payments in respect of the Secured Obligations and any proceeds of the Collateral, when received by the Administrative Agent or any Secured Party in Money, will be applied in reduction of the Secured Obligations in the order set forth in Section 8.03 of the Credit Agreement.

10.      Continuing Agreement.

(a)      This Security Agreement shall remain in full force and effect until the Facility Termination Date, at which time this Security Agreement shall be automatically terminated and the Administrative Agent shall, upon the request and at the expense of the Grantors, forthwith release all of its liens and security interests hereunder and shall execute and deliver all UCC termination statements and/or other documents reasonably requested by the Obligors evidencing such termination.

(b)      This Security Agreement shall continue to be effective or be automatically reinstated, as the case may be, if at any time payment, in whole or in part, of any of the Secured Obligations is rescinded or must otherwise be restored or returned by the Administrative Agent or any Secured Party as a preference, fraudulent conveyance or otherwise under any Debtor Relief Law, all as though such payment had not been made; provided, that, in the event payment of all or any part of the Secured Obligations is rescinded or must be restored or returned, all costs and expenses payable pursuant to Section 11.04 of the Credit Agreement incurred by the Administrative Agent or any Secured Party in defending and enforcing such reinstatement shall be deemed to be included as a part of the Secured Obligations.

11.      Amendments, Waivers, Modifications, etc.  This Security Agreement and the provisions hereof may not be amended, waived, modified, changed, discharged or terminated except as set forth in Section 11.01 of the Credit Agreement; provided, that, any update or revision to Schedule 2(c) hereof delivered by any

13

EHREN-WALIA 003778

Grantor in accordance with the terms hereof shall not constitute an amendment for purposes of this <u>Section 11</u> or Section 11.01 of the Credit Agreement.

12. <u>Successors in Interest</u>. This Security Agreement shall be binding upon each Grantor, its successors and assigns and shall inure, together with the rights and remedies of the Administrative Agent and the Secured Parties hereunder, to the benefit of the Administrative Agent and the Secured Parties and their successors and permitted assigns.

13. <u>Notices</u>. All notices required or permitted to be given under this Security Agreement shall be given as provided in Section 11.02 of the Credit Agreement.

14. <u>Counterparts</u>. This Security Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Security Agreement by facsimile or other electronic imaging means (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Security Agreement.

15. <u>Headings</u>. The headings of the sections and subsections hereof are provided for convenience only and shall not in any way affect the meaning or construction of any provision of this Security Agreement.

16. <u>Governing Law; Submission to Jurisdiction; Waiver of Venue; Waiver of Jury Trial</u>. The terms of Sections 11.14 and 11.15 of the Credit Agreement with respect to governing Law, submission to jurisdiction, waiver of venue and waiver of jury trial are incorporated herein by reference, mutatis mutandis, and the parties hereto agree to such terms.

17. <u>Severability</u>. If any provision of this Security Agreement is determined to be illegal, invalid or unenforceable, such provision shall be fully severable and the remaining provisions shall remain in full force and effect and shall be construed without giving effect to the illegal, invalid or unenforceable provisions.

18. <u>Entirety</u>. This Security Agreement, the other Loan Documents and the other documents relating to the Secured Obligations represent the entire agreement of the parties hereto and thereto, and supersede all prior agreements and understandings, oral or written, if any, including any commitment letters or correspondence relating to the Loan Documents, any other documents relating to the Secured Obligations, or the transactions contemplated herein and therein.

19. <u>Other Security</u>. To the extent that any of the Secured Obligations are now or hereafter secured by property other than the Collateral (including real property and securities owned by a Grantor), or by a guarantee, endorsement or property of any other Person, then the Administrative Agent shall have the right to proceed against such other property, guarantee or endorsement upon the occurrence of an Event of Default and during the continuation thereof, and the Administrative Agent shall have the right, in its sole discretion, to determine which rights, security, liens, security interests or remedies the Administrative Agent shall at any time pursue, relinquish, subordinate, modify or take with respect thereto, without in any way modifying or affecting any of them or the Secured Obligations or any of the rights of the Administrative Agent or the Secured Parties under this Security Agreement, under any of the other Loan Documents or under any other document relating to the Secured Obligations; <u>provided</u> that nothing in this <u>Section 19</u> shall grant to the Administrative Agent any right, title or interest in, to or under any Excluded Property.

20. <u>Joinder</u>. At any time after the date of this Security Agreement, one or more additional Persons may become party hereto by executing and delivering to the Administrative Agent a Joinder Agreement. Immediately upon such execution and delivery of such Joinder Agreement (and without any further action), each such additional Person will become a party to this Security Agreement as a "Grantor" and have all of the

14

EHREN-WALIA 003779

rights and obligations of a Grantor hereunder and this Security Agreement and the schedules hereto shall be deemed amended by such Joinder Agreement.

21.  <u>Rights of Required Lenders</u>.  All rights of the Administrative Agent hereunder, if not exercised by the Administrative Agent, may be exercised by the Required Lenders.

*[signature pages follow]*

15

EHREN-WALIA 003780

Each of the parties hereto has caused a counterpart of this Security Agreement to be duly executed and delivered as of the date first above written.

GRANTORS:

CHT MERGERSUB, INC.,
a Delaware corporation

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC.,
a Delaware corporation

ORION HEALTHCORP, INC.,
a Delaware corporation

ALLEGIANCE BILLING & CONSULTING, LLC,
a New York limited liability company

ALLEGIANCE CONSULTING ASSOCIATES, LLC,
a New York limited liability company

INTEGRATED PHYSICIAN SOLUTIONS, INC.,
a Delaware corporation

MDRX MEDICAL BILLING, LLC,
a Delaware limited liability company

MEDICAL BILLING SERVICES, INC.,
a Texas corporation

NEMS ACQUISITION LLC,
a Delaware limited liability company

NEMS WEST VIRGINIA, LLC,
a Pennsylvania limited liability company

NORTHEAST MEDICAL SOLUTIONS, LLC,
a Pennsylvania limited liability company

By: _Paul Parmar_
Name: PAUL PARMJIT PARMAR
Title: CHIEF EXECUTIVE OFFICER

NORTHSTAR FHA, LLC,
a Delaware limited liability company

NORTHSTAR FIRST HEALTH, LLC,
a Delaware limited liability company

PHOENIX HEALTH, LLC,
a Delaware limited liability company

PHYSICIANS PRACTICE PLUS HOLDINGS LLC,
a Delaware limited liability company

PHYSICIANS PRACTICE PLUS LLC,
a Delaware limited liability company

RAND MEDICAL BILLING, INC.,
a California corporation

RMI PHYSICIAN SERVICES CORPORATION,
a Texas corporation

VACHETTE BUSINESS SERVICES, LTD.,
an Ohio limited liability company

VEGA MEDICAL PROFESSIONALS, LLC,
a Delaware limited liability company

WESTERN SKIES PRACTICE MANAGEMENT, INC.,
a Colorado corporation

By: _____
Name:
Title:

Accepted and agreed to as of the date first above written.

BANK OF AMERICA, N.A.,
as Administrative Agent

By: *Brenda Schriner*
Name: Brenda Schriner
Title: Vice President

<u>SCHEDULE 2(c)</u>

COMMERCIAL TORT CLAIMS

None.

EHREN-WALIA 003784

# EXHIBIT 11

Thomas R. Califano, Esq.
Rachel Nanes, Esq. (admitted *pro hac vice*)
**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile:  (212) 335-4501
E-mail:  thomas.califano@dlapiper.com
            rachel.nanes@dlapiper.com

*Counsel to the Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

| In re: | : | Chapter 11 |
|---|---|---|
| | : | |
| ORION HEALTHCORP, INC. | : | Case No. 18-71748 (AST) |
| CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. | : | Case No. 18-71749 (AST) |
| NEMS ACQUISITION, LLC | : | Case No. 18-71750 (AST) |
| NORTHEAST MEDICAL SOLUTIONS, LLC | : | Case No. 18-71751 (AST) |
| NEMS WEST VIRGINIA, LLC | : | Case No. 18-71752 (AST) |
| PHYSICIANS PRACTICE PLUS, LLC | : | Case No. 18-71753 (AST) |
| PHYSICIANS PRACTICE PLUS HOLDINGS, LLC | : | Case No. 18-71754 (AST) |
| MEDICAL BILLING SERVICES, INC. | : | Case No. 18-71755 (AST) |
| RAND MEDICAL BILLING, INC. | : | Case No. 18-71756 (AST) |
| RMI PHYSICIAN SERVICES CORPORATION | : | Case No. 18-71757 (AST) |
| WESTERN SKIES PRACTICE MANAGEMENT, INC. | : | Case No. 18-71758 (AST) |
| INTEGRATED PHYSICIAN SOLUTIONS, INC. | : | Case No. 18-71759 (AST) |
| NYNM ACQUISITION, LLC | : | Case No. 18-71760 (AST) |
| NORTHSTAR FHA, LLC | : | Case No. 18-71761 (AST) |
| NORTHSTAR FIRST HEALTH, LLC | : | Case No. 18-71762 (AST) |
| VACHETTE BUSINESS SERVICES, LTD. | : | Case No. 18-71763 (AST) |
| MDRX MEDICAL BILLING, LLC | : | Case No. 18-71764 (AST) |
| VEGA MEDICAL PROFESSIONALS, LLC | : | Case No. 18-71765 (AST) |
| ALLEGIANCE CONSULTING ASSOCIATES, LLC | : | Case No. 18-71766 (AST) |
| ALLEGIANCE BILLING & CONSULTING, LLC | : | Case No. 18-71767 (AST) |
| PHOENIX HEALTH, LLC | : | Case No. 18-71789 (AST) |
| NEW YORK NETWORK MANAGEMENT, L.L.C. | : | Case No. 18-74545 (AST) |
| | : | |
| Debtors. | x | (Jointly Administered) |

------------------------------------------------------------------------

### DEBTORS' THIRD AMENDED JOINT PLAN OF LIQUIDATION
### PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Dated:  January 6, 2019

EHREN-WALIA 003404

# TABLE OF CONTENTS

Page

SECTION 1.    DEFINITIONS AND INTERPRETATION .................................................... 2
   1.1    Definitions ................................................................................................. 2
   1.2    Interpretation, Application of Definitions and Rules of Construction ................ 13
   1.3    Computation of Time ................................................................................. 14

SECTION 2.    ADMINISTRATIVE AND PRIORITY CLAIMS ........................................ 14
   2.1    Administrative Expense Claims ................................................................... 14
   2.2    Accrued Professional Compensation Claims ................................................ 14
   2.3    Priority Tax Claims .................................................................................... 15

SECTION 3.    CLASSIFICATION OF CLAIMS AND INTERESTS .................................. 15
   3.1    Classified Claims Against and Interests in the Debtors .................................. 15
   3.2    CHT ......................................................................................................... 16
   3.3    Orion ....................................................................................................... 16
   3.4    Northeast Medical Solutions ...................................................................... 17
   3.5    NEMS West Virginia .................................................................................. 17
   3.6    Physicians Practice Plus ............................................................................ 18
   3.7    Medical Billing Services ............................................................................. 18
   3.8    Rand Medical Billing ................................................................................. 19
   3.9    RMI Physician Services ............................................................................. 19
   3.10    Western Skies Practice Management ........................................................... 20
   3.11    Integrated Physician Solutions ................................................................... 20
   3.12    Northstar First Health ............................................................................... 21
   3.13    Vachette Business Services ........................................................................ 21
   3.14    Allegiance Consulting Associates ............................................................... 22
   3.15    Allegiance Billing & Consulting .................................................................. 22
   3.16    NYNM Management ................................................................................... 23

SECTION 4.    TREATMENT OF CLAIMS AND INTERESTS ........................................ 23
   4.1    General ..................................................................................................... 23

SECTION 5.    ACCEPTANCE OR REJECTION OF THE PLAN ..................................... 26
   5.1    Holders of Claims and Interests Entitled to Vote .......................................... 26
   5.2    Classes Deemed to Reject .......................................................................... 26
   5.3    Classes Deemed to Accept ......................................................................... 27
   5.4    Acceptance by a Class ............................................................................... 27
   5.5    Cramdown Under Section 1129(b) of the Bankruptcy Code ........................... 27
   5.6    Ballots ..................................................................................................... 27

-i-

EHREN-WALIA 003405

# TABLE OF CONTENTS
(continued)

Page

SECTION 6.    MEANS FOR IMPLEMENTATION ........................................................ 27

6.1    Compromise Regarding Deemed Consolidation .............................................. 27
6.2    Initial Secured Lender Distribution .................................................................. 28
6.3    Liquidating Trust .............................................................................................. 28
6.4    The Shell Debtors ............................................................................................. 32

SECTION 7.    DISTRIBUTIONS ........................................................................................ 32

7.1    Distribution Record Date .................................................................................. 32
7.2    Date of Distributions ........................................................................................ 32
7.3    Disbursing Agent .............................................................................................. 33
7.4    Rights and Powers of Disbursing Agent .......................................................... 33
7.5    Delivery of Distributions in General ................................................................ 33
7.6    Payments and Distributions on Disputed Claims ............................................. 33
7.7    Manner of Payment ........................................................................................... 33
7.8    Undeliverable Distributions and Unclaimed Property ...................................... 34
7.9    Withholding and Reporting Requirements ........................................................ 34
7.10   Surrender Instruments ....................................................................................... 34
7.11   Setoffs ............................................................................................................... 34
7.12   Insurance Claims ............................................................................................... 34
7.13   Applicability of Insurance Policies .................................................................. 35
7.14   No Post-petition Interest ................................................................................... 35
7.15   Distributions Free and Clear ............................................................................. 35
7.16   Fractional Dollars; De Minimis Distributions .................................................. 35

SECTION 8.    PROCEDURES FOR DISPUTED CLAIMS ............................................... 35

8.1    Allowance of Claims and Interests ................................................................... 35
8.2    Objections to Claims ......................................................................................... 36
8.3    Estimation of Claims ......................................................................................... 36
8.4    No Distribution Pending Allowance ................................................................. 36
8.5    Distributions After Allowance .......................................................................... 36
8.6    Preservations of Rights to Settle Claims .......................................................... 36
8.7    Disallowed Claims ............................................................................................ 37

SECTION 9.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..................... 37

9.1    Assumption and Rejection of Executory Contracts and Unexpired Leases ........ 37
9.2    Inclusiveness ..................................................................................................... 37
9.3    Rejection Claims ............................................................................................... 37
9.4    Full Release and Satisfaction ............................................................................ 38
9.5    Reservation of Rights ........................................................................................ 38

-ii-

EHREN-WALIA 003406

# TABLE OF CONTENTS
(continued)

Page

SECTION 10.   CONDITIONS PRECEDENT TO CONFIRMATION AND THE
              EFFECTIVE DATE ............................................................................... 38
    10.1   Conditions Precedent to Confirmation............................................. 38
    10.2   Conditions Precedent to the Effective Date ..................................... 38
    10.3   Effect of Failure of Conditions ....................................................... 39

SECTION 11.   EFFECT OF CONFIRMATION............................................................ 39
    11.1   Immediate Binding Effect ............................................................... 39
    11.2   Compromise and Settlement of Claims, Interests and Controversies................. 39
    11.3   Releases by the Debtors .................................................................. 39
    11.4   Releases by Holders of Claims ........................................................ 40
    11.5   Exculpation ..................................................................................... 41
    11.6   Injunction........................................................................................ 41
    11.7   Term of Injunctions or Stays ........................................................... 42
    11.8   Injunction Against Interference with Plan........................................ 42
    11.9   Release of Liens .............................................................................. 42
    11.10  Effectuating Documents and Further Transactions ........................... 42
    11.11  Corporate Action............................................................................. 42
    11.12  Cancellation of Documents ............................................................. 43
    11.13  Dissolution of the Debtors............................................................... 43
    11.14  Preservation of Causes of Action..................................................... 43
    11.15  Preservation of Rights Under Bankruptcy Rule 2004....................... 43

SECTION 12.   MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS
              PLAN............................................................................................... 44
    12.1   Modification and Amendments ....................................................... 44
    12.2   Effect of Confirmation on Modifications......................................... 44
    12.3   Revocation or Withdrawal of this Plan ............................................ 44

SECTION 13.   RETENTION OF JURISDICTION ............................................................ 44

SECTION 14.   MISCELLANEOUS PROVISIONS ......................................................... 46
    14.1   Payment of Statutory Fees............................................................... 46
    14.2   Dissolution of Committee ............................................................... 46
    14.3   Section 1125(e) Good Faith Compliance ......................................... 46
    14.4   Substantial Consummation .............................................................. 46
    14.5   Section 1146 Exemption .................................................................. 46
    14.6   Closing of the Chapter 11 Cases ..................................................... 47
    14.7   Plan Supplement ............................................................................. 47
    14.8   Further Assurances.......................................................................... 47
    14.9   Exhibits Incorporated...................................................................... 47

EHREN-WALIA 003407

**TABLE OF CONTENTS**
(continued)

14.10   Inconsistency ................................................................. 47

14.11   No Admissions ............................................................... 47

14.12   Reservation of Rights ...................................................... 47

14.13   Successors and Assigns ................................................... 48

14.14   Entire Agreement ........................................................... 48

14.15   Notices .......................................................................... 48

14.16   Severability ................................................................... 48

14.17   Governing Law .............................................................. 49

14.18   Request for Confirmation Pursuant to Bankruptcy Code Sections 1129(a) and 1129(b) .................................................................. 49

-iv-

EHREN-WALIA 003408

## INTRODUCTION

On March 16, 2018 (the "*Petition Date*"), Orion HealthCorp, Inc. ("*Orion*"), Constellation Healthcare Technologies, Inc. ("*CHT*"), NEMS Acquisition, LLC ("*NEMS Acquisition*"), Northeast Medical Solutions, LLC ("*Northeast Medical Solutions*"), NEMS West Virginia, LLC ("*NEMS West Virginia*"), Physicians Practice Plus, LLC ("*Physicians Practice Plus*"), Physicians Practice Plus Holdings, LLC ("*Physicians Practice Plus Holdings*"), Medical Billing Services, Inc. ("*Medical Billing Services*"), Rand Medical Billing, Inc. ("*Rand Medical Billing*"), RMI Physician Services Corporation ("*RMI Physician Services*"), Western Skies Practice Management, Inc. ("*Western Skies Practice Management*"), Integrated Physician Solutions, Inc. ("*Integrated Physician Solutions*"), NYNM Acquisition, LLC ("*NYNM Acquisition*"), Northstar FHA, LLC ("*Northstar FHA*"), Northstar First Health, LLC ("*Northstar First Health*"), Vachette Business Services, Ltd. ("*Vachette Business Services*"), MDRX Medical Billing, LLC ("*MDRX*"), Vega Medical Professionals, LLC ("*Vega Medical Professionals*"), Allegiance Consulting Associates, LLC ("*Allegiance Consulting Associates*"), Allegiance Billing & Consulting, LLC ("*Allegiance Billing & Consulting*"), and Phoenix Health, LLC ("*Phoenix Health,*" and collectively with Orion, CHT, NEMS Acquisition, Northeast Medical Solutions, NEMS West Virginia, Physicians Practice Plus, Physicians Practice Plus Holdings, Medical Billing Services, Rand Medical Billing, RMI Physician Services, Western Skies Practice Management, Integrated Physician Solutions, NYNM Acquisition, Northstar FHA, Northstar First Health, Vachette Business Services, MDRX, Vega Medical Professionals, Allegiance Consulting Associates and Allegiance Billing & Consulting, the "*Initial Debtors*") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Eastern District of New York (the "*Bankruptcy Court*"). On July 5, 2018 (the "*NYNM Petition Date*"), New York Network Management, L.L.C. ("*NYNM Management*" and together with the Initial Debtors, the "*Debtors*"), an affiliate of the Initial Debtors, commenced a chapter 11 case (together with the chapter 11 cases of the Initial Debtors, the "*Chapter 11 Cases*") by filing with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases are jointly administered.

The Debtors propose this *Third Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (as it may be further amended, modified, or supplemented from time to time, together with any and all exhibits and schedules attached hereto or referenced herein, this "*Plan*") for the resolution and satisfaction of all Claims against and Interests in the Debtors.

Subject to certain restrictions and requirements set forth in Bankruptcy Code section 1127 and Bankruptcy Rule 3019, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan prior to its substantial consummation.  Reference is made to the Disclosure Statement for a discussion of the Debtors' history and assets, a summary and analysis of this Plan, and certain related matters, including the distributions to be made under this Plan and the risk factors relating to consummation of this Plan.  Capitalized terms used but not defined herein have the meanings ascribed to them in Section 1 of this Plan.

## SECTION 1.   DEFINITIONS AND INTERPRETATION

### 1.1   *Definitions*.

The following terms used herein shall have the respective meanings below:

*Accrued Professional Compensation* means, at any given time, all accrued, contingent and/or unpaid fees (including success fees) for legal, financial advisory, investment banking, and other services and obligations for reimbursement of expenses rendered or incurred before the Effective Date under sections 328, 330(a), 331 or 363 of the Bankruptcy Code by any retained Professional in the Chapter 11 Cases, or under section 503 of the Bankruptcy Code, that the Bankruptcy Court has not denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid.

*Administrative Agent* means Bank of America, N.A., as administrative agent under the Prepetition Credit Agreement.

*Administrative Expense Claim* means any Claim for payment of costs and expenses of administration pursuant to sections 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date or NYNM Petition Date, as applicable, and through the Effective Date of preserving the Debtors' Estates and operating the businesses of the Debtors; (b) compensation for Accrued Professional Compensation; (c) all fees and charges assessed against the Estates pursuant to 28 U.S.C. § 1930; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code.

*Administrative Expense Claims Bar Date* means sixty (60) days after the Effective Date or such other date ordered by the Bankruptcy Court.

*Allegiance Billing & Consulting* shall have the meaning set forth in the Introduction.

*Allegiance Consulting Associates* shall have the meaning set forth in the Introduction.

*Allowed* means, with reference to any Claim against the Debtors, a Claim (i) as to which no objection or request for estimation has been filed on or before any deadline therefor set by the Bankruptcy Court or the expiration of such other applicable period fixed by the Bankruptcy Court or this Plan; (ii) as to which any objection has been settled, waived, withdrawn or denied by a Final Order or in accordance with this Plan; or (iii) that is allowed (a) by a Final Order, (b) by an agreement between the Holder of such Claim and the Debtor or Liquidating Trustee or (c) pursuant to the terms of this Plan; *provided, however*, that, notwithstanding anything herein to the contrary, by treating a Claim as "Allowed" under clause (i) above (the expiration of the applicable deadline), neither the Debtors nor the Liquidating Trustee waives any rights to contest the amount and validity of any disputed, contingent and/or unliquidated Claim in (a) the time, manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced, or (b) the Bankruptcy Court or any other court that has venue

2

EHREN-WALIA 003410

and jurisdiction pursuant to 28 U.S.C. §§ 157 and 1409. An Allowed Claim shall be net of any valid setoff exercised with respect to such Claim pursuant to the provisions of the Bankruptcy Code and applicable law. Moreover, any portion of a Claim that is satisfied, released, or waived during the Chapter 11 Cases is not an Allowed Claim. Unless otherwise specified in this Plan, in section 506(b) of the Bankruptcy Code or by Final Order of the Bankruptcy Court, "Allowed" Claims shall not, for purposes of Distributions under this Plan, include interest on such Claim accruing from and after the Petition Date or NYNM Petition Date, as applicable.

*Allowed Secured Lender Claim* means the Allowed Secured Claim of the Secured Lenders pursuant to this Plan in the amount of Fifty Million Dollars ($50,000,000.00).

*Allowed Secured Lender Deficiency Claim* means the Allowed Deficiency Claim of the Secured Lenders pursuant to this Plan in the amount of One Hundred and Seven Million Six Hundred Twelve Thousand Three Hundred Forty-Two Dollars and Seventy Four Cents ($107,612,342.74).

*Assets* means all assets of the Debtors of any nature whatsoever, including, without limitation, all property of the Debtors' Estates pursuant to Bankruptcy Code section 541, Cash, Avoidance Actions, Causes of Action, equipment, inventory, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and proceeds of any of the foregoing.

*Assigned Causes of Action* means any and all Causes of Action assigned to the Liquidating Trust by any Person pursuant to this Plan.

*Avoidance Actions* means claims or causes of action arising under Bankruptcy Code sections 502, 510, 541, 544, 545, 547, 548, 549, 550, 551 or 553, or under related state or federal statutes and common law, including, without limitation, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, or the Uniform Voidable Transfer Act (including any similar laws of each of the foregoing enacted by any state, commonwealth or territory of the United States), and any law of similar effect, whether or not litigation is commenced to prosecute such claims or causes of action.

*Ballot* means the ballots upon which Holders of Impaired Claims entitled to vote on this Plan have indicated their acceptance or rejection of this Plan in accordance with the instructions regarding voting.

*Bankruptcy Code* means title 11 of the United States Code, as now in effect or hereafter applicable to these Chapter 11 Cases.

*Bankruptcy Court* means the United States Bankruptcy Court for the Eastern District of New York having jurisdiction over the Chapter 11 Cases.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure, as amended, and the local rules of the Bankruptcy Court, as applicable to these Chapter 11 Cases.

*Beneficiaries* means the Holders of each of the Allowed Secured Lender Claim, Allowed Secured Lender Deficiency Claim, Allowed General Unsecured Claims and Allowed

3

EHREN-WALIA 003411

Subordinated Claims against the Debtors' Estates as beneficiaries of the Liquidating Trust, as set forth in this Plan and the Liquidating Trust Agreement.

*Beneficiary Tax Information* shall have the meaning set forth in section 6.3(e).

*Beneficiary Tax Reserve* shall have the meaning set forth in section 6.3(e).

*Business Day* means any day of the calendar week, except Saturday, Sunday, a "legal holiday," as defined in Bankruptcy Rule 9006(a), or any day on which commercial banks are authorized or required by law to close in New York, New York.

*Cash* means cash and cash equivalents including, without limitation, checks and wire transfers.

*Cash Collateral Stipulations* means those stipulations agreed to among the Debtors, the Secured Lenders and the Committee providing for the Debtors' continued use of the Secured Lenders' Cash Collateral (as such term is defined in section 363 of the Bankruptcy Code) during the Chapter 11 Cases.

*Causes of Action* means any claim (other than the Claims against the Debtors), cause of action, controversy, demand, agreement, right (including to legal or equitable remedies), action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and/or franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Cause of Action also includes without limitation: (a) any right of setoff, counterclaim, or recoupment and/or any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action. The term "Causes of Action" shall include, without limitation, those actions and claims described in the Plan Supplement.

*Chapter 11 Case* means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code; and (b) when used with reference to all Debtors, the procedurally consolidated Chapter 11 Cases pending for the Debtors in the Bankruptcy Court under case number 18-71748-AST.

*CHT* shall have the meaning set forth in the Introduction.

*Claim* has the meaning set forth in section 101(5) of the Bankruptcy Code.

*Class* means a class or category of Claims as classified and described in Section 3 of this Plan pursuant to Bankruptcy Code section 1122.

*Collateral* means any property or interest in property of the Estates that any party asserts is subject to a Lien, charge or other encumbrance to secure the payment or performance of

4

EHREN-WALIA 003412

a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or other applicable law.

*Committee* means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases by the United States Trustee on April 4, 2018 with respect to the Initial Debtors' Chapter 11 Cases, and on July 26, 2018 with respect to NYNM Management's Chapter 11 Case, pursuant to section 1102 of the Bankruptcy Code.

*Confirmation Date* means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the Bankruptcy Court's docket in each of the Debtors' Chapter 11 Cases.

*Confirmation Hearing* means the hearing on confirmation of this Plan pursuant to Bankruptcy Code section 1129.

*Confirmation Order* means the order entered by the Bankruptcy Court confirming this Plan in accordance with chapter 11 of the Bankruptcy Code.

*Contingent Claim* means any contingent or unliquidated Claim asserted or which may be asserted against any of the Debtors.

*Creditor* means a Holder of a Claim.

*Cure* means the payment of Cash by the Debtors or the Liquidating Trustee, as applicable, as necessary and required under the Bankruptcy Code to (i) cure a default by a Debtor in accordance with the terms of an Executory Contract or Unexpired Lease of a Debtor, and (ii) permit that Debtor to assume such Executory Contract or Unexpired Lease under section 365(a) of the Bankruptcy Code.

*Debtor Released Claims* shall have the meaning set forth in section 11.3.

*Debtors* shall have the meaning set forth in the Introduction.

*Debtors in Possession* means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to Bankruptcy Code sections 1101, 1107(a) and 1108.

*Deficiency Claim* means, to the extent the value of any property securing a Claim is less than the amount of such Claim, the difference between such value and such Claim.

*DIP Loan* means that senior secured postpetition financing consisting of a revolving credit facility in the principal amount of up to Seven Million Five Hundred Thousand ($7,500,000.00) provided to the Initial Debtors in accordance with the Superpriority Secured Debtor-In-Possession Credit Agreement among (a) Orion, as borrower; (b) the other Initial Debtors, as guarantors thereto; (c) NYNM Management, Network Management Insurance Brokerage Services LLC, New York Network IPA, Inc., New York Premier IPA, Inc., Brooklyn Medical Systems IPA 3, Inc., Brooklyn Medical Systems IPA 4, Inc., and Brooklyn Medical Systems IPA 5, Inc.; (d) Bank of America, N.A. as administrative agent, and (e) the lenders from time to time party thereto.

5

EHREN-WALIA 003413

*Disallowed Claim* means any Claim or portion thereof which has been disallowed by a Final Order and includes any Claim which is not an Allowed Claim for any other reason.

*Disbursing Agent* shall have the meaning set forth in section 7.3.

*Disclosure Statement* means the Third Amended Disclosure Statement for the Debtors' Third Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code, dated January 6, 2019, as the same may be altered, modified, or amended.

*Disputed Claim* means a Claim that has neither been Allowed nor disallowed pursuant to a Final Order of the Bankruptcy Court, and (a) if no Proof of Claim has been filed by the applicable deadline: (i) a Claim that has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated; or (ii) a Claim that has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but as to which a Debtor, the Liquidating Trustee, or any other party in interest has interposed an objection or request for estimation which has not been withdrawn or determined by a Final Order; or (b) if a Proof of Claim or other request for payment has been filed by the applicable deadline: (i) a Claim for which no corresponding Claim has been or hereafter is listed on the Schedules or Allowed in this Plan; (ii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but the nature or amount of the Claim or as asserted in the Proof of Claim varies from the nature and amount of such Claim as listed on the Schedules to the extent of such positive variance; (iii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated; or (iv) a Claim for which a timely objection or request for estimation is interposed by the Debtors, the Liquidating Trustee, or any other party in interest which has not been withdrawn or determined by a Final Order.

*Distribution* means Cash, property, interests in property or other value distributed to Holders of Allowed Claims, or their designated agents, under this Plan.

*Distribution Record Date* means five (5) Business Days prior to the Confirmation Date or any subsequent date established by the Liquidating Trustee upon notice to all Holders of Claims or Interests that may receive a Distribution from the Liquidating Trust.

*Effective Date* means the first Business Day after the Confirmation Date on which the conditions precedent specified in Section 10 of this Plan have been either satisfied or waived.

*Estates* means the estate created in each Debtor's Chapter 11 Case containing all Assets of the Debtor pursuant to Bankruptcy Code section 541.

*Excess Liquidating Trust Distributable Cash* means the Liquidating Trust Distributable Cash and any other assets of the Liquidating Trust reduced to Cash net of (i) all expenses and costs of operating or effectuating the duties of the Liquidating Trust as determined by the Liquidating Trustee with the approval of the Liquidating Trust Oversight Board as set forth in the Liquidating Trust Agreement; (ii) any reserves as the Liquidating Trustee may determine are necessary with the approval of the Liquidating Trust Oversight Board as set forth in the Liquidating Trust Agreement; and (iii) payment in full of the Allowed Secured Lender Claim, Allowed Secured Lender Deficiency Claim and the Allowed General Unsecured Claims as set forth in this Plan.

6

EHREN-WALIA 003414

*Exculpated Claim* means any claim related to any act or omission by an Exculpated Party in connection with, relating to or arising out of (i) the Chapter 11 Cases, (ii) the negotiation or consummation of the Sales, (iii) the negotiation, administration or consummation of the DIP Loan or Cash Collateral Stipulations in the Chapter 11 Cases, (iv) the post-petition formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement or this Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or this Plan, (v) the filing of the Chapter 11 Cases, (vi) the pursuit of confirmation of this Plan, including, without limitation, any compromise or settlement under Bankruptcy Rule 9019, (vii) the administration and implementation of this Plan, or (vii) the Distribution of property under this Plan and/or any other related agreement; *provided, however,* that Exculpated Claims shall include any act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct to the extent imposed by applicable non-bankruptcy law.  No Cause of Action, obligation or liability expressly preserved by the Plan or the Plan Supplement constitutes an Exculpated Claim.

*Exculpated Party* means each of: (i) the Debtors' professionals retained in these Chapter 11 Cases pursuant to an Order of the Bankruptcy Court, including DLA Piper LLP (US), FTI Consulting, Inc., Houlihan Lokey Capital, Inc., Hahn & Hessen LLP, Epiq Bankruptcy Solutions, LLC and any Related Person to such professionals; (ii) the members of the Committee in their capacity as such and the Committee's professionals retained in these Chapter 11 Cases pursuant to an Order of the Bankruptcy Court, including Pachulski Stang Ziehl & Jones LLP and CBIZ MHM, LLC and any Related Persons to such professionals; (iii) the Administrative Agent and the Secured Lenders solely in their capacity as creditors and parties in interest in these Chapter 11 Cases, Moore & Van Allen, PLLC, Reed Smith LLP, Chapman and Cutler LLP and Carl Marks Advisors and any of the Related Persons to such Secured Lenders, including attorneys and financial advisors solely in their capacity as advisors, creditors and parties in interest in these Chapter 11 Cases; (iv) the Liquidating Trustee, any professionals retained by the Liquidating Trustee and any Related Person to the Liquidating Trustee or such professionals, (v) the Liquidating Trust, any professionals retained by the Liquidating Trust and any Related Person to the Liquidating Trust or such professionals, (vi) the Liquidating Trust Oversight Board and the members thereof, solely in their capacity as such and any professionals retained by the Liquidating Trust Oversight Board; (vii) Robert Rosenberg, solely in his capacity as the independent board member of the Debtors; and (viii) Timothy J. Dragelin, Daniel S. Jones and Frank Lazzara in their capacities as officers and managers of the Debtors.  Any current or former Insider of any of the Debtors and any of their Related Persons, except Robert Rosenberg, Timothy J. Dragelin, Daniel S. Jones and Frank Lazzara, shall not have the benefit of the exculpation or releases granted pursuant to this Plan or the Confirmation Order.

*Executory Contract* means a contract to which one or more of the Debtors is a party that is capable of assumption or rejection under section 365 of the Bankruptcy Code.

*Final DIP Order* means that *Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* [D.I. 159], which approved, among other things, the DIP Loan.

EHREN-WALIA 003415

*Final Order* means an order or judgment of a court entered by the clerk of the court on the docket of a case, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired; *provided, however,* that a motion under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed relating to such order shall not cause such order to not be a Final Order.

*General Unsecured Claim* means any Claim asserted against any Debtor which is not included within the other specifically defined Classes hereunder or which is otherwise determined by the Bankruptcy Court to be a General Unsecured Claim.

*Governmental Unit* has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

*HealthTek APA* means that certain Asset Purchase Agreement, dated as of July 5, 2018, between NYNM Management and HealthTek Solutions, LLC.

*Holder* means the legal or beneficial holder of a Claim or Interest.

*Impaired* means, with respect to a Claim or Interest, that such Class of Claims or Interests is impaired within the meaning of Bankruptcy Code section 1124.

*Initial Debtors* shall have the meaning set forth in the Introduction.

*Initial Liquidating Trust Distributions* shall have the meaning set forth in section 6.2.

*Insider* shall have the meaning set forth in section 101(31) of the Bankruptcy Code.

*Insurance Policies* means, collectively, all of the Debtors' insurance policies.

*Integrated Physician Solutions* shall have the meaning set forth in the Introduction.

*Intercompany Claims* shall have the meaning set forth in section 3.1.

*Interest* means the interest of any Holder in an equity security of any Debtor, within the meaning of Bankruptcy Code section 101(16) represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership or membership interest in any of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, including a partnership, limited liability company or similar interest in a Debtor.

8

EHREN-WALIA 003416

*Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*Liquidating Trust* means the grantor trust to be created upon the Effective Date for the benefit of the Beneficiaries.

*Liquidating Trust Agreement* means the agreement, substantially in the form included in the Plan Supplement, governing the operations of the Liquidating Trust, as such agreement may be subsequently amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

*Liquidating Trust Assets* means the assets held in the Liquidating Trust comprised of (i) the Net Sale Proceeds; (ii) the Liquidating Trust Reserve; (iii) all of the Debtors' books and records; (iv) all Causes of Action of the Debtors, except those expressly waived herein, (v) all Assigned Causes of Action; and (vi) all other unencumbered Assets of the Debtors' Estates remaining after all required payments have been made pursuant to the Plan, Confirmation Order and Liquidating Trust Agreement, as applicable, on the Effective Date.

*Liquidating Trust Distributable Cash* means the Liquidating Trust Cash and any other Assets of the Liquidating Trust reduced to Cash net of all expenses and costs of operating or effectuating the duties of the Liquidating Trust and establishing any reserves as the Liquidating Trustee may determine is necessary with the consent of the Liquidating Trust Oversight Board pursuant to the terms of this Plan and the Liquidating Trust Agreement.

*Liquidating Trust Oversight Board* shall have the meaning set forth in section 6.3(d) herein.

*Liquidating Trust Professionals* shall have the meaning set forth in section 6.3(b).

*Liquidating Trust Reserve* means an amount sufficient to fund the accrued and estimated expenses and costs of operating or effectuating the duties of the Liquidating Trust, as may be incurred from time to time by the Liquidating Trustee and approved by the Liquidating Trust Oversight Board pursuant to the Liquidating Trust Agreement.

*Liquidating Trustee* means the individual or entity designated and retained as the trustee to the Liquidating Trust, as of the Effective Date or as soon as reasonably practicable thereafter, as the fiduciary responsible for administering the Liquidating Trust.

*MDRX* shall have the meaning set forth in the Introduction.

*Medical Billing Services* shall have the meaning set forth in the Introduction.

*MTBC APA* means that certain Asset Purchase Agreement, dated as of June 25, 2018, between certain of the Debtors and Medical Transcription Billing, Corp.

*NEMS Acquisition* shall have the meaning set forth in the Introduction.

*NEMS West Virginia* shall have the meaning set forth in the Introduction.

EHREN-WALIA 003417

*Net Sale Proceeds* means the gross proceeds of the Sales, net of (i) the Liquidating Trust Reserve; (ii) 125% of the amounts estimated for payment of Professionals' fees and expenses that have not been previously paid as of the Effective Date; and (iii) 125% of the amounts allocated for payment of administrative expenses and other priority claims, including, without limitation, unpaid Secured Tax Claims that have not been previously paid as of the Effective Date.

*Northeast Medical Solutions* shall have the meaning set forth in the Introduction.

*Northstar First Health* shall have the meaning set forth in the Introduction.

*Northstar FHA* shall have the meaning set forth in the Introduction.

*Noteholder Litigation* means that certain proceeding pending before the Bankruptcy Court captioned *Orion HealthCorp, Inc., et al. v. Capita IRG Trustees (Nominees) Limited, et al. (In re Orion HealthCorp, Inc.)*, Adv. Pro. No. 18-08048-AST.

*NYNM Acquisition* shall have the meaning set forth in the Introduction.

*NYNM Management* shall have the meaning set forth in the Introduction.

*NYNM Petition Date* means July 5, 2018.

*Orion* shall have the meaning set forth in the Introduction.

*Other Priority Claim* means any Claim entitled to priority under Bankruptcy Code sections 507(a)(4) and 507(a)(5).

*Other Secured Claim* means a Secured Claim other than the Secured Tax Claims and the Allowed Secured Lender Claim.

*Parmar Litigation* means that certain proceeding pending before the Bankruptcy Court captioned *Orion HealthCorp, Inc., et al. v. Parmjit Singh Parmar, et al. (In re Orion HealthCorp., Inc.)*, Adv. Pro. No. 18-08053-AST.

*Person* means an individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, estate, unincorporated organization, governmental unit, government (or agency or political subdivision thereof), or other entity, including, without limitation, the Debtors.

*Petition Date* means March 16, 2018.

*Phoenix Health* shall have the meaning set forth in the Introduction.

*Physicians Practice Plus* shall have the meaning set forth in the Introduction.

*Physicians Practice Plus Holdings* shall have the meaning set forth in the Introduction.

*Plan* shall have the meaning set forth in the Introduction.

10

EHREN-WALIA 003418

*Plan Supplement* means the compilation of documents and forms of documents, schedules, and exhibits to this Plan as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code and the Bankruptcy Rules.

*Prepetition Credit Agreement* means that certain Credit Agreement, dated as of January 30, 2017, among the Debtors, certain non-Debtor affiliates, the Administrative Agent and the Secured Lenders.

*Priority Claim* means any Claim entitled to priority pursuant to Bankruptcy Code section 507(a) other than an Administrative Expense Claim, Accrued Professional Compensation Claim or Priority Tax Claims.

*Priority Tax Claim* means any Claim of a governmental unit of a kind entitled to priority under Bankruptcy Code section 507(a)(8), if Allowed.

*Pro Rata* means the proportion that the amount of a Claim in a particular Class or Classes bears to the aggregate amount of all Allowed Claims in such Class or Classes, unless the Plan otherwise provides.

*Professionals* means all professionals employed in these Chapter 11 Cases pursuant to Bankruptcy Code sections 327, 363 and 1103.

*Proof of Claim* means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

*Rand Medical Billing* shall have the meaning set forth in the Introduction.

*Related Persons* means, with respect to any Person, such Person's successors, assigns and present and former affiliates (whether by operation of law or otherwise) and each of their respective members, partners, equity holders, certificate holders, officers, directors, employees, representatives, advisors, attorneys, auditors, agents, and professionals, in each case acting in such capacity on or any time prior to or after the Petition Date or NYNM Petition Date, as applicable, and any Person claiming by or through any of them.

*Released Parties* means each of: (i) the following professionals of the Debtors: DLA Piper LLP (US), FTI Consulting, Inc., Houlihan Lokey Capital, Inc., Hahn & Hessen LLP, Epiq Bankruptcy Solutions, LLC, and any Related Person to such professionals, with respect to services rendered before and after the Petition Date and NYNM Petition Date; (ii) the members of the Committee in their capacity as such and the Committee's professionals retained in these Chapter 11 Cases pursuant to an Order of the Bankruptcy Court, including Pachulski Stang Ziehl & Jones LLP and CBIZ MHM, LLC and any Related Persons to such professionals; (iii) the Administrative Agent, the Secured Lenders, Moore & Van Allen, PLLC, Reed Smith LLP, Chapman and Cutler LLP and Carl Marks Advisors and any of Related Persons thereof, in each case solely with regard to any prepetition or postpetition conduct or activity relating to the Debtors or Debtors in Possession; (iv) the Liquidating Trustee, any professionals retained by the Liquidating Trustee and any Related Person to the Liquidating Trustee or such professionals, (v) the Liquidating Trust, any professionals retained by the Liquidating Trust and any Related Person to the Liquidating Trust or such professionals, (vi) the Liquidating Trust Oversight Board, the

11

EHREN-WALIA 003419

members of the Liquidating Trust Oversight Board, solely in their capacity as such, and any Related Persons to members of the Liquidating Trust Oversight Board; (vii) Robert Rosenberg, solely in his capacity as the independent board member of the Debtors and with regard to any prepetition or postpetition conduct or activity relating to the Debtors or Debtors in Possession; and (viii) Timothy J. Dragelin, Daniel S. Jones and Frank Lazzara in their capacities as officers and managers of the Debtors and with regard to any prepetition or postpetition conduct or activity relating to the Debtors or Debtors in Possession.  Any current or former Insider of any of the Debtors and any of their Related Persons, except Robert Rosenberg, Timothy J. Dragelin, Daniel S. Jones and Frank Lazzara, shall not have the benefit of the exculpation or releases granted pursuant to this Plan or the Confirmation Order.

      *Releasing Parties* means all Persons who have held, hold or may hold Claims or Interests that have been released, discharged or are subject to exculpation pursuant to this Plan.

      *RMI Physician Services* shall have the meaning set forth in the Introduction.

      *Robinson Brog Litigation* means that certain proceeding pending before the Bankruptcy Court captioned *Orion HealthCorp, Inc., et al. v. Robinson Brog Leinwand Greene Genovese & Gluck P.C., A. Mitchell Greene and Adam Greene (In re Orion HealthCorp., Inc.)*, Adv. Pro. No. 18-08104-AST.

      *Sales* means the sale of substantially all of the Debtors' Assets pursuant to the MTBC APA and HealthTek APA, respectively.

      *Schedules* means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs, if any, filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

      *Secured Claim* means any Claim of a Creditor that is secured by property of the Estates, to the extent of the value of the Creditor's interest in the Estate's interest in such property, as provided in Bankruptcy Code section 506(a).  Secured Claim also means a Claim of a Creditor that is subject to setoff under Bankruptcy Code section 553, to the extent of the amount subject to setoff, as provided in Bankruptcy Code section 506(a).  To the extent the value of any property securing such Claim is less than the amount of such Claim, the difference between such value and such Claim is a *"Deficiency Claim"* unless the holder of such Claim validly elects under Section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

      *Secured Lenders* means, collectively, Bank of America, N.A., BMO Harris Bank, N.A., Keybank National Association, Stifel Bank & Trust, and Woodforest National Bank.

      *Secured Tax Claim* means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under Bankruptcy Code section 507(a)(8).

      *Section 503(b)(9) Claims* shall have the meaning set forth in Section 2.1(b).

EHREN-WALIA 003420

**Shell Debtors** shall have the meaning set forth in section 6.4.

**Standing Motion** means the *Motion of the Official Committee of Unsecured Creditors for an Order Granting Leave, Standing, and Authority to Prosecute Certain Causes of Action on Behalf of the Debtors and Their Estates* [Docket No. 504] filed in the Chapter 11 Cases.

**Standing Motion Settlement** means the settlement between the Debtors, the Committee and the Secured Lenders regarding the Standing Motion as embodied and described in the Plan and Disclosure Statement.

**Subordinated Claims** means those Claims that have been subordinated pursuant to section 510 of the Bankruptcy Code by Final Order of the Bankruptcy Court.

**Unexpired Lease** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

**Unimpaired** means, with respect to a Claim or Interest, a Class of Claims or Interests that is not Impaired within the meaning of Bankruptcy Code section 1124.

**United States Trustee** means the Office of the United States Trustee for Region 2.

**Vachette Business Services** shall have the meaning set forth in the Introduction.

**Vega Medical Professionals** shall have the meaning set forth in the Introduction.

**Voting Agent** means Epiq Bankruptcy Solutions, LLC.

**Voting Record Date** shall have the meaning ascribed to such term in the Disclosure Statement.

**Western Skies** shall have the meaning set forth in the Introduction.

1.2    **Interpretation, Application of Definitions and Rules of Construction.** Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan, as the same may be amended, supplemented, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein.  A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to this Plan.  The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Unless otherwise provided, any reference in this Plan to an existing document, exhibit or schedule means such document, exhibit or schedule as it may have been amended, restated, revised, supplemented or otherwise modified.  If a time or date is specified for any payments or other Distribution under this Plan, it shall mean on or as soon as reasonably practicable thereafter.  Further, where appropriate from a contextual reading of a term, each term includes the singular and plural form of the term regardless of how the term is stated and each stated pronoun is gender neutral.  In the event of any ambiguity or conflict between this Plan and the Disclosure Statement, the provisions of this Plan

13

EHREN-WALIA 003421

shall govern. Any reference to the "Liquidating Trustee" shall be deemed to include a reference to the "Liquidating Trust" and any reference to the "Liquidating Trust" shall be deemed to include a reference to the "Liquidating Trustee" unless the context otherwise required.

    1.3  ***Computation of Time***.  Bankruptcy Rule 9006 shall apply to all computations of time periods prescribed or allowed by this Plan unless otherwise set forth herein or provided by the Bankruptcy Court.

## SECTION 2.  ADMINISTRATIVE AND PRIORITY CLAIMS

    2.1  ***Administrative Expense Claims***.

      (a)  ***Treatment***.  Except as otherwise provided in Section 2.1(b) of the Plan, in Section 2.2 of the Plan regarding Accrued Professional Compensation Claims, or to the extent that a Holder of an Allowed Administrative Expense Claim agrees to different treatment with the Debtors or Liquidating Trustee, each Holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to the unpaid amount of such Allowed Administrative Expense Claim on the later of the Effective Date or the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, or liabilities arising under obligations incurred by the Debtors, as Debtors in Possession, prior to the Effective Date, shall be paid by the Debtors, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions, including, but not limited to, the budgets related to the Final DIP Order, Cash Collateral Stipulations and all other orders entered by the Bankruptcy Court related to the foregoing. In addition, Allowed Administrative Expense Claims of the United States Trustee for statutory fees under 28 U.S.C. § 1930 incurred prior to the Effective Date shall be paid on the Effective Date by the Debtors, and thereafter, as such fees may thereafter accrue and be due and payable, by the Liquidating Trustee in accordance with the applicable schedule for payment of such fees.

      (b)  ***Administrative Expense Claims Bar Date***.  To be eligible to receive Distributions under the Plan on account of an Administrative Expense Claim, including but not limited to a Claim pursuant to section 503(b)(9) of the Bankruptcy Code ("***Section 503(b)(9) Claims***"), that is not otherwise Allowed by the Plan, a request for payment of an Administrative Expense Claim must have been or be filed with the Bankruptcy Court on or before the Administrative Expense Claims Bar Date. Any Administrative Expense Claims, including Section 503(b)(9) Claims, that are not asserted in accordance herewith and with Section 2.1(a) of the Plan shall be deemed disallowed under the Plan and shall be forever barred against the Debtors, their Estates, the Liquidating Trust, or any of their Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

    2.2  ***Accrued Professional Compensation Claims***.  All Professionals seeking payment of Accrued Professional Compensation Claims shall (i) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses

14

EHREN-WALIA 003422

incurred in the Debtors' Chapter 11 Cases by the date that is sixty (60) days after the Effective Date and (ii) be paid (a) the full unpaid amount as is Allowed by the Bankruptcy Court within five (5) Business Days after the date that such Claim is Allowed by Order of the Bankruptcy Court, or (b) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Accrued Professional Compensation Claim and the Debtors or Liquidating Trustee. Any Accrued Professional Compensation Claim that is not asserted in accordance with this Section 2.2 shall be deemed disallowed under this Plan and shall be forever barred against the Debtors, the Debtors' Estates, the Liquidating Trust, or any of their Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

2.3    *Priority Tax Claims*.    Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a different treatment of such Claim, each Holder of an Allowed Priority Tax Claim, if any such Claim exists, shall receive Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the date that is ninety (90) calendar days after the Effective Date.

## SECTION 3.    CLASSIFICATION OF CLAIMS AND INTERESTS

3.1    *Classified Claims Against and Interests in the Debtors*.    Except as set forth herein, all Claims against and Interests in a particular Debtor are placed in a particular Class for that Debtor.    The Debtors have not classified Administrative Expense Claims, Accrued Professional Compensation Claims or Priority Tax Claims.    In addition, the Debtors have not classified any Claims they may have against any other Debtor ("*Intercompany Claims*").    All Intercompany Claims shall be assigned to the Liquidating Trust pursuant to this Plan.

The following tables classify Claims against and Interests in each of the Debtors for all purposes, including voting, confirmation and Distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.    This Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.    A Claim or Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.    Each Class set forth below is treated hereunder as a distinct Class for voting and Distribution purposes.

Subject to all other applicable provisions of this Plan (including its Distribution provisions), classified Claims shall receive the treatment described in Section 4 herein.    This Plan will not provide any Distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third parties.

15

EHREN-WALIA 003423

### 3.2    *CHT*.

The following table designates the Classes of Claims against and Interests in **CHT**, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interests | Status | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Allowed Secured Lender Claim | Impaired | Yes | TBD |
| 4 | Other Secured Claims | Impaired | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Yes | TBD |
| 6 | Subordinated Claims | Impaired | Yes | TBD |
| 7 | Interests in CHT | Impaired | No (deemed to reject) unless the Interests are held by another Debtor in which case such other Debtor shall, by proposing this Plan, be deemed to accept | 0% |

### 3.3    *Orion*.

The following table designates the Classes of Claims against and Interests in **Orion,** a direct subsidiary of CHT, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interests | Status | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Allowed Secured Lender Claim | Impaired | Yes | TBD |
| 4 | Other Secured Claims | Impaired | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Yes | TBD |
| 6 | Subordinated Claims | Impaired | Yes | TBD |
| 7 | Interests in Orion | Impaired | No (deemed to reject) unless the Interests are held by another Debtor in which case such other Debtor shall, by proposing this Plan, be deemed to accept | 0% |

EHREN-WALIA 003424

988

### 3.4    *Northeast Medical Solutions*.

The following table designates the Classes of Claims against and Interests in **Northeast Medical Solutions**, a direct subsidiary of NEMS Acquisition, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interests | Status | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Allowed Secured Lender Claim | Impaired | Yes | TBD |
| 4 | Other Secured Claims | Impaired | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Yes | TBD |
| 6 | Subordinated Claims | Impaired | Yes | TBD |
| 7 | Interests in Northeast Medical Solutions | Impaired | No (deemed to reject) unless the Interests are held by another Debtor in which case such other Debtor shall, by proposing this Plan, be deemed to accept | 0% |

### 3.5    *NEMS West Virginia*.

The following table designates the Classes of Claims against and Interests in **NEMS West Virginia**, a direct subsidiary of NEMS Acquisition, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interests | Status | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Allowed Secured Lender Claim | Impaired | Yes | TBD |
| 4 | Other Secured Claims | Impaired | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Yes | TBD |
| 6 | Subordinated Claims | Impaired | Yes | TBD |
| 7 | Interests in NEMS West Virginia | Impaired | No (deemed to reject) unless the Interests are held by another Debtor in which case such other Debtor shall, by proposing this Plan, be deemed to accept | 0% |

EHREN-WALIA 003425

### 3.6    *Physicians Practice Plus*.

The following table designates the Classes of Claims against and Interests in **Physicians Practice Plus**, a direct subsidiary of Physicians Practice Plus Holdings, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interests | Status | Entitled to Vote | Estimated Recovery |
|-------|----------------------|--------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Allowed Secured Lender Claim | Impaired | Yes | TBD |
| 4 | Other Secured Claims | Impaired | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Yes | TBD |
| 6 | Subordinated Claims | Impaired | Yes | TBD |
| 7 | Interests in Physicians Practice Plus | Impaired | No (deemed to reject) unless the Interests are held by another Debtor in which case such other Debtor shall, by proposing this Plan, be deemed to accept | 0% |

### 3.7    *Medical Billing Services*.

The following table designates the Classes of Claims against and Interests in **Medical Billing Services**, a direct subsidiary of Orion, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interests | Status | Entitled to Vote | Estimated Recovery |
|-------|----------------------|--------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Allowed Secured Lender Claim | Impaired | Yes | TBD |
| 4 | Other Secured Claims | Impaired | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Yes | TBD |
| 6 | Subordinated Claims | Impaired | Yes | TBD |
| 7 | Interests in Medical Billing Services | Impaired | No (deemed to reject) unless the Interests are held by another Debtor in which case such other Debtor shall, by proposing this Plan, be deemed to accept | 0% |

18

EHREN-WALIA 003426

### 3.8 *Rand Medical Billing*.

The following table designates the Classes of Claims against and Interests in **Rand Medical Billing**, a direct subsidiary of Orion, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interests | Status | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Allowed Secured Lender Claim | Impaired | Yes | TBD |
| 4 | Other Secured Claims | Impaired | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Yes | TBD |
| 6 | Subordinated Claims | Impaired | Yes | TBD |
| 7 | Interests in Rand Medical Billing | Impaired | No (deemed to reject) unless the Interests are held by another Debtor in which case such other Debtor shall, by proposing this Plan, be deemed to accept | 0% |

### 3.9 *RMI Physician Services*.

The following table designates the Classes of Claims against and Interests in **RMI Physician Services**, a direct subsidiary of Orion, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interests | Status | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Allowed Secured Lender Claim | Impaired | Yes | TBD |
| 4 | Other Secured Claims | Impaired | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Yes | TBD |
| 6 | Subordinated Claims | Impaired | Yes | TBD |
| 7 | Interests in RMI Physician Services | Impaired | No (deemed to reject) unless the Interests are held by another Debtor in which case such other Debtor shall, by proposing this Plan, be deemed to accept | 0% |

EHREN-WALIA 003427

3.10    *Western Skies Practice Management.*

The following table designates the Classes of Claims against and Interests in **Western Skies Practice Management**, a direct subsidiary of Orion, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interests | Status | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Allowed Secured Lender Claim | Impaired | Yes | TBD |
| 4 | Other Secured Claims | Impaired | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Yes | TBD |
| 6 | Subordinated Claims | Impaired | Yes | TBD |
| 7 | Interests in Western Skies Practice Management | Impaired | No (deemed to reject) unless the Interests are held by another Debtor in which case such other Debtor shall, by proposing this Plan, be deemed to accept | 0% |

3.11    *Integrated Physician Solutions.*

The following table designates the Classes of Claims against and Interests in **Integrated Physician Solutions**, a direct subsidiary of Orion, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interests | Status | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Allowed Secured Lender Claim | Impaired | Yes | TBD |
| 4 | Other Secured Claims | Impaired | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Yes | TBD |
| 6 | Subordinated Claims | Impaired | Yes | TBD |
| 7 | Interests in Integrated Physician Solutions | Impaired | No (deemed to reject) unless the Interests are held by another Debtor in which case such other Debtor shall, by proposing this Plan, be deemed to accept | 0% |

EHREN-WALIA 003428

992

### 3.12 *Northstar First Health*.

The following table designates the Classes of Claims against and Interests in **Northstar First Health**, a direct subsidiary of Northstar FHA, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interests | Status | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Allowed Secured Lender Claim | Impaired | Yes | TBD |
| 4 | Other Secured Claims | Impaired | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Yes | TBD |
| 6 | Subordinated Claims | Impaired | Yes | TBD |
| 7 | Interests in Northstar First Health | Impaired | No (deemed to reject) unless the Interests are held by another Debtor in which case such other Debtor shall, by proposing this Plan, be deemed to accept | 0% |

### 3.13 *Vachette Business Services*.

The following table designates the Classes of Claims against and Interests in **Vachette Business Services**, a direct subsidiary of Northstar First Health, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interests | Status | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Allowed Secured Lender Claim | Impaired | Yes | TBD |
| 4 | Other Secured Claims | Impaired | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Yes | TBD |
| 6 | Subordinated Claims | Impaired | Yes | TBD |
| 7 | Interests in Vachette Business Services | Impaired | No (deemed to reject) unless the Interests are held by another Debtor in which case such other Debtor shall, by proposing this Plan, be deemed to accept | 0% |

EHREN-WALIA 003429

993

3.14   *Allegiance Consulting Associates*.

The following table designates the Classes of Claims against and Interests in **Allegiance Consulting Associates**, a direct subsidiary of Vega Medical Professionals, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interests | Status | Entitled to Vote | Estimated Recovery |
|-------|----------------------|--------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Allowed Secured Lender Claim | Impaired | Yes | TBD |
| 4 | Other Secured Claims | Impaired | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Yes | TBD |
| 6 | Subordinated Claims | Impaired | Yes | TBD |
| 7 | Interests in Allegiance Consulting Associates | Impaired | No (deemed to reject) unless the Interests are held by another Debtor in which case such other Debtor shall, by proposing this Plan, be deemed to accept | 0% |

3.15   *Allegiance Billing & Consulting*.

The following table designates the Classes of Claims against and Interests in **Allegiance Billing & Consulting**, a direct subsidiary of Vega Medical Professionals and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interests | Status | Entitled to Vote | Estimated Recovery |
|-------|----------------------|--------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Allowed Secured Lender Claim | Impaired | Yes | TBD |
| 4 | Other Secured Claims | Impaired | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Yes | TBD |
| 6 | Subordinated Claims | Impaired | Yes | TBD |
| 7 | Interests in Allegiance Billing & Consulting | Impaired | No (deemed to reject) unless the Interests are held by another Debtor in which case such other Debtor shall, by proposing this Plan, be deemed to accept | 0% |

22

EHREN-WALIA 003430

994

3.16    *NYNM Management.*

The following table designates the Classes of Claims against and Interests in **NYNM Management**, a direct subsidiary of NYNM Acquisition, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interests | Status | Entitled to Vote | Estimated Recovery |
|-------|---------------------|--------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Allowed Secured Lender Claim | Impaired | Yes | TBD |
| 4 | Other Secured Claims | Impaired | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Yes | TBD |
| 6 | Subordinated Claims | Impaired | Yes | TBD |
| 7 | Interests in NYNM Management | Impaired | No (deemed to reject) unless the Interests are held by another Debtor in which case such other Debtor shall, by proposing this Plan, be deemed to accept | 0% |

## SECTION 4.    TREATMENT OF CLAIMS AND INTERESTS

4.1    *General.*    Pursuant to the Standing Motion Settlement described in the Disclosure Statement, all Assets of each of the Debtors and all Assigned Causes of Action shall be assigned to the Liquidating Trust.  Subject to the Liquidating Trust Agreement, the Liquidating Trustee shall make Distributions from the Liquidating Trust Distributable Cash to Holders of Allowed Claims as follows:

a.    ***Other Priority Claims (Class 1 against any or all Debtors).***  This Class consists of all Allowed Other Priority Claims against any of the Debtors that are specified as having priority in Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date.  Except to the extent that a Holder of an Allowed Other Priority Claim against any of the Debtors has agreed to a different treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date the Other Priority Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between the applicable Debtor or the Liquidating Trustee and the Holder of the Allowed Other Priority Claim against the applicable Debtor.

b.    ***Secured Tax Claims (Class 2 against any or all Debtors).***  This Class consists of all Allowed Secured Tax Claims against any of the Debtors that, absent the secured status of such Claim, would be entitled to priority in right of payment under Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Each Holder of an Allowed

EHREN-WALIA 003431

Secured Tax Claim against any of the Debtors shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Secured Tax Claim, Cash in an amount equal to such Allowed Secured Tax Claim, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date the Secured Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between the applicable Debtor or the Liquidating Trustee and the Holder of the Secured Tax Claim. The applicable Debtor and the Liquidating Trustee (after the Effective Date) specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid, pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

          c.    **_Allowed Secured Lender Claim (Class 3 against any or all Debtors)_**. This Class consists of the Secured Lenders' Allowed Secured Lender Claim, which shall be deemed Allowed pursuant to this Plan in the amount of Fifty Million Dollars ($50,000,000.00), against each of the Debtors, which amount includes (i) unpaid principal and accrued but unpaid interest owed under the Prepetition Credit Agreement as of the Petition Date and NYNM Petition Date; and (ii) any post-petition adequate protection claims under section 507 of the Bankruptcy Code, the Final DIP Order, the Cash Collateral Stipulations or otherwise. Upon the terms and subject to the conditions set forth in this Plan, in full and final satisfaction, settlement, release, and discharge of the Allowed Secured Lender Claim against any of the Debtors, the Secured Lenders will receive (i) the Net Sale Proceeds and (ii) all Distributions from the Liquidating Trust pursuant to the terms of the Liquidating Trust Agreement until such time as the Secured Lenders' Allowed Secured Lender Claim and all interest accruing thereon has been paid in full. Interest shall accrue on the then outstanding balance of the Allowed Secured Lender Claim at a per annum floating rate equal to the prime rate of Bank of America, N.A. publicly announced from time to time plus 2.00%, with a 2.00% floor and a 6.00% cap. Upon and subject to the occurrence of the Effective Date, the Secured Lenders shall, and by their acceptance of, and by operation of, this Plan, transfer and assign to the Liquidating Trust any and all Causes of Action they may have against any Person who is not a Debtor, related directly or indirectly to the Debtors and their Estates, whether arising before or after the Petition Date. The Debtors shall not be obligated to pay the fees and expenses incurred on or after the Effective Date of any Professionals retained by the Administrative Agent and Secured Lenders; _provided, however_, the Administrative Agent and the Secured Lenders shall be entitled to receive and retain Professional Fees and expenses to the extent incurred prior to the Effective Date and permitted to be paid pursuant to the Final DIP Order or any Cash Collateral Stipulations entered from time to time in the Chapter 11 Cases. Upon the unanimous acceptance of the Secured Lenders to this Plan and the confirmation thereof, the Secured Lenders consent to the treatment of their Allowed Secured Lender Claim and Allowed Secured Lender Deficiency Claim as provided in this Plan. Upon the Effective Date by operation of the Plan, the rights (other than with respect to the Allowed Secured Lender Claim and the Allowed Secured Lender Deficiency Claim) and Causes of Action of each accepting Secured Lender and/or the Administrative Agent against any Person arising out of or on account of the Prepetition Loans (as defined in the Final DIP Order) shall be assigned to the Liquidating Trust and shall be deemed Assigned Causes of Action pursuant to this Plan. The Assigned Causes of Action shall accrue to the benefit of the Liquidating Trust and the Liquidating Trustee shall have sole and exclusive authority to administer, pursue, litigate, settle or abandon any Assigned Causes of Action subject only to the terms of this Plan and the Liquidating Trust Agreement. The Secured Lenders and\or the Administrative Agent shall undertake such actions and execute such documents

EHREN-WALIA 003432

996

as necessary to memorialize, effectuate or enforce the assignment of any Assigned Causes of Action.

d. ***Other Secured Claims (Class 4 against any or all Debtors)***. This Class consists of the Other Secured Claims against any of the Debtors if any such Claims exist as of the Effective Date. Upon the terms and subject to the conditions set forth in this Plan, on the Effective Date or as soon as practicable thereafter, in full and final satisfaction, settlement, release, and discharge of the Allowed Other Secured Claims against any of the Debtors, the Holders of Allowed Other Secured Claims against any of the Debtors will receive, on the Effective Date or as soon as practicable thereafter, the Collateral that secures their Claims.

e. ***General Unsecured Claims (Class 5 against any or all Debtors).*** This Class consists of (i) the Secured Lenders' Allowed Secured Lender Deficiency Claim against each of the Debtors, which shall be deemed Allowed pursuant to this Plan in the amount of One Hundred and Seven Million Six Hundred Twelve Thousand Three Hundred Forty-Two Dollars and Seventy Four Cents ($107,612,342.74); and (ii) all Allowed General Unsecured Claims against each of the Debtors. Except to the extent the Secured Lenders on account of their Allowed Secured Lender Deficiency Claim or a Holder of an Allowed General Unsecured Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of the Allowed Secured Lender Deficiency Claim or Allowed General Unsecured Claims against each of the Debtors, the Secured Lenders and each Holder of an Allowed General Unsecured Claim against any of the Debtors will receive their Pro Rata share of the Liquidating Trust Distributable Cash as soon as practicable as determined by the Liquidating Trustee in accordance with the Liquidating Trust Agreement; *provided, however*, that each Holder of an Allowed General Unsecured Claim against more than one Debtor shall be entitled to a single distribution on account of each Claim that arises out of the same facts and circumstances regardless of the number of Debtors against which the Claim is asserted. The Debtors and the Liquidating Trustee reserve their rights, however, to dispute the validity of any General Unsecured Claim (other than the Allowed Secured Lender Deficiency Claim), whether or not objected to prior to the Effective Date.

f. ***Subordinated Claims (Class 6 against any or all Debtors).*** This Class consists of the Allowed Subordinated Claims against any of the Debtors, which have been subordinated to the Allowed Secured Lender Deficiency Claim and Allowed General Unsecured Claims. Except to the extent that a Holder of an Allowed Subordinated Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Subordinated Claim, each Holder of an Allowed Subordinated Claim will receive its Pro Rata share of the Excess Liquidating Trust Distributable Cash as soon as practicable as determined by the Liquidating Trustee. The Debtors and the Liquidating Trustee reserve their rights, however, to dispute the validity of any Subordinated Claim, whether or not objected to prior to the Effective Date.

g. ***Interests (Class 7 in any or all Debtors).*** This Class consists of any Holder's Interest in the Debtors, which will be cancelled as of the Effective Date. However, the Interests in any of the Debtors held by any other Debtor shall be held as Assets in the Liquidating Trust, unless abandoned by the Liquidating Trustee in accordance with the Liquidating Trust Agreement.

EHREN-WALIA 003433

## SECTION 5.   ACCEPTANCE OR REJECTION OF THE PLAN

    5.1   *Holders of Claims and Interests Entitled to Vote*.  Pursuant to section 1126 of the Bankruptcy Code, each Impaired Class of Claims or Interests that will receive a Distribution pursuant to this Plan may vote separately to accept or reject this Plan.  Each Holder of an Allowed Claim in such an Impaired Class shall receive a Ballot and may cast a vote to accept or reject this Plan.  The following Classes of each of the Debtors are Impaired and entitled to vote:

| Debtor | Impaired Classes Entitled to Vote |
|---|---|
| CHT | 3, 4, 5 and 6 |
| Orion | 3, 4, 5 and 6 |
| Northeast Medical Solutions | 3, 4, 5 and 6 |
| NEMS West Virginia | 3, 4, 5 and 6 |
| Physicians Practice Plus | 3, 4, 5 and 6 |
| Medical Billing Services | 3, 4, 5 and 6 |
| Rand Medical Billing | 3, 4, 5 and 6 |
| RMI Physicians Services | 3, 4, 5 and 6 |
| Western Skies Practice Management | 3, 4, 5 and 6 |
| Integrated Physician Solutions | 3, 4, 5 and 6 |
| Northstar First Health | 3, 4, 5 and 6 |
| Vachette Business Services | 3, 4, 5 and 6 |
| Allegiance Consulting Associates | 3, 4, 5 and 6 |
| Allegiance Billing & Consulting | 3, 4, 5 and 6 |
| NYNM Management | 3, 4, 5 and 6 |

    5.2   *Classes Deemed to Reject*.  The following Classes of each of the Debtors are Impaired, are not entitled to a Distribution and are deemed to reject the Plan:

| Debtor | Impaired Class Deemed to Reject Unless held by a Debtor |
|---|---|
| CHT | 7 |
| Orion | 7 |
| Northeast Medical Solutions | 7 |
| NEMS West Virginia | 7 |
| Physicians Practice Plus | 7 |
| Medical Billing Services | 7 |
| Rand Medical Billing | 7 |
| RMI Physicians Services | 7 |
| Western Skies Practice Management | 7 |
| Integrated Physician Solutions | 7 |
| Northstar First Health | 7 |
| Vachette Business Services | 7 |
| Allegiance Consulting Associates | 7 |
| Allegiance Billing & Consulting | 7 |
| NYNM Management | 7 |

26

EHREN-WALIA 003434

     5.3    **_Classes Deemed to Accept_**.  The following Classes of the Debtors are Unimpaired, not entitled to vote to accept or reject the Plan and are deemed to accept the Plan:

| Debtor | Unimpaired Classes |
|---|---|
| CHT | 1 and 2 |
| Orion | 1 and 2 |
| Northeast Medical Solutions | 1 and 2 |
| NEMS West Virginia | 1 and 2 |
| Physicians Practice Plus | 1 and 2 |
| Medical Billing Services | 1 and 2 |
| Rand Medical Billing | 1 and 2 |
| RMI Physicians Services | 1 and 2 |
| Western Skies Practice Management | 1 and 2 |
| Integrated Physician Solutions | 1 and 2 |
| Northstar First Health | 1 and 2 |
| Vachette Business Services | 1 and 2 |
| Allegiance Consulting Associates | 1 and 2 |
| Allegiance Billing & Consulting | 1 and 2 |
| NYNM Management | 1 and 2 |

     5.4    **_Acceptance by a Class_**.  A Class of Claims entitled to vote to accept or reject this Plan accepts this Plan if the Holders of Claims in such voting Class that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Claims that complete and return Ballots in such Class vote to accept this Plan.  A Class of Interests is deemed to accept this Plan if this Plan has been accepted by Holders of at least two-thirds (2/3) of the amount of the Allowed Interests held by Holders of such Interests who vote in such Class.  Notwithstanding the foregoing, in order for any Class 3 to accept the Plan, all Holders of Claims in such Class must vote to accept the Plan.

     5.5    **_Cramdown Under Section 1129(b) of the Bankruptcy Code_**.  If all applicable requirements for confirmation of this Plan are met as set forth in section 1129(a) of the Bankruptcy Code except subsection (8) thereof, the Debtors will request that the Bankruptcy Court confirm this Plan in accordance with section 1129(b) of the Bankruptcy Code on the bases that this Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims or Interests that is Impaired under, and has not accepted or is deemed to reject, this Plan.

     5.6    **_Ballots_**.  Each Holder of a Claim or Interest entitled to vote on this Plan will be asked to complete and return a Ballot to the Voting Agent, which will compile the votes so received.

## SECTION 6.    MEANS FOR IMPLEMENTATION

     6.1    **_Compromise Regarding Deemed Consolidation_**.  This Plan includes, and is implemented by, a settlement under Bankruptcy Rule 9019, between and among the Debtors, the Secured Lenders and the Committee which provides for a deemed consolidation of the Debtors' Estates solely for distribution purposes.  The Debtors shall retain their separate corporate identities for all other purposes.

27

6.2    ***Initial Secured Lender Distribution.***    On the Effective Date, all Debtor Cash will be transferred to the Liquidating Trust and used to pay or establish a reserve for (i) Allowed Administrative Expense Claims; (ii) Allowed Accrued Professional Compensation Claims; (iii) Allowed Priority Claims; and (iv) the initial funding of the Liquidating Trust Reserve (the "***Initial Liquidating Trust Distributions***").    All Debtor Cash remaining after payment of the Initial Liquidating Trust Distributions may be distributed to the Holders of the Allowed Secured Lender Claim as a Distribution on account of such Claim upon consent of the Liquidating Trust Oversight Board pursuant to the Liquidating Trust Agreement.

6.3    ***Liquidating Trust.***

a.    ***Overview of Liquidating Trust.***    On the Effective Date, the Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the purpose of liquidating any non-Cash Liquidating Trust Assets, prosecuting and resolving the Causes of Action (including any Assigned Causes of Action), objecting to all Claims (including, with respect to Claims in Class 4, objecting to any purported Liens), resolving all Disputed Claims, and effecting the Distributions to be made under the Plan to the Holders of Allowed Claims in accordance with the terms of the Plan.    The Beneficiaries of the Liquidating Trust shall be the Holders of Allowed Class 3 Claims (Allowed Secured Lender Claim), Allowed Class 5 Claims (General Unsecured Claims, including the Allowed Secured Lender Deficiency Claim) and Allowed Class 6 Claims (Subordinated Claims).    On the Effective Date, by operation of the Plan, each Holder of Allowed Class 3, Class 5 and Class 6 Claims shall (i) become a Beneficiary of the Liquidating Trust, (ii) be bound by the Liquidating Trust Agreement, and (iii) receive an uncertificated beneficial interest in the Liquidating Trust.    Pursuant to the Plan, the Liquidating Trust shall contain a waterfall for Distributions by which, subject to the Liquidating Trust Reserve, Liquidating Trust Distributable Cash shall satisfy, in full and in Cash, and in order of priority: (i) first, Allowed Class 3 Claims and the interest accruing thereon pursuant to Section 4(c) of the Plan, (ii) second, Allowed Class 5 Claims (including the Allowed Secured Lender Deficiency Claim), and (iii) third, the Allowed Class 6 Claims.    All beneficial interests in the Liquidating Trust shall be subject to such priorities in Distributions.

b.    ***Appointment of Liquidating Trustee.***    On or before the Confirmation Date, the Liquidating Trustee shall be designated by mutual agreement of the Secured Lenders and the Committee, after consultation with the Debtors, and the Liquidating Trustee shall be appointed pursuant to the Confirmation Order.    The Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3) as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.    The powers, rights and responsibilities of the Liquidating Trustee shall be specified in and subject to the terms of the Liquidating Trust Agreement and shall include the authority and responsibility to: (i) receive, manage, invest, supervise and protect the Liquidating Trust Assets; (ii) pay taxes and other obligations incurred by the Liquidating Trust; (iii) retain and compensate, without further order of the Bankruptcy Court, the services of professionals (the "***Liquidating Trust Professionals***") to advise and assist in the administration, prosecution and Distribution of Liquidating Trust Assets; (iv) calculate and implement Distributions of Liquidating Trust Distributable Cash and, as applicable, the Excess Liquidating Trust Distributable Cash; (v) prosecute, compromise and settle all Disputed Claims and all claims and Causes of Action (including the Assigned Causes of Action) vested in the Liquidating Trust;

28

EHREN-WALIA 003436

and (vi) pay Professional Fees of professionals retained in the Chapter 11 Cases which are Allowed pursuant to any order of the Bankruptcy Court, whether such Professional Fees were incurred before or after the Effective Date.  Other rights and duties of the Liquidating Trustee shall be set forth in the Liquidating Trust Agreement.

        c.     ***Compensation of Liquidating Trustee.***  The Liquidating Trustee shall be reasonably compensated out of the Liquidating Trust for his services and reimbursed out of the Liquidating Trust for his reasonable expenses in accordance with the compensation schedule attached the Liquidating Trust Agreement as Exhibit B.

        d.     ***Appointment of Liquidating Trust Oversight Board***.  On the Effective Date, an oversight committee comprised of seven (7) members– five (5) of whom shall be designated by the Secured Lenders and two (2) of whom shall be designated by the Committee – shall be appointed (the "***Liquidating Trust Oversight Board***").  The Liquidating Trustee shall consult with the Liquidating Trust Oversight Board with respect to, among other matters described in the Liquidating Trust Agreement, (i) settlements of any Cause of Action over Two Hundred and Fifty Thousand Dollars ($250,000.00), (ii) commencement or abandonment of any litigation or other Asset on behalf of the Liquidating Trust, and (iii) the retention or termination of any Liquidating Trust Professional.  The Liquidating Trust Oversight Board shall have such other rights and obligations as set forth in the Liquidating Trust Agreement.

        e.     ***Treatment***.  It is intended that the Liquidating Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Sections 671 through 679 of the Internal Revenue Code, with no objective to continue or engage in the conduct of a trade or business.  In furtherance of this objective, the Liquidating Trustee shall, in his business judgment, make continuing best efforts not to prolong unduly the duration of the Liquidating Trust.  All Liquidating Trust Assets on the Effective Date shall be deemed for federal income tax purposes (i) to have been distributed (subject to any obligations relating to such assets) by the Debtors to the Beneficiaries (other than the Liquidating Trusts Assets allocable to the Liquidating Trust Reserve and any reserves created with respect to any Disputed Claims) in partial satisfaction of Allowed Claims and (ii) immediately thereafter contributed by such Beneficiaries to the Liquidating Trust in exchange for their respective beneficial interests.  The Beneficiaries will be treated as the deemed owners of the Liquidating Trust (other than the assets allocable to any Liquidating Trust Reserve and any reserves created with respect to Disputed Claims).  The Liquidating Trust will be responsible for filing information on behalf of the Liquidating Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a).

        Subject to contrary definitive guidance from the Internal Revenue Service or a court of competent jurisdiction (including the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee may (i) timely elect to treat any disputed claims reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B9 and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the Liquidating Trustee, the Debtors and the Beneficiaries) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.

EHREN-WALIA 003437

The Liquidating Trustee may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Internal Revenue Code or any provision of any foreign, state or local tax law with respect to any payment or distribution to the Beneficiaries. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such Beneficiaries for all purposes of the Liquidating Trust Agreement. The Liquidating Trustee shall be authorized to collect such tax information from the Beneficiaries (including, without limitation, social security numbers or other tax identification numbers) and forms (including without limitation IRS Form W-8 and IRS Form W-9) as he, in his sole discretion, reasonably deems necessary to effectuate the Plan, the Confirmation Order and the Liquidating Trust Agreement in accordance with the tax laws of the United States and any state, commonwealth or territory thereof (any such information or forms, "***Beneficiary Tax Information***"). In order to receive Distributions under the Plan, all Beneficiaries shall identify themselves to the Liquidating Trustee and provide tax information and the specifics of their holdings, to the extent the Liquidating Trustee reasonably deems appropriate in his sole discretion. The Liquidating Trustee may refuse to make a Distribution to any Beneficiary that fails to furnish such information within sixty (60) days of any request therefor by the Liquidating Trustee, until such information is delivered; *provided, however*, that, upon the delivery of such information by a Beneficiary, the Liquidating Trustee shall make such Distribution to which the Beneficiary is entitled, without interest; and, provided, further, that, if the Liquidating Trustee fails to withhold in respect of amounts received or distributable with respect to any such Beneficiary and the Liquidating Trustee is later held liable for the amount of such withholding, such Beneficiary shall reimburse the Liquidating Trustee for such liability. The Liquidating Trustee shall reserve all Distributions due to any Beneficiary that does not timely provide Beneficiary Tax Information (any such Distribution collectively, the "***Beneficiary Tax Reserve***") until the earlier of (a) such time that the Beneficiary provides the Beneficiary Tax Information and (b) the final Distribution Record Date. Any Beneficiary that does not timely provide Beneficiary Tax Information to the Liquidating Trustee as of the final Distribution Record Date shall not be entitled to receive any Distributions from the Liquidating Trust. Any funds that remain in the Beneficiary Tax Reserve as of the final Distribution Record Date shall be distributed Pro Rata to the Beneficiaries of the Liquidating Trust in accordance with the terms of the Liquidating Trust Agreement.

The Liquidating Trust shall be responsible for filing all federal, state, and local tax returns for the Debtors and the Liquidating Trust. The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements.

f.   ***Liquidating Trust Assets***. On the Effective Date, pursuant to section 1123(b)(3) of the Bankruptcy Code and by operation of the Plan, the Liquidating Trust Assets shall be transferred by the Debtors (and deemed transferred) to the Liquidating Trust, free and clear of all Claims, Liens, charges, encumbrances, rights, and interests, without the need for any Person to take any further action or obtain any approval. On the Effective Date, and by operation of the Plan and in furtherance of the Standing Motion Settlement embodied in the Plan, in the event that each of the Holders of the Allowed Secured Lender Claim in Class 3 has voted to approve the Plan, each Secured Lender shall be deemed to have assigned, without recourse, representation or warranty, to the Liquidating Trust, free and clear of all Claims, Liens, charges, encumbrances, rights and interests, any and all Causes of Action they may have against any Person

30

EHREN-WALIA 003438

who is not a Debtor, related directly or indirectly to the Debtors and their Estates, whether arising before or after the Petition Date, which assigned Causes of Action shall be deemed Assigned Causes of Action without the need for any Person to take any further action or obtain any approval. The Assigned Causes of Action shall exclude any action released or settled by the Debtors (or other Releasing Parties) pursuant to this Plan or an order of the Bankruptcy Court.

The Liquidating Trust may pursue any Assigned Causes of Action in accordance with the best interests of the Liquidating Trust. **No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Liquidating Trust will not pursue any and all available Causes of Action**. The Plan expressly reserves for the Liquidating Trust all rights to prosecute any and all Assigned Causes of Action against any Person, except as otherwise provided in the Plan. Unless any Assigned Causes of Action against any Person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the Liquidating Trust expressly reserves all Assigned Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Assigned Causes of Action upon, after, or as a consequence of confirmation or consummation of the Plan.

g.    *Claims Reconciliation Process*.  From and after the Effective Date, the Liquidating Trust shall be solely responsible for objecting to Claims which are not otherwise Allowed, for all related aspects of the claims reconciliation process, and for the payment of all costs and expenses incurred by the Liquidating Trust in connection with such process.

h.    *Preservation of Right to Conduct Investigations*.  Any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 held by the Debtors or the Committee prior to the Effective Date shall vest with the Liquidating Trust upon the Effective Date and shall continue in effect until dissolution or termination of the Liquidating Trust.

i.    *Preservation of Privilege and Defenses*.  No action taken by the Debtors in connection with this Plan shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtors, as applicable, including any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral).  The Confirmation Order shall provide that notwithstanding the Debtors providing any privileged information to the Liquidating Trustee, the Liquidating Trust, or any party or Person associated with the Liquidating Trust, such privileged information shall be without waiver in recognition of the joint and/or successorship interest in prosecuting any Claim or Cause of Action on behalf of the Estates and shall remain privileged.

j.    *Indemnification and Exculpation*.  The Liquidating Trustee, the Liquidating Trust Professionals, the Liquidating Trust Oversight Board, the members of the Liquidating Trust Oversight Board and any professionals retained by the Liquidating Trust Oversight Board or its members, shall not be liable for actions taken or omitted in such capacities, except those acts arising out of its or their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the Liquidating Trust for fees and expenses in defending any and all of its actions or inactions in such capacities, except for any

31

EHREN-WALIA 003439

actions or inactions involving willful misconduct or gross negligence.  Any indemnification claim of the Liquidating Trustee (and any other parties entitled to indemnification under this subsection) shall be satisfied first from the Liquidating Trust Reserve and, then, to the extent the Liquidating Trust Reserve is exhausted, from the Liquidating Trust Distributable Cash.

   **k.**  ***Liquidating Trust Agreement Controlling.***  In the event of any conflict between this summary or any other provision of the Plan and the Liquidating Trust Agreement, then the terms and provisions of the Liquidating Trust Agreement shall control.  In the event of any conflict between the Confirmation Order and the Liquidating Trust Agreement, then the terms of the Confirmation Order shall control.  These descriptions of the Liquidating Trust and the scope and terms of the Liquidating Trust Agreement are qualified in their entirety by reference to the specific terms and conditions of the Liquidating Trust Agreement.

   6.4 ***The Shell Debtors.***  The Debtors' equity interests in NEMS Acquisition, Physician Practice Plus Holdings, NYNM Acquisition, Northstar FHA, Phoenix Health, MDRX and Vega Medical Professionals (collectively, the "***Shell Debtors***") shall be retained and transferred to the Liquidating Trust.

**SECTION 7. DISTRIBUTIONS**

   7.1 ***Distribution Record Date.***  As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their agents shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Interests, except for death and by operation of law.  The Liquidating Trustee shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring after the Distribution Record Date unless specifically notified in writing of a transfer by death or by operation of law.  The Debtors, the Liquidating Trustee, or any party responsible for making Distributions shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

   7.2 ***Date of Distributions.***  Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the Distributions that this Plan provides for Allowed Claims in the applicable Class and in the manner provided herein.  Distributions made after the Effective Date to Holders of Allowed Claims (other than Distributions to Holders of the Allowed Secured Lender Claim) shall be deemed to have been made on the Effective Date and, except as otherwise provided in this Plan, no interest shall accrue or be payable with respect to such Claims or any Distribution related thereto.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in this Plan.  Except as otherwise provided in this Plan, Holders of Claims

EHREN-WALIA 003440

1004